UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

JERICHO GROUP LTD. and JERICHO CO.,

              Plaintiffs,

     -against-

MID-TOWN DEVELOPMENT LIMITED
PARTNERSHIP, MIDTOWN DEVELOPMENT.
L.P., EDWARD G. IMPERATORE, MAURICE
L. STONE, EDWARD W. ROSS, ARTHUR E.
IMPERATORE, WR WEST SIDE
ASSOCIATES, HADRIAN PROPERTIES LTD,
FANFARE ENTERPRISE INC, ARCORP
PROPERTIES, JERRART VENTURE
PROPERTIES, HARWOOD LLOYD LLC,
GEORGE BERGER, JEFFREY SHORE,
PHILIPS NIZER LLP, FREDRICK E.
SHERMAN, TODD R. GEREMIA, JONES DAY,
BROWN HARRIS STEVENS LLC, ELAINE
OSBORN EMMET, MICHAEL A. SZEGDA,
BAYSTONE EQUITIES INC, ROBERT B.
GOEBEL, RICHARD MARASSE, LISA
SOLOMON, JOHN DOE 1-10 and XYZ
CORPORATION 1-10.

              Defendants.

----------------------------------------X

**CIVIL ACTION NO.:**

**JURY TRIAL DEMANDED**

## <u>VERIFIED COMPLAINT</u>

Dated:  New York, New York
        April 10, 2014

              The Law Offices of Bradley S. Gross
              Attorney for Plaintiffs
              *JERICHO GROUP LTD. and JERICHO CO.*
              45 Rockefeller Plaza – Suite 2000
              New York, New York 10111
              (212) 732-7412

**NATURE OF THE ACTION** .................................................................. 4
**SUBJECT MATTER JURISDICTION AND VENUE** ............................... 5
**THE PARTIES** ...................................................................................... 5
**THE DEFENDANTS' PATTERN OF FRAUD** ....................................... 10
**THE DEFENDANTS' WINNING LIES** .................................................. 12
**THE DEFENDANTS BUILT A HOUSE OF LIES**
**ON A FOUNDATION OF FRAUD** ........................................................ 13
**THE MERITORIOUS SECONDARY CLAIMS** ...................................... 15
**ARE ALSO UNDERCUT BY FRAUD** ................................................... 15
**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION** .................. 17
  THE PRIOR LITIGATION AND THE DEFENDANTS' FRAUD – WHICH CONTINUES TO DATE ...... 17
  PLAINTIFFS' ATTORNEY AND HIS COLLUSION WITH THE DEFENDANTS ...................... 20
**RECENT ADMISSIONS BY THE MIDTOWN GROUP DEFENDANTS** ...... 22
  MIDTOWN ADMITS THAT THE CONTRACT WAS NEVER CANCELLED ........................ 22
  MIDTOWN ADMITS THAT IT WILFULLY AND DELIBERATELY BREACHED THE CONTRACT ...... 24
  MIDTOWN ADMITS THAT IT COMMITTED ACTIONABLE FRAUD ON THE PLAINTIFFS .......... 26
  MIDTOWN ADMITS THAT PLAINTIFFS REQUESTED OIL SPILL, HAZARD AND ................ 27
  MIDTOWN ADMITS THAT THERE HAD BEEN AN OIL SPILL .............................. 28
  MIDTOWN ADMITS THAT PLAINTIFFS REQUESTED DOCUMENTS .......................... 30
  MIDTOWN ADMITS THAT PLAINTIFFS DID NOT ELECT TO CANCEL ...................... 32
  MIDTOWN ADMITS ITS EXTORTION, BLACKMAIL AND ACTS OF INTIMIDATION ............ 34
**MIDTOWN'S STUNNING ADMISSIONS AND THE 2014 FRAUD** .......... 35
**THE EMMET EMAIL** ........................................................................... 39

THE MIDTOWN DEFENDANTS COULD HAVE SIMPLY RESPONDED IN THEIR AUGUST 23, 2002 EMAIL OR ANYTIME THEREAFTER THROUGH SEPTEMBER 12, 2002, THAT THE NYDEC WAS CLEANING THE OIL SPILL, AT NO COST TO THE PROPERTY OWNER, AND THAT THEY WOULD CONTINUE TO CLEAN FURTHER, AT NO COST TO THE PROPERTY OWNER, BUT INSTEAD THEY CONCEALED THIS INFORMATION BECAUSE THEY WANTED THE PLAINTIFFS TO CANCEL THE CONTRACT ...................... 54

**THE CONTRACT WAS NEVER CANCELLED** ........................................ 55
**PLAINTIFF'S DISCOVERY OF THE EMMET EMAIL** ............................ 62
**THE EMMET EMAIL BEARS FRUIT** .................................................. 66
**GOEBEL'S 2013 ADMISSION AND EXTORTION** ............................... 67
**SZEGDA'S BACKGROUND** .................................................................. 71
**THE SHAFRAN INVESTIGATION** ....................................................... 75
**THE FRAUD ON THE COURT** ............................................................ 81

AT THE HEARING OF MAY 12, 2005, THE DEFENDANTS ADMITTED THAT THEY BROUGHT A FALSE MOTION TO DISMISS; THAT THEY HAD ENGAGED IN ACTIONABLE FRAUD; THAT THEY WERE IN WILLFUL AND DELIBERATE BREACH OF THE CONTRACT; THAT PLAINTIFFS HAD REQUESTED THE EXHIBITS TO THE AMTRAK AGREEMENT AS OF JULY, 2002; THAT PLAINTIFFS DID NOT ELECT TO CANCEL THE CONTRACT AND THAT THERE WAS NO VALID CANCELLATION OF THE CONTRACT ...................... 88

INSTEAD OF ARGUING THE CASE ON APPEAL, BASED UPON WHAT HAD TRANSPIRED IN THE COURT BELOW, ON MAY 12, 2005, AND UPON WHAT JUSTICE RAMOS BASED HIS MAY 16, 2002 ORDER DENYING THE MOTION TO DISMISS, THE MIDTOWN DEFENDANTS

1

LIED TO THE APPELLATE DIVISION WITH FALSE CLAIMS THAT JUSTICE RAMOS HAD "HYPOTHESIZED", "FIXATED" AND INVENTED "NEW LAW" AND INSTEAD THEY REPRESENTED TO THE APPELLATE DIVISON JUST THE OPPOSITE OF WHAT THEY HAD ADMITTED TO JUSTICE RAMOS ON MAY 12, 2005 ................................................................... 95

NOW WE KNOW WHY, ON AUGUST 17, 2006, THE APPELLATE DIVISON REVERSED JUSTICE RAMOS' ORDERS OF MAY 12, 2005 AND MAY 16, 2005 ................................................ 104

DEFENDANTS WITHHELD DOCUMENTS DURING THE UNDERLYING TRANSACTION AND DURING THE PRIOR LITIGATION ................................................................... 108

RAMOS DISCOVERED ON FEBRUARY 2, 2007, THAT THE OIL SPILL WAS ON MIDTOWN'S PROPERTY, THAT THE REMEDIATION WAS ON MIDTOWN'S PROPERTY, AND THAT THE DOCUMENTS DISCOVERED WERE RELATED TO OIL SPILL ON MIDTOWN'S PROPERTY – THAT IS WHY HE VACATED THE JUDGMENT OF DISMISSAL AND SAID THAT HE DID NOT WANT TO BE A PARTY TO THE DEFENDANTS' FRAUD ON THE COURT ............................... 110

ON FEBRUARY 2, 2007, JUSTICE RAMOS FOUND, RELATING TO THE OIL SPILL, THAT MIDTOWN COMMITTED DIRECT FRAUD ON THE COURT IN THEIR JANUARY 2005 MOTION TO DISMISS, AND THE AFFIRMATION IN SUPPORT OF THE MOTION TO DISMISS, AND THAT MIDTOWN HAD ALSO WILLFULLY AND DELIBERATELY BREACHED THE CONTRACT, AND ALSO COMMITTED FRAUD ON PLAINTIFFS ................................... 110

ON APRIL 11, 2007, THE DEFENDANTS COMITTED FRAUD ON JUSTICE RAMOS, WHEN THEY REPRESENTED TO JUSTICE RAMOS PRECISELY THE  OPPOSITE, THAT THE OIL SPILL WAS NOT ON MIDTOWN'S PROPERTY, THAT THE REMEDIATION WAS NOT ON MIDTOWN'S PROPERTY AND THAT THE DOCUMENTS DISCOVERED WERE NOT RELATED TO ANY OIL SPILL ON MIDTOWN'S PROPERTY, BECAUSE THERE WAS NO OIL SPILL ON MIDTOWN'S PROPERTY AND JERICHO WAS TOLD ALL THE ABOVE BEFORE SIGNING OF THE CONTRACT. ................................................................... 113

THE APPEALLATE DIVISIONS REVERSAL OF JUDGE RAMOS, ON JANUARY 16, 2008, OF JUSTICE RAMOS' ORDER AND FINDINGS OF FEBRUARY 2, 2007, WAS THE DIRECT RESULT OF THE FRAUDS DEFENDANTS COMMITTED ON THE COURT, AS HEREINABOVE COMPLAINED OF ................................................................... 119

NOW WE KNOW WHY, ON JANUARY 16, 2008, THE APPELLATE DIVISION REVERSED JUSTICE RAMOS'S ORDER OF FEBRUARY 2, 2007 ................................................ 119

**CLAIMS FOR RELIEF** ................................................................... **124**

**FIRST CLAIM** ................................................................... **124**
  (DIRECT FRAUD ON PLAINTIFFS BY IMPERATORE, STONE, MIDTOWN AND THE MGD)

**SECOND CLAIM** ................................................................... **127**
  (DIRECT FRAUD ON PLAINTIFFS BY GOEBEL/SOLOMON/MARRASSE)

**THIRD CLAIM** ................................................................... **131**
  (DIRECT FRAUD ON PLAINTIFFS BY SZEGDA)

**FOURTH CLAIM** ................................................................... **132**
  (DIRECT FRAUD ON PLAINTIFFS BY EMMET AND BHS)

**FIFTH CLAIM** ................................................................................................................**133**
    (INDIRECT FRAUD ON PLAINTIFFS – FRAUD ON THE COURT BY ALL DEFENDANTS)

**SIXTH CLAIM** ................................................................................................................**135**
    (CIVIL CONSPIRACY)
    (AGAINST ALL DEFENDANTS)

**SEVENTH CLAIM** ..........................................................................................................**136**
    (VIOLATIONS OF RICO, 18 U.S.C. § 1962(C))
    (AGAINST ALL RICO DEFENDANTS)

**EIGHTH CLAIM** ............................................................................................................**140**
    (CONSPIRACY TO VIOLATE RICO, VIOLATION OF 18 U.S.C. § 1962(D))
    (AGAINST ALL RICO DEFENDANTS)

**NINTH CLAIM** ..............................................................................................................**142**
    (FOR DECLARATORY RELIEF ESTABLISHING, *INTER ALIA*, THE CONTINUED VIABILITY OF THE
    CONTRACT)

**TENTH CLAIM** ..............................................................................................................**143**
    (SPECIFIC PERFORMANCE AGAINST MIDTOWN)

**ELEVENTH CLAIM** ........................................................................................................**144**
    (BREACH OF CONTRACT AGAINST MIDTOWN)

**TWELFTH CLAIM** ..........................................................................................................**144**
    (BAD FAITH CLAIM AGAINST THE MIDTOWN GROUP DEFENDANTS)

**THIRTEENTH CLAIM** ....................................................................................................**145**
    (CONVERSION AGAINST GOEBEL AND SZEGDA)

**FOURTEENTH CLAIM** ..................................................................................................**146**
    (CONVERSION AGAINST SZEGDA AND BAYSTONE)

**FIFTEENTH CLAIM** ......................................................................................................**147**
    (BREACH OF CONTRACT/FIDUCIARY DUTY AGAINST HARWOOD)

**SIXTEENTH CLAIM** ......................................................................................................**148**
    (TORTIOUS INTERFERENCE WITH CONTRACT)

**SEVENTEENTH CLAIM** ................................................................................................**149**
    (VIOLATIONS OF NEW YORK JUDICIARY LAW § 487 - AGAINST THE ATTORNEY DEFENDANTS)

## NATURE OF THE ACTION

1.      This action arises out of a massive, ongoing and pervasive fraud upon the Plaintiffs, and the Court, which permeates throughout a protracted history amongst the parties.

2.      The Defendants, all sophisticated business people, have shown themselves to be practiced at the art of deception – for years – at the expense of the Plaintiffs and indeed the State and Federal Judicial Systems. Through a secret conspiracy, subtle misdirection and widespread perjury, the Defendants have kept the Plaintiffs and the Court in the dark for nearly a decade. By the Defendants' scheme, Plaintiffs have been deprived the benefits of their contract to purchase a valuable piece of property.

3.      Recent events have shone a light on the Defendants' deception, however, which had kept the Plaintiffs in an epic ten-year battle for the truth to prevail.  Through an elaborate sham, including the collusion of attorneys purporting to be working for the Plaintiffs' interests, coercion, extortion, perjury and fraud, the Defendants have thus far managed to hold on to the property, which is the subject of this action, at the expense of Plaintiffs and their rights.  In furtherance of their scheme, and to avoid the consequence of their own willful and deliberate breach, the Defendants fabricated a scenario whereby they claimed that Plaintiffs had cancelled the contract.  The gravamen of this action, seeks final adjudication that the Plaintiffs did not elect to cancel the subject contract, the contract has never been cancelled and in fact the contract remains in full force and effect today.

4.      By this action, the Plaintiffs do not seek to re-litigate claims adjudicated in any prior action[1], but rather they seek equitable relief from the prior results; a declaration that the contract remains viable and that Plaintiffs are entitled to specific performance thereof; in addition to statutory, compensatory and punitive damages on account of the manner in which the Defendants attained the prior results.

## SUBJECT MATTER JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331and1332, and under 18 U.S.C. § 1964(c).  Plaintiffs' Seventh and Eight Claims for relief arises under 18 U.S.C. § 1961, *et seq.*, as hereinafter more fully appears. Plaintiffs' state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

6.      Venue is proper in this District under 28 U.S.C. § 1391 (b )(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

## THE PARTIES

7.      Jericho Group, Ltd. (hereinafter referred to as "Jericho" or "Plaintiff(s)"), is a domestic corporation organized and existing under the laws of the State of New York

---

[1] In fact, as set forth below, and on account of the fraud on the court herein complained of, the

with a principal place of business in Brooklyn, New York, in the County of Kings, State of New York.

8.      Jericho Co, (hereinafter referred to as "Jericho Co" or "Plaintiff(s)"), is a company organized and existing under the laws of the State of New York with a principal place of business in the County of Kings, State of New York.

9.      Upon information and belief, Defendant, Mid-Town Development Limited Partnership (hereinafter referred to as "Mid-Town" or "Defendant(s)) is a Limited Partnership, organized and existing under the laws of the State of New York with a place of business at Weehawken, New Jersey and or Hackensack, New Jersey.[2]

10.     Upon information and belief, Defendant, Midtown Development L.P (hereinafter referred to as "Midtown" or "Defendant(s))" is a Limited Partnership, with a place of business at Weehawken, New Jersey and or Hackensack, New Jersey.[3]

11.     Upon information and belief, Defendant, Edward Imperatore (hereinafter referred to as "Imperatore" or "Defendant(s)") was and is a principal and counsel to Mid-Town Development Limited Partnership, since 1987 to present, was a partner at Harwood Lloyd, LLC, is presently a partner at Philips Nizer and is a resident of the State of New Jersey and his principal place of business is in Hackensack New Jersey.

12.     Upon information and belief, Defendant Maurice Stone (hereinafter referred to as "Stone" or "Defendant(s)") is an attorney, was counsel to Mid-Town

---

[2]"Mid-Town Development Limited Partnership" is listed in the Land Records as the owner of the Property. The Agreement with Amtrak is also "Mid-Town Development Limited Partnership".
[3]"Midtown Development, L.P." is only added herein because Defendants used the name "Midtown Development, L.P." as the Seller in the June 18, 2002 Contract of Sale.

Development Limited Partnership and a Partner at Harwood Lloyd and is residing in the State of New Jersey and his principal place of business is in Teaneck, New Jersey.

13.     Upon information and belief, Defendant Edward W. Ross (hereinafter referred to as "Ross" or "Defendant(s)") is residing in the State of Illinois and his principal place of business is in Chicago, Illinois.

14.     Upon information and belief, Defendant Arthur E. Imperatore (hereinafter referred to as "Arthur Imperatore" or "Defendant(s)") is a resident of the State of New Jersey and his principal place of business is in Weehawken, New Jersey.

15.     Upon information and belief, Defendant, WR West Side Associates, (hereinafter referred to as "WR West" or "Defendant(s)") has their office in Chicago, Illinois.

16.     Upon information and belief, Defendant, Hadrian Properties LLC, (hereinafter referred to as "Hadrian" or "Defendant(s)") has their office in New York, NY.

17.     Upon information and belief, Defendant, Fanfare Enterprise Inc, (hereinafter referred to as "Fanfare" or "Defendant(s)") has their office in New Jersey.

18.     Upon information and belief, Defendant, Arcorp Properties Inc., (hereinafter referred to as "Arcorp" or "Defendant(s)") has their office in Weehawken, New Jersey.

19.     Upon information and belief, Defendant, Jerrart Venture Properties, (hereinafter referred to as "Jerrart" or "Defendant(s)") has their office in Weehawken, New Jersey.

20.     Upon information and belief, Defendant, Harwood Lloyd, LLC, (hereinafter referred to as "Harwood" or "Defendant(s)") has an office in New York, New York and or in Hackensack, in the State of New Jersey.

21.     The Defendants, Mid-Town, Midtown, Imperatore, Stone Ross, Arthur Imperatore, WR West, Hadrian, Fanfare, Arcorp, Jerrart and Harwood are also hereinafter sometimes referred to collectively as the "Midtown Group Defendants", or "MGD".

22.     Upon information and belief, Defendant George Berger, (hereinafter referred to as "Berger" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

23.     Upon information and belief, Defendant Jeffrey Shore (hereinafter referred to as "Shore" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

24.     Upon information and belief, Philips Nizer LLP (hereinafter referred to as "Philips Nizer" or "Defendant(s)") is a domestic registered limited liability partnership which resides in the State of New York and has an office in New York, New York.

25.     Upon information and belief, Defendant Fredrick E. Sherman (hereinafter referred to as "Sherman" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

26.     Upon information and belief, Defendant Todd R. Geremia, (hereinafter referred to as "Geremia" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

27.     Upon information and belief, Jones Day, was and is a general partnership engaged in the practice of law, with an office located in New York, New York.

28.     The Defendants, Berger, Shore, Philips Nizer, Sherman, Geremia, Jones Day, Goebel, Solomon, Szegda, Merrasa, Imperatore, Stone and Harwood are also hereinafter sometimes referred to collectively as the "Attorney Defendants".

29.     Upon information and belief, Defendant, Brown Harris Stevens (hereinafter referred to as "BHS" or "Defendant(s)") is a licensed Real Estate firm, organized and existing under the laws of the State of New York with a principal place of business in New York County, New York.

30.     Upon information and belief, Defendant, Elaine Osborn Emmet (hereinafter referred to as "Emmet" or "Defendant(s)") is a licensed Real Estate Broker and residing in Long Island, New York.

31.     Upon information and belief, Defendant, Michael Szegda (hereinafter referred to as "Szegda" or "Defendant(s)" is a resident and lives in Old Tappan, in the State of New Jersey.

32.     Upon information and belief, Defendant, Baystone Equities Inc, (hereinafter referred to as "Baystone" or "Defendant(s)") was or still is a corporation existing under the laws of the State of New York had a principal place of business in New York County, New York.

33.     Upon information and belief, Defendant, Robert A. Goebel (hereinafter referred to as "Goebel" or "Defendant(s)" is a resident of Scarsdale, New York, and has his principal place of business in Scarsdale, New York.

34.     Upon information and belief, Defendant, Richard Marassa, (hereinafter referred to as "Marassa", "Goebel" or "Defendant(s)") is an attorney affiliated with Goebel, including but not limited to the time during which Goebel purported to represent Plaintiffs, is a resident of the State of New York or New Jersey (or any other State of USA) his principal place of business is either New York or New Jersey, (or any other State of USA).

35.     Upon information and belief, Defendant, Lisa Solomon, (hereinafter referred to as "Solomon" or  "Goebel" or "Defendant(s)" is an attorney affiliated with Goebel, including but not limited to the time during which Goebel purported to represent Plaintiffs, and has her principal place of business in New York County, New York.

36.     Upon information and belief, the Defendants, John Doe 1-10, (hereinafter referred to as "John Doe" or "Defendant(s)") are residing in the State of New York or New Jersey (or any other State of USA) their  principal place of business is either New York or New Jersey, (or any other State of USA).

37.     Upon information and belief, Defendants, XYZ Corporation 1-10, (hereinafter referred to as "XYZ" or "Defendant(s)") are entities in the State of New York or New Jersey (or any other State of USA) their  principal place of business is either New York or New Jersey, (or any other State of USA).

## THE DEFENDANTS' PATTERN OF FRAUD

38.     On August 17, 2006, the Defendants perpetrated a fraud upon the Appellate Division, First Department, causing a prior order denying their motion to dismiss the Plaintiffs complaint against them in Jericho v Midtown (Supreme Court New York County Index No.:113274/04) to be reversed.

39.     Upon a motion to vacate the fraudulently obtained reversal, Supreme Court Justice Charles Ramos, explicitly recognized that "this Court cannot reverse the Appellate Division's dismissal of the complaint".

40.     The Trial Court went on to state, however, that it would vacate its own Judgment of dismissal, issued subsequent to the August 17, 2006 reversal, because, as Justice Ramos put it, "this court will not be a party to defendant's fraud on the Court".

41.     Left with no case then before him, but opining as to the merits of the Plaintiffs' claims, Justice Ramos encouraged Plaintiffs to file a new action.  Plaintiffs filed a new action.

42.     Facing the likelihood that they would be back in front of a trial court judge, who had already seen through their deception, the Defendants promptly sought removal to the United States District Court, claiming complete diversity, when no such Federal jurisdiction existed.

43.     The prayer for removal was denied and declared to be fraudulent, because the Defendants were caught lying about the identity and domicile of Midtown's owners. Their failed attempt to remove the case was not, however, without gainful purpose.

44.     While the Defendants fraudulent efforts to fabricate federal jurisdiction were otherwise occupying the District Court, the Plaintiffs' new action languished.  The Defendants used this time to secure for themselves protection from Justice Ramos' knowing eyes, by once again going to the Appellate Division where their fraud had thus far gone unnoticed.

45.     In essence, fraud begets fraud, as the Defendants used the time attained by their false removal application to again trick the Appellate Division.  As a result, the

Appellate Division reinstated the dismissal Justice Ramos vacated.  The reinstatement too was a product of fraud.

46.     The fraudulently obtained dismissal contains a recitation of facts at odds with reality, but which has since become the Defendants' mantra. The facts set forth in the decision were not the result of any adjudication, but were the product of the Defendants' fraud.

## THE DEFENDANTS' WINNING LIES

47.     The genesis of this dispute was the purchase and sale of a piece of property from Midtown to the Plaintiffs.

48.     Always at issue was the fact that Midtown, as seller, willfully and deliberately breached the contract of sale.

49.     To cover its tracks, and to undo the sale, Midtown orchestrated an elaborate charade to support the notion that Plaintiffs cancelled the contract.

50.     Plaintiffs never cancelled the contract, but have always maintained that Midtown's willful and deliberate breach prevented the deal from closing.

51.     Unable to coerce a cancellation from Plaintiffs, Midtown recruited the aid of Plaintiffs' transactional attorney, Szegda, in an illicit scheme to facilitate that objective.

52.     Szegda, who has since been disbarred for stealing client funds, saw an opportunity to add $250,000 to the escrow he had already stolen from his unsuspecting client (the Plaintiffs), by helping the remorseful seller (Midtown) out of the deal.

53.     The seller always knew it could not accept a cancellation from Plaintiffs' attorney, Szegda.

54.     The seller always knew there has not been a valid cancellation.

## THE DEFENDANTS BUILT A HOUSE OF LIES
## ON A FOUNDATION OF FRAUD

55.     Unfortunately, when Plaintiffs brought suit to enforce their rights under the contract, their prior litigation counsel, Goebel, too succumbed to the Defendants' influence.

56.     Midtown lied throughout the litigation that ensued, claiming that Plaintiffs had cancelled the contract.

57.     Midtown lied throughout the litigation that ensued, claiming that the Plaintiffs had made a valid election to cancel the contract.

58.     The Defendants concealed documentary evidence, throughout the litigation that ensued, which would have revealed the truth and debunked all of the Defendants lies.

59.     The Defendants, acting in collusion with the Plaintiffs' prior litigation attorney, Goebel, were able to proceed through the litigation process, their lies unchallenged.

60.     The Defendants had an absolute obligation to be truthful in their statements to the Court, but violated that obligation through perjury and lies at every turn.

61.     The Defendants, including Plaintiff's litigation counsel, falsely claimed that the contract was cancelled.

62.     The Defendants, with the assistance of Plaintiffs' litigation counsel, altered documents, which had already been verified by Plaintiffs, to create the appearance that even Plaintiffs were admitting that the contract had been cancelled.

63.     As a result of the Defendants lies and collusion, the Court incorrectly held that there had been a valid election by Plaintiffs, to cancel the contract; that the contract was in fact cancelled; and that the Plaintiffs, therefore, were not entitled to specific performance.

64.     These findings were not an adjudication by the Court, but were based upon what appeared before the Appellate Division to be an uncontroverted issue; to wit, that the Plaintiffs had cancelled the contract.

65.     These findings, that there had been a valid election to cancel the contract and that the contract was in fact cancelled, were the product of the Defendants fraud.

66.     From that point forth, the Defendants seized upon that ruling to repeatedly argue that the Appellate Division made a finding of fact that Plaintiffs had cancelled canceled the contract.  Each time they did so, knowing the infirm decision to be the product of their fraud, the Defendants perpetrated yet another fraud on the Court.

67.     When the complaint in the second case came before the Appellate Division, and the Plaintiffs argued that there had not been a cancelation, the Court queried why such claims had not been made before.

68.     In May, 2013, Geobel admitted to Plaintiffs that he had been working in collusion with the Midtown Defendants, in a scheme to ensure that Plaintiffs were not able to specifically perform the Contract.  Only now, with the Defendants' collusion finally revealed, we know why, as the Appellate Division queried, the proper claims were not previously made.

69.     The proper claims were never interposed because all the Defendants acted in concert to keep the truth from the Court, and to thereby keep the Plaintiffs from realizing the benefits of their contract.

70.     Had it not been for the Defendants lies and collusion, Plaintiffs would have been awarded specific performance and damages on account of the Defendants willful and deliberate breach of the contract.

71.     The Defendants fraud upon the Court, and the Courts' reliance thereon, also constitutes a direct fraud on the Plaintiffs.

## THE MERITOROUS SECONDARY CLAIMS
## ARE ALSO UNDERCUT BY FRAUD

72.     While the Defendants falsely turned the first case into one where the Plaintiffs were said to have cancelled the Contract, Goebel instead put forth a case against Midtown, claiming that they had willfully and deliberately breached the Contract by failing to provide critical documents they were contractually obligated to turn over.

73.     The documents at issue pertained to an oil spill on the property.

74.     The contract at issue had a 75 day study period, during which the seller was required to provide any and all documents in its custody and control, reasonably requested by the buyer and relating to the property.

75.     Immediately upon learning of the oil spill on Midtown's Property, on and before August 21, 2002, and thereafter, Plaintiffs requested documents concerning the condition of the property and the clean up.

76.     Midtown, despite having such documents in its possession and control, refused or otherwise failed to turn the documents over to the Plaintiffs.

77.     Midtown lied throughout the litigation that ensued, claiming that Plaintiffs had not asked for documents, but only sought information or representation, or notice of violation or advice about an oil spill.

78.     The seller lied throughout the litigation that ensued, claiming that Plaintiffs only asked for such information, for the first time, on August 30, 2002, the 71st day of the 75 day study period.

79.     These lies are refuted by documentary evidence concealed by Midtown.

80.     Plaintiffs recently discovered an email to Midtown, dated August 21, 2002, proving that Plaintiffs were asking for documents relating to the oil spill on Midtown's property from on and before that date.

81.     Midtown itself recently authenticated the August 21, 2002 email, stating that a certain August 23, 2002 email heavily relied upon them in the prior litigation was their response.

82.     The Court relied upon the Defendants lies when it mistakenly found that Plaintiffs didn't ask for documents, and that what they did ask for wasn't done in a timely fashion.

83.     Had it not been for the Defendants lies and collusion, Plaintiffs would have been awarded specific performance and damages on account of the Defendants willful and deliberate breach of the contract.

84.     The Defendants fraud upon the Court, and the Courts' reliance thereon, also constitutes a direct fraud on the Plaintiffs.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**The Prior Litigation and the Defendants' Fraud – Which Continues to Date**

85.     The parties to this action have been engaged in a longstanding dispute relating to a contract of sale (the "Contract") between Plaintiffs, as purchaser, and Mid-Town Development LP, as seller, concerning certain property located in the State and City of New York and described on the tax map as Block 708 Lot 1 and Block 709 Lot 17 (the "Property").

86.     As a direct result of the conduct hereinafter complained of, the Plaintiffs have been deprived of their bargained for rights under the Contract, and have instead had to endure more than a decade of contentious fighting, through several prior Court Actions (the "Prior Litigation").

87.     The fraud upon the Court herein complained of continues to date, even as recently as January 8, 2014, when the Midtown Defendants and their attorneys, Defendants Berger, Shore and Philips Nizer, filed a Notice of Motion, Affirmation in Support and Memorandum of Law, seeking dismissal of a Verified Complaint filed in the matter of Jericho v Midtown et al, Index No: 101105/2013. (A copy of that complaint is annexed as Exhibit 1)

88.     The January 8, 2014, Memorandum of Law and the Affirmation of Berger, again contain the misrepresentations herein complained of, and further have the temerity to ask for sanctions against the Plaintiffs and an injunction preventing Plaintiffs from commencing further litigation without prior court approval.  Copies of the Affirmation in Support and Memorandum of Law (collectively hereinafter the "2014 Submissions") are

annexed hereto as Exhibits 2 and 3, respectively, and incorporated herein by reference as if fully set forth.

89.     The 2014 Submissions contain misstatements of fact, which have been repeated by the Midtown Group Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, throughout the Prior Litigation, constituting just some of the fraud herein complained of.

90.     The 2014 Submissions also contain misstatements of facts constituting a continuance of the fraud and collusion herein complained of.  On pages 2-3 and 7 of the January 8, 2014 Memorandum of Law, and seeking to attack Plaintiffs assertion of the collusion herein also complained of, the Defendants claim that Plaintiffs, "also makes the incredible and conclusive allegation that they did so in collusion with Jericho Group's own lawyers. Plaintiffs attempt to support these baseless allegations with what they claim to be newly discovered evidence,  ….."

91.     On the contrary, Plaintiffs affirmed in par's 34-35, 41, 96, 103, 104, 106, 149, 150, 170-175, 413, 424-425, 447-48, 498, 508-509, 573-75, 583-84, of the Verified Complaint that Jericho Group's own lawyers admitted the collusion to Plaintiffs in 2013.

92.     Claiming Plaintiffs' concrete, sworn statement to be merely conclusory further highlights Defendants' willingness to ignore what is before the Court for the benefit of their ongoing scheme.

93.     The frauds put forth throughout the Prior Litigation, and which were continued in the 2014 Submissions, can be summarized as follows:

a.  That the Defendants claimed the contract was "as is", but the Defendants ignore the fact that they returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to

18

zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto;

b.  That Plaintiffs elected to cancel the Contract, and that the Contract was cancelled by the Plaintiffs;

c.  That information on the actual oil spill on Midtown's Property could be gotten from NYDEC seven days, one day, or even in one hour on September 3, 2002 between 4pm and 5pm;

d.  That the Appellate Division made a finding and ruling on August 17, 2006 that Jericho cancelled the Contract through Szegda;

e.  That the recently discovered but previously concealed Emmet Email was "immaterial" (but rather it was the main issue in the Prior Litigation);

f.  That the Defendants had admitted to Justice Ramos that they didn't have exhibits to the Amtrak Agreement.

94.    The 2014 Submissions also contain shocking first time admissions by the Midtown Group Defendants, and the Defendants Berger, Shore and Philips Nizer, which prove all that the Midtown Group Defendants have been claiming to the Court since 2004 has been false.

95.    To this end, although the Emmet Email had never before been produced by the Defendants, when displayed to them now they admit that an email they had relied on extensively in the Prior Litigation was a response thereto.

96.    The Emmet Email puts context on the email response they did produce, to show that the facts were other than what the Defendants were claiming.

97.    The Emmet Email is intrinsic evidence of the Plaintiffs' timely request for the critical documents. The Emmet Email is anything but immaterial. The Defendants' concealment of the Emmet Email is anything but immaterial.

**Plaintiffs' Attorney and his Collusion with the Defendants**

98.    Only recently have facts been discovered, and evidence previously withheld from Plaintiffs revealed, which show the true nature and depth of the Defendants' knowing and intentional deceit.

99.    Plaintiffs' former litigation attorney, Goebel, admitted to Plaintiffs, in May, 2013, that he colluded with Midtown and others, and against the interest of the Plaintiffs.

100.    Goebel admitted to Plaintiffs, in May, 2013, that he has withheld documents from Plaintiffs and from the Court, the existence of which was only recently acknowledged as part of Goebel's extortive scheme to secure a general release from Plaintiffs, in his favor.

101.    Goebel was specifically hired and agreed to argue that the Plaintiffs had not cancelled the Contract; that documentary evidence proves that Plaintiffs did not cancel the Contract; that documentary evidence proves that Midtown knew Plaintiffs did not cancel the Contract; and that documentary evidence proves that Plaintiffs had been in contact with Midtown during the two years before the Prior Litigation was commenced, stressing that the Plaintiffs had not cancelled the Contract and that the Plaintiffs were requesting throughout that time to proceed with the Contract and closing.

102.    Instead, and without Plaintiffs' knowledge or consent, Goebel misrepresented just the opposite to the Court, that Plaintiffs had cancelled the Contract.

103.    In furtherance of this scheme, Goebel mislead Plaintiffs by having them sign documents and pleadings and even displayed documents signed by Goebel, himself, which set forth that Plaintiffs had not cancelled the Contract.

104.    Goebel also attended the depositions of officers and principals of Plaintiffs, and secured extensive testimony in March 2006, where they all testified that Plaintiffs did not cancel the Contract and that Defendants knew Plaintiffs did not cancel the Contract and that for two years Plaintiffs were corresponding with letters that proved that Plaintiffs did not cancel the Contract, but Goebel hid this extensive and critical testimony from Appellate Division and from the Court

105.    Plaintiffs' claims were not raised by Goebel, and said attorney instead represented to the Court and allowed the Midtown Defendants to falsely claim just the opposite, to wit; that the Plaintiffs actually canceled the Contract as of September 3, 2002; that Plaintiffs did nothing for two years thereafter, until they commenced litigation against the Midtown Defendants in 2004; and that the Plaintiffs never complained that the Contract was not cancelled or that they wanted to proceed with the closing.

106.    As a direct result of Goebel's collusion with the very people Plaintiffs hired him to sue, the Plaintiffs never had any case, before any Court, because the courtroom doors slammed shut on Plaintiffs, as soon as Goebel falsely represented to the Court that his clients had cancelled the Contract.

107.    Presented for the first time with the actual claims in dispute, (i.e. that the Contract had not been cancelled), the Appellate Division upheld a dismissal of Plaintiffs' second case, by order dated November 5, 2009, stating that dismissal was proper only because Plaintiffs could have raised their claims in the prior Case and did not.

108.    Plaintiffs have now discovered why their claims were not raised in the prior case.

109.    As a direct result of the conduct hereinafter complained of, the Plaintiffs, have been deprived of a full or fair opportunity to be heard on their meritorious claims, arising out of the Contract.

110.    As a direct result of the conduct hereinafter complained of, the Plaintiffs, have been deprived of their due process and constitutional rights to have their claim to the Property adjudicated.

111.    As a direct result of the conduct hereinafter complained of, the Defendants abused the Court and its processes, at great expense of judicial resources, and also rendering the results thereof fatally infirm.

112.    As a direct result of the conduct hereinafter complained of, the Court never had before it the true controversy herein involved and never came to any adjudication of the genuine dispute between the parties.

## RECENT ADMISSIONS BY THE MIDTOWN GROUP DEFENDANTS

### Midtown Admits that the Contract was Never Cancelled

113.    Confronted with the facts and evidence Plaintiffs recently discovered and put forth in the Verified Complaint dated November 17, 2013 (Exhibit 1), the Defendants have now by their Memorandum of Law (Exhibit 3) admitted that the Contract was never cancelled, that the Midtown Defendant's have willfully and deliberately breached the Contract, and that the Defendants have committed fraud on the Plaintiffs and on the Court from the inception to present.

114.    The Midtown Defendants claimed to Plaintiffs, since September 2002, and to the Court throughout the Prior Litigation, from January 2005 until April 2010, that Plaintiffs cancelled the Contract.

115.    The Contract was never cancelled, and is in full force and effect, even today.

116.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Contract was never cancelled, and is in full force and effect, even today.

117.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants, and the Defendants Berger, Shore and Philips Nizer, have finally admitted that the Contract was never cancelled.

118.    The memorandum of law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs cancelled the Contract.

119.    The admission in the memorandum of law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statements contained in their decision and order of August 17, 2005, that:

> "On September 13, *Jericho sent* a letter stating that it was exercising its option to cancel the contract, and *it demanded* the return of its down payment."

and that;

> ". . .indicated that *Jericho cancelled the contract* and *recovered its down payment*."

23

and that;

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

120.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that it Wilfully and Deliberately Breached the Contract**

121.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that they did not willfully, deliberately or in any manner breach the Contract.

122.    Documentary evidence exists, including but not limited to that herein referred to, which proves that the Midtown Defendants willfully and deliberately breached the Contract.

123.    The Midtown Defendants willfully and deliberately breached the Contract, including but not limited to paragraph 29c), thereof.

124.    Paragraph 29c) of the Contract, states:

> Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which purchaser reasonably requests.

125.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Midtown willfully and deliberately breached the Contract.

126.    The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that Midtown did not willfully, deliberately or in any manner breach the Contract.

127.    The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "The assertions in this complaint, brought two years subsequent to the cancellation of the agreement, do not support Jericho's allegation that Midtown breached the contract to sell the subject property, but instead indicate that Jericho cancelled the contract and recovered its down payment.

and that

> ". . . instead indicate that Jericho cancelled the contract and recovered its down payment."

and that

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a cancelled real estate contract …[specific performance unavailable where a contact for sale of real estate was validly cancelled]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

128.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that it Committed Actionable Fraud on the Plaintiffs**

129.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that they did not commit actionable fraud on the Plaintiffs.

130.    The Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed, and thereafter.

131.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed, and thereafter.

132.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that the Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed and thereafter.

133.    The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented

26

throughout the Prior Litigation, from January 2005 until April 2010, that Midtown did not commit actionable fraud on the Plaintiffs.

134.    The admission in the memorandum of law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> However, none of these allegations *constitute actionable fraud*

and

> Further, the record is plain that Midtown provided Jericho with information in its possession and that it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill.

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

135.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that Plaintiffs Requested Oil Spill, Hazard and Other Environmental Documents Before June 14, 2002**

136.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that the Plaintiffs requested documents or information relating to an oil spill only, and for the first time, on August 30, 2002.

137. Plaintiffs requested documents relating to any oil spill or other environmental or hazardous materials on Midtown's Property well before the Contract was executed by Plaintiffs on June 14, 2002.

138. Documentary evidence exists, including but not limited to that herein referred to, which prove that the Plaintiffs requested documents and information relating to any oil spill or other environmental or hazardous materials on Midtown's Property well before the Contract was executed by Plaintiffs on June 14, 2002.

139. The Midtown Defendants represented to Plaintiffs, well before the Contract was executed by Plaintiffs, that there wasn't any oil spill or other environmental or hazardous materials on Midtown's Property.

**Midtown Admits that There Had Been an Oil Spill
Before the Contract was Countersigned and Returned**

140. The Midtown Defendants represented to Plaintiffs, when they countersigned the Contract on June 19, 2002, that there wasn't any oil spill or other environmental or hazardous materials on Midtown's Property.

141. In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that there was an oil spill or other environmental or hazardous materials on Midtown's Property before, at the time when the Contract was executed, and thereafter.

142. The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that there was no oil

spill or other environmental or hazardous materials on Midtown's Property before, at the time when the Contract was executed, and thereafter.

143.    Plaintiffs requested all documents, relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs finally discovered, contrary to the Midtown Defendants representation, that there had been a major oil spill on Midtown's Property.

144.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Plaintiffs requested all documents, relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs finally discovered, contrary to the Midtown Defendants representation, that there had not been a major oil spill on Midtown's Property.

145.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Plaintiffs requested all documents, relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property, and not only for the first time on August 30, 2002.

146.    The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs requested documents or information relating to an oil spill only, and for the first time, on August 30, 2002.

147.    The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase."

was incorrect, based upon a mistake of fact, and is the product of the Defendants' fraud.

148.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that Plaintiffs Requested Documents**
**Relating to the Oil Spill on or Before August 21, 2002**

149.    The Midtown Defendants also represented to the Court, throughout the Prior Litigation, that the reason they did not provide documents relating to an oil spill was because i) Plaintiffs only requested the information, for the first time, on August 30, 2002; ii) because even on August 30, 2002, Plaintiffs only requested representations and not documents; and iii) because even on August 30, 2002, Plaintiffs only requested notice of violations and not documents.

150.    Plaintiffs requested all documents, (not for the first time on August 30, 2002, not representations and not just copies of notices of violations), relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property.

151.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Plaintiffs requested all documents, (not for the first time on August 30, 2002, not representations and not just copies of notices of violations), relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property.

152.    The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the reason Midtown did not provide documents relating to an oil spill was because i) Plaintiffs only requested the information, for the first time, on August 30, 2002; ii) because even on August 30, 2002, Plaintiffs only requested representations and not documents; and iii) because even on August 30, 2002, Plaintiffs only requested notice of violations and not documents.

153.    The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about

> the *alleged* oil spill and *whether or not it had been cleaned up. This was not the*
> *first correspondence* between the parties on this subject. By e-mail dated August
> 23, 2002, Midtown let Jericho   know that it had *no information* concerning the
> cleanup of *an* oil spill*on properties neighboring the land* Jericho sought to
> purchase."

were incorrect, based upon a mistake of fact, and is the product of the Defendants' fraud.

154.    The foregoing mistake of fact was based upon the Midtown Defendants

and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud

upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005,

and presented to the Appellate Division in the Record on Appeal and as presented in the

January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-

Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and

Reply Brief of December 15, 2005.

**Midtown Admits that Plaintiffs Did Not Elect to Cancel**
**the Contract and that there is No Valid Cancellation**

155.    The Midtown Defendants represented to the Court, throughout the Prior

Litigation, that the Plaintiffs have elected to cancel the Contract and that there was a valid

cancellation.

156.    The Plaintiffs never elected to cancel the Contract and never cancelled the

Contract.

157.    Documentary evidence exists, including but not limited to that herein

referred to, which prove that the Plaintiffs never elected to cancel the Contract and never

cancelled the Contract.

158.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the

Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally

admitted that Plaintiffs never elected to cancel the Contract and never cancelled the Contract.

159.   The Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs have elected to cancel the Contract and that there was a valid cancellation.

160.   The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement*, do *not support Jericho's allegation that Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*.

and that

> ". . . instead indicate that *Jericho cancelled the contract* and *recovered its down payment*."

and that

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

161.   The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the

January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

## Midtown Admits Its Extortion, Blackmail and Acts of Intimidation

162.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, admit that from August 29, 2002 through September 12, 2002, the Midtown Defendants used extortion, blackmail and threats seeking to cause Plaintiffs to cancel the Contract.

163.    In their Memorandum of Law dated January 8, 2014 (Exhibit 3), the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, admit that from September 12, 2002 through February 16, 2004, the Midtown Defendants used extortion, blackmail and threats intimidating Plaintiffs, seeking to have Plaintiffs agree that the Contract was cancelled and also causing them to forbear earlier litigation.

164.    The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

"The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement. . . .*

and that

". . . do *not support Jericho's allegation that Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*."

and that

". . . instead indicate that *Jericho cancelled the contract* and *recovered its down payment*."

and that

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

165.   The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and in the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

166.   Based upon the foregoing, the Plaintiffs respectfully request that the Court exercise its equitable jurisdiction and issue a judgment declaring that the Contract between Jericho and Midtown is Still in Full Force and Effect, that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract, that Plaintiffs never cancelled the Contract, and the Court should Order that Mid-town and the Defendants should specifically perform and close and transfer title of the Property to Plaintiffs under the terms of the Contract, and award the Plaintiffs compensatory damages, in an amount to be proven at trial, but at-least $200,000,000, together with punitive damages, sanctions plus statutory trebling of its damages under 18 U.S.C. § 1964( c ) and Judiciary Law § 487, in an amount to be determined.

## MIDTOWN'S STUNNING ADMISSIONS AND THE 2014 FRAUD

167.   The foregoing admissions appear in two places contained in the January 8, 2014 Memorandum Of Law.

168.    In the Memorandum of Law, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, represent that "[o]n September 12, 2002, Jericho Group, *through its counsel*, cancelled the contract and requested the return of its deposit, which midtown promptly returned". (Exhibit 3 at p.3 – referring to Berger Aff., Ex J, p.3 – which is the Appellate Division decision dated August 17, 2006)

169.    Not only does the foregoing misquote the decision referred to by them, but it shows their knowledge of the falsity of their representations made by the Defendants throughout the Prior Litigation.

170.    By inserting the words "through its counsel", where no such words are contained in the cited decision, the Midtown Defendants, and the Defendants Berger, Shore and Philips Nizer, verify their knowledge that the Plaintiffs never cancelled the Contract.

171.    By inserting the words "through its counsel", where no such words are contained in the cited decision, the Midtown Defendants, and the Defendants Berger, Shore and Philips Nizer, confirm that they have no documents or evidence that Plaintiffs, including Jericho, cancelled the Contract.

172.    That the words "through its counsel" don't exist in the cited decision, underscores that they had falsely, albeit successfully, argued throughout the Prior Litigation that Plaintiffs cancelled the Contract.

173.    The Midtown Defendants argued throughout the Prior Litigation, and even now in 2014, that the Appellate Division ruled that Jericho cancelled the Contract, even though they know it is untrue.

174.    BY ADDING THE WORDS "THROUGH ITS COUNSEL" TO THE
APPELLATE DIVISION'S RULING OF AUGIST 17, 2006, THE DEFENDANTS
ARE AGAIN COMMITTING FRAUD ON THE COURT AND COVERING UP
THEIR LONG STANDING MALFEASANCE, BECAUSE THEY WANT THE
COURT TO BELIEVE THAT THE APPELLATE DIVISON ACTUALLY MADE
A FINDING IN THEIR RULING OF AUGUST 17, 2006, THAT UNDER THE
LAW AN ATTORNEY COULD CANCEL THE CONTRACT, WHEN IN FACT
THE APPELLATE DIVISION ONLY STATED SUCH IN RELIANCE UPON
THE  UNCONTROVERTED,  BUT  FALSE  JUDICIAL  ADMISSIONS  OF
GOEBEL THEN BEFORE IT (AS DEFENDANTS SPECIFICALLY CLAIMED
TO  THE  APPELLATE  DIVISION  IN  THEIR  DECMBER  15,  2005  REPLY
BRIEF).

175.    BY ADDING THE WORDS "THROUGH ITS COUNSEL" TO THE
APPELLATE DIVISION'S RULING OF AUGIST 17, 2006, THE DEFENDANTS
ARE AGAIN COMMITTING FRAUD ON THE COURT AND COVERING UP
THEIR LONG STANDING MALFEASANCE, BECAUSE THEY WANT THE
COURT TO BELIEVE THAT THE APPELLATE DIVISON ACTUALLY MADE
A FINDING IN THEIR RULING OF AUGUST 17, 2006, THAT THE LETTERS
OF SZEGDA DATED SEPTEMBER 3, 2002 AND OR THE FAX OF SZEGDA
DATED  SEPTEMBER  12,  2002,  MET  THE  SPECIFIC  TERMS  AND
REQUIREMENTS OF THE CONTRACT, AS SPELLED OUT IN PARAGRAPHS
44, 42, 29A) AND 29B) OF THE CONTRACT, WHEN IN FACT THE APPELATE
DIVISION  ONLY  STATED  SUCH  IN  RELIANCE  UPON  THE

**UNCONTROVERTED, BUT FALSE JUDICIAL ADMISSION OF GOEBEL THEN BEFORE IT (AS DEFENDANTS SPECIFICALLY CLAIMED TO THE APPELLATE DIVISION IN THEIR DECMBER 15, 2005 REPLY BRIEF).**

176.    The second instance of the Midtown Defendants admissions appears in page 16, fn 11 and page 17 of the January 8, 2014 Memorandum of Law, wherein it is stated, as follows:

> "The only specific documents referenced as being "recently discovered" are in an August 21, 2002 3-line email from Defendant Emmet to Defendant Imperatore noting that Pfeiffer was asking for "papers documenting the successful cleanup of the oil spill caused… by the neighboring property…" (Section C – MOL pg 16)

> "Imperatore promptly responded by email dated August 23, 2002, which was discussed by the Appellate Division, stating that in this email "Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase" but "Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup." (Berger Aff., Ex. L, pg. 3). FN 11 on p 16

> Imperatore promptly responded to Emmet's email, advising Jericho Group that Midtown did not have the information about the oil spill . . . Therefore, the email from Emmet requesting information is immaterial." – (Berger Aff p17)

177.    The foregoing was a major admission by the Midtown Defendants, that they all had this critical Emmet Email in their possession and that they willfully and deliberately withheld it from the Court and from the Plaintiffs, from inception, to present, and that they lied to the Court from inception to present, when they stated that documentary evidence proves just the opposite of what truly represents.

178.    Only now, confronted with the fact that Plaintiffs finally discovered the existence of the Emmet Email, do the Midtown Defendants come forward and acknowledged its existence.

179.   The Midtown Defendants had an obligation to come forward with the Emmet Email during the Prior Litigation, but instead concealed its existence and denied its import.

180.   Even now, having finally admitted the existence of this email, the Midtown Defendants still try to cover up their fraud on the Court, by downplaying the significance of this critical piece of documentary evidence.

## The Emmet Email

181.   The email from Emmet, referred to in the MOL, states as follows:

> Dear Ed [IMPERATORE]:
>
> Sam Pfeiffer of Plaintiffs wondered if you might send him the papers documenting the successful clean-up of the oil spill CAUSED (emphasis added) by the neighboring property.
>
> My best
>
> Elaine

182.   By her email (the "Emmet Email"), Emmet confirmed that Samuel Pfeiffer, on behalf of Plaintiffs, was then (as of August 21, 2002) requesting documents relating to an oil spill on Midtown's 90,000 square foot Property, which Plaintiffs had contracted to purchase for $28,000,000.

183.   The Emmet Email proves that Plaintiffs discovered on or before August 21, 2002, that there actually was an oil spill on Midtown's Property.

184.   The Emmet Email proves that Plaintiffs discovered, on or before August 21, 2002, that the Midtown Defendants had misrepresented to Plaintiffs since

negotiations initiated in March 2002, until execution of the Contract, that there was no oil spill or hazardous materials on Midtown's Property.

185.   The Emmet Email proves that Plaintiffs discovered, on or before August 21, 2002, that the Midtown Defendants committed actionable fraud upon Plaintiffs when they returned the countersigned Contract and misrepresented that there was no oil spill or hazardous materials on Midtown's Property.

186.   The Emmet Email proves that Plaintiffs discovered, on or before August 21, 2002, that the Midtown Defendants committed actionable fraud upon Plaintiffs from the execution of the Contract, until August 21, 2002, by misrepresenting that there was no oil spill or hazardous materials on Midtown's Property.

187.   The Emmet Email proves that Plaintiffs discovered, on or before August 21, 2002, that the Midtown Defendants had by that time willfully and deliberately breached the Contract.

188.   The Emmet Email proves that Plaintiffs:

      a.  Requested the critical documents relating to the Oil Spill and clean up on Midtown's Property on or before August 21, 2002, and not only for the first time on August 30, 2002, as they claim.

      b.  That Plaintiffs and Emmet knew and understood that since the oil spill was on Midtown's property, Midtown has many documents (as seen from  Emmets' Email request);

40

c. That Plaintiffs themselves requested documents from Imperatore (not only through Szegda, and much before Szegda's requests); and

d. That the Defendants' claim to the Court that "documentary evidence" (letters from Szegda and from Midtown to Szegda) proves when and what Plaintiffs requested from Midtown and what and when Midtown responded was a fraud on the Court.

189.    So this proves why they all hid until Now 2014, the Critical "Emmet Email" of 8/21/02 and what Fraud (and Significant Fraud they hid and) they committed on the Court since 1/6/05 to present.

190.    The Midtown Defendants now, and for the first time, admit that the August 23, 2002 email from Imperatore was a response to Plaintiffs' request, through Emmet's Email, for the critical documents, which were required to be turned over together with the executed Contract on June 19, 2002.

191.    The Emmet Email proves, that when Imperatore sent to Emmet his Email dated August 23, 2002, that stated as follows:

"We have no papers confirming the successful cleanup of the oil spill from the properties neighboring the Sites

EDWARD G. IMPERATORE …"

That his email was a response – and not as the Defendants argued throughout the Prior Litigation, simply an offer of information from Imperatore.

192.    As a response to the Emmet Email, and not simply an isolated communication from Imperatore, his email is an admission:

      a.   That there actually was an oil spill on Midtown's Property; that it had not been successfully cleaned;

      b.   That the 90,000 square foot Property was still contaminated as of August 23, 2002;

      c.   That Midtown had many documents relating thereto; and

      d.   That Imperatore responded to requests made directly by Plaintiffs, and not just through Szegda.

193.    Taken in that context, Imperatore admitted in his response Email, that the Midtown Defendants committed fraud on the Plaintiffs from before execution of the Contract, and when they sent the executed contract to Plaintiffs, and that they committed fraud and willfully and deliberately breached the Contract as of August 23, 2002.

194.    Taken in that context, Imperatore admitted in his response Email, that the Midtown Defendants were required under the Contract to provide these critical documents as soon as possible, failing which the Midtown Defendants were in willful and deliberate breach of the Contract.

195.    Taken in that context, Imperatore's letter to Szegda dated August 29, 2002, that

"Midtown directs Jericho to proceed in accordance with the Contract in all respects, with the understanding that the Study Period expires next Tuesday September 3, 2002."

was an extortion letter, and not simply notice to Plaintiffs to proceed under the Contract.

196.    Imperatore had just days before admitted that there was an oil spill on Midtown's Property and that it was not yet cleaned up.

197.    Imperatore had just days before admitted that critical documents existed, and would be provided.

198.    Imperatore's demand for the Study Period to close in 4 days and for Plaintiffs to close on the property in 20 days for 28 million dollars, even though he had not provided the necessary and promised critical documents, was an extortive attempt to force Plaintiffs to cancel the Contract.

199.    From August 26 and thereafter, Plaintiffs made repeated requests for the critical documents relating to the oil spill on Midtowns Property.

200.    Taken in that context, when Imperatore sent a letter to Szegda on Sept 3, at 4pm, that

> Finally, Jericho has known since Midtown's broker's e-mail to Jericho's broker dated August 23, 2002, a copy of which is also attached, that Midtown has no information with respect to whether or not an oil spill from adjacent properties onto the Sites was cleaned up. Nevertheless, Midtown provided Jericho in that e-mail with all information necessary to make that determination.
>
> In short, Jericho's options are limited to either terminating the Contract by the end of business [just 1 hour later, at 5pm] today and receiving a refund of the Downpayment or proceeding to Closing in accordance with the Contract. If Jericho elects to proceed to Closing in accordance with the Contract, Jericho ought to understand that Midtown, … would enforce the Contract strictly.

was an extortion letter, and not simply notice Plaintiffs to proceed under the Contract.

201.    Imperatore's response and threat that Plaintiffs had one hour to make a decision and notify them if they intended to cancel the Contract, and if they will not cancel within an hour they will release the $250,000 Contract deposit to Midtown and

Plaintiffs will have to close on or before September 18, 2002, within 15 days, for $28,000,000, knowing that the entire 90,000 square foot Property may be still be completely contaminated with oil because Midtown was still refusing to provide the critical documents, was an extortive attempt to force Plaintiffs to cancel the Contract, and not simply a notice to Plaintiffs to proceed under the Contract.

202.   Taken in that context, when Szegda (not Plaintiffs) sent a letter to Imperatore on Sept 3, at about 4:48pm, that

> Be advised that, unless you advise us in writing that Midtown is willing (1) to make an affirmative representation that the oil spill referred to in my earlier letter of today's data hen been cleaned up and paid for or (II) to undertake whatever cleanup may be necessary at its cost and expense or (III) to extend the study period far a sufficient period to allow Jericho to investigate this matter, and, in any case provide Jericho with the requested clue due diligence documentations, Jericho requests that the monies paid upon execution of the Contract be returned to it in accordance with the Contract terms.

> Said monies should be wired to our IOLA Trust Account. Wiring instructions are transmitted herewith.

He was not requesting that they return the deposit, but rather he was stating that unless the Midtown Defendants provided the critical documents required under the Contract, and which had been requested numerous times, but which were not provided, in violation of para. 29(c) of the Contract, and relating to the Oil Spill on Midtowns Property, they should return the deposit to Plaintiff, to be placed in escrow with a title company.

203.   Taken in that context, when Imperatore sent his letter dated September 4, 2002 to Szegda (and not to Plaintiffs), that they will not return the deposit unless Plaintiffs provide a general release and that "Midtown expects that its refund of the Downpayment to Jericho will constitute a termination of the Contract in all respects" was another extortive attempt to force Plaintiffs to cancel the Contract, and to obtain through

extortion and fraud from Plaintiffs a General Release that Plaintiffs should not be able to sue them for their extortion and blackmail (as Goebel tried and did in May 2013), rather than simply comply with their contractual obligation to provide the critical documents relating to the oil spill on Midtowns Property.

204.    Plaintiffs told Imperatore and Midtown that they refused to execute a general release, again told the Midtown Defendants that they will not cancel the Contract, and again requested the critical documents.

205.    By letter dated September 5, 2002, Stone stated that Szegda's letter of September 3, 2002 was not a cancellation of the Contract because any cancellation had to be by formal Notice by Plaintiffs, pursuant to the Contract.

206.    Stone's September 5, 2002 letter stated as follows:

Paragraph 29 of the Contract sets forth a specific procedure for Jericho to cancel the Contract.  Specifically, the Contract states,:

If prior to the conclusion of the Study Period, the Purchaser determined at its sole and absolute discretion that the Property was not suitable for its needs, the Purchaser {Plaintiffs} shall have the right to cancel this Contract upon written notice to the Seller {Midtown} and the Escrowee {Midtown's law firm}… Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser {Plaintiffs} the monies paid upon execution hereof." [Emphasis added]."

To this point, neither you nor Jericho has actually provided any notice that Jericho was canceling the Contract. In light of your most recent letters, we cannot imagine that Jericho would seek a refund of its Downpayment and still rely on a Contract that it has repudiated.

Nevertheless, we must state that Jericho cannot have it "both ways". Either Jericho formally cancels the Contract by notice required by Paragraph 29 or it must proceed to close at its own risk: This Firm, as Escrow Agent under the Contact, requires Jericho (or you) to send *us* the requisite notice confirming Jericho's cancellation of the Contract.

207.    Stone's letter of September 5 memorializes his and Midtown's understanding concerning the requirements as to how to cancel the Contract.

208.    Stone's letter of September 5 memorializes his and Midtowns understanding that Szegda's September 3 letter was not a cancellation of the Contract.

209.    Stone's letter of September 5 memorializes his and Midtowns understanding that Szegda is not "Jericho".

210.    After Stone's letter of September 5, 2002, Plaintiffs by Pfeifer and Szegda, again told Imperatore and Stone that Plaintiffs were not cancelling the Contract, but demanded instead that Midtown provide the requested critical documents and proceed to closing in accordance with the terms of the Contract.

211.    Unable to get the formal notice from Plaintiffs, and having been expressly told by Plaintiffs that they would not cancel the Contract, Stone instead invited Szegda to commit a fraud on the Plaintiffs when he advised him that he could write a letter stating that the letter of September 3, 2002 was intended as a cancellation of the Contract.

212.    Szegda, without authority from Plaintiffs, committed fraud on Plaintiffs when he responded by letter of September 12, 2002, stating:

> Although Jericho's principals felt, and still feel, that under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof.

213.    Szegda's September 12 letter was sent without the knowledge of Plaintiffs, without Plaintiffs' authorization, and it was in direct contravention of Plaintiffs' instructions not to cancel the Contract.

214.    The letters from Szegda, to the Midtown Defendants, show that Szegda knew and understood his direction from Plaintiffs, that the Contract not be cancelled but should remain in effect, and that he was to obtain the critical documents relating to the oil spill on Midtowns Property that had been requested since before August 21, 2002 (and earlier).

215.    Szegda sent the September 12 letter as a means of getting possession and control of the $250,000 Downpayment, and to cooperate with the Midtown Defendants by securing for them the purported cancellation they could not get from Plaintiffs.

216.    The Midtown Defendants knew that the September 12 letter from Szegda was not a cancellation of the Contract, they knew that Plaintiffs did not intend to cancel the Contract, they knew that Szegda could not cancel the Contract, they knew that there was no Notice of cancellation, they knew that they did not receive a Notice of cancellation, on September 3, 2002 or on September 12, 2002, as required by the Contract and as they themselves specifically stated in their letter of September 5, 2002.

217.    In that context, Plaintiffs continued to correspond with the Midtown Defendants, orally and in writing, from September 18, 2002 through February, 2004, that Plaintiffs never cancelled the Contract, that Midtown knew the Contract was never cancelled and that they should advise as to how they wanted to proceed to closing.

218.    Plaintiffs discovered on September 12, 2002, that Szegda had committed fraud on Plaintiffs by sending on September 12, 2002, an unauthorized fax letter to the Defendants, purportedly cancelling the Contract if Midtown still refused to provide Jericho with the "Requested Critical Documents requested much before August 30, 2002" that Midtown was obligated to provide under par. 29c) of the Contract, etc.

219.    Plaintiffs immediately called Szegda on September 12, 2002, complained that he had no right to send any letter to Defendants without Plaintiffs written consent and especially not the fraudulent September 12, 2002 letter.

220.    Plaintiffs immediately, on or about September 12, 2002, fired Szegda as Attorney of Jericho.

221.    Plaintiffs immediately contacted Defendants and told them to disregard Szegda's fax because he was not authorized to send the letter; that Plaintiffs never cancelled the Contract and that the Contract is not cancelled; and again requested that they should immediately provide the critical documents Plaintiffs requested many times from Defendants.

222.    On or about September 15, 2002 Midtown claimed that Jericho canceled the Contract and told their agents and brokers that they could market the Property to other prospective purchaser because Jericho cancelled the Contract.

223.    That Plaintiffs sent to Maurice Stone, immediately on September 18, 2002, a letter stating as follows:

Dear Mr. Stone:

… Please be informed that Jericho has not authorized Michael Szegda, to cancel the contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(b) and 42, that only the "Purchaser" could cancel the Contract. Please inform Jericho in writing, by certified mail, when and how you want to proceed with the Contract.

224.    That Plaintiffs sent a copy of the September 18, 2002 letter, to Defendants, by Certified Mail, Return Receipt Requested, again on October 18, 2002, that stated as follows:

Please respond to my letter dated September 18, 2002 (Copy attached)

225.    Imperatore responded by letter dated October 25, 2002, wherein he stated:

In any event, Jericho appears inclined to contend that its own attorney was not authorized to terminate a Connect that once existed between Midtown and Jericho with respect to the Sites. You acknowledge in your letter purportedly dated September 18, 2002 that Jericho's attorney, Michael Szegda, cancelled the Contract and accepted in return Jericho's Downpayrnent of $250,000.00 in accordance with the Contract…

226.    Imperatore lied in his response of October 25, 2002, because he knew that Szegda couldn't cancel the Contract and was not authorized to cancel the Contract, and he knew that Midtown did not receive a Notice of cancellation, as required under the Contract, and he knew that the Contract was not cancelled, and he knew that the Escrow Agent had no right to return the $250,000 Downpayment to Szegda.

227.    Imperatore continued, in his October 25 response letter, as follows:

In any event, we view Jericho's attempt now to assert some rights in a Contract that has long since been terminated to be nothing less than fraudulent.  Should Jericho persist in this attempt by, among other things, questioning Midtown's ownership of the Sites, misinforming third parties that Jericho has any interest in the Sites or in any other way interfering with Midtown's ownership of the Sites, we will have no alternative but to consider bringing an action against Jericho  and, if appropriate, Jericho's principals for fraud, slander of title, tortious interference with prospective economic advantage and all other proper claims and to seek in such action consequential and punitive damages, sanctions, attorneys' fees and costs against Jericho, its principals, if appropriate, and Mr. Szegda, if warranted.

I trust Midtown's position is clear. Do not attempt to contact me or any Midtown representative, including its Broker.

228.    The foregoing constituted threats and coercion, which scared Plaintiffs into forbearing litigation at that time.

229.    Plaintiffs instead tried to work out the deal through phone calls and letters.

230.    By letter dated January 5, 2004, Plaintiffs wrote to the Midtown Defendants, reiterating the frequent attempts to enforce its right under the Contract, and stated as follows:

Dear Mr. Stone:

I respectfully request that you please *respond* directly to Jericho's letters to you dated September 18, 2002 and October 18, 2002. Mr. Michael Szegda, Esq., told us that the reason that he requested back the deposit was because Midtown did not comply with the terms of the contract and other representation and understandings. See the letters from Michael Szegda, dated July 17, 29, Aug. 13, 19, 28, 30, Sept. 2-4 and 12, of 2002, etc...

Please inform Jericho, by certified mail, when and how you want to proceed with the Contract, between Midtown Development, LLC (Midtown) and Jericho Group Ltd (Jericho).

Thanking you in advance.

231.    Stone responded in a letter dated January 19, 2004 stating as follows:

Dear Mr. Pfeiffer:

We are in receipt of your January 5, 2004 letter and we are, in fact, amazed at your gall in sending it. Please be reminded that your group, Jericho, terminated the "Contract" to which you refer more then sixteen (16) months ago and we returned the Deposit to Jericho in accordance with specific instructions given us by Jericho and its attorney, Mr. Szegda.

232.    Stone lied in his response of January 19, 2004, because he knew that Plaintiffs did not terminate the Contract, and he knew that the Deposit was not returned to Plaintiffs, and he knew that he didn't receive any Notice from Plaintiffs regarding cancellation of the Contract and return of the Deposit, and he knew that the Contract was not cancelled.

233.    Stone's knowledge on these matters is manifest in his letter of September 5, 2002, wherein he expressly stated that to be effective, a cancellation

had to come by Notice and must be a formal cancellation under the terms of the Contract, which mandates that it be from Plaintiffs, signed by Plaintiffs and sent from Plaintiffs, by certified mail, return receipt requested, to the Seller, Midtown, with copies to Midtown's and Plaintiff's attorneys, and he knew that none of the above requirements were met.

234.    Stone continued, in his January 19, 2004 letter, as follows:

I believe that Edward Imperatore's October 25, 2002 response to your October, 2002 correspondence, a copy of which is attached, is very clear and absolutely controlling. There is not now, and *has not* been for more than sixteen (16) months, any Contract between Midtown and Jericho concerning the Property because Jericho cancelled that Contract pursuant to its terms in September 2002.

Should you, Jericho or its principals assert any claim or hold itself out as having any rights or interest concerning the Property, Midtown will consider bringing an action against Jericho and, if appropriate. Jericho's principals and agents for fraud, slander of title, tortious interference with prospective economic advantage and all other proper claims and to seek in such action consequential and punitive damages, sanctions, attorneys' fees and costs against Jericho, its principals, if appropriate, and Mr. Szegda, if warranted.

I trust Midtown's position remains clear. Please be guided accordingly.

235.    The foregoing constituted further and continued threats and coercion, which once again scared Plaintiffs into forbearing litigation at that time.

236.    Plaintiffs instead again tried to work out the deal through phone calls and letters.

237.    Plaintiffs responded on January 23, 2004, as follows:

I received your letter dated Jan. 19, 2004 where you stated "we returned the Deposit to Jericho in accordance with the specific instruction given us by Jericho and its attorney, Mr. Szegda."

I respectfully request that you please provide us a copy (front and back) of the Check that reflects the return of the Deposit. Please also provide us a copy of the document that had "specific instruction given to you by Jericho" (emphasis added)."

238.    The Midtown Defendants never responded to the January 23, 2004 letter, because they knew they could not provide documents to show that they returned the deposit to Jericho, they could not provide any document containing a Notice they claimed to have received from Plaintiffs, and they could not provide a copy of any check showing that the deposit was returned to Plaintiffs.

239.    They could not respond, because such documents have never existed and they knew that they could no longer support their false claim that the Contract had been cancelled.

240.    Without any response from Midtown, Plaintiffs then sent another letter to Stone, dated February 16, 2004, as follows:

Dear Mr. Stone:

I respectfully request that you please respond to our letter to you dated Jan. 23, 04. We have mailed our Jan. 23, 04, letter to you, by Regular Mail, by Fax, and by Certified Mail, Return Receipt Requested, Postage Prepaid, as provided under the Contract.

You have also not responded to our specific claim in our letter to you, dated September 18, 02.  Please be informed that Jericho has not authorized Michael Szegda, to cancel the Contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(a) and 42, that only the "Purchaser" could cancel the Contract."

The Contract specifically stated in par. 29(a),
"the **Purchaser** shall have the right to cancel this Contract upon written notice to Seller and the Escrowee.  .. Upon timely receipt of such notice of cancellation, the Escrowee shall promptly <u>return to</u> **Purchaser** the monies paid upon execution hereof.";

In par. 42, it is stated
"This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in <u>writing signed by the Party</u> against whom the change, modification or discharge is claimed or sought to been enforced; nor shall any waiver of the conditions or provisions of this

contract or of any of the rights of either of the parties hereunder be **effective or binding** unless such waiver shall be in writinj and signer by the **Party** claimed to have given, consented or suffered the waiver.";

In par. 44, it is stated,
"All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice. At the time any Notice is given to **either party**, a copy shall be sent to its attorney. For the purposes of this paragraph 44, the attorneys for the parties are as follows: "

I respectfully request that you please respond immediately to the above letters plus to Jericho's letters to you dated, October18, 02 and January 5, 04. You have never responded directly or refuted our specific claims raised in our letter to you dated, Octoberl 8, 02 and January 5, 04.

Please inform Jericho, by certified mail when and how you want to proceed with the Contract, between Midtown Development, LLC (Midtown) and Jericho Group Ltd (Jericho).

Thanking you in advance.

241.    The February 16, 2004 letter detailed the Plaintiffs' position and efforts to close the Contract.

242.    The Midtown Defendants never responded to the February 16, 2004 letter, nor have they ever controverted any of the detailed and factually supported assertions therein contained, yet they refused to proceed with the Contract.

243.    This correspondence proves that Midtown knew the Contract was not cancelled and that they never received any Notice of cancellation as required under the Contract.

**THE MIDTOWN DEFENDANTS COULD HAVE SIMPLY RESPONDED IN THEIR AUGUST 23, 2002 EMAIL OR ANYTIME THEREAFTER THROUGH SEPTEMBER 12, 2002, THAT THE NYDEC WAS CLEANING THE OIL SPILL, AT NO COST TO THE PROPERTY OWNER, AND THAT THEY WOULD CONTINUE TO CLEAN FURTHER, AT NO COST TO THE PROPERTY OWNER, BUT INSTEAD THEY CONCEALED THIS INFORMATION BECAUSE THEY WANTED THE PLAINTIFFS TO CANCEL THE CONTRACT**

244. Existence of the Emmet Email, and the Midtown Defendants' acknowledgement in their January 8, 2014 Memorandum of Law that Imperatore's Email of August 23, 2002 was a direct response to the Emmet Email, is an admission that their failure to provide the critical documents relating to the oil spill on the Midtown Property on and before August 29, 2002, and thereafter, constitutes a willful and deliberate breach of the Contract.

245. Existence of the Emmet Email, and the Midtown Defendants' acknowledgement in their January 8, 2014 Memorandum of Law that Imperatore's Email of August 23, 2002 was a direct response to the Emmet Email, is an admission that they instead engaging in the scheme to intimidate and extort Plaintiffs into cancelling the Contract, which continued until February 16, 2004.

246. Existence of the Emmet Email, and the Midtown Defendants' acknowledgement, in their January 8, 2014 Memorandum of Law, that Imperatore's Email of August 23, 2002 was a direct response to the Emmet Email, is an admission that the Midtown Defendants always knew that they willfully and deliberately breached the contract; that Plaintiffs never cancelled the Contract; and that the Contract is in full force and effect, even as of this date.

247. Existence of the Emmet Email, and the Midtown Defendants' acknowledgement, in their January 8, 2014 Memorandum of Law, that

**Imperatore's Email of August 23, 2002 was a direct response to the Emmet Email, is an admission that the Defendants perpetrated a fraud on the Court when they lied throughout the Prior Litigation, leaving the prior results fatally infirm and ineffectual.**

## THE CONTRACT WAS NEVER CANCELLED

248.    Before Plaintiffs signed the Contract, on June 14, 2002, Plaintiffs and their transactional attorney, Szegda, informed Midtown that all notices from Midtown must be sent to Plaintiffs at 155 Lee Avenue, Brooklyn and that all notices to Midtown, must be in writing and signed by Plaintiffs, not Szegda, and must be sent by Plaintiffs from 155 Lee Avenue, Brooklyn to Midtown with copies to their attorneys.

249.    The Contract described the parties and listed their addresses, to be as follows: Midtown Development L. P. a New York Limited partnership with an office 40 Arcorp Properties, Pershing Road, Weekawken, New Jersey, as the Seller, and Jericho Group, Ltd c/o Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, NY, 11211, as the Purchaser.

250.    On June 14, 2002, Szegda sent to Midtown, the deposit and the Contract signed by Plaintiffs, with cover-letters stating that all notices from Midtown must be sent to Plaintiffs at 155 Lee Avenue, Brooklyn and that all notices to Midtown, must be in writing and signed by Plaintiffs, not Szegda, and must be sent by Plaintiffs to Midtown.

251.    On June 19, 2002, Midtown returned the counter-signed Contract together with documents relating to the property (allegedly all the documents relating to the Property).

252.    The simultaneous transmission of the property documents, with the return of the countersigned Contract, constituted a representation by Midtown under the Contract.

253.    Paragraph 44 of the Contract provided:

All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party s hall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney.  For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:

Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ  07601

Attorney for Purchaser:

Szegda & Gerbing
300 East 42nd Street
New York, New York  10017
Attn:  Michael A. Szegda, Esq.

254.    The Contract further provided, in paragraph 42:

This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

255.    The Contract provided in paragraph 29 (a) that if prior to the conclusion of the Study Period, (on or before September 3, 2002) the "Purchaser" (i.e., Plaintiffs) determined at its sole and absolute discretion that the Property was not suitable for its needs, "the Purchaser (i.e., Plaintiffs) shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]… Upon the timely receipt (on or before 9/3/02) of such notice of cancellation, the Escrowee shall promptly return to Purchaser (i.e., Plaintiffs) the monies paid upon execution hereof."

256.    The Contract further provided, in paragraph 29(b) "Purchaser shall have no right to terminate this Agreement other then as provided in 29(a) above."

257.    From his introduction to the Property, through the Contract formation, its execution, and thereafter, Plaintiffs's Principal, Sam Pfeiffer, made numerous requests directly to Imperatore and to Stone and also communicated with Imperatore and Stone through Midtown's Brokers Emmet and Shafran.

258.    The purpose of these requests was to obtain information and documents, as well as to move the Contract to closing.

259.    Pfeiffer informed Szegda that he had no authority outside of his function of advising as to the language of the Contract, writing letters as directed by Plaintiffs, and securing information regarding the property.

260.    Pfeiffer informed Midtown that Szegda had no authority outside of his function of advising as to the language of the Contract, writing letters as directed by Plaintiffs, and securing information regarding the property.

261.    On September 3, 2002, Pfeifer again wrote to Szegda not to send out any letters without Plaintiffs written authorization.

262.     Pfeiffer was in constant contact directly with Imperatore, Stone, and through Shafran and Emmet, requesting documents before and during the due diligence period, as evidenced by the Emmet email and the Shafran Investigation.

263.     On September 3, 2002, Plaintiffs informed Midtown that unless they provide the critical documents required under the Contract, and which had been requested numerous times, but which were not provided, in violation of para29(c) of the Contract, relating to the Oil Spill and the Amtrak Agreement, they should return the deposit to Plaintiff, to be placed in escrow with a title company.

264.     On September 3, 2002, Szegda, sent a letter to Midtown that unless they provide the critical documents required under the Contract, and which had been requested numerous times but which were not provided, in violation of para29(c) of the Contract, relating to the Oil Spill and the Amtrak Agreement, they should return the deposit but, acting beyond the scope of his authority, Szegda asked for the money to be wired, not to the Plaintiffs, but to his own account.

265.     By letter dated September 4, 2002, Imperatore demanded that Plaintiffs provide a general release as a precondition for the release of the escrow.

266.     Plaintiffs refused to execute a general release, again told the Midtown Defendants that they will not cancel the Contract, again requested the critical documents and again demanded that if they didn't provide the documents, then they should send the deposit back to Plaintiffs.

267.     Szegda sent a letter on September 4, 2002, that plaintiffs refused to execute a general release and indicated that Plaintiffs needed the critical documents.

268.     Absent from Szegda's September 4 letter was any mention of cancelling the Contract.

269.     By letter dated September 5, 2002, Stone stated that Szegda's letter of September 3, 2002 was not a cancellation of the Contract because any cancellation had to be by formal notice pursuant to the Contract.

270.     Stone's September 5, 2002 letter stated as follows:

Paragraph 29 of the Contract sets forth a specific procedure for Jericho to cancel the Contract.  Specifically, the Contract provides:

If prior to the conclusion of the Study Period, (on or before September 3, 2002) the "Purchaser" (i.e., plaintiffs) determined at its sole and absolute discretion that the Property was not suitable for its needs, "the Purchaser (i.e., plaintiffs) shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]... Upon the timely receipt (on or before 9/3/02) of such notice of cancellation, the Escrowee shall promptly return to Purchaser (i.e., plaintiffs) the monies paid upon execution hereof.".

To this point, neither you nor Jericho has actually provided any notice that Jericho was canceling the Contract. In light of your most recent letters, we cannot imagine that Jericho would seek a refund of its Downpayment and still rely on a Contract that it has repudiated.

Nevertheless, we must state that Jericho cannot have it "both ways". Either Jericho formally cancels the Contract by notice required by Paragraph 29 or it must proceed to close at its own risk: This Firm, as Escrow Agent under the Contact, requires Jericho (or you) to send *us* the requisite notice confirming Jericho's cancellation of the Contract.

271.     Stones letter of September 5 memorializes his and Midtown's understanding concerning the requirements as to how to cancel the Contract.

272.     Stone's letter of September 5 memorializes his and Midtowns understanding that Szegda's September 3 letter was not a cancellation of the Contract.

273.     After Stone's letter of September 5, 2002, Plaintiffs by Pfeiffer and Szegda, again told Imperatore and Stone that Plaintiffs were not cancelling the Contract,

but demanded instead that they should provide the requested critical documents and proceed to closing in accordance with the terms of the Contract.

274.    Unable to get the formal notice from Plaintiffs, and having been expressly told by Plaintiffs that they would not cancel the Contract, Stone instead invited Szegda to commit a fraud on the Plaintiffs.

275.    On September 10, 2002, recognizing that Plaintiffs will not cancel the Contract, Stone advised Szegda that he could write a letter stating that the letter of September 3, 2002 was intended as a cancellation of the Contract.

276.    In so doing, Midtown abandoned its request for a proper Notice of cancellation from Plaintiffs, instead telling Szegda that if he would lie and write in a letter that when he wrote his September 3, 2002 letter, he really intended to cancel the Contract (but for some reason he forgot to write it in the September 3, 2002 letter) they would accept it as a cancellation by Plaintiffs;

a.  Even though they themselves had previously discredited the September 3, 2002 from being a valid cancellation;

b.  Even though the letter was from him, and not the Plaintiffs;

c.  Even though their request was for a ratification from Szegda, not the Plaintiffs; and

d.  Even though they themselves had previously identified that a letter from Szega, and not the Plaintiffs, was ineffectual Notice under the law and the specific terms of the Contract.

277.    Szegda, without authority from Plaintiffs, committed fraud on Plaintiffs when he responded by letter of September 12, 2002, stating:

Although Plaintiffs' principals felt, and still feel, that under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Plaintiffs dated September 3, 2002, requesting the return of Plaintiffs' down payment was intended as the exercise of Plaintiffs' right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof.

278.    Szegda's September 12 letter was sent without the knowledge of Plaintiffs and without Plaintiffs' authorization, and it was in direct contravention of Plaintiffs' instructions not to cancel the Contract.

279.    Plaintiffs had advised Midtown on several occasions, that Szegda, the attorney who authored and sent the September 12 letter, did not have authority to cancel the Contract.

280.    In addition, the September 12, 2002 letter did not comply with the requirements of the Contract for cancellation of the Contract.

281.    The September 12, 2002 letter was not signed by the party (Plaintiffs), against whom the cancellation was to be enforced.

282.    The September 12, 2002 letter was not sent to "the party to be notified".

283.    The September 12, 2002 letter was not sent by certified mail, return receipt requested.

284.    The September 12, 2002 letter was not signed by Plaintiffs, or even cc'd to them.

285.    On September 16, 2002, Harwood Lloyd wired the deposit of $250,000 to Szegda's account, not to Plaintiffs.

286.    The Midtown Defendants knew that the September 12 letter from Szegda was not a cancellation of the Contract, they knew that Plaintiffs did not intend to cancel the Contract, they knew that Szegda could not cancel the Contract, and they knew that there was no Notice of cancellation, as required by the Contract and as they themselves specifically stated in their letter of September 5, 2002.

287.    Immediately upon learning of Szegda's unauthorized act, Plaintiffs contacted the Midtown Defendants and thereafter continued to correspond with the Midtown Defendants, orally and in writing, from September 18, 2002 through February 16, 2004, that Plaintiffs never cancelled the Contract, that Midtown knew the Contract was never cancelled and that they should advise as to how they wanted to proceed to closing, as hereinabove set forth.

288.    The Prior Litigation ensued.

289.    Plaintiffs, however, never had a full or fair opportunity to have its claims adjudicated, on account of the facts and circumstances herein complained of.

## PLAINTIFF'S DISCOVERY OF THE EMMET EMAIL

290.    On August 16, 2012, Plaintiffs came into possession of an email from Emmet to Imperatore, dated August 21, 2002.

291.    Plaintiffs had no prior knowledge of the Emmet Email or its existence because the Defendants withheld it from Plaintiff and the Court despite having been served with prior Court Orders for the production of such documents.

292.    The Defendants represented, throughout the Prior Litigation, that no request for any oil spill documents or information had been made by Plaintiffs before August 30, 2002.

293.    The Emmet Email unequivocally proves otherwise.

294.    The email from Emmet states, as follows:

> Dear Ed [IMPERATORE]:
>
> Sam Pfeiffer of Plaintiffs wondered if you might send him the papers documenting the successful clean-up of the oil spill CAUSED (emphasis added) by the neighboring property.
>
> My best
>
> Elaine

295.    By her email (the "Emmet Email"), Emmet confirmed that Samuel Pfeiffer, on behalf of Plaintiffs, was then (as of August 21, 2002) requesting documents relating to an oil spill on Midtown's property.

296.    The Property at issue is a 90,000 square foot lot, which Plaintiffs had contracted to purchase for $28,000,000.

297.    The location of the oil spill had been a central issue in the Prior Litigation.

298.    The Plaintiffs' due diligence, and the timeliness of their demands for documents relating to the oil spill had been a central issue in the Prior Litigation.

299.    Whether or not Plaintiffs even requested such documents relating to any oil spill, at any time, had been a central issue in the Prior Litigation.

300.    Existence of the Emmet Email proves all that the Midtown Defendants and their attorneys claimed from the time they filed their motion to dismiss the Prior Litigation, on January 6, 2005, through the last filing in the Prior Litigation, on April 1, 2010, and even now in 2014, was false.

301.    Throughout the prior litigation, the Defendants hid the Emmet Email from the Court and from the Plaintiffs.

302.    In this regard, the Defendants have consistently represented to the Court that on August 23, 2002, they had volunteered information relating to an oil spill on a neighboring property.

303.    To support this contention, the Defendants offered an email from Imperatore to Emmet, dated August 23, 2002 (the "Imperatore Email"), which states as follows:

> "We have no papers confirming the successful cleanup of the oil spill from the properties neighboring the Sites
>
> EDWARD G. IMPERATORE …"

304.    The foregoing contention, based largely on the Imperatore Email, led to faulty court rulings, including that as stated by the Appellate Division on August 17, 2005, wherein it held, mistakenly, that:

> On August 30, 2002, Plaintiffs informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Plaintiffs know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Plaintiffs sought to purchase.

305.    By hiding the Emmet Email from the Court and from the Plaintiffs, the Defendants effectively concealed the true meaning of the Imperatore Email.

306.    Reading the Emmet Email, as one must, it is clear that the Imperatore Email was a response to Plaintiffs' request for documents relating to the oil spill on Midtown's Property.

307.    Taken in that context, Imperatore was not volunteering that Midtown had no information about an oil spill on the neighbors' property, as the Appellate Division

ruled, but rather he was admitting, for the first time, that there was an oil spill on the Midtown Property; that it had not been cleaned; that it was still contaminated as of August 23, 2002; and that he had documents relating thereto.

308. Existence of the Emmet Email proves that each of the various Affirmations of Defendant Imperatore, dated January 6, 2005, June 29, 2006 and September 18, 2006, respectively, contained false statements of fact and constituted misrepresentations to the Court.

309. Existence of the Emmet Email proves that all of the numerous submissions made in the Prior Litigation, and even now in 2014, to the Trial Court, to the Appellate Division, to the Court of Appeals and to the Southern District Federal Court, contained false statements of fact and constituted misrepresentations to the Court.

310. Existence of the Emmet Email proves that the Midtown Defendants and their attorneys knew of the falsity of the statements of fact and representations that they were then making to the Court.

311. Imperatore was a principal of Midtown, he held himself out as a partner at Harwood Lloyd, he controls Stone, and has since become a partner at Phillips Nizer.

312. Imperatore and all of the above referenced defendants are therefore charged with knowledge of what the Plaintiff's had been requesting as of August 21, 2002, and what Imperatore had replied on August 23, 2002.

313. Emmet was a broker at BHS. Based upon the authorship of the Emmet Email, in the course of her duties as an agent for BHS, she and BHS are likewise charged with knowledge of what the Plaintiff's had been requesting as of August 21, 2002, and what Imperatore had replied on August 23, 2002

314.    Existence of the Emmet Email underscores the failings of the Court rulings in the Prior Litigation, and the purported findings of fact therein contained.

315.    By concealing its existence from Plaintiffs, and from the Court, the defendants avoided their duty of candor and obligation to be truthful in the arguments they made and the evidence they presented throughout the Prior Litigation, when they instead misrepresented the true state of affairs to the Court.

316.    By concealing its existence and then making statements to the Court which flat out contradict the secreted evidence, the Defendants perpetrated a fraud on the Court.

## THE EMMET EMAIL BEARS FRUIT

317.    Based upon their discovery of the Emmet Email, Plaintiffs approached the defendant, Robert Goebel, in late 2012 through May 2013, seeking to ascertain if said attorney previously knew of its existence.

318.    Goebel had been retained by Plaintiffs and acted as Plaintiffs' attorney in the Prior Litigation.

319.    Plaintiffs asked Goebel if he had received the Emmet Email during the discovery phase of the Prior Litigation.

320.    Goebel failed and otherwise simply refused to respond to Plaintiffs' direct inquiry.

321.    Plaintiffs then demanded from Goebel, all of the documents said attorney had obtained during the discovery phase of the Prior Litigation

322.    Plaintiffs also demanded from Goebel, at that time, for a turnover of copies of all the deposition transcripts said attorney had obtained during the discovery phase of the Prior Litigation.

323.    Having received the Emmet Email from Emmet's Co-Broker representing Midtown in connection with the Contract, Mr. Benjamin A. Shafran, Plaintiffs specifically asked for the transcript of Shafran's deposition, and any documents received by Goebel, from Shafran.

324.    Plaintiffs also demanded from Goebel, at that time, all of the original documents and things it had entrusted to said attorney as part of Goebel's prior representation of Plaintiffs.

325.    Goebel failed and otherwise simply refused to turn the demanded documents and things over to Plaintiffs.

## GOEBEL'S 2013 ADMISSION AND EXTORTION

326.    Goebel instead proposed a new business plan, pursuant to which Plaintiffs would again retain his services, this time to act as a "supervising attorney", under which agreement Plaintiffs would give him $100,000 to hire and pay for the services of an attorney to work under him on the matter, in addition to a contingency fee to be paid on account of any potential recovery arising out of any action against Midtown and concerning the property.

327.    To support this new arrangement, Goebel claimed to Plaintiffs that he had "new ideas" and "new claims to bring", but he refused to disclose his purportedly newly conceived plans unless or until Plaintiffs executed the retention agreement being presented by him.

328.   Plaintiffs refused Goebel's overtures, refused Goebel's "new ideas" and refused to enter into any new retainer agreement with Goebel.

329.   Plaintiffs again demanded a turnover of the documents Goebel had received during the discovery phase of the Prior Litigation, and the things which remained in his possession but belong to Plaintiffs.

330.   Goebel again refused Plaintiffs' demands, but instead began a campaign to lure Plaintiffs back under his influence.

331.   Goebel perpetrated this fraud, claiming to be in possession of documents withheld from Plaintiffs, and from the Court, describing them as "explosive"; "dynamite"; "atomic bombs"; and "bombs, bombs, bombs".

332.   Goebel claimed to Plaintiffs, that if and when he turned over these documents Plaintiffs would "dance in the middle of the Street".

333.   Goebel claimed to Plaintiffs, that the withheld documents "prove that Imperatore, and others [defendants herein named], committed fraud on Plaintiffs, fraud on Justice Ramos, fraud directly on the Justices of the Appellate Division and on the Justices of the Court of Appeals."

334.   Goebel claimed to Plaintiffs, that "if they filed a motion or complaint based on documents he could provide, the defendants would not dare to file any motion, reply, answer or opposition because [the withheld documents] are so powerful, but instead the defendants would run to settle with Plaintiffs."

335.   Goebel claimed to Plaintiffs, that the withheld documents "are so powerful, that if he were plaintiff in this case he would immediately run to the bank

and borrow $1,000,000 and immediately retain one of the biggest Park Avenue law firms, and give them the $1,000,000 as a Retainer."

336.   In response to his pronouncements regarding the existence of the withheld documents, and their purportedly explosive nature, Plaintiffs asked Goebel why he didn't argue Plaintiffs' position in the Prior Litigation, and why he lied and mislead Plaintiffs and the Court throughout.

337.   In this regard, Plaintiffs maintain, even today, that the Contract has never been cancelled.

338.   Goebel was retained by Plaintiffs, *inter alia*, for the stated purpose of bringing suit against the Midtown Defendants, seeking specific performance and damages because the Contract was never cancelled.

339.   Goebel accepted such retention, with the express direction from Plaintiffs that there had never been any cancellation of the Contract.

340.   Goebel accepted and agreed that documentary evidence Plaintiffs provided to Goebel proved that the Contract had not been cancelled and that he would present those documents to the Court.

341.   Goebel accepted and agreed that documentary evidence Plaintiffs provided to Goebel proved that Plaintiffs notified Midtown on September 18, 2002 and thereafter up to and including February 16, 2004, that Plaintiffs did not cancel the Contract and that Plaintiffs wanted to proceed with the Contract.

342.   Goebel accepted and agreed that the documentary evidence Plaintiffs provided to him proved that Midtown knew that Plaintiffs did not cancel the Contract and that they had no documents or evidence to prove otherwise.

343.   Contrary to his own repeated assurances to Plaintiffs, that he would argue that the Contract had not been cancelled and that he would present the documentary evidence provided to him by Plaintiffs, Goebel failed to do so.

344.   Facing Goebel's demands to be re-hired, the Plaintiffs instead asked Goebel why he failed to argue and present documentary evidence that Plaintiffs had not canceled the Contract, as he had been hired and promised to do.

345.   Facing Goebel's demands to be re-hired, the Plaintiffs instead asked Goebel why he allowed the Midtown Defendants to represent to the Court that the Contract had been cancelled and why he failed to refute their false representation.

346.   Facing Goebel's demands to be re-hired, Plaintiffs instead asked Goebel why he falsely represented to the Court just the opposite of what he had been hired to do and what he promised to do, to wit; by he himself representing to the Court that Plaintiffs had canceled the Contract.

347.   Facing Goebel's demands to be re-hired, Plaintiffs instead asked Goebel why he falsely represented to the Court that Plaintiffs had canceled the Contract when he had documentary evidence that proved that Plaintiffs had not cancelled the Contract.

348.   Goebel did not deny having engaged in the conduct he was accused of in the Plaintiffs' questions, but instead responded, that if he got an agreement from Plaintiffs, including a general release of any and all claims Plaintiffs might have against him, that he would provide the "explosive" documents he claimed to be withholding.

349.   Goebel also stated at that time, that he would provide Plaintiffs with an affirmation, and other proof, that he was working together with Midtown and some of the people involved on the other side of Prior Litigation; and that he had aided the Midtown

Defendants by misleading Plaintiffs and the Court throughout the time he purportedly was representing Plaintiffs in the Prior Litigation and even thereafter, through 2010.

350.    Goebel also stated at that time, that he had misled Plaintiffs through 2010 by continuing to withhold documents and facts from Plaintiffs; and that he had destroyed certain documents in 2011 and 2012 and would destroy more documents unless Plaintiffs agreed to issue him a general release.

351.    On or about April 15, 2013, through May 17, 2013, Goebel transmitted several revised versions of an agreement calling for a general release from Plaintiffs, in his favor, in exchange for his testimony and a turnover of the withheld documents to Plaintiffs.

352.    Plaintiffs signed the agreement, and sent a release to Goebel, whereupon Goebel sent useless documents and baseless legal theories to Plaintiffs.


## SZEGDA'S BACKGROUND

353.    Michael Szegda, acted as the Plaintiffs' attorney in connection with the Contract.

354.    Szegda is a convicted criminal, who was permanently disbarred to practice law.

355.    Szegda has admitted to having defrauded his own clients and has misappropriated escrow funds

356.    Szegda  recently admitted to Plaintiffs, in 2013, that he had committed the same fraud on Plaintiffs, and stole from Plaintiffs $150,000 he had been holding for them in escrow.

357.    Szegda admitted to Plaintiffs that he sent by fax an unauthorized and fraudulent letter to Defendants (not even cc'd to Plaintiffs) on September 12, 2002

358.    Szegda admitted to Plaintiffs, in May 2013, that he had and still has even in 2013, in his possession, Documents that Plaintiffs provided to him (with condition to return original to Plaintiffs but he never did), plus other critical Documents and evidence that Prove that the Defendants committed fraud on Justice Ramos, on the Justices of the Appellate Division and on the Justices of the Court of Appeals, from inception to Present, but he has refused to return them and or to provide Plaintiffs copies thereof.

359.    Szegda admitted to Plaintiffs, in May 2013, that he was in collusion with Midtown Defendants (but he did not reveal with which Defendants) and that together they have willfully and deliberately defrauded Plaintiffs, the Justices of the Supreme Court, the Justices of the Appellate Division, First Department and the Justices of the Court of Appeals and others.

360.    Szegda admitted to Plaintiffs, in May 2013, that in September 2002, he entered into an agreement whereby he would send Midtown an unauthorized letter, purporting to cancel the Contract between Jericho and Defendants, and for that, Defendants would wire from their New Jersey bank, directly to Szegda's Bank account in New York, the $250,000 which Defendants were holding in escrow as the deposit on the Jericho/Midtown contract.

361.    Szegda admitted further that he knew and Midtown knew that they had no right to wire the $250,000 from their New Jersey bank to his bank in New York.

362.   Szegda admitted further that he knew and Midtown knew and he told Midtown that Jericho did not want to cancel the Contract and did not authorized him to cancel the Contract.

363.   Szegda admitted further that he knew and Midtown knew that no cancellation could be effective unless it is sent by "Notice" from Jericho and signed by Samuel Pfeiffer or any other principle of Jericho.

364.   Szegda admitted further that the documents and information in his file proves that what Defendants argued to the Court in the Prior Litigation was false.

365.   Szegda admitted further that he had the file of Jericho-Midtown in 2002-2006 and still has them even in 2013, contrary to what he told Plaintiffs in 2002-2006.

366.   Szegda admitted further that Goebel and Defendants never subpoenaed him for "Production of documents Request or for his deposition".

367.   Plaintiffs have requested an opportunity to review their files in Szegda's possession, but Szegda has refused.

368.   Szegda also represented Plaintiffs in a matter concerning Baystone Equities, Inc.

369.   In that capacity, Szegda took possession of a $150,000 escrow deposit belonging to Plaintiffs.

370.   When the escrow deposit went missing, Szegda claimed to Plaintiffs that the deposit had been release "by accident" to Baystone.

371.   Plaintiffs have since learned that Szegda was a principal of Baystone, and that his accidental release of the funds was nothing more than him stealing the money and misappropriating Plaintiffs escrow deposit.

372.    Szegda misappropriated other escrow funds belonging to Plaintiffs under a false time charge billing statement, when Plaintiffs did not have any such time based fee arrangement with said attorney.

373.    By order entered September 20, 2005, Szegda was suspended from the practice of law pursuant to 22 NYCRR 603.4(e)(1)(i) and (iii) for failure to cooperate with the Committee's investigation into two complaints, one concerning escrowed real estate downpayment funds totaling more than $350,000 and the other concerning escrowed funds being held on behalf of a film producer, and based upon uncontested evidence of professional misconduct (i.e., conversion of escrowed funds) (Matter of Szegda, 22 A.D.3d 103, 804 N.Y.S.2d 50 [2005] ).

374.    On or about December 2, 2005, an indictment was filed in New York County, Supreme Court, charging respondent with grand larceny in the second degree in violation of Penal Law § 155.40(1), for stealing property valued in excess of $50,000 (the escrowed real estate downpayment funds) from his client *during the period February 2001 through March 2003*.

375.    On December 13, 2005, respondent pleaded guilty to the indictment, grand larceny in the second degree (Penal Law § 155.40[1] ), a class C felony and on the same day respondent was sentenced to 100 hours of community service and five years probation.

376.    In 2007 Szegda was automatically and retroactively disbarred as of the date of his felony conviction. See In re Szegda, 42 A.D.3d 193, 194 (1st Dep't 2007).

**THE SHAFRAN INVESTIGATION**

377.   After they received the Emmett Email from Shafran, Plaintiffs sought further information and documents from Shafran.

378.   The Shafran investigation further uncovered the conspiracy and fraud herein complained of.

379.   Shafran is a licensed real estate broker, and one of the real estate brokers involved in the sale of the subject Property.

380.   At Imperatore's request, Shafran marketed the subject property at 11th Avenue at 36th – 38th Street, block 708, lot 1 and Block 709, lot 17, and other properties for Midtown, to many prospective purchasers including to Jericho.

381.   Imperatore and Emmet ("Emmet") had represented to Shafran that all the zoning, variances, zoning and approvals that Midtown obtained from the City agencies, to build as of right 728,904 square foot, were in place, that all agreements with Amtrak were in place and they could be transferred to any purchaser, that there was no environmental problem or hazards material on Midtowns property or affecting Midtowns property.

382.   Imperatore and Emmet ("Emmet") had represented to Shafran that any purchaser will be able to go into shovel and start building the day after they close title on the subject property.

383.   Shafran represented the same to all his prospective purchasers, including to Jericho, based on Imperatore and Emmet's representations to him.

384.   Shafran was the successful Broker in 2002 in the marketing and the actual sale of another property of Midtown, (that Imperatore and Emmet requested him to

market and sell) on West 47th Street, block 1076 lot 24, to another entity, West 47th Street Association, LLC.

385.    Shafran learned of an oil spill on Midtown's  90,000 square foot property sometime before August 21, 2002, from Pfeiffer, when Pfeiffer called him inquiring about this major development and requested that Shafran obtain from Emmet, Imperatore and Midtown all documents and information about the oil spill on Midtown's own property from inception to present.

386.    Prior to that, Shafran had not heard about any oil spill on Midtown's property or affecting Midtown's property.

387.    Shafran agreed to do everything he could to obtain all information and documents about the oil spill and cleanup.

388.    Shafran contacted Elaine Emmet and requested that she immediately contact Edward Imperatore on behalf of Pfeiffer and request from Imperatore that he immediately provide to Pfeiffer any and all documents and information relating to the oil spill on Midtown's property from inception to present.

389.    Emmet told Shafran on or about August 23, 2002 that Imperatore told her that he would provide to Pfeiffer as soon as possible all documents and information relating to the oil spill on Midtown's property from inception to August 23, 2002 (how it happened, when it happened, who was responsible, how much of the 90,000 SF was affected, how much was already cleaned up, who paid for the cleanup, what has to be done to fully clean up, and the duration to successfully clean up and to obtain a certificate,  etc.)

390.   Shafran informed Emmet on or about August 23, 2002, that he already contacted the New York Department of environment control, ("NYDEC") and requested to review or obtain the file on the oil spill on Midtown's property, that NYDEC responded that it must be done through a FOIL Request, and it will take four to six weeks from the time a FOIL Request is filed with NYDEC, he told Emmet that he had already made at the request of Samuel Pfeiffer the FOIL Request but he needed the documents and information from Imperatore, immediately, because, since Imperatore now admitted for the first time, that oil was spilled on Midtown's 90,000 square foot Property and that it was not even fully remediated, and still contaminated, and he has no certificate, accordingly, unless, Imperatore provides those documents to Pfeiffer immediately, Pfeiffer will have to retain an Environmental Engineering firm to conduct an extensive Environmental Study (Phase 1), plus to conduct on Site soil borings, etc on the 90,000 SF Property (Phase ii) and that would take at-least 10 weeks.

391.   Shafran informed Pfeiffer, on or about Monday August 26, 2002, that Imperatore admitted that there was an oil spill on Midtown's property and that it was not fully cleaned up, and that he promised to provide as soon as possible all documents and information relating to the oil spill on Midtown's Property.

392.   At Pfeiffer's request in July 2002 and again also in August 2002, Shafran asked Emmet and Imperatore for the critical Exhibits to the Amtrak Agreement plus the signed Permits and subsequent agreements and documents relating to the Amtrak Agreement.

393.   Emmet sent those request to Imperatore by e-mail in July 2002 and again in August 2002 and Imperatore responded by e-mail in July and also in August 2002 that

he will provide those critical exhibits and documents to Pfeiffer. Emmet provided Shafran in July and August 2002 with copies of those emails.

394. At Pfeiffer's request in July 2002, Shafran asked Emmet and Imperatore for the critical multiple filing's by Midtown and their zoning attorneys with the City Agencies where they requested many times that they should extend their permits, zoning, and approvals even though that did not go into shovel (started to build) and the multiple responses from the City Agencies' agreeing to extend plus to provide the last request they made to the City Agencies' and the City Agencies' response notifying Midtown that they will not extend and that all permits, zoning, and approvals are null and void.

395. Emmet sent those requests to Imperatore also by e-mail in July and also in August 2002 and Imperatore responded by e-mail in July 2002 and also in August 2002 that he will provide those critical documents to Pfeiffer. Emmet provided Shafran in July 2002 and also in August with copies of those e-mails.

396. Pfeiffer also requested in July 2002 that he should request from Emmet and Imperatore that Imperatore and Midtown extend the due diligent period, to December 31, 2001, because Midtown had not yet provided to Jericho many critical documents that Pfeiffer had requested, plus that Pfeiffer and his Architects discovered in mid July 2002 that the permits, zoning and approvals etc… were no longer valid, the fact of which Imperatore had thereafter admitted.

397. Subsequently Emmet informed Shafran that Imperatore had extended to Pfeiffer the due diligent period to December 31, 2002.

398. There were many e-mails that Shafran sent to Emmet and many e-mails that Shafran received from Emmet relating to the numerous requests that Pfeiffer made

either to Shafran, and Shafran made to Emmet or that Pfeiffer made directly to Emmet, and that Emmet in turn requested them by email from Imperatore and or Stone, and the responses from Imperatore and Stone by email to Emmet from inception (March 2002) and throughout the 75 days due diligent period and thereafter.

399.    In February 2006, before Shafran's deposition, Shafran provided to Goebel, the documents in his possession relating to the above Property and Contract with Jericho, including the many e-mails that Shafran sent to Emmet and the many e-mails that Shafran received from Emmet relating to the numerous requests that Pfeiffer made either to Shafran, and Shafran made to Emmet or that Pfeiffer made directly to Emmet, and that Emmet in turn requested them by email from Imperatore and or Stone, and the responses from Imperatore and Stone by email to Emmet from inception March 2002 and throughout the 75 days due diligent period and thereafter.

400.    Upon information and belief, Shafran also provided to Goebel in February 2006, the Emmet Email dated August 21, 2002 and the Imperatore response Email dated August 22, 2002, that Emmet emailed to Shafran on August 23, 2002, and relating to the oil spill on Midtown's Property.

401.    Upon information Goebel provided all the above emails and documents to Defendant Geremia before Shafran's deposition in February 2006.

402.    Upon information and belief, on or about mid September 2002, Shafran was told by Emmet and Imperatore, that Shafran could again market the subject property for sale on behalf of Midtown.

403.    Upon information and belief, Shafran asked them if they would provide to other prospective purchaser the documents relating to the oil spill on Midtown's property,

plus the exhibits, permits, documents relating to the Amtrak Agreement, etc, and they asserted that they will provide them to new prospective purchasers.

404.    Based on that representation, Shafran marketed the subject property, and brought a prospective purchaser, the Chetrit Group, in September 2002, and there was a meeting between Imperatore, Emmet, Shafran, and the Chetrit Group, but the deal was not consumated even though the Chetrit Group offered $34,000,000 because Imperatore wanted offers well above $34,000,000.

405.    Pfeiffer told Shafran at the inception of the due diligent period that he wants to develop the Property and not sell or flip the Property but indicated that he may entertain offers to sell the Properties only if they are well above $50,000,000. But subsequently he told Shafran that he will not sell it because Pfeiffer will close and develop the Property with his partners.

406.    Pfeiffer also told Shafran on or about end of September 2002, that he will file a claim against Midtown for specific performance and, upon information and belief, Shafran relayed that to Emmet and Edward Imperatore on or about the same time.

407.    Shafran has so testified at his deposition on February 27, 2006, that Pfeiffer told him in September-October 2002 "That he would proceed for specific performance because there was no cancellation of the contract and to the extent that the seller believes it was a cancellation, it wasn't a valid cancellation

408.    Based upon the facts discovered during the on going Shafran investigation, almost all that the Midtown Group Defendants and their attorneys have argued from inception, to date, is false.

409. Shafran, as Midtowns' agent and broker, had knowledge of the facts and circumstances set forth above.

410. The foregoing proves that the Midtown Defendants knowingly misrepresented and concealed the things set forth above from the Court.

411. The foregoing proves, and the documents Shafran provided and the deposition he attests to, proves that the Defendants knowingly withheld the documents Shafran provided during discovery, including his important testimony from the Court and Plaintiffs.

412. Withholding his deposition and his documents from the Courts and from the Plaintiffs, until 2013, mislead the court from the time of his testimony to present, as a part of the scheme herein complained of.

413. The Complaint Verified by Pfeiffer on November 17, 2013, is submitted herewith, as the affidavit of said individual concerning the facts and circumstances therein recited, including but not limited to the events since 2001 relating to the Baystone case and 2002 relating to the Midtown, which facts and circumstances are also incorporated herein by reference, as if fully set forth herein.

## THE FRAUD ON THE COURT

414. All of the Defendants intentionally engaged in conduct and made statements to the Court constituting material misrepresentations.

415. Also during the course of their conduct, and while they had duties of disclosure to Plaintiffs and to the Court, the Defendants affirmatively concealed material facts from the Plaintiffs and from the Court.

416.     All of the Defendants' conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful

417.     The nature of the misrepresentations, and because they constitute the basis of all of the Defendants claims and defenses, render each and every argument, statement, claim and representation to the Court false.  The statements identified throughout this Complaint only represent examples of the overriding fraud, the full extent of which will continue to be developed throughout this case.

418.     The Plaintiffs and the Court relied on the misrepresentations of Defendants, and would have acted differently and granted specific performance and/or damages had they known of the falsity of the Defendants statements and of their non-disclosures.

419.     The fraud on the Court and scheme to defraud Plaintiffs continue to date, even as of January 8, 2014, when the Defendants filed their Memorandum of Law and the Affirmation of Berger, again containing the misrepresentations herein complained of, and asking for sanctions against the Plaintiffs and an injunction preventing Plaintiffs from commencing further litigation without prior court approval.

420.     The false representations and omissions of Goebel, to the Court, included, without limitation, that:

(a)     When he filed the complaint dated September 2, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that Plaintiffs had cancelled the Contract;

(b)     When he filed the complaint dated September 2, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that the complaint had been approved and verified by Plaintiffs,

(c)     When he filed the amended complaint dated November 29, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that Plaintiffs had cancelled the Contract;

(d)    When he filed the amended complaint dated November 29, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that that the amended complaint had been approved and verified by Plaintiffs;

(e)    When he filed the memorandum of law dated February 23, 2005, purportedly on behalf of Plaintiffs, he falsely represented to the Court that the Plaintiffs had cancelled the Contract;

(f)    When he failed to correct Marrasse as he represented in open Court, to Justice Ramos on May 12, that Plaintiffs had cancelled the Contract;

(g)    When he failed to amend the complaint or put any motion into the Court, showing that documentary evidence proved that "Jericho" did not cancel the Contract

(h)    He failed to introduce the Plaintiffs' letters from 9/18/2002 through 2/16/04, to prove that Plaintiffs remained in contact with the Midtown Defendants for the two years preceding the commencement of the lawsuit, seeking to close the transaction, or to otherwise introduce these letters to refute the Midtown Defendants' representations that Plaintiffs did nothing during those two years;

(i)    He failed to introduce copies of the Amtrak Agreement, the NYDEC documents from September 24, 2002, the documents and correspondence exchanged between Plaintiffs and Defendants from inception through the signing of the Contract;

(j)    When he did not claim or argue that Plaintiff's had requested the oil spill documents and Amtrak exhibits much earlier than the Midtown Defendants claimed, and failed to refute the Defendants clams that the documents weren't requested until August 30, 2002 and September 2, 2002;

(k)    When he filed the affirmation of Samuel Pfeiffer, dated February 27, 2005, he falsely represented to the Court that the Plaintiffs had cancelled the Contract;

(l)    When he filed the affidavit of Samuel Pfieffer, dated February 27, 2005, he falsely represented to the Court that the affidavit had been approved and sworn to by Plaintiffs;

(m)    When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court in the Imperatore Affirmation of January 6, 2005; the Midtown Defendants' Memorandum of Law dated January 6, 2005; the oral argument before Justice Ramos on May 12, 2005; the Notice of Appeal and Pre-Argument Statement of July 5, 2005; the Midtown Defendants' Appeal Brief dated November 7, 2005 and the Midtown Defendants' Reply Brief of December 15, 2005;

(n)     When he intentionally and knowingly failed to controvert the arguments made by the Defendants in their Appellate Briefs, and to point out to the Court and correct the record with the admissions made by the Defendants in their argument before Justice Ramos on May 12, 2005;

(o)     When he intentionally and knowingly allowed the Midtown Defendants to interpose their Motion for Summary Judgment, containing contradictory statements and arguments from that presented by the Defendants in the Motion to Dismiss and in the Defendants Appeal Briefs, but failed to point out these contradictions and admissions to correct the record before the Court;

(p)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs had cancelled the Contract;

(q)     When he intentionally and knowingly withheld documents and deposition testimony obtained during discovery, and withheld documents provided by the Plaintiffs, which would have refuted the Defendants contentions;

(r)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs didn't ask for documents regarding the oil spill on the Midtown Property until August 30, 2002;

(s)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs didn't ask for documents regarding the Amtrak Agreement until September 2, 2002;

421.    The foregoing were part of a scheme to defraud Plaintiffs, by acting in collusion with the Defendants, and also resulted in the fraud on the Court herein complained of.

422.    By his Affirmation of January 6, 2005, submitted to the Court in support of the Midtown Defendants' Motion to Dismiss, Imperatore made false representations and omissions to the Court, including but not limited to;

       a.   *I am a member of the law firm Harwood Lloyd, LLC* **in Hackensack, New Jersey.** *Our firm represented Midtown Development, L.P.* **in connection with its negotiation' with plaintiff Jericho Group, Ltd. for the sale of the real property that is the subject of this dispute.**

By this statement, Imperatore concealed from the Court, as he had done from the Plaintiffs, that he was not just an attorney for Midtown, but that he was a principal too.   As a principal, attesting to facts, and not simply an attorney involved in the litigation, Imperatore's "affirmation" was not even properly before the Court, in that it should have been in the form of an Affidavit, to be considered.

> **b. A *true and correct copy* of the Contract *between Jericho and Midtown*, including a rider to it: is attached [to the Affirmation]**

By this statement, Imperatore was mislead the Court, even more than Midtown had done to Plaintiffs when the Contract was executed, because there were exhibits missing from the Contract on signing, but to the Appellate Division he didn't even attach the "Amtrak Agreement" nor the missing exhibits that they claimed they misplaced in 2002 from time of signing of Contract  6/14/02 to 9/3/02 but they had them in January 2005, when he signed the Affirmation thereby leaving the Appellate Division without a basis to evaluate the impact of the missing exhibits. Imperatore also failed to attach the transmittal letters which contained representations and which were part of the Contract and Directions as to the manner in which notice thereunder were to be given and received to and from Plaintiffs at 155 Lee Avenue by certified mail RRR and postage paid.

> **c. On September 3, 2002—the very day that the study period expired in accordance with the terms of the Contract— *Jericho wrote to* Midtown to cancel the Contract and request the return of its down payment.**

By this statement, Imperatore mislead the Court, because it was Szegda who wrote to midtown, and not Jericho.

> **d. By letters dated September 5, 2002 and September 10, 2002, Harwood Lloyd, acting as appointed Escrow Agent under the Contract, stated *that Jericho* was not entitled return of its down payment unless it provided clear *notice* that Jericho was canceling the Contract.**

By this statement Imperatore was misleading the Court, as because the request for the downpayment was so it could be placed with the title company because midtown was continuing to refuse providing the requested critical documents. The statement also reflects that he understood that Jericho was Plaintiffs, and not Szegda, and that it must be by notice as defined in Contract and that the *notice* under the contract must come from Plaintiffs, and not Szegda.

      **e.   On September 10, 2002, Harwood Lloyd *wrote to both Jericho* and Jericho's counsel by certified mail, requesting a response to Harwood Lloyd's September 5 letter.**

By this statement Imperatore was misrepresenting, to the Court, as Midtown had done to Plaintiffs when the Contract was executed, that he was the lawyer for Midtown, when he was in fact a principal.   The statement also reflects that he and Harwood and Llyod understood that Jericho was Plaintiffs and not Szegda and misled the Court when they wrote "Jericho cancelled" instead of writing that "Szegda cancelled".

      **f.   On September 12, 2002, *Jericho finally responded* by making clear that it had indeed intended to cancel the Contract.**

By this statement, Imperatore mislead the Court, because it was Szegda who ***finally responded* by making clear that Szegda had indeed intended to cancel the Contract"** and "not Jericho".

And now, for the first time, in their Memorandum of Law of January 8, 2014, the Midtown Defendants and Berger, Shore and Phillips finally admit that it was Szegda, not Plaintiffs.

      **g.   On September 13, 2002, Midtown returned Jericho's down payment.**

By this statement, Imperatore mislead the Court, because, he knew that they sent the down payment to Szegda, and not to Jericho.

      **h.   JERICHO'S ELEVENTH-HOUR REQUESTS FOR DOCUMENTS AND MIDTOWN'S RESPONSES
As the study period came to a close, Jericho made several requests for documents that Jericho now claims Midtown concealed.**

By this statement, Imperatore mislead the Court, because he knew that the Plaintiffs made requests for documents well before the study period came to a close, and also because he knew that in fact Midtown had been concealing the documents.

      **i.   The parties' contemporaneous correspondence shows that Midtown did not conceal any documents from Jericho.**

By this statement, Imperatore mislead the Court, because he knew that in fact Midtown had been concealing the critical documents relating to the oil spill on Midtown's property at counter-signing of Contract,

during the diligent period and since requested August 21, 2002 and the exhibits since July 2002 and also because he personally had the foregoing documents in his possession, even when he was writing and affirming this false statement.

**j.   Only one day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Amtrak and Midtown.**

By this statement, Imperatore mislead the Court, because he knew that the Plaintiffs made requests for documents well before the study period came to a close, and also because he knew that in fact Midtown had been concealing the documents evidencing such requests. Sherman even admitted to Justice Ramos on 5/12/02 that Plaintiffs had requested the documents already in July, plus Email's exist from Emmet and Shafran requesting in July 2002 on behalf of Pfeiffer

**k.   The Amtrak agreement was attached to the Contract; but the exhibits to it were not. *The day after Jericho asked for these exhibits, Midtown informed Jericho by letter that Midtown did not have the exhibits and did not have them when the parties executed the Contract either.***

By this statement, Imperatore mislead the Court, because he knew that the Plaintiffs had asked for the Exhibits already in July, and the first time they said that they didn't have the Exhibits was only on September 3, 2002. In addition, they lied to the Court, because they had the Exhibits.

**l.   On August 30—only a few days before the study period was to expire—*Jericho informed* Midtown by letter of "scuttlebutt" it had heard that there may have been an oil spill on the Property and asked Midtown for *any* documents relating to it.**

By this statement, Imperatore mislead the Court, because he knew that the Plaintiffs (not Szegda) made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email. Also they misled the Court because the letter of August 30, 2002 was from Szegda not from Jericho

**m.   On August 23, 2002. Midtown's broker transmitted to Jericho's broker an e-mail from Midtown's counsel noting that "[w]e have no papers confirming the**

**successful cleanup of the oil spill *from* properties neighboring the Sites".**

By this statement, Imperatore mislead the Court, because he knew that the email he refers to was a response to the Emmet Email which had been concealed by them, and which shows that he was instead admitted that there was a massive oil spill on the 90,000 square feet Midtown Property and that it was still contaminated and not cleaned up and that they had many documents in their custody possession and control. By this statement, they further mislead the Court, because they knew that as of August 21, 2002, and before, Midtown was required to provide those critical documents.

    **n.  By this email [the Imperatore Email] Midtown also gave Jericho all of the information necessary to obtain any such documents from the New York Department of Environmental Conservation.**

By this statement, Imperatore mislead the Court, because he knew that he must provide the critical documents in their possession and control under par. 29c) of the Contract since on or before August 21, 2002, in addition, that he knew that it takes four to six weeks to get the documents from the NYDEC, in addition, since he admitted that Midtown's 90,000 square feet was contaminated, he knew that Plaintiffs would have to retain an Environmental Company to perform a phase-1 and phase-2 study and report which would take six to ten weeks, or more.

**AT THE HEARING OF May 12, 2005, THE DEFENDANTS ADMITTED THAT THEY BROUGHT A FALSE MOTION TO DISMISS; THAT THEY HAD ENGAGED IN ACTIONABLE FRAUD; THAT THEY WERE IN WILLFUL AND DELIBERATE BREACH OF THE CONTRACT; THAT PLAINTIFFS HAD REQUESTED THE EXHIBITS TO THE AMTRAK AGREEMENT AS OF JULY, 2002; THAT PLAINTIFFS DID NOT ELECT TO CANCEL THE CONTRACT AND THAT THERE WAS NO VALID CANCELLATION OF THE CONTRACT**

423.   The Motion to Dismiss was heard before Justice Ramos on May 12, 2005,

wherein they made major admissions to the Court, at the second part of the hearing the

following transpired:

THE COURT:      Explain to me what this claim of deceit that you set forth, which is your fifth cause of action. I am not sure if I quite follow, plaintiff.

MR. GOEBEL:          I am Robert Goebel.

THE COURT: I would rather have the attorney.

MR. GOEBEL:          I am the attorney, Robert Goebel.

THE COURT:          Stand up, please …

MR. GOEBEL:          Paragraph 31, Your Honor, of the contract states that annexed to the contract is a true and complete Amtrak Agreement. It turns out -- the Amtrak Agreement is basically an agreement that the seller purportedly had with Amtrak, and basically the agreement was to provide for allowance of the seller, of the owner of the property to build above the railways, the railroad tracks. Without an agreement that provides for that there is no way you can develop the site because the tracks runright through the property.  So it's basically worthless property that can't be developed, or it is not worth nearly as much. but it cannot be developed.

MR. GOEBEL:          That is correct. They, told us when we signed the contract they represented in paragraph 31A that annexed thereto is a true and complete copy of the Amtrak Agreement. It turns out that there were many of the exhibits were missing.

THE COURT: So they didn't give you complete copy of-the Amtrak Agreement?

MR. GOEBEL:  We [Pfeiffer] tried to get copies of the exhibits from both the seller and also from Amtrak, and Amtrak bounced us around. They basically said go back to the seller. The seller said we've given you everything we, are required to give you, and then near the very end of the study period, about 70 days into the study period, Your Honor, they told us they didn't have the exhibits.

THE COURT: Let me frame the question if I can for my purposes and for PURPOSES OF THE RECORD.  From what counsel has told me, he put some meat on the bone now, he said DURING the 75-day period [July 2002] they asked for a copy of the lease [exhibits] with Amtrak because obviously if they didn't have a right to build above. The Amtrak tracks, the property could be used for what, a PARKING LOT, and that would be it.
Did you supply a copy of the Amtrak contract to the purchaser during that 75-day period?

MR.SHERMAN:          The copy that we have was supplied on the day of the execution of the contract, and it's an exhibit to the Contract.

THE COURT:          Was it complete?

MR. SHERMAN:     It didn't contain exhibits.

THE COURT:  This is a motion under-3211, not 3212, without those exhibits in my possession I have to assume that those exhibits would permit the owner of the property to build as high as the local regulations would permit, or those exhibits would say no, You cannot build at all.  So those exhibits would really determine to me what the value of the property is. …

THE COURT:  How can I decide this?   Either the – from what the plaintiff is alleging I think the plaintiff has at least a valid cause of action.

MR. SHERMAN:     Let's assume for moment, you think it's a valid CLAIM for breach of representation that they got a copy of the contract, how does that become deceit or fraud in this action?   Why is that not a breach of contract, how does he turn it into a fraud issue?

THE COURT:          The fraud of the deceit is when you are asked to turn over [with the Contract] a document, instead of turning over [with the Contract] the complete document you turn over half the document [but represent in the Contract that you turned over the complete document]. …[4]

THE COURT:          Was it clear from the Amtrak contract that was attached to the purchase and sale agreement, that the Amtrak contract was incomplete?

MR. SHERMAN:       YES, because it didn't have some of these exhibits.

THE COURT:          Did they then request those exhibits?

MR. SHERMAN:     After 60 days, two months into the so-called study period. It is not as-though they read it on day one and say we need those exhibits.

THE COURT: The answer is yes, DURING the 75-day period they requested the exhibits.

---

[4] **Paragraph 31** of the Contract states, "Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

THE COURT:        It dose strike me as some what odd that the owner of the property would not have a full copy of the lease [agreement]…

THE COURT:  Indeed it strikes me as not credible. The motion is denied, get your answer in.  Thank you very much."

424.   The Defendants Sherman and Geremia admitted the falsity of the statements they themselves had submitted in support of their motion to dismiss.

425.   During the oral argument held before Justice Ramos, the Defendants Sherman and Geremia admitted the falsity of the statements contained in the Imperatore Affirmation.

426.   Accordingly, the Defendants Sherman and Geremia admitted that

a.  Plaintiffs requested from Amtrak and from Midtown the Exhibits already in July 2002 (But to the appellate division they argued the opposite);

b.  That the Amtrak exhibits existed and that Midtown had them (but when requested from Midtown in July, 2002, Midtown responded "We already gave the Exhibits to you at the signing of Contract, so they admitted in the reply of July, 2002, that there were Exhibits and Midtown has them but, already gave them to Plaintiffs with the letter of 6/19/02, but on 9/3/02 they responded, lied and claimed for first time, that they misplaced the Exhibits and did not have the Exhibits on 6/19/02 and on 9/3/02. But on 7/11/06 in their Summary Judgment Motion to Justice Ramos, and

thereafter, up to and including 4/1/10 they claimed to the Court that the Exhibits never existed);

c.  That Plaintiffs requested the exhibits from Midtown much before September 2, 2002, much before the "eve" of the expiration of the due diligence period (But to the appellate division they argued the opposite);

d.  That Midtown had committed fraud on the Court, in their "Motion to Dismiss" and Imperatore committed fraud on the Court in his Affirmation where they represented to the Court that documentary evidence, proves that Jericho only requested the exhibits from Midtown for the first time, only on the 74th day of the due diligent period on September 2, 2002(But to the appellate division they argued the opposite);

e.  That Midtown had willfully and deliberately breached the Contract, specifically par. 29c) of the Contract, by not providing to Plaintiffs the critical exhibits requested by Plaintiffs from Midtown and from Amtrak already in July 2002.(But to the appellate division they argued the opposite);

f.  That without the exhibits Plaintiffs and Defendants knew that Plaintiffs will only be able to use the Property only for a Parking Lot (at a value of $5,000,000 not the Contract

price of $28,000,000) (But to the appellate division, they argued such change in valuation is immaterial);

g.  That Plaintiffs did not *elect* to cancel the Contract but were *forced* by Midtown to cancel the Contract on account of Midtown's willful and deliberate breach (But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because they had no other reason to have cancelled);and

h.  That there had not been a *valid* cancellation (But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because there was no other reason to cancel);

i.  That Midtown had committed fraud on the Court in their "Motion to Dismiss" where they represented to the Court that Jericho *elected* to cancel the Contract and that it was a *valid* cancellation;(But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because there was no reason to cancel);

j.  That anybody reading the "Amtrak Agreement" would know that the exhibits were missing  and even so Midtown did not attach the exhibits to the Contract and not provided the exhibits to Jericho during the 75 days due diligent

period. (But they subsequently claimed that the exhibits never even existed.)

427.    Accordingly, Defendants' Attorneys Sherman and Geremia again admitted to Justice Ramos that Defendants had committed "Actionable fraud" on Jericho when Defendants signed the Contract and thereafter because they knew the exhibits were not attached.

428.    In fact, Justice Ramos explained to Defendants' Attorneys Sherman and Geremia why it was an "actionable fraud" and why it was not a simple breach and Defendants' Attorneys subsequently even they agreed that it was an "actionable fraud".

429.    To the Appellate Division, however, they argued that they didn't commit an actionable fraud, because at worst, it was simply a "promise" which was not actionable at all.

430.    Accordingly, Defendants' Attorneys Sherman and Geremia also admitted to Justice Ramos that Defendants had committed fraud on the Court in their "Motion to Dismiss" where they represented to the Court that a promise to provide documents is only a breach and not "actionable fraud", even though they knew that this was not a promise to provide documents but a representation in the Contract that attached to the Contract is a true and complete Amtrak Agreement when they knew that it was false because they did not attach the critical exhibits.

431.    But to the Appellate Division they argued that they did not have the exhibits during that period and that it was only a promise, in any event, when in fact it was a representation.

432.   In addition, Justice Ramos made a fact finding that it was not believable that Defendants did not have the exhibits when they signed the Contract, when Plaintiffs requested the exhibits from Defendants and Amtrak in July 2002, when Plaintiffs again requested the exhibits from Defendants on or about August 17, 2002, when Szegda requested the exhibits from Midtown on September, 2, and again on September 3, 2002.

**INSTEAD OF ARGUING THE CASE ON APPEAL, BASED UPON WHAT HAD TRANSPIRED IN THE COURT BELOW, ON MAY 12, 2005, AND UPON WHAT JUSTICE RAMOS BASED HIS MAY 16, 2002 ORDER DENYING THE MOTION TO DISMISS, THE MIDTOWN DEFENDANTS LIED TO THE APPELLATE DIVISION WITH FALSE CLAIMS THAT JUSTICE RAMOS HAD"HYPOTHESIZED", "FIXATED" AND INVENTED "NEW LAW" AND INSTEAD THEY REPRESENTED TO THE APPELLATE DIVISON JUST THE OPPOSITE OF WHAT THEY HAD ADMITTED TO JUSTICE RAMOS ON MAY 12, 2005**

433.   On August 17, 2006, the Appellate Division reversed Justice Ramos' denial of the Defendants motion to dismiss, because the Defendants' Sherman and Geremia represented to the Appellate Division just the opposite of what they themselves admitted to Justice Ramos on May 12, 2005, and acting in collusion with Goebel, these Defendants lied and represented just the opposite of what they had admitted to the trial Court.

434.   Accordingly Justice Ramos denied Defendants Motion to Dismiss based on Defendants' Attorneys Sherman and Geremia and Goebel's responses and admissions and not, as Defendants asserted in their Appeal Brief, that they are appealing Justice Ramos Order because Justice Ramos "hypothesized"; because Justice Ramos "fixated" because Justice Ramos made up "new law"; because Justice Ramos erroneously made a mistake in the "law"; or because "there is no law to support the lower court's rationale".

435.   Acknowledging all of the foregoing, and that the statements of fact in their motion to dismiss were false, the Defendants did not correct the record, but rather they filed their Notice of Appeal and Appeal Briefs again misrepresenting the facts, and contradicting their own admissions to Justice Ramos.

436.   Justice Ramos ruled the way he did, based upon the admissions they made to him, and then they went to the Appellate Division, ignored their admissions and argued the opposite.

437.   In their Appeal Brief dated November 7, 2005 and their Reply Brief of December 15, 2005, the Midtown Defendants and the Defendants Sherman and Geremia, made false representations and omissions to the Court, including but not limited to:

> a.   **"The most fundamental ground, however, is that *Jericho cancelled the contract* years before it brought this action."**

By this statement, they mislead the Court because they knew that Jericho never cancelled the contract.

> b.   **New York law is absolutely clear that a party may not seek specific performance of a contract for real property that it "*elected*" to cancel.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

> c.   **In ruling from the bench on Midtown's motion, the lower court stated that this was an "interesting point," but then wondered whether there is an exception to it. The court *hypothesized* that, if Jericho could prove that Midtown committed "fraud" in performing its contractual obligations, Jericho should be allowed to rescind its *notice of cancellation* as a remedy for *fraud* and then proceed, on the strength of the same allegations, to seek specific performance as a remedy for *breach of contract*. There is no law to support this notion. …The exception that the lower court *hypothesized* simply does not exist in the law.**

By this statement, they mislead the Court because Justice Ramos based his decision on their admissions of the relevant facts.

    **d. The lower court noted in response, "That is an interesting point." (R.18) But the court then *fixated* on the notion that it could not, on a motion to dismiss, decide whether Midtown had fully responded to Jericho's various requests for due diligence materials, as alleged by the complaint. (R.15-17) The court reasoned that, if Midtown had committed "fraud" in fulfilling its contractual obligations, Jericho should be entitled to rescind its cancellation as a remedy for that "fraud" and then seek specific performance for breach of contract.**

By this statement, they mislead the Court because Justice Ramos based his decision on their admissions of the relevant facts.

    **e. But the court then proceeded to wonder whether there should be an exception to it in this case if Midtown could be said to have committed a fraud in performing under the contract:[L]et's assume for purposes of this motion that there was a fraud committed …. [W]ouldn't the plaintiff be entitled, if they were successful in proving the fraud, wouldn't they be entitled to rescind their rejection of the contract and compel specific performance?**

By this statement, they mislead the Court because Justice Ramos based his decision on their admissions of the relevant facts.

    **f. Without invoking any legal authority to support this speculation, the court later ruled that Jericho's specific performance claims should not be dismissed because "the complaint sets forth that potential" that Midtown committed fraud in performing its disclosure obligations under the contract. there is no law to support the lower court's *rationale*."**

By this statement, they mislead the Court because Justice Ramos based his decision on their admissions of the relevant facts.

    **g. On September 3, 2002, the day the study period ended, *Jericho exercised* its right to cancel the contract and requested return of its downpayment. *Jericho wrote* to**

> **Midtown to "request that the monies paid upon execution of the Contract be returned *to it* in accordance with the Contract's terms.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract. They also know they sent the deposit to Szegda, not to Plaintiffs, contrary **to the Contract's terms.**

> **h.  On September 12, *Jericho made clear* that our letter on behalf of Jericho dated September 3, 2002, was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of monies paid upon execution thereof.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

> **i.  On September 3, 2002—the day the study period expired and only six days after Jericho attempted to "accept" a proposal to extend it—*Jericho wrote to Midtown* to exercise its right to cancel the contract and request the return, of its downpayment.**

By this statement, they mislead the Court because they knew that Jericho never wrote, Jericho never elected and never cancelled the contract.

> **j.  By *letters to Jericho* dated September 5 and September 10, Midtown's counsel (which also served as the escrow agent under the contract) [Imperatore] wrote that Jericho was not entitled to return of its downpayment unless Jericho provided clear *NOTICE* that it was canceling the contract.**

By this statement, they mislead the Court because they knew that Jericho is the Plaintiffs and not Szegda.

> **k.  On September 12, 2002, *Jericho finally responded* with a crystal-clear statement that it had intended to cancel the contract…"**

By this statement, they mislead the Court because they knew that Jericho never intended to cancel and never cancelled the contract.

l.   **First,** *only one day* **before the study period expired,** *Jericho asked* **Midtown for the exhibits to a development agreement between Amtrak.**

By this statement, they mislead the Court, because they knew that the Plaintiffs had asked for the Exhibits already in July.

m.   **…But** *Jericho did not* **request those exhibits from Midtown** *until nearly two and a half months later***, on the** *eve* **of the expiration of the study period.   The day after** *Jericho asked* **Midtown for these exhibits, Midtown informed Jericho that** *Midtown did not have* **the exhibits and also did not have them when the parties executed the contract."**

By this statement, they mislead the Court, because they knew that the Plaintiffs had asked for the Exhibits already in July, and that the first time they said that they didn't have the Exhibits wasn't until September 3, 2002. In addition, they lied to the Court, because they had the Exhibits all the time, but simply refused to turn them over.

n.   **Second, on August 30—***only a few* **days before the study period was to expire—Jericho informed Midtown of "scuttlebutt" it had heard that there may have been an oil spill on the property that "may or may not have been cleaned up" and asked Midtown to make** *representations* **to Jericho about whether there had been such a spill on the property and, if so, whether it had been cleaned.**

By this statement, they mislead the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.

o.   **By September 3, Midtown had informed Jericho that it did not have any documents confirming whether an oil spill "from neighboring properties" had been cleaned …**

By this statement, they mislead the Court, because they knew that the email he refers to was a response to the Emmet Email which had been concealed by them, and which shows that he was instead admitted that there was an oil spill on the 90,000 square feet Midtown Property and that it was still contaminated and not cleaned up and that they had many documents in their custody possession and control. By this statement, they further mislead the Court, because they knew that the as of August 21, 2002, and before, Midtown was required to provide those critical documents.

p. **These cases are readily distinguishable, …. because Rather, Midtown is relying on, the fact that Jericho *expressly cancelled* the contract by sending Midtown a Notice of cancellation. …**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contractand they never received any notice.

q. ***Jericho's*Notice of cancellation is what precludes its claims for specific performance, not the mere return of the downpayment…**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract and they never received any notice.

r. ***Midtown did not* "default" in its performance under the contract. The only reason it was "unable to convey title in accordance with the terms of this contract … was that *Jericho* had *elected* to cancel the contract before the scheduled closing. Indeed, *Midtown twice informed Jericho that Midtown was ready, willing*, and able to close by September 18 in accordance with the terms of the contract.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.  In addition, Midtown was never ready, willing and able to close because they never provided the requested critical documents that they had to provide before closing.

s. **By canceling the contract on September 3, 2002, *Jericho plainly induced* Midtown to believe that the contract was cancelled. ……. …. Midtown, meanwhile, in *good faith reliance on Jericho's* September 12 letter *canceling the contract*, returned Jericho's down payment.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

t. **Thus, unlike the cases on which Jericho relies, *Midtown did not create any barrier to closing*.  Midtown create many barriers to closing, because they refused to**

100

**provide the critical documents requested much before September 3, 2002.**

**u. Finally, the entire complaint should be dismissed because Jericho is estopped from enforcing a contract that *it cancelled*.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

**v. As Midtown pointed out in its opening brief, by canceling the contract, *Jericho plainly induced* Midtown to believe that the contract was cancelled and that the parties would no longer be bound by its terms.**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

438.    The Appellate Division justifiably relied upon the foregoing false statements of fact and misrepresentations contained in the attorney's brief, because of the respective attorneys' duty of candor and obligation to be truthful in statements made by them to the Court.

439.    In July 2006, the Defendants filed a Summary Judgment Motion before Justice Ramos, containing the Affirmations of Imperatore and of Geremia.

440.    Almost every claim and every paragraph in the Affirmations submitted in support of the July 2006 Summary Judgment Motion are false and perjurious.

441.    Almost every claim and every paragraph in the Affirmations submitted in support of the July 2006 Summary Judgment Motion and contradicted the arguments they made in the Motion to Dismiss and the Appellate Briefs.

442.    Moreover, the Defendants had an obligation to inform the Appellate Division of their contradictory arguments and statements of fact, but never did.

443.    Based upon the false statements presented to it, the Appellate Division

mistakenly ruled, on August 17, 2005:

> Order, Supreme Court, New York County (Charles Edward Ramos, J.), entered May 18, 2005, which denied defendant's CPLR 3211 (a) (7) motion to dismiss the amended complaint, unanimously reversed, *on the law*, with costs, the motion granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly. [but Justice Ramos denied their MTD not on the *law* but based on the facts based on the admissions of Sherman and Geremia and of Goebel, and based on the unopposed Affirmation of Pfeiffer and the letters attached]
> On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase.
>
> However, Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, *so that Jericho could find out the status of any spill and/or cleanup*.
> *On the day before the study period expired*, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits.
>
> *It also reminded Jericho* that it had 75 days during the study period *to request the exhibits from Amtrak*, or to meet with employees of Amtrak to discuss any issues regarding its easement.
>
> On September 3, 2002, *counsel* for Jericho sent Midtown a letter stating: "Be advised that, unless you advise us in writing th[at] Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the Study Period for a sufficient time to allow Jericho to investigate this matter, and, *in any case provide Jericho with the requested due diligence documentation*, Jericho requests that the monies paid upon execution of the contract be *returned to it*  in accordance with the Contract's terms."  Midtown responded by requesting an express statement *from Jericho* as to whether it intended to cancel the contract. It indicated that in the absence of such express statement it would presume that Jericho intended to proceed to closing on September 18, 2002 pursuant to the terms of the contract.

On September 12, 2002, *Jericho sent Midtown a letter* stating: "*Although Jericho's principals felt, and still feel*, that, under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period *and the request for production of documents was warranted*, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of J0ericho's down payment was intended as the exercise of Jericho's right under paragraph 29 (a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof." *Midtown returned the $250,000 down payment the next day*.


On September 3, 2002, the last day of the study period, *Jericho requested* return of its down payment unless it received certain "due diligence" *information* from Midtown. Midtown advised Jericho that it would not return the down payment unless, pursuant to the terms of the contract, Jericho *acknowledged in writing* that the contract was cancelled. On September 13, *Jericho sent* a letter stating that it was exercising its option to cancel the contract, and *it demanded* the return of its down payment.

The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement*, do *not support Jericho's allegation that Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*. …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]

An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]

 "Had Midtown willfully or deliberately breached its obligations under paragraph … of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment (*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]).  ..

However, none of these allegations *constitute actionable fraud*

Further, the *record is plain* that *Midtown provided Jericho* with *information* in its possession and that *it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill*.
It should also *be noted* that *Jericho made requests for documents on the eve of the expiration period which could have been made much earlier*.

444.     The flawed Appellate Division order of dismissal is based upon the

intentional and knowing misrepresentations of the Defendants, facilitated by their

collusion, which allowed the foregoing misrepresentations to go into the record without

opposition.

**NOW WE KNOW WHY, ON AUGUST 17, 2006, THE APPELLATE DIVISON REVERSED JUSTICE RAMOS' ORDERS OF MAY 12, 2005 AND MAY 16, 2005**

445.     Plaintiffs' motion to reargue the appeal was met by opposition which

again repeated and reasserted the Defendants' fraud.

446.     By Affirmation dated September 25, 2006, Geremia once again reiterated

the false statements of fact and knowing misrepresentations of fact which led to the

adverse ruling in the first instance.

447.     Geremia Affirmed, that:

> **a.  Midtown moved to dismiss the complaint on, among other grounds, that Jericho may not seek to enforce a contract that it cancelled….**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

> **b.  the Court (the Appellate Division} noted that Jericho did not even ask Midtown for these exhibits until "the day before the study period expired" a fact that shows Jericho manufactured this issue as a pretext for bringing its meritless lawsuit. Final Order at 39.**

They had admitted to Justice Ramos, on May 12, that the Plaintiffs had requested the exhibits already in July (See also Shafran Investigation)

> **c.  As the Court's Final Order later noted—in support of its alternative holding that there was no "actionable fraud" in this case—"Jericho made requests for documents *on the* eve of the expiration [of the study] period which could have been made much earlier." *Id* at 45-46**

They had admitted to Justice Ramos, on May 12, that the Defendants had committed actionable fraud. They had admitted to Justice Ramos, on May 12, that the Plaintiffs had requested the exhibits already in July and the Emmet Email proves that Plaintiffs requested docuemtns relating to the oil spill on Midtown's Property on or before August 21, 2002. (See also Shafran Investigation)

      **d.  As the Court noted in its Final Order, Jericho waited until thelast day of the study period to ask Midtown for the exhibits to the Amtrak agreement, and Midtown promptly responded (the next day) that it did not have them:**

Because they lied to the Court. In addition, they had the exhibits and modification documents in their possession, custody and control.

      **e.  On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it didn't have the requested exhibits.**

They had admitted to Justice Ramos, on May 12, that the Plaintiffs had requested the exhibits already in July. In addition, they had the exhibits and modification documents in their possession, custody and control.

      **f.  Final 'Order at 39. The Midtown letter to which the Court referred stated, in pertinent part, "Midtown does not now (and did not at the commencement of the Contractual 'Study Period') have the Exhibits referred [to] in your letter, so it could not provide those Exhibits to Jericho…**

Because they lied to the Court. In addition, they had the exhibits and modification documents in their possession, custody and control. (See also Shafran Investigation)

      **g.  Only *four days* before the study period expired, Jericho asked Midtown to "advise, immediately, if there is any truth to [the] *information*," which Jericho characterized as "scuttlebutt," that "there may-have been an oil spill on the properties which may or may not have been cleaned up" and also to "advise" whether Midtown had ever "received any notice, written or oral about the spill front the City of New York or any agency thereof or-from any third party" about the spill and its disposition…**

By this statement, they mislead the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.

> **h. At the threshold, Jericho signed a contract in which it expressly agreed that Midtown "has made *no representations and is unwilling to make any representations*" about the property or its condition. …**

They mislead the Court because they concealed the fact that they made representations when they sent the countersigned Contract back, with cover letters that were representations.

> **i. Accordingly, Midtown was not contractually obligated to make the *requested representations* about the oil spill or "advise" Jericho in any manner, let alone "immediately." For this reason alone, the Court did not err in holding that "[t]he assertions in this complaint [including Jericho's allegations about the oil spill] ... do not support Jericho's allegation that Midtown breached the contract." Final Order at 42.**

By this statement, they mislead the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email, because of paragraph 29c) of the Contract and was a willful and deliberate breach.

> **j. Nevertheless, as the Court's Final Order noted, Midtown informed Jericho during the study period {on August 23, 2002} that there had been an oil spill *on* properties neighboring Midtown's sites.**

This was because of their fraud on the Court by misleading that the oil spill was on a neighboring property, and not on Midtowns property, and by withholding the Emmet Email, that proves that the August 23, 2002 email was a reply, and an admission of an oil spill on Midtown's Property.

> **k. . . . and gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup. Final Order at 39….**

106

By this statement, Imperatore mislead the Court, because he knew that it takes four to six weeks to get the documents from the NYDEC, in addition, since he admitted that the 90,000 square feet was contaminated, he knew that Plaintiffs would have to perform a phase-1 and phase-2 study and report which would take six to ten weeks, or more.  (See also Shafran Investigation)

> **l.   This is a "misreading of Midtown's obligations," as the Court correctly ruled. Final Order at 43.   The Contract provides that Midtown  was obligated to disclose only those "documents" in its current possession or control that Jericho "reasonably requests," not everything that Jericho might *silently imagine* to be "due diligence" material…**

By this statement, they mislead the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email, because of paragraph 29c) of the Contract and was a willful and deliberate breach. And those "documents" were in their current possession or control and was a "reasonably requests," by Jericho.

> **m.   Third, even if Jericho's request concerning the oil spill night be considered a "reasonabl[e] request[]" for "documents" (and it was not), Jericho was asking Midtown to "advise" about "any notice" to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.123) *There is no such document*,because,  as discovery showed, Midtown has never received any notice from the City, State, any City or State agency, or any"third party" about the oil spill….**

By this statement, they mislead the Court, because they knew that the Plaintiffs made requests for actual documents, not for "advice" and not for "any notice", and concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email, because of paragraph 29c) of the Contract and was a willful and deliberate breach.

> **n.   The Court similarly and accurately ruled that "Jericho made requests for documents on the eve of the expiration period which could have been made much earlier.". Final Order at 45-46. As noted, Jericho did not ask Midtown for the exhibits to the Amtrak agreement until the day before the study period expired, and it first raised the issue of the oil**

> **spill only four days before the study period expired. (R.119, 8.123)**

By this statement, they mislead the Court, because they knew that they had admitted to Justice Ramos that Plaintiffs requested the exhibits already in July, and document relating to the oil spill on Midtown's Property, on or before August 21, 2002.

> o. **The documents in the record on appeal thus refute Jericho's conclusory allegations that information about the oil spill and the exhibits to the Amtrak agreement were "*absolutely crucial*" or "*materially relevant*" to Jericho (R.37, Comp1.1 5), and therefore support the court's order dismissing the complaint… ("dismissal of the complaint was warranted" where "Plaintiffs allegations in this action for . . . specific performance of contracts for the sale of real property" *were* "refuted by the Documentary Evidence")**

> p. By this statement, they mislead the Court, because they knew that they had admitted to Justice Ramos that Plaintiffs requested the exhibits already in July, and document relating to the oil spill on Midtown's Property, on or before August 21, 2002 and that they were critical documents and they had promised to provide them (See also Shafram Investigation)

> q. **As Midtown argued in its briefs on appeal—and the Court agreed—this limitation-of-liability provision is directly applicable here. Midtown could not "convey title in accordance with the terms of this contract" because Jericho cancelled the contract before the title was to be conveyed at the closing. *See also* Final Order at 46"**

By this statement, they mislead the Court because they knew that Jericho never elected and never cancelled the contract.

448.    The Geremia Affirmation underscores the fraud on the Court herein complained of, and memorializes that the fraud successfully resulted in the product of the scheme.

## DEFENDANTS WITHHELD DOCUMENTS DURING THE UNDERLYING TRANSACTION AND DURING THE PRIOR LITIGATION

449.    Documents discovered by Plaintiffs at the Defendants offices in 2005 confirmed what Plaintiffs knew and requested on and before August 21, 2002, that Midtown had committed fraud on Plaintiffs because there was an oil spill on Midtown's property and they had those and many additional documents in their possession and control before signing of Contract, and when they executed Contract and provided the due diligence documents relating to the property on June 19, 2002.

450.    The foregoing proves that Midtown willfully and deliberately breached the Contract by not providing those documents, and many more critical documents that they had in their possession, custody and control, when requested before signing of Contract, and they committed fraud on Plaintiffs when they represented before signing the Contract that there was no oil spill on Midtown's Property; when they sent the countersigned Contract and relevant property documents on June 19, 2002 and represented that there was no oil spill on Midtown's Property; when they represented since June 19, 2002 to August 21, 2002 that there was no oil spill on Midtown's Property; and when they lied to the Court when they claimed in the motion to Dismiss and Appellate Briefs that they did not have documents relating to the Oil Spill.

451.    Midtown willfully and deliberately breached the Contract by not providing those documents, and many more documents they had in their possession, custody and control, when requested, and committed fraud on the Court when they claimed in the motion to Dismiss and Appellate Briefs that they did not have documents relating to the Oil Spill.

452.    In his Order of February 2, 2007, Justice Ramos spelled out the frauds relating the oil spill as follows:

a)   "These documents completely and totally contradict Midtown's statement to Jericho in its September 3, 2002 letter signed by Edward G. Imperatore Esq., that `Midtown has no information with respect to whether or not an oil spill from adjacent properties onto the site was cleaned up'" (p. 7 of February 20, 2007 decision, annexed as part of Exhibit B to moving aff.).

b)   The lower Court further noted in its Decision that in 2002, in response to Jericho's question whether an environmental study had been performed, Midtown stated that "no Phase I environmental study" had been performed and that "Midtown has performed no environmental studies". During discovery which took place during the pendency of the prior appeal, however, Midtown produced documents to Jericho which showed that had performed such a study and that Midtown knew about it.  In fact, Midtown produced photographs of the oil spill it had taken in 1998.  Said the lower Court, "Clearly, Midtown had some information about the spill when in 2002 it stated to Jericho it had none"

**RAMOS DISCOVERED ON FEBRUARY 2, 2007, THAT THE OIL SPILL WAS ON MIDTOWN'S PROPERTY, THAT THE REMEDIATION WAS ON MIDTOWN'S PROPERTY, AND THAT THE DOCUMENTS DISCOVERED WERE RELATED TO OIL SPILL ON MIDTOWN'S PROPERTY – THAT IS WHY HE VACATED THE JUDGMENT OF DISMISSAL AND SAID THAT HE DID NOT WANT TO BE A PARTY TO THE DEFENDANTS' FRAUD ON THE COURT**

**ON FEBRUARY 2, 2007, JUSTICE RAMOS FOUND, RELATING TO THE OIL SPILL, THAT MIDTOWN COMMITTED DIRECT FRAUD ON THE COURT IN THEIR JANUARY 2005 MOTION TO DISMISS, AND THE AFFIRMATION IN SUPPORT OF THE MOTION TO DISMISS, AND THAT MIDTOWN HAD ALSO WILLFULLY AND DELIBERATELY BREACHED THE CONTRACT, AND ALSO COMMITTED FRAUD ON PLAINTIFFS**

453.   The Defendants fraud on the Court did not end, even after Justice Ramos clearly identified it.

454.    Following the Ramos finding that there was fraud on the Court, Fraud on Plaintiffs and that the Contract had been willfully and deliberately breached by the Midtown Defendants, there was a hearing before Justice Ramos April 11, 2007, at which time the following transpired:

> **MR. BERGER: That was the deal at the beginning, There is no question they knew that our client's position was that the spill was on somebody else's property and the state was taking care of it with that other person. That was never an issue in the case...**

By this statement, Berger mislead the Court, because he knew that the oil spill was on Midtown's Property, he knew that they didn't tell Plaintiffs, before the Contract, that the spill was on somebody else's property and that the state was taking care of it with that other person, and in fact that the main issue of the case was that Plaintiffs discovered on or before August 21, 2002 that there was a massive oil spill on Midtown's property, that Plaintiffs requested the critical documents on or before August 21, 2002, as reflected in the Emmet Email, and they didn't provide those critical documents.

> **MR. BERGER: There was no question that everybody knew from the outset that the remediation was on the adjoining property. There is no question about that....**

By this statement, Berger mislead the Court, because he knew that the remediation was on Midtown's Property, he knew that Plaintiffs didn't know about any remediation until August 21, 2002, and in fact, Imperatore in his response Email of August 23, 2002, admitted that the remediation was on Midtown's property but it was not fully remediated and they still refused to provide those critical documents.

> **MR. BERGER: The only reason the plaintiffs didn't buy the property, with all due respect, is because they didn't have a penny....**

By this statement, Berger mislead the Court. Berger knew that the reason Plaintiffs didn't buy the property was because Midtown refused to provide the critical requested documents and falsely claimed that the plaintiffs cancelled the Contract.

455.   In so doing, Defendant Berger, accompanied by Sherman and Geremia, now represented i) that Midtown had told the Plaintiffs, before entering the Contract, that oil spill was only on a neighboring property; ii) that the State is taking care of it with the other person; iii) that there was no remediation on Midtown's Property; and iv) that the documents discovered by Plaintiffs had nothing to do with Midtown's Property.

456.   In so doing, Defendant Berger, accompanied by Sherman and Geremia, misrepresented that Plaintiffs had been told and knew everything concerning the oil spill and accordingly, that Plaintiffs had no further information discovered during the due diligence period and Plaintiffs had no reason to cancel on account of the oil spill, and that any cancellation was only because Plaintiffs elected to cancel the Contract because they didn't have the money necessary to close.

457.      In so doing, Defendant Berger, accompanied by Sherman and Geremia, misrepresented that Ramos' findings of 2/2/07, that there was fraud on the Court, Fraud on Plaintiffs and that the Contract had been willfully and deliberately breached by the Midtown Defendants, was a mistake.

458.   Not only were the foregoing false and misleading statements to the Court, but given the existence and their possession of the Emmett Email, what Berger, accompanied by Sherman and Geremia were then representing to the Court, was false and known by them to be false when they made such statements.

459.    A transcript of the foregoing exchange was also submitted to the Appellate Division as part of the record on appeal and also as an exhibit to the Midtown Defendants' opposition to Plaintiffs' motion to extend and strike on 4/12/07.

**ON APRIL 11, 2007, THE DEFENDANTS COMITTED FRAUD ON JUSTICE RAMOS, WHEN THEY REPRESENTED TO JUSTICE RAMOS PRECISELY THE  OPPOSITE, THAT THE OIL SPILL WAS NOT ON MIDTOWN'S PROPERTY, THAT THE REMEDIATION WAS NOT ON MIDTOWN'S PROPERTY AND THAT THE DOCUMENTS DISCOVERED WERE NOT RELATED TO ANY OIL SPILL ON MIDTOWN'S PROPERTY, BECAUSE THERE WAS NO OIL SPILL ON MIDTOWN'S PROPERTY AND JERICHO WAS TOLD ALL THE ABOVE BEFORE SIGNING OF THE CONTRACT.**

460.    The Midtown Appeal Brief filed by Berger, dated March 23, 2007, (also 7/15/08 to the Court of Appeals and others) also contained those false representations relating to the oil spill, and other misrepresentations and omissions to the Court, including but not limited to:

      a.  **Re: oil spill.  As to documents concerning the oil spill, both Jericho and the lower court fixate on how Midtown purportedly committed a "fraud" by failing to disclose that there had been an oil spill on adjacent land, and all documents concerning it.**

Midtown committed "fraud" by failing to disclose that there had been an oil spill on Midtown's Property, and refused to provide the Critical documents requested on and before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

      b.  **The contract did not, however, impose an open-ended obligation on Midtown to disclose all environmental conditions or all documents that might conceivably pertain to the property…**

Midtown made a representation when they sent the executed contract, that there was no oil spill on their property.  Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since requested on or before August 21, 2002.  This was also part of

Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**c.   The Contract provided that Midtown was to disclose only those "documents" in its current possession or control that Jericho "reasonably requests."…**

Plaintiffs had reasonably requested these documents and they were within Midtown's "current possession or control"  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**d.   The lower court stated that Midtown "failed" to comply with its obligation to "disclose documents in its custody or control that Jericho requests," but curiously never mentioned Jericho's actual request.**

The Court referred to the Plaintiffs August 13, 2002 letter. This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**e.   Only four days before the Study Period expired, Jericho asked Midtown to "advise, immediately, if there is any truth to [the] information," which Jericho characterized as "scuttlebutt," that "there may have been an oil spill on the properties which may or may not have been cleaned up and also to "advise" whether Midtown had ever `received any notice, written or oral, from the City of New York or any agency thereof, or from any third party" about the spill and its disposition.**

By this statement, Berger mislead the Court, because he knew that the Plaintiffs made requests for "documents" concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**f.   Midtown's response to this request cannot, as a matter of law, cannot be deemed a breach of the contract. First Jericho expressly agreed in the contract that Midtown "has *made no representations (and] is unwilling to make any***

114

> ***representations"* about the property or its condition. (R.106 ¶38 (emphasis added);…**

Plaintiffs requested documents and not representations. (see Emmet Email)  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

> **g.  Accordingly, Midtown was not contractually obligated to "advise" Jericho in any manner, let alone "immediately."**

Midtown made representations when they sent the executed contract, that there was no oil spill on their property.  Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since requested on or before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

> **h.  No matter what new facts Jericho claims it uncovered regarding the oil spill, Jericho cannot avoid that, under the plain language of the contract, Midtown was not required to make the requested representations about the oil spill…**

Midtown made representations when they sent the executed contract, that there was no oil spill on their property.  Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since requested on or before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

> **i.  Second, even if Jericho's request concerning the oil spill might be considered a "reasonabl[e] request[]" for "documents" (and it was not), Jericho was asking Midtown about *"any notice"* to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.101-02 ¶29(c); R.547). *There is no such document,* because, as discovery showed, Midtown has never received any notice from the City, State, any City or State agency, or any "third party" about the oil spill,…**

Plaintiffs requested documents and not "representations", "advice" or "any notice". (see Emmet Email)

**j.  Indeed, in its entire bulky submission on its motion to vacate, Jericho could not point to a *single document* about the oil spill that, according to it, Midtown should have disclosed in response to Jericho's request that Midtown "advise" Jericho about a "notice" to Midtown.**

Berger himself finally admitted to the Court of Appeals, in his filing of April 1, 2010, that the oil spill was on Midtowns Property and that the documents show that it was on Midtowns Property. This statement mislead the Court because Plaintiffs requested documents (not for advice or notices) on and before August 21, 2002, which requests are well documented in the submission. This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**k.  Nor was Jericho's principal able to identify such a document at his deposition, even after he used the very information that Midtown provided to him to obtain documents concerning the spill from the DEC.**

Plaintiffs were able to identify such documents.

**l.  Fourth, even assuming that Midtown was required to make representations and Jericho was entitled to rely on them, Midtown's conduct cannot be characterized as "willful or deliberate,"…**

Midtown's conduct was willful and deliberate.

**m.  Midtown also promptly responded to each of Jericho's inquiries during the Study Period, even after it became apparent that Jericho did not have a genuine interest in information regarding the property but was only seeking to protract the Study Period after the parties could not come to terms on an extension…**

Midtown did not provide the critical exhibits and documents relating to the Amtrak Agreement, requested since July, and didn't provide the critical documents relating to the oil spill, requested on and before August 21, 2003.  At no time did Plaintiffs not have a genuine interest in information regarding the property.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **n. Thus, as this Court noted in its opinion, "the record is plain that Midtown provided Jericho with information in its possession, and that-it alerted Jericho as to additional sources of information as to the .... alleged oil spill.**

The referenced language from the Court opinion was a product of Defendants' prior fraud on the Court.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **o. Although Jericho now contends that Midtown did not disclose every scrap of information Jericho had requested in its flurry of eleventh-hour letters, Midtown's conduct in promptly responding to Jericho's inquiry about the oil spill, disclosing that there had been a spill on adjacent properties, and giving Jericho detailed instructions on how to obtain current information about it directly from the DEC, cannot be deemed "willful or deliberate" in the circumstances of this case…**

Plaintiffs' requests were not on the "Eleventh Hour" and were not concerning the adjacent property.  Berger also knew that it takes four to six weeks to get the documents from the NYDEC.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **p. Finally, Jericho's conduct in waiting until four days before the Study Period expired to inquire about, the oil spill refutes its conclusory complaint allegation that information about the oil spill was "materially relevant" to Jericho…**

Plaintiffs made requests for "documents" concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.

    **q. The lower court took it on faith that Jericho had no notice of what it now calls a "massive" oil spill until four days before the Study Period expired. "Jericho could not have inquired earlier as it had no notice of the oil spill prior to four days before [the end, of the Study Period]." The record contradicts that assumption... But even if Jericho's principal were being truthful, the lower court might have trained its lens on Jericho for just a moment before vacating a judgment and asked why Jericho waited for *more than 70 days after* signing the contract**

to *make any* inquiry concerning the environmental condition of a property it had agreed to purchase for $28 million." ...

Because Plaintiffs requested, before entering into the Contract, if there were any environment problems or oil spill and they represented before entering into the Contract and upon execution of the Contract, that there was no oil spill or environmental problems on their property, and that they will provide a phase-1 showing it is clean and only discovered on or before August 21 that they lied and there was a massive oil spill on the property.

### r. Re: Amtrak exhibits and documents "The Copy Of The Amtrak Agreement Attached To The Contract Was A "True Copy"

The Amtrak Agreement was not a complete and therefore not a "true copy".

### s. As noted, Midtown did not breach the contract or commit a fraud by "failing to disclose" that the Amtrak exhibits do not exist. There is no evidence that they do, and so the contract accurately states that the copy of the Amtrak agreement attached to it, which did not include the exhibits, was a "true copy."

The Amtrak Agreement states, and the signatories, including National Railroad, and Defendants, Arthur Imperator, Edward Ross, and other partners of Midtown, affirmed, that the Amtrak Exhibits exist and were part of the agreement. In addition, Amtrak, Imperatore and Ross, have stated in their responses since July 2002 that the exhibits existed and their attorney Sherman represented to Justice Ramos on 5/12/05 that the Exhibits existed, and based upon this admission, Judge Ramos made a finding that the exhibits existed and were in their possession.

### t. Also, when Jericho asked Midtown for the exhibits on the day before the Study Period expired, Midtown truthfully stated it did not have them.

Sherman admitted to Justice Ramos on May 12, 2005, that Plaintiffs requested the exhibits already, in July 2002.

461. The Appellate Division relied on the misrepresentations of Defendants, including but not limited to Berger's false representations that the oil spill was not on

Midtown's Property, that the remediation was not on Midtown's property and the documents discovered had nothing to do with Midtown's property.

462.    The Appellate Division reversed Justice Ramos' vacatur of the judgment of dismissal, and would have acted differently in their ruling of January 16, 2008, had they known of the falsity of the Defendants statements and of their non-disclosures.

463.    As a direct result of the foregoing misrepresentations and omissions of material fact, the Appellate Division reversed Justice Ramos' order and findings of February 2, 2007.

464.    As a direct result of the foregoing misrepresentations and omissions of material fact, the Appellate Division reversed Justice Ramos' findings of February 2, 2007 (that there was fraud on the Court, Fraud on Plaintiffs and that the Contract had been willfully and deliberately breached by the Midtown Defendants), and found instead just the opposite, that there was no fraud on the Court, no Fraud on Plaintiffs and that the Contract had not been willfully and deliberately breached by the Midtown Defendants.

**THE APPEALLATE DIVISIONS REVERSAL OF JUDGE RAMOS, ON JANUARY 16, 2008, OF JUSTICE RAMOS' ORDER AND FINDINGS OF FEBRUARY 2, 2007, WAS THE DIRECT RESULT OF THE FRAUDS DEFENDANTS COMMITTED ON THE COURT, AS HEREINABOVE COMPLAINED OF**

**NOW WE KNOW WHY, ON JANUARY 16, 2008, THE APPELLATE DIVISION REVERSED JUSTICE RAMOS'S ORDER OF FEBRUARY 2, 2007**

465.    From inception to 2010 the Defendants engaged in a pattern of activity whereby they defrauded the Court through oral representations in open Court, and the submission of written statements to the Court, including but not limited to the items identified in this paragraph:

a. Midtowns' First Motion to Dismiss and MOL (by Sherman and Geremia) and Affirmation of Imperatore in support of Motion to Dismiss dated 1/6/05, and all subsequent filings etc, including but not limited to, the Hearing before Ramos on 5/12/05;

b. Midtowns' Notice of Appeal & Pre-Argument Statement 7/5/05;

c. Midtowns' Production of Documents, 10/24/05;

d. Midtowns' Appeal Brief 11/7/05;

e. Imperatore's Deposition of 11/8/05;

f. Goebels' Respondent Brief 12/7/05;

g. Midtowns' Reply Brief, 12/15/05, (Production of documents and Deposition by parties in 2006);

h. Midtowns' Summary Judgment Motion and Affirmations of Midtowns' Attorneys and Imperatore in support of Summary Judgment Motion 7/7/06;

i. Emmet's Deposition 7/7/06;

j. Midtowns' Opposition to Motion to Reargue before Appellate Division 9/25/06;

k. Midtowns' Opposition to Motion to Vacate Judgment, 11/6/06, and the hearing of 11/8/06;

l. Midtowns' Appeal Brief  2/22/07;

m. Midtowns' Opposition to Motion to extend filing of
   Respondent Brief & to Strike, Hearing before Ramos
   4/11/07, 4/12/07, Midtowns' Reply Brief 9/14/07;

n. Midtowns' Opposition to Motion to Reargue before
   Appellate Division, 2/28/08;

o. Midtowns' multiple Motions before Ramos, 5/9/08 (in
   Second case), Midtowns 'Reply Affirmation, 6/19/08,

p. Midtowns' Respondent Brief, 9/9/09;

q. Midtowns' Memo in Opposition to Application to
   Appellate Division for permission to Appeal, 12/29/09; and

r. Midtowns' Response to Plaintiffs Motion to Court of
   Appeals to Appeal, 4/1/10 and thereafter.

s. Midtown's Memorandum of Law and Berger's Affirmation
   dated January 8, 2014.

466.   The fraud herein complained of is as contained in almost every page in
every paragraph of the above submission.  Plaintiffs hereinafter set forth the following
specified misrepresentations, to identify the nature of the Defendants fraud, the
magnitude of which would unduly belabor the Court at this time.

467.   The false representations and omissions of the Defendants, to the Court,
included, without limitation

a. That "Jericho" had cancelled the Contract;

b. That "Jericho" had cancelled the Contract on September 3,
   2002;

c. That "Jericho" had cancelled the Contract on September
   12, 2002;

d.  That "Jericho" had elected to cancel the Contract and that there was in fact a valid cancelation of the Contract;

e.  That Midtown did not willfully and deliberately breach the Contract;

f.  That Midtown did not breach the Contract;

g.  That "Jericho" had requested a return of the deposit on September 3, 2002;

h.  That "Jericho" had requested a return of the deposit on September 12, 2002;

i.  That "Jericho" received a return of the deposit on September 13, 2002;

j.  That the Plaintiffs did nothing about the Contract, contacting the Midtown Defendants or attempting to close the transaction during the two year period preceding the filing of the Complaint in September 2004;

k.  That Plaintiffs didn't ask for documents or information relating to any oil spill on Midtown's Property until August 30, 2002;

l.  That even on August 30, 2004, Plaintiffs had only asked for notice of violations relating to an oil spill, and not documents;

m.  That even on August 30, 2004, Plaintiffs had only asked for representations relating to an oil spill, and not documents;

n.  That Plaintiffs, or anyone, could get documents relating to an oil spill from the NYDEC in seven days, one day, or even in one hour on September 3, 2002 between 4pm and 5pm;

o.  That Midtown did not have documents relating to the oil spill;

p.  When they hid the existence of other documents in their possession, they misrepresented, by omission, and also hid from the Court the true state of facts underlying the Prior Litigation which would, if discovered, have refuted the claims made in their motion when they argued for dismissal based upon;

122

q.   That they had fully complied with all outstanding discovery obligations and had provided all documents responsive to Plaintiffs' demands and subpoenas, when they had not;

r.   That they intentionally and knowingly withheld documents and deposition testimony obtained during discovery which was contradictory to the statements of fact they were simultaneously representing to the Court;

s.   When they hid the existence of the Emmet Email, they misrepresented, by omission, and also hid from the Court that the Plaintiffs had been asking for documents concerning the oil spill on Midtown's Property from and prior to August 21, 2002;

t.   That there was no oil spill on Midtown's Property;

u.   That the oil spill documents were not material to the Contract;

v.   That Midtown had provided all due diligence material required under the Contract;

w.   That Midtown had provided all due diligence material requested under the paragraph 29c) of the Contract;

x.   That the Contract was "as is", and that there were no representations made to Plaintiffs in the Contract, or when the executed copy was returned;

y.   That Midtown had misplaced the Amtrak exhibits, and did not have it when the Contract was signed, and during the due diligence period through July 11, 2006

z.   From and after July 11, 2006, they claimed that the Amtrak exhibits never existed (but they admitted to Justice Ramos on May 12, 2005, that the Exhibits did exist, and if in fact they "never" existed, then they committed fraud on Plaintiffs at the contract signing, and thereafter, because the "Amtrak Agreement" attached to Contract was "null and void", and the Plaintiffs couldn't build without the "Amtrak Agreement", and also because Defendants represented in the Contract that it was subject to the "Amtrak Agreement" and would be assigned to Plaintiffs at Closing, including their rights under the "Amtrak Agreement" but if the exhibits didn't exist, then they had NONE since it was therefore null and void);

aa. That Plaintiffs didn't ask Midtown for the exhibits to the Amtrak Agreement until September 2, 2002;

bb. That Plaintiffs didn't ask Amtrak for the exhibits to the Amtrak Agreement;

cc. That Plaintiffs could contact Amtrak and get exhibits and documents relating to the Amtrak Agreement even in two hours on September 3, 2002 between 3:00 and 5pm;

dd. That the Amtrak Agreement Exhibits were not material to the Contract;

ee. That all dealings throughout the course of the underlying Contract transaction were with Szegda and not Plaintiffs;

ff. The Defendants repeated all of these misrepresentations and omissions in the Federal District Court, when they attempted to have the case removed; and

gg. The Defendants also misrepresented in the removal application that Midtown only had three partners and that there was complete diversity.

# CLAIMS FOR RELIEF
## FIRST CLAIM

### (Direct Fraud on Plaintiffs by Imperatore, Stone, Midtown and the MGD)

468. Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

469. Imperatore, Stone, Midtown and the Midtown Group Defendants knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to Plaintiffs.

470. Also during the course of his conduct, and while he had a duty of disclosure to Plaintiffs, he affirmatively concealed material facts from Plaintiffs.

471. All of Imperatore's conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful.

472. Plaintiffs relied on the misrepresentations of Imperatore, and would have acted differently had it known of the falsity of his statements and of his non-disclosures.

473. The false representations and omissions of Imperatore included, without limitation, that:

      a. When Plaintiffs first negotiated the transaction at issue, and thereafter, Imperatore stated that he had and would provide a clean phase one environmental report concerning the Midtown Property;

      b. Prior to execution of the Contract and during the due diligence period under the Contract, Imperatore stated that there was no oils spill or environmental problems on Midtowns Property;

      c. When Plaintiffs first negotiated the transaction at issue, and thereafter, Imperatore stated that he was the lawyer for Midtown, and not a principal;

      d. When the Contract was executed, Imperatore said he was the lawyer for Midtown, and not a principal, and that he, through Harwood and Lloyd, and not a title company, should hold the escrow deposit;

      e. They represented that Midtown had provided all relevant documents when the signed Contract was returned to Plaintiffs on June 19, 2002;

      f. They stated that full and complete copies of the Amtrak Agreement were annexed, when the fully executed Contract was returned; together with what they also claimed to have been all documents relating to zoning, air right, approvals, permits, etc. . . from NYC agencies.

      g. They stated before the Contract was executed, at the time the Contract was executed and thereafter, that there was no oil spill or other environmental conditions on the Midtown Property;

h.  They caused Midtown to willfully and materially breach the Contract when he refused to give the exhibits and documents related to the Amtrak Agreement requested by Plaintiffs, on and prior to July 2002;

i.  They promised to give the Amtrak Exhibits and other documents related to the Amtrak Agreement as and when requested by Plaintiffs in July, 2002 and thereafter;

j.  On September 3, 2002, and for the first time, they stated that Midtown did not have the Amtrak exhibits at that time and when they signed the contract;

k.  They stated, during the due diligence period under the Contract, that there was no oil spill or environmental problem on the property;

l.  They caused Midtown to willfully and materially breach the Contract when he refused to give the documents requested by Plaintiffs, on and prior to August 21, 2002 and thereafter, and relating to the oil spill on Midtown's Property;

m.  They stated on and subsequent to August 23, 2002 that he would turn over the documents requested by Plaintiffs, and relating to the oil spill on Midtown's Property;

n.  They during the due diligence period, including August 2, 20002, that they had provided all due diligence materials;

o.  They had each fully complied with the Plaintiffs' subpoena duces tecum, and they had each produced and turned over all documents responsive thereto; and

p.  They had each failed to produce and disclose the Emmet Email and other documents, which was in their custody and control and which was responsive to the Plaintiff's subpoena duces tecum.

474.  These misrepresentations and omissions were material and made with the intent to defraud Plaintiffs.

475.  Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

## SECOND CLAIM

### (Direct Fraud on Plaintiffs by Goebel/Solomon/Marrasse)

476.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

477.    Goebel knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to Plaintiffs.

478.    Also during the course of his conduct, and while he had a duty of disclosure to Plaintiffs, he affirmatively concealed material facts from Plaintiffs.

479.    All of Goebel's conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful.

480.    Plaintiffs relied on the misrepresentations of Goebel, and would have acted differently had it known of the falsity of his statements and of his non-disclosures.

481.    The false representations and omissions of Goebel included, without limitation, that:

> a.   When initially retained by Plaintiffs, and thereafter, Goebel stated he had no prior relationship with Szegda;
>
> b.   When initially retained by Plaintiffs, and thereafter, Goebel stated he had no conflict of interest concerning his representation of Plaintiffs and no restriction on prior relationship with Szegda;
>
> c.   When initially retained by Plaintiffs, and thereafter, Goebel stated he had no conflict of interest concerning his representation of Plaintiffs and no restriction on prior relationship with Midtown and Defendants;
>
> d.   When initially retained by Plaintiffs, and thereafter, Goebel stated, with no intention of doing so, that he would sue Szegda in the Baystone case;

e.  When initially retained by Plaintiffs, and thereafter, Goebel stated, with no intention of doing so, that he would sue Szegda in the case against Midtown;

f.  When initially retained by Plaintiffs, and thereafter, Goebel stated he knew and understood that Plaintiffs did not cancel the Contract, and also stated, with no intention of doing so, that he would put such claim into the Court;

g.  When initially retained by Plaintiffs, and thereafter, he promised, with no intention of doing so, to put the letters of September 18, 2002 through February 16, 2002 and the Amtrak Agreement into the record;

h.  After the Shafran Deposition, he stated that he didn't receive any documents from Shafran, he hid the testimony from Plaintiffs, and told Plaintiffs that the testimony was brief and not important;

i.  He stated, with no intention of actually doing so, that he would subpoena documents from the city agencies; and he would subpoena documents and testimony from Szegda, Stone, NYDEC, Amtrak, Arthur Imperatore and third party witness Witkoff;

j.  When initially retained by Plaintiffs, and thereafter, Goebel stated, with no intention of doing so, tht he would not send anything out without written authorization from the Plaintiffs;

k.  When initially retained by Plaintiffs, and thereafter, Goebel stated, with no intention of doing so, that he would have regular meetings with Plaintiffs;

l.  When he prepared the complaint dated September 2, 2004, purportedly on behalf of Plaintiffs, he displayed to Plaintiffs a version of the pleading which set forth allegations to show that Plaintiffs had not cancelled the Contract, but then revised and filed a modified and fraudulent complaint with the Court, without Plaintiffs' knowledge, to claim that they had;

m.  When he prepared the amended complaint dated November 29, 2004, purportedly on behalf of Plaintiffs, he displayed to Plaintiffs a version of the pleading which set forth allegations to show that Plaintiffs had not cancelled the Contract, but then revised and filed with the Court a

modified and fraudulent complaint, without Plaintiffs' knowledge, to claim that they had;

n.   When he prepared the memorandum of law dated February 23, 2005, to be filed with the Court purportedly on behalf of Plaintiffs, he hid from the Plaintiffs the fact that he was then representing to the Court that Plaintiffs had cancelled the Contract;

o.   When he prepared and presented to Plaintiffs the affirmation of Samuel Pfieffer, dated February 27, 2005, he displayed a version of the document for execution which set forth allegations to show that Plaintiffs had not cancelled the Contract, but then removed exhibits, revised and filed with the Court a modified and fraudulent affidavit, without Plaintiffs' knowledge, to claim that they had;

p.   From on or about October, 2005, through August 16, 2006, and thereafter, Goebel, with a present intent not to do so, repeatedly misrepresented to Plaintiffs that he would amend the amended complaint or file motions with the Court to clarify that Plaintiffs never elected to cancel the Contract, that Plaintiffs never cancelled the Contract, that the Contract was never canceled, and that Plaintiffs sent letters to Midtown for the next two years that contract was not cancelled.

q.   From on or about July 25, 2006, when Plaintiffs learned that he had represented to the Court that "Jericho" had cancelled the Contract, through August 16, 2006, Goebel , repeatedly misrepresented to Plaintiffs that it meant and was understood to mean that "Jericho" was not the Plaintiffs, but that "Jericho" was meant and was understood to mean Szegda and, with a present intent not to do so, Goebel repeatedly misrepresented to Plaintiffs that he would amend the amended complaint or file motions with the Court that under the specific terms of the Contract it meant and was understood to mean that "Jericho" was not the Plaintiffs, but that "Jericho" was meant and was understood to mean Szegda, and that Jericho never cancelled the Contract, never authorized the Contract to be canceled, and the contract was never cancelled; and that Jericho sent letters to Midtown for the next two years that contract was not cancelled;

r.  During his purported representation of the Plaintiffs, Goebel withheld from Plaintiffs information and documents received by him during the discovery phase of the Prior Litigation, and further affirmatively stated that critical information obtained during the discovery phase of the Prior Litigation was not important;

s.  During his purported representation of the Plaintiffs, Goebel withheld from Plaintiffs information and documents received by him during the discovery phase of the Prior Litigation, and further affirmatively stated that the critical information and documents obtained during discovery would be used in later proceedings, but never was;

t.  During his purported representation of the Plaintiffs, Goebel repeatedly stated that he would controvert the Midtown Defendants' claims that Plaintiffs didn't ask for information regarding the oil spill on the Midtown Property until August 30, 2002, but he never did;

u.  During his purported representation of the Plaintiffs, Goebel repeatedly stated that he would amend the complaint to refute the Midtown Defendants claim that Plaintiffs didn't ask for information regarding the oil spill on the Midtown Property until August 30, 2002, but he never did;

v.  During his purported representation of the Plaintiffs, Goebel repeatedly stated that he would controvert the Midtown Defendants' claims that Plaintiffs didn't ask for copies of the exhibits and other documents relating to the Amtrak Agreement until September 2, 2002, but he never did;

w.  During his purported representation of the Plaintiffs, Goebel repeatedly stated that he would amend the complaint to refute the Midtown Defendants' claim that the Plaintiffs didn't ask for copies of the exhibits to the Amtrak Agreement until September 2, 2002, but he never did

x.  During his purported representation of the Plaintiffs, Goebel; and

y.  In 2013, Goebel stated that he would provide Plaintiffs with documentary evidence and an affidavit attesting to the collusion and fraud surrounding the Contract, in exchange for a release from Plaintiffs, but he never provided same.

482.   These misrepresentations and omissions were material and made with the intent to defraud Plaintiffs.

483.   Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

## THIRD CLAIM

### (Direct Fraud on Plaintiffs by Szegda)

484.   Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

485.   Szegda knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to Plaintiffs.

486.   Also during the course of his conduct, and while he had a duty of disclosure to Plaintiffs, he affirmatively concealed material facts from Plaintiffs.

487.   All of Szegda's conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful.

488.   Plaintiffs relied on the misrepresentations of Szegda, and would have acted differently had it known of the falsity of his statements and of his non-disclosures.

489.   The false representations and omissions of Szegda included, without limitation, that:

> a.   He was only a lawyer for Baystone, thereby concealing from Plaintiffs that he was in fact a Baystone principal;
>
> b.   That he was receiving Plaintiffs' 150k, related to the Baystone matter, to be held by him in escrow as an attorney;

    c.   He had mistakenly released the Plaintiffs' $150,000 escrow deposit to Baystone;

    d.   He hid from Plaintiffs his intention to send a letter to the Midtown Defendants, on September 12, 2002, purportedly on behalf of Plaintiffs, and purportedly cancelling the Contract;

    e.   He created a false time charge invoice and took money from Plaintiffs' escrow to pay himself an unauthorized fee; and

    f.   He stated from 2002 through 2004 that he did not have documents in his possession to assist Plaintiff in the prosecution of their claims against Midtown.

490.    These misrepresentations and omissions were material and made with the intent to defraud Plaintiffs.

491.    Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

## FOURTH CLAIM

### (Direct Fraud on Plaintiffs by Emmet and BHS)

492.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

493.    Emmet and BHS knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to Plaintiffs.

494.    Also during the course of their conduct, and while they had a duty of disclosure to Plaintiffs, they affirmatively concealed material facts from Plaintiffs.

495.    All of Emmet' and BHS' conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful.

496.     Plaintiffs relied on the misrepresentations of Emmet and BHS, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

497.     The false representations and omissions of Emmet and BHS included, without limitation, that:

> a.  They misrepresented, prior to execution of the Contract and during the due diligence period under the Contract, that there was no oils spill or environmental problems on Midtowns Property;
>
> b.  They had each fully complied with the Plaintiffs' subpoena duces tecum, and they had each produced and turned over all documents responsive thereto; and
>
> c.  They had each failed to produce and disclose the Emmet Email and other documents, which was in their custody and control and which was responsive to the Plaintiff's subpoena duces tecum.

498.     These misrepresentations and omissions were material and made with the intent to defraud Plaintiffs.

499.     Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

## FIFTH CLAIM

### (Indirect Fraud on Plaintiffs – Fraud on the Court by All Defendants)

500.     Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

501.     All of the Defendants knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

502.   Also during the course of their conduct, and while they had a duty of disclosure to the Court, they affirmatively concealed material facts from Court.

503.   All of Defendants' conduct was, through misrepresentations and nondisclosures, fraudulent and deceitful.

504.   The Court relied on the misrepresentations of the Defendants, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

505.   The false representations and omissions of the Defendants are as set forth in detail above.

506.   These misrepresentations and omissions were material and made with the intent to defraud the Court.

507.   The Court relied on the misrepresentations of Defendants, and would have acted differently in their rulings during the Prior Litigation, had they known of the falsity of the Defendants statements and of their non-disclosures.

508.   Plaintiffs have been damaged as a result the Court's reliance on the foregoing misrepresentations and omissions.

509.   As a direct result of the foregoing misrepresentations and omissions of material fact, and despite the Plaintiffs' meritorious claims, the Court dismissed the Prior Litigation.

510.   Had it not been for the Defendants fraud on the Court, Plaintiffs would have been awarded specific performance of the Contract and would also have been granted damages on account of the Defendants willful and deliberate breach of the Contract.

# SIXTH CLAIM

## (Civil Conspiracy)
## (Against All Defendants)

511.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

512.    As set forth throughout this Complaint, the Defendants have committed torts against Plaintiffs, including acts of racketeering giving rise to violations of RICO, fraud, tortious interference with contract and conversion.

513.    Defendants agreed to participate in a common scheme against Plaintiffs.

514.    Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from Plaintiffs.

515.    In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

516.    As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against Plaintiffs, Plaintiffs have been damaged in its business and property, and further damage to Plaintiffs' business and property is threatened and imminent.

517.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants.

## SEVENTH CLAIM

### (Violations of RICO, 18 U.S.C. § 1962(c))
### (Against All RICO Defendants)

518.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

519.    At all relevant times, Plaintiff(s) is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

520.    At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**The RICO Enterprise**

521.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multifaceted campaign of lies, fraud, extortion and threats, to coerce Plaintiffs into forfeiting their rights and benefits under the Contract. These RICO Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure. While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme.

522.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961 (4) and 1962(c), referred to hereinafter as the "Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

523.   At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity**

524.   The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U .S.C. § 1961 (5) and in violation of 18 U .S.C. § 1962( c ), to wit:

***Pattern of Racketeering Activity: Obstruction of Justice in Violation of 18 U.S.C. § 1503***

525.   In a concerted effort to thwart Plaintiffs' attempts to realize the benefits of their Contract, the RICO Defendants, and their counsel, have habitually filed or caused to be filed documents, including affirmations sworn to under penalty of perjury, that falsely represent, *inter alia*, that Plaintiffs elected to cancel the Contract and that the Contract was cancelled.

526.   They have done so with the full knowledge that these statements were false, as evidenced by their own internal files and correspondence.

527.   By making these deliberate and strategic false representations in various pending judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

528.   Each of the RICO Defendants has engaged in multiple predicate acts, as described in detail above. The conduct of each of the RICO Defendants described in

detail above, constitutes a pattern of racketeering activity within the meaning of 18U.S.C.

§ 1961(5).

***Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18U.S.C.§§1341, 1343***

529.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiffs and various courts of law.

530.    The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to deprive Plaintiffs of their rights under the Contract.

531.    In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

> a.  emails incorporating false and misleading statements;
>
> b.  wirings and/or mailings between and among the RICO Defendants;
>
> c.  communications directed toward Plaitniffs;
>
> d.  funds transferred by among the Defendants, with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities; and,
>
> e.  electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts.

532.   The foregoing constitute uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443.

533.   The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiffs

534.   The RICO Defendants' false and misleading statements have been relied on by U.S. courts (where the Defendants obtained the delay they needed) and by the Courts of the State of New York, by means of their acceptance of the Defendants' misrepresentations and omissions and failure to take meaningful corrective action.

535.   Further, the RICO Defendants' false and misleading statements have caused Plaintiffs substantial damages.

**Pattern of Racketeering Activity: Extortion in Violation of New York Penal Law §§110.00, 155.05(2)(e), 155.42**

536.   The RICO Defendants' wrongful attempts to appropriate Plaintiffs' property by instilling fear that if the property is not delivered the RICO Defendants would perform an act calculated to harm Plaintiffs materially with respect to its business, financial condition, and reputation violates New York Penal Law§§ 110.00, 155.05(2)(e), 155.42.

**Pattern of Racketeering Activity: Witness Tampering in Violation of l8 U.S.C. § 1512**

537.   Defendants knowingly engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward Plaintiffs and Pfeiffer, with the specific intent to influence, delay, and prevent Pfeiffer's testimony or cause Pfeiffer to withhold records, objects, documents, and testimony from an official proceeding.   The Defendants

contacted Pfeiffer and emphatically attempted to convince Pfeiffer not to testify or provide evidence, warning him that testifying could result in a potential law case against. The Defendants tampered with Pfeiffer's testimony in violation of 18 U.S.C. § 1512 in furtherance of the Enterprise's scheme.

538.     Plaintiffs were injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c).

539.     The injuries to Plaintiffs caused by reason of the violations of 18 U.S.C. § 1962( c) include but are not limited to damage to Plaintiffs' reputation and goodwill; the impairment of Plaintiffs' interest in executed contracts (the Contract); and the attorneys' fees and costs associated with exposing the RICO.

540.     Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiffs are the ultimate victims of the RICO Defendants' unlawful Enterprise. Plaintiff has been and will continue to be injured in its business and property in an amount to be determined at trial.

541.     Pursuant to 18 U .S.C. § 1964(c), Plaintiffs are entitled to recover treble damagesplus costs and attorneys' fees from the RICO Defendants.

## EIGHTH CLAIM

### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))
### (Against All RICO Defendants)

542.     Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

543.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962( c) as described above, in violation of 18 U.S.C. § 1962(d).

544.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

545.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

546.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiffs. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in detail above.

547.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §l962(d), Plaintiffs have been injured in their business and property, including damage to Plaintiffs' reputation; the impairment of

Plaintiffs' interest in executed contracts (the Contract) and the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud.

548.    Pursuant to 18 U.S.C. § 1964( c ), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.


## NINTH CLAIM

### (For Declaratory Relief Establishing, *inter alia*, the Continued Viability of the Contract)

549.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

550.    Defendants willfully and deliberately lied to Plaintiffs and to the Court in making false representations that Plaintiffs had elected to cancel the Contract, and that the Contract was cancelled.

551.    Plaintiffs maintain that the Contract remains in full force and effect, even today.

552.    Defendants willfully and deliberately lied to Plaintiffs and to the Court in making false representations that Midtown had produced all the materials in its possession concerning environmental matters referenced in the Contract.

553.    Defendant's fraudulent representations, misleading responses and concealments were intended to induce the Court into ruling, as it did, and dismissing the Prior Litigation.

554.    The Court reasonably relied on defendants' fraudulent representations, misleading responses and concealments in its decision to dismissing the Prior Litigation.

555.    Were it not for the Defendants' fraudulent representations, misleading responses and concealments, the Plaintiffs would have been awarded specific performance and damages on account of the Defendants willful and deliberate breach.

556.    Plaintiffs have been injured as a result of Defendants' conduct in various ways, including by virtue of the fact that they have thus far been deprived of the benefits under the Contract.

557.    Plaintiffs have no adequate remedy at law.

558.    By virtue of the Defendants fraudulent conduct, Plaintiffs are entitled to declaratory relief establishing the continued viability of the Contract, that the Midtown Defendants willfully and deliberately breached the Contract, that the Defendants perpetrated a fraud upon Plaintiffs and the Court.

## TENTH CLAIM

### (Specific Performance against Midtown)

559.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

560.    The Contract represents an agreement between the Plaintiffs and the Defendant, Midtown, for a purchase of the Midtown Property.

561.    The Midtown Property is comprised of a unique and specific real estate devise.

562.    The Plaintiffs remain ready, willing and able to close pursuant to the terms of the Contract.

563.    The Defendant, Midtown, is the owner of the Midtown Property and it is within its power to perform the Contract and convey the Midtown Property pursuant to the Contract.

564.    Plaintiffs have been damaged for which no monetary relief can be granted.


## ELEVENTH CLAIM

### (Breach of Contract against Midtown)

565.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

566.    Plaintiffs performed all that was required of them under the Contract.

567.    Plaintiffs remain ready willing and able to perform under and pursuant to the Contract.

568.    Midtown has breached the Contract, including but not limited to its failure to provide documents requested by Plaintiffs, under paragraph 29c), and its failure to close pursuant to the terms of the Contract.

569.    Plaintiffs have been damaged as a result of the foregoing breach of contract.


## TWELFTH CLAIM

### (Bad Faith Claim against the Midtown Group Defendants)

570.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

571.    The Midtown Group Defendants acted in bad faith and with wonton disregard for the rights of the Plaintiffs, with respect to the real estate transaction which is the subject to this action.

572.    The bad faith conduct herein complained of includes, but is not limited to, Midtown Group Defendants failure and refusal to provide the oil spill documents and the exhibits, documents and modifications to the Amtrak Agreement, when requested and as required under the Contract; their wrongful declaration that Plaintiffs cancelled the Contract, and their failure and refusal to close pursuant to the terms of the Contract.

573.    The Midtown Group Defendants willfully and deliberately breached the Contract.

574.    The Plaintiffs have been damaged as a result of the foregoing breach of contract.


## THIRTEENTH CLAIM

### (Conversion against Goebel and Szegda)

575.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

576.    Plaintiffs are the rightful owners of the files and original documents and things (the "Converted Property") now in the possession of Goebel and Szegda.

577.    Plaintiffs are entitled to possession thereof.

578.    The Defendants Goebel and Szegda have and continue to exert wrongful dominion and control over the Converted Property, in violation of Plaintiffs' rights in and to the same.

579.    Plaintiffs made due and proper demand for the return of the Converted Property.

580.    The Defendants have refused to return the Converted Property.

581.    The Defendants, Goebel and Szegda, have thereby converted Plaintiffs' property, causing damage to Plaintiffs.

582.    Plaintiffs have been damaged on account of the Defendants' conversion of the Converted Property, for which it seeks compensatory damages herein.

583.    The Defendants, Goebel and Szegda,  undertook the foregoing wrongful conduct with actual malice towards Plaintiffs, or with wonton and reckless disregard for the interest of Plaintiffs, or under such other circumstances, thus warranting an award of punitive damages in this matter.


## FOURTEENTH CLAIM

### (Conversion against Szegda and Baystone)

584.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

585.    Plaintiffs are the rightful owners of certain funds placed in deposit with Szegda (the "Escrow Funds").

586.    Szegda is in possession of the Escrow Funds, either in his individual capacity, or as his alter ego – Baystone.

587.    Plaintiffs are entitled to possession thereof.

588.    Upon information and belief, Szegda, in his individual capacity, or as his alter ego – Baystone, has and continues to exert wrongful dominion and control over the Escrow Funds, in violation of Plaintiffs' rights in and to the same.

589.    Plaintiffs made due and proper demand for the return of the Escrow Funds.

590.    The Defendants have refused to return the Escrow Funds.

591.    Szegda, in his individual capacity, or as his alter ego – Baystone, has thereby converted Plaintiffs' property, causing damage to Plaintiffs.

592.    Plaintiffs have been damaged on account of the Szegda's and Baystone's conversion of the Escrow Funds, for which it seeks compensatory damages herein.

593.    Upon information and belief, Szegda, in his individual capacity, or as his alter ego – Baystone, undertook the foregoing wrongful conduct with actual malice towards Plaintiffs, or with wonton and reckless disregard for the interest of Plaintiffs, or under such other circumstances, thus warranting an award of punitive damages in this matter.


### FIFTEENTH CLAIM

### (Breach of Contract/Fiduciary Duty Against Harwood)

594.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

595.    Harwood was the escrow agent named under the Contract to hold the $250,000 contract Downpayment.

596.    Pursuant to the Contract, Harwood, as escrow agent, was required to hold the $250,000 Downpayment in trust for the benefit of the Contract.

597.    Harwood, as escrow agent, had a fiduciary responsibility to hold the $250,000 Downpayment in trust for the benefit of the Contract.

598.    Harwood breached its obligation to hold the Downpayment in trust for the benefit of the Contract when it instead transmitted the escrowed funds to the Defendant, Szegda.

599.    The Plaintiffs have been damaged as a result of the foregoing breach of contract and breach of fiduciary duty.

## SIXTEENTH CLAIM

### (Tortious Interference With Contract)

600.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

601.    Defendants are and have been aware of valid and enforceable contracts between Midtown and Plaintiffs.

602.    Defendants have intentionally caused and continued to cause an ongoing breach of the Contract.

603.    Defendants have intentionally caused the Plaintiffs to take actions necessary to secure their rights under the Contract.

604.    As a direct, proximate, and foreseeable result of Midtown's breach of the Contract, Plaintiffs have been deprived of the benefit of the Midtown Property, which has

caused significant pecuniary and other damages. These injuries include significant damage to attorneys' fees and costs in related litigation to attempt to enforce the Contract.

605.   Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants.

## SEVENTEENTH CLAIM

**(Violations of New York Judiciary Law§ 487 - Against the Attorney Defendants)**

606.   Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

607.   New York Judiciary Law § 487 provides, in pertinent part, as follows: "An attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

608.   As set forth above, the Attorney Defendants engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive both Plaintiffs and multiple state and federal courts, including the United States District Court for the Southern District of New York and the New York State Supreme Court and Court of Appeals.

609.   The Attorney Defendants actively participated in the preparation and filing of multiple court submissions to the various courts, as described in detail above.

149

610.   The Attorney Defendants knowingly caused these misstatements to be filed with the intent of deceiving the Court.

611.   The Attorney Defendants concealed evidence and testimony in furtherance of their scheme to deprive Plaintiffs of the benefits under the Contract.

612.   As a result of the deceitful and fraudulent conduct of the Attorney Defendants, as described herein, Plaintiffs have been injured in an amount to be established at trial.

613.   By reason of the foregoing, Plaintiffs are entitled to monetary damages against the Attorney Defendants, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law§ 487.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants herein, as follows:

        a.   On their First Claim, awarding Plaintiffs compensatory and punitive damages against the Defendants, Imperatore, Stone, Midtown and the MGD;

        b.   On their Second Claim, awarding Plaintiffs compensatory and punitive damages against the Defendants, Goebel, Solomon and Marrasse;

        c.   On their Third Claim, awarding Plaintiffs compensatory and punitive damages against the Defendant, Szegda;

d.  On their Fourth Claim, awarding Plaintiffs compensatory and punitive damages against the Defendants, Emmet and BHS;

e.  On their Fifth Claim, awarding Plaintiffs compensatory and punitive damages against all the Defendants;

f.  On their Sixth Claim, awarding Plaintiffs compensatory and punitive damages against all the Defendants;

g.  On their Seventh Claim, awarding Plaintiffs compensatory, punitive and statutory trebling damages against all the Defendants;

h.  On their Eight Claim, awarding Plaintiffs compensatory, punitive and statutory trebling damages against all the Defendants;

i.  On their Ninth Claim, declaring:

   i.  The continued viability of the Contract, that the Contract is in full force and effect and that the Defendants should specifically perform under the terms of the Contract, close and transfer title of the property known as and located at 11th Avenue at 36th − 38th Street, block 708, lot 1 and Block 709, lot 17, to the Plaintiffs;

   ii.  That under the laws of the State of New York, and under the terms of the contract, Szegdas letters of September 3, 2002 and September 12, 2002, did not constitute an election by Plaintiffs, to cancel the Contract, and did not Cancel the Contract;

   iii.  That failing to disclose the oil spill before, during and after execution of the Contract was an actionable fraud upon Plaintiffs;

     iv.  That failing to give the documents requested by Plaintiffs, concerning the oil spill on the property, was a willful and deliberate breach of the Contract;

     v.  That failing to give the complete Amtrak Agreement with the countersigned contract was a fraud on the Plaintiffs;

     vi.  That the Defendants committed fraud on the Plaintiffs, and on the Court, from August 29, 2002 and thereafter, because they knew that they didn't give the Plaintiffs the oils spill documents when they were requested, they knew they were in willful and deliberate breach of the Contract, and they knew Plaintiffs never elected to cancel the Contract and never canceled the Contract; and

     vii.  That the Defendants perpetrated a fraud on the Plaintiffs, and on the Court, in their numerous filings and representations made throughout the Prior Litigation and in the Memorandum of Law filed by them on January 8, 2014.

j.  On their Tenth Claim, awarding Plaintiffs specific performance of the Contract, together with compensatory and punitive damages against the Midtown Defendants;

k.  On their Eleventh Claim, awarding Plaintiffs compensatory and punitive damages against the Midtown Defendants;

l.  On their Twelfth Claim, awarding Plaintiffs compensatory and punitive damages against the Midtown Defendants;

m.  On their Thirteenth Claim, awarding Plaintiffs compensatory and punitive damages against the Defendants, Goebel and Szegda, and directing said

Defendants to turn over and return Plaintiffs' property to them;

n.  On their Fourteenth Claim, awarding Plaintiffs compensatory and punitive damages against the Defendants, Szegda and Baystone, and directing said Defendants to turn over and return Plaintiffs' property to them;

o.  On their Fifteenth Claim, awarding Plaintiffs compensatory damages against the Defendants, Harwood;

p.  On their Sixteenth Claim, awarding Plaintiffs compensatory and punitive damages against all the Defendants;

q.  On their Seventeenth Claim, awarding Plaintiffs compensatory, punitive and statutory trebling damages against all the Attorney Defendants.

r.  Awarding Plaintiffs such other and further relief as the Court may deem appropriate, including injunctive and declaratory relief, as may be required in the interests of justice.

VERIFICATION

I, Samuel Pfeiffer, a citizen of the United States and resident of the State of New York, am an officer of the Plaintiff in this action. I have read the foregoing Complaint and declare under penalty of perjury that the foregoing facts are correct and true to the best of my knowledge and belief and that those factual matters that are stated upon information and belief are believed by me to be true.

_Samuel Pfeiffer_
Samuel Pfeiffer

Dated: New York, New York
April 10, 2014

The Law Offices of Bradley S. Gross

By: _____
Bradley S. Gross (1909)
Attorney for Plaintiffs
JERICHO GROUP LTD. and JERICHO CO.
45 Rockefeller Plaza – Suite 2000
New York, New York 10111
(212) 732-7412

154