SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x          **Index No.** 101105/13

JERICHO GROUP, LTD., and JERICHO CO.,


                                    *Plaintiffs,*

             *-against-*                                               **VERIFIED COMPLAINT**

        *Defendants*

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP,
MIDTOWN DEVELOPMENT. L.P., EDWARD G.
IMPERATORE, MAURICE L. STONE, EDWARD W.
ROSS, ARTHUR E. IMPERATORE, WR WEST SIDE                        **F I L E D**
ASSOCIATES, HADRIAN PROPERTIES LTD,
FANFARE ENTERPRISE INC, ARCORP PROPERTIES,                     NOV 2 9 2013
JERRART PROPERTIES, HARWOOD LLOYD LLC,
BROWN HARRIS STEVENS LLC, ELAINE OSBORN                     COUNTY CLERK'S OFFICE
EMMET, MICHAEL A. SZEGDA,  BAYSTONE EQUITIES                      NEW YORK
INC,  ROBERT B. GOEBEL, MARASSE, LISA  SOLOMON,
CBRE INC, JOHN DOE 1-10 and XYZ CORPORATION 1-10.
-----------------------------------------------------------------X

Plaintiffs as and for their Verified Complaint allege as follows;

1. Jericho Group, Ltd.(hereinafter referred to as "Jericho" or "Plaintiff(s)"), is a corporation organized and existing under the laws of the State of New York with a principal place of business in Brooklyn, New York, in the County of Kings, State of New York.

2. Jericho Co, (hereinafter referred to as "Jericho Co" or "Plaintiff(s)"), is a company organized and existing under the laws of the State of New York with a principal place of business in Brooklyn, New York, in the County of Kings, State of New York.

3. Upon information and belief, Defendant, Mid-Town Development Limited Partnership (hereinafter referred to as "Mid-Town" or "Defendant(s))" is a Limited Partnership, organized and existing under the laws of the State of New York with a place of business at Weehawken, New Jersey and or Hackensack New Jersey.[1]

---

[1] "Mid-Town Development Limited Partnership" is listed in the Land Records as the owner of the Property. The Agreement with Amtrak is also "Mid-Town Development Limited Partnership".

1

4. Upon information and belief, Defendant, Midtown Development. L.P (hereinafter referred to as Midtown" or "Defendant(s))" is a Limited Partnership, with a place of business at Weehawken, New Jersey and or Hackensack New Jersey.[2]

5. Upon information and belief, Defendant, Edward Imperatore (hereinafter referred to as "Imperatore" or "Defendant(s)")   was and is a principal and counsel to Mid-Town Development Limited Partnership, since 1987 to present, was a partner at Harwood Lloyd, LLC, is a resident of the State of New Jersey and his principal place of business is in Hackensack New Jersey.

6. Upon information and belief, Defendant Maurice Stone (hereinafter referred to as "Stone" or "Defendant(s)") is an attorney, was counsel to Mid-Town Development Limited Partnership and a Partner at Harwood Lloyd and is residing in the State of New Jersey and his principal place of business is in Teaneck, New Jersey.

7. Upon information and belief, Defendant Edward W. Ross (hereinafter referred to as "Ross" or "Defendant(s)") is residing in the State of Illinois and his principal place of business is in Chicago, Illinois.

8. Upon information and belief, Defendant Arthur E. Imperatore (hereinafter referred to as "Arthur Imperatore" or "Defendant(s)") is a resident of the State of New Jersey and his principal place of business is in Weehawken, New Jersey.

9. Upon information and belief, Defendant, WR West Side Associates, (hereinafter referred to as "WR West" or "Defendant(s)") has their office in Chicago, Illinois.

10. Upon information and belief, Defendant, Hadrian Properties Ltd, (hereinafter referred to as "Hadrian" or "Defendant(s)") has their office in New York, NY.

11. Upon information and belief, Defendant, Fanfare Enterprise Inc, (hereinafter referred to as "Fanfare" or "Defendant(s)") has their office in New Jersey.

12. Upon information and belief, Defendant, Arcorp Properties, (hereinafter referred to as "Arcorp" or "Defendant(s)") has their office in Weehawken, New Jersey.

---

[2] "Midtown Development, L.P." is only added herein because Defendants used the name "Midtown Development, L.P." as the Seller in the June 18, 2002 Contract of Sale.

Defendants have committed some kind of fraud on Plaintiffs by using in the Contract a fictions name "Midtown Development. L.P," instead of the Sellers real name, "Mid-Town Development Limited Partnership".

2

Supreme Court Records OnLine Library -  page 2 of 145

13.  Upon information and belief, Defendant, Jerrart Properties, (hereinafter referred to as "Jerrart" or "Defendant(s)") has their office in Weehawken, New Jersey.

14.  Upon information and belief, Defendant, Harwood Lloyd, LLC, (hereinafter referred to as "Harwood" or "Defendant(s)") has an office in New York, New York and or in Hackensack, in the State of New Jersey.[3]

15.  Upon information and belief, Defendant, Brown Harris Stevens (hereinafter referred to as "BHS" or "Defendant(s)") is a licensed Real Estate firm, organized and existing under the laws of the State of New York with a principal place of business in New York County, New York.[4]

16.  Upon information and belief, Defendant, Elaine Osborn Emmet (hereinafter referred to as "Emmet" or "Defendant(s)") is a licensed Real Estate Broker and residing in Long Island, New York.

17.  Upon information and belief, Defendant, Michael Szegda (hereinafter referred to as "Szegda" or "Defendant(s)" is a resident and lives in Old Tappan, in the State of New Jersey.

18.  Upon information and belief, Defendant, Baystone Equities Inc, (hereinafter referred to as "Baystone" or "Defendant(s)" was or still is a corporation existing under the laws of the State of New York had a principal place of business in New York County, New York.

19.  Upon information and belief, Defendant, Robert A. Goebel (hereinafter referred to as "Goebel" or "Defendant(s)" is a resident of Scarsdale, New York, and has his principal place of business in Scarsdale, New York.

20.  Upon information and belief, Defendant, Marasse, (hereinafter referred to as "Marasse" or "Defendant(s)")  is residing in the State of New York or New Jersey (or any other State of USA) his principal place of business is either New York or New Jersey, (or any other State of USA).

---

[3] Plaintiffs do not have enough information to know exactly what Harwood's relationship and agreements were with the other Defendants before, during and after 2002, and what documents and information Harwood had and has, without Discovery. But upon information and believe at a minimum they are liable because Midtown, Imperatore and Stone and others operated under Harwood before and after September 12, 2002.

[4] Plaintiffs do not have enough information to know exactly what BHS's relationship and agreements were with the other Defendants before, during and after 2002 and what documents and information BHS had and has, without Discovery. But upon information and believe at a minimum they are liable because Emmet was their agent and worker plus they marketed the Property for sale before and after September 12, 2002.

3

21.   Upon information and belief, Defendant, Lisa Solomon, (hereinafter referred to as "Solomon" or "Goebel" or "Defendant(s)" has her principal place of business in New York County, New York.

22.   Upon information and belief, Defendant, CBRE INC (hereinafter referred to as "CBRE" or "Defendant(s)" has their principal place of business in New York County, New York. [5]

23.   Upon information and belief, Defendants , John Doe 1-10, (hereinafter referred to as "John Doe" or "Defendant(s)")  are residing in the State of New York or New Jersey (or any other State of USA) their  principal place of business is either New York or New Jersey, (or any other State of USA).

24.    Upon information and belief, Defendants , XYZ  Corporation 1-10, (hereinafter referred to as "XYZ" or "Defendant(s)") are entities in the State of New York or New Jersey (or any other State of USA) their  principal place of business is either New York or New Jersey, (or any other State of USA).

## PRELIMINARY STATEMENT

25.   Plaintiffs are bringing this case pro se. even though Plaintiffs are not attorneys, composers or writers because under the circumstances they have no choice and had to bring it pro se. Plaintiffs have interviewed many reputable major, medium and small law firms and spent a lot of time and money, but in the end it was determined that under the circumstances Plaintiffs have no choice but to bring the case pro se.

26.   The main claims are spelled out in the Preliminary Statement paragraphs 27-87 below.

27.   Plaintiffs are bringing this Complaint mainly because Midtown and Jericho have entered into a Contract in June 2002 that Midtown will sell, close and transfer to Jericho Midtown's two property's ("Property") Block 708 Lot 1 and Block 709 Lot 17, at 11th Avenue between 36 and 38 Street, in Manhattan, New York, but as of today Midtown did not closed yet title with Jericho and did not transfer yet the Property to Jericho,

28.   Michael Szegda, (Plaintiffs Contract Attorney in the Baystone and Midtown cases), a **convicted criminal**, who was permanently Disbarred to practice law, because he Defrauded his own clients and stole money from his own clients and from the Escrow

---

[5] Plaintiffs claim re CBRE Inc is that they and Defendants not enter into an agreement to sell to a third party the Property that Mid-Town entered into Contract with Jericho to transfer the same Property to Jericho.

4

Supreme Court Records OnLine Library -  page 4 of 145

accounts, (He recently admitted in 2013 that he had committed the same fraud on Plaintiffs, conspired and became an **Imposter** and stole from Plaintiffs $150,000 from the Escrow Account), sent by fax an **unauthorized and fraudulent letter** to Defendants (not even cc'd to Plaintiffs) on September 12, 2002 that "UNLESS" Defendants will comply with Plaintiffs prior requests to provide the "critical Documents", (that Plaintiffs requested since July 2002, a) that Defendants represented in the Contract that they had provided them with the Contract, (but was false), b) that Defendants were required to provide together with the Contract, c) that Defendants were required to provide throughout the 75 days Due Diligent Period (but did not), d) that Defendants were required to provide under par. 29c) of the Contract since Plaintiffs requested them in July and many times thereafter, e) that Defendants promised to provide to Plaintiffs), then the Contract is cancelled.

29. Defendants[6], who were also Attorneys **knew, that** under the specific terms of the Contract, "documentary evidence" **it was not a Cancellation Notice**, because; the unauthorized and fraudulent letter was only a request that Defendants provide the prior "Requested Critical Documents ", 2) that Szegda could not cancel the Contract, 3) that any cancellation must be signed by an Officer of Jericho (not by Szegda), 3) that any Cancellation must be sent by "Notice" from Jericho Group LTD from 155 Lee Avenue, Brooklyn, NY, 11211 to Midtown plus a copy must be sent to Imperatore and Szegda, 4) that the "Notice" must be sent by Certified mail Return Receipt Requested, postage pre-paid, 5) that it must be sent and received on or before September 3, 2002, 6) that any cancellation "Notice" sent or received after September 3, 2002 is not a valid cancellation, 7) that Plaintiffs told them many times that under no circumstances will they cancel the Contract, 8) that Plaintiffs and even Szegda told them many times that Plaintiffs are ready, willing and able to close on or before September 18, 2002.

30. **DEFENDANTS KNEW IN SEPTEMBER 2002 and thereafter and even in 2013, that The Contract Was Never Cancelled** and that the Contract was in 2002 and thereafter and even in 2013, *in Full Force and Effect*. But even so, Defendants fraudulently told their brokers and agents in September 2002 and thereafter and even now in 2013, that Jericho had cancelled the Contract and that they could and should market the Property to new

---

[6] "Defendants" in this document could mean all Defendants, some of the Defendants or even one Defendant, because Plaintiffs do not have all documents, depositions and information because Goebel and Szegda and others withheld them from Plaintiffs.

5

Supreme Court Records OnLine Library -  page 5 of 145

prospective purchasers and Defendants promised to them in September 2002 and thereafter that they will provide to any new prospective purchasers the "Requested Critical Documents", that they had refused to provide to Plaintiffs!

31. Plaintiffs immediately called Plaintiffs and also sent many letters to Defendants commencing September 18, 2002 and up to and including February 16, 2002, that Plaintiffs have never cancelled the Contract, that Plaintiffs never requested back the deposit and that Defendants had no right to send the deposit to Szegda and that Defendants proceed to close title with Plaintiffs. Defendants claimed to Plaintiffs that they received "Notices" from Jericho to wire the deposit to Szegda and to cancel Contract but Defendants never produced those "Notices" because Plaintiffs never sent and Defendants never received any "Notice" from Plaintiffs.

32. Plaintiffs retained Goebel in 2004, to file a Complaint, main claim that Plaintiffs never cancelled the Contract and that the Contract is in full force and effect and that the Court order Midtown and Defendants to specifically perform and close under the terms of the Contract (similar to the claims herein) . Goebel filed in September 2004 a Complaint and filed in November 2005 an Amended Complaint ("AC"). Defendants then filed a Motion to Dismiss, Memo of Law ("MOL"), and an Affirmation from Imperatore in support of their Motion to Dismiss. (See more below),

33. There was a Hearing before the Honorable Justice Charles Ramos on May 12, 2005. Justice Ramos denied Defendants Motion to Dismiss and signed an Order to that effect on May 16, 2005. Defendants appealed and filed an Appeal brief and Reply brief in 2005. The Justices of the Appellate Division on August 17, 2006 reversed Justice Ramos Order on the *Law* and dismissed Plaintiffs claims and AC.

34. **GOEBEL AND SZEGDA HAVE RECENTLY ADMITTED** that they Conspired together with the Defendants to defraud Plaintiffs and that they together with the Defendants have actually defrauded Plaintiffs in both cases from inception and thereafter to present. (See more below)

35. **GOEBEL AND SZEGDA HAVE RECENTLY ADMITTED** that they have Conspired together with the Defendants to defraud the Justices of the Supreme Court and the Justices of the Appellate Division and that they have actually defrauded the Justices of the Supreme

6

Supreme Court Records OnLine Library - page 6 of 145

Court and the Justices of the Appellate Division Justices of the COA, from inception and thereafter to present. (See More Below)

36. **PLAINTIFFS HAVE RECENTLY DISCOVERED** documents, evidence, information, depositions, and obtained Affirmation, etc, ("Evidence") that proves that Defendants were in a collusion and or conspiracy to defraud Plaintiffs and that Defendants have actually defrauded Plaintiffs from inception to present. (See more below)

37. **PLAINTIFFS HAVE RECENTLY DISCOVERED** documents, evidence, information, that proves that Defendants were in a collusion and or conspiracy to defraud and that they have actually defrauded the Justices of the Supreme Court and Appellate Division and also the Justices of the Court of Appeals and the Justices of the Disciplinary Committee for the first Judicial Department and the District Attorney, etc, from inception to present. (See more below)

38. **PLAINTIFFS HAVE RECENTLY DISCOVERED** that Defendants were in a major Conspiracy, and have committed Fraud, Perjury, Extortion, Blackmail, Conspiracy, Forgery, Conversion, Grand Larceny, Obstruction of Justice, Contempt of Court, and Cover-Up, etc, and that they have willfully and deliberately committed actionable fraud on Plaintiffs, on the Justices of the Supreme Court, on the Justices of the Appellate Division, First Department, on the Justices of the Court of Appeals, on other Courts, on the Justices of the Disciplinary Committee for the First Judicial Department and on the District Attorney, etc. (See more below).

39. **GOEBEL AND SZEGDA HAVE RECENTLY ADMITTED** that they had and still have even in 2013, in their possession, Documents that Plaintiffs provided to them (with condition to return original to Plaintiffs but they never did), plus other critical Documents and evidence that they obtained during Discovery, **That Prove That Defendants Committed Fraud On Justice Ramos, On The Justices Of The Appellate Division And On The Justices Of The COA From Inception To Present,** But they refused to return them even in 2013, and or to provide Plaintiffs copies thereof even in 2013,. (See more below).

40. **GOEBEL AND SZEGDA HAVE RECENTLY ADMITTED** that they had and still have even in 2013, in their possession, in their possession Documents that Plaintiffs provided to them (with condition to return original to Plaintiffs but they never did), plus

7

other critical Documents that they obtained during discovery **that prove beyond a doubt that Defendants committed fraud on Justice Ramos, on the Justices of the Appellate Division and on the Justices of the COA from inception to present**. But they refused to return them even in 2013, and or to provide Plaintiffs copies thereof even in 2013,. (See more below).

41. **PLAINTIFFS HAVE MANY RECORDINGS** of Conversations with Defendant(s) that proves the claims in this Complaint, etc. (See more below)

42. **PLAINTIFFS HAVE AN AFFIRMATION** affirmed under penalty of perjury from an Agent of Defendant(s) that proves the claims in this Complaint, etc. (See more below)

43. The fact was and still is that:

44. **DOCUMENTARY EVIDENCE PROVES that the Contract Between Midtown and Jericho Was Always in Full Force and Effect and Is Still in 2013 in Full Force and Effect.**

45. **DOCUMENTARY EVIDENCE PROVES That Plaintiffs Have Never Cancelled The Contract and Never Sent to Midtown A "Notice" Cancelling the Contract As Is Specifically Required Under The Contract.**

46. **DOCUMENTARY EVIDENCE PROVES** that Midtown has never sent a "Notice" to Plaintiffs setting a 14 day Time of Essence Closing date as is specifically required under the parties Contract. In addition that:

47. **DOCUMENTARY EVIDENCE PROVES** that Imperatore and Defendants have willfully and deliberately committed *actionable fraud* on Plaintiffs, Perjury and *fraud* on Justice Ramos and *fraud* on the Justices of the Appellate Division and on the Justices of the Court of Appeals, ("COA"), from inception to present by **representing that Jericho Cancelled the Contract.**

48. **DOCUMENTARY EVIDENCE PROVES** that Goebel had willfully and deliberately committed Fraud on Plaintiffs by claiming and representing to the Courts, **that Jericho cancelled the Contract, Just the Opposite**: of the truth, of the facts, of the documentary evidence and of what he was specifically retained to claim and what he had promised to claim.

8

49. **DOCUMENTARY EVIDENCE PROVES** that Imperatore had willfully and deliberately committed Perjury and Fraud on the Courts in his Affirmations from inception to present.

50. **DOCUMENTARY EVIDENCE PROVES** that Defendants had willfully and deliberately committed Perjury and Fraud on the Courts in their Affirmations and filings from inception to present.

51. **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed *actionable fraud* on Plaintiffs, *fraud* on Justice Ramos and *fraud* on the Justices of the Appellate Division from inception to present by representing that Jericho sent to Midtown a "Notice" Cancelling the Contract. In addition that:

52. **GOEBEL AFTER EXTREME PRESSURE** from Plaintiffs, subsequently claimed and admitted to the Appellate Division in his December 2005, "Respondent Brief", that Jericho never sent a "Notice" cancelling the Contract, and that "documentary evidence" proves that the Contract was never cancelled, etc. (See more below)

53. **UNBEKNOWN TO PLAINTIFFS**, Goebel subsequently "Committed Fraud on Plaintiffs and Perjury and Fraud directly on the Appellate Division, because Goebel subsequently somehow withdraw his admission and claim and somehow lied to the Appellate Division that "Jericho" does not want to proceed with the above claims and that Jericho Withdraws those claims and the "documentary evidence".

54. **DOCUMENTARY EVIDENCE PROVES** that Plaintiffs have never defaulted on the Contract. in addition that:

55. **DOCUMENTARY EVIDENCE PROVES** that Plaintiffs have never sent to Midtown a "Notice" requesting back the deposit and never sent to Midtown a "Notice" requesting that they wire the deposit to Szegda as is specifically required under the parties Contract.

56. **DOCUMENTARY EVIDENCE PROVES** that Imperatore, Defendants and Goebel have willfully and deliberately committed fraud on Plaintiffs, fraud on Justice Ramos and fraud on the Justices of the Appellate Division by representing and or misleading, that Plaintiffs requested back the deposit, that Plaintiffs sent a "Notice" to Defendants requesting back the deposit, that Plaintiffs sent a "Notice" to Defendants requesting to wire

9

Supreme Court Records OnLine Library - page 9 of 145

the deposit to Szegda, and that Plaintiffs have actually received back the Deposit on December 13, 2002.

57.  **RECENT ADMISSIONS BY SZEGDA PROVES** that Plaintiffs have never received back the $250,000 deposit from the Midtown Contract, accordingly based on this new admission, which is "Newly discovered Evidence" the Contract was never cancelled. In addition that:

58.  **RECENT ADMISSIONS BY SZEGDA PROVES** that Szegda personally stole from Plaintiffs the $150,000 deposit in the Baystone Case. In addition that:

59.  **DOCUMENTARY EVIDENCE PROVES** that Plaintiffs were ready willing and able to close and that Plaintiffs so notified Defendants in August and September 2002 and thereafter in 2002, 2003 and 2004 and thereafter.

60.  **DOCUMENTARY EVIDENCE PROVES** *that Defendants have willfully and deliberately breached the Contra*ct.

61.  **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed fraud on Justice Ramos by claiming in their Motion to Dismiss and MOL and Imperatore in his Affirmation in support of Midtowns' Motion to Dismiss, *that Defendants have not willfully and deliberately breached the Contract.*

62.  **DOCUMENTARY EVIDENCE PROVES** that Defendants' Attorneys, Fredrick Sherman and Todd Geremia and Robert Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005, that Defendants have willfully and deliberately breached the Contract.

63.  **DOCUMENTARY EVIDENCE PROVES** *that Justice Ramos had confirmed at the Hearing of May 12, 2005,* (directly or indirectly) *that defendants have willfully and deliberately breached the Contract.*

64.  **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed fraud on the Justices of the Appellate Division by claiming in their 2005 Appeal Briefs, **Just the Opposite**, *that Defendants have never willfully and deliberately breached the Contract and that Defendants have never even breached the Contract .*

10

65.  **DOCUMENTARY EVIDENCE PROVES** that Goebel had also willfully and deliberately committed fraud on the Justices of the Appellate Division by not claiming in his 2005 Respondant Brief and or thereafter that Defendants Attorneys, Sherman and Geremia and himself had actually admitted and or represented **Just the Opposite** to Justice Ramos at the Hearing on May 12, 2005, plus that "documentary evidence proves" **Just the Opposite**.  In addition that:

66.  **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed *Actionable Fraud* on Plaintiffs.

67.  **DOCUMENTARY EVIDENCE PROVES** that Defendants' Attorneys, Fredrick Sherman and Todd Geremia and Robert Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005, *that Defendants have willfully and deliberately committed Actionable Fraud* on Plaintiffs.

68.  **DOCUMENTARY EVIDENCE PROVES** that Justice Ramos had confirmed (directly or indirectly) at the Hearing of May 12, 2005, ***that Defendants have willfully and deliberately committed Actionable Fraud on Plaintiffs***.

69.  **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed fraud on the Justices of the Appellate Division by claiming in their 2005 Appeal Briefs, **Just the Opposite**, *that Defendants have never committed any Actionable Fraud on Plaintiffs*.

70.  **DOCUMENTARY EVIDENCE PROVES** that Goebel had also willfully and deliberately committed fraud on the Justices of the Appellate Division by not claiming in his 2005 Respondant Brief that Defendants Attorneys, Sherman and Geremia and himself have admitted to Justice Ramos at the Hearing of May 12, 2005, **Just the Opposite**, plus that "documentary evidence" proves **Just the Opposite**.  In addition that:

71.  **DOCUMENTARY EVIDENCE PROVES** that Plaintiffs *did not elect* to cancel the Contract.

72.  **DOCUMENTARY EVIDENCE PROVES** that Defendants in their Motion to Dismiss and MOL and Imperatore in his Affirmation in support of Midtowns' Motion to Dismiss, have willfully and deliberately committed fraud on Justice Ramos *by claiming and affirming that Plaintiffs have elected to cancel the Contract*.

11

73. **DOCUMENTARY EVIDENCE PROVES** that Defendants' Attorneys, Fredrick Sherman and Todd Geremia and Robert Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005, *that Plaintiffs had not elected to cancel the Contract.*

74. **DOCUMENTARY EVIDENCE PROVES** that Justice Ramos had confirmed (directly or indirectly) at the Hearing of May 12, 2005, ***that Plaintiffs had not elected to cancel the Contract.***

75. **DOCUMENTARY EVIDENCE PROVES** that Defendants have willfully and deliberately committed fraud on the Justices of the Appellate Division by claiming in their 2005 Appeal Briefs, **Just the Opposite**, *that Plaintiffs have elected to cancel the Contract.*

76. **DOCUMENTARY EVIDEN0CE PROVES** that Goebel had willfully and deliberately committed fraud on the Justices of the Appellate Division by not claiming in his 2005 Respondant Brief that Defendants Attorneys, Sherman and Geremia have admitted to Justice Ramos at the Hearing of May 12, 2005 **Just the Opposite**, (plus that Goebel had actually claimed in the AC, and also before Justice Ramos (through Marasse and also personally) at the Hearing on May 12, 2005, that Jericho did not *elect* but was forced to cancel the Contract). In addition that:

77. **DOCUMENTARY EVIDENCE PROVES** that Defendants Motion to Dismiss, MOL, and Imperatore's Affirmation in support of Midtowns' Motion to Dismiss was frivolous, perjury, false and fraud on the Court.

78. **DOCUMENTARY EVIDENCE PROVES** that Defendants' Attorneys, Sherman and Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005, that Defendants Motion to Dismiss, MOL, and Imperatore's Affirmation in support of Midtowns' Motion to Dismiss *was frivolous, false and fraud on the Court*.

79. **DOCUMENTARY EVIDENCE PROVES** that Justice Ramos had confirmed (directly or indirectly) at the Hearing of May 12, 2005, ***that Defendants Motion to Dismiss, MOL, and Imperatore's Affirmation in support of Midtowns' Motion to Dismiss was frivolous, false and fraud on the Court.***

80. **DOCUMENTARY EVIDENCE PROVES** that Justice Ramos had before him, before he signed the Order, dated May 16, 2005, denying Midtown's Motion to Dismiss, the Affirmation of Imperatore in support of Motion to Dismiss and the Exhibits that he attached and the Affirmation of

12

Plaintiffs in support of Jericho's Opposition to Motion to Dismiss and the Exhibits Plaintiffs attached to it, (that Goebel did not remove), whereby Justice Ramos knew or had to have known even just from reading those Affirmations and the Exhibits Attached,. ("Documentary Evidence")  that Imperatore's Affirmation in support of Midtowns' Motion to Dismiss and Defendants Motion to Dismiss and Memo of Law *were frivolous, false and fraud on the Court*.

81.   **DOCUMENTARY EVIDENCE PROVES** that Defendants have never appealed Justice Ramos Order that were based on the real reasons (as mentioned above and below), why Justice Ramos denied Midtowns' Motion to Dismiss.

82.   **DOCUMENTARY EVIDENCE PROVES** that Defendants have appealed a **"HYPOTHETICAL QUESTION"** of Justice Ramos that he asked in the first part of the Hearing of May 12, 2005.

83.   **DOCUMENTARY EVIDENCE PROVES** that Justice Ramos's reasons of May 12, 2005 and Justice Ramos's Order of May 16, 2005 was and is **STILL IN FULL FORCE AND EFFECT**, because they were never appealed by Defendants. (Defendants could not have even tried to appeal those reasons because Defendants Attorneys Admitted to them at the second part Hearing on May 12, 2002, and also because the real "documentary evidence" proves same, plus that Pfeiffer's Affirmation under penalty of perjury, in support of Jericho's Opposition to MTD, was never contradicted or challenged by any Affirmation or any other way, by Defendants or by Defendants Attorneys).

84.   **DOCUMENTARY EVIDENCE PROVES** that Edward Imperatore was actually the **Owner** of Midtown and of the Subject Property. They prove that Imperatore was an **Imposter**, they prove that Imperatore had willfully and deliberately lied and misled Plaintiffs from inception and thereafter, and they prove that Imperatore had willfully and deliberately lied and misled Justice Ramos and the Justices of the Appellate Division in his Affirmation in support of Midtown's Motion to Dismiss and thereafter and in his Affirmation in support of Midtown's Summary Judgment Motion, that he was a simple outside Attorney, who has happened to have worked for Harwood, that Harwood happened to have a client named Midtown and that Harwood happened to have requested Stone and Imperatore to work on a Contract between Midtown and Jericho but that he really was a stranger to Midtown, the Property, Amtrak, NYDEC, and all his knowledge was only

Supreme Court Records OnLine Library  -  page 13 of 145

through "documentary evidence" that he received as part of being an Attorney working for Harwood on a Contract between Midtown and Jericho.

85. **ACCORDINGLY,** because of the recent admissions of Goebel and Szegda, the Court should Order that first before anything, Defendants Goebel and Szegda shall immediately return to Plaintiffs all Documents that they had received from Plaintiffs relating to Baystone, Midtown and other cases.

86. **ACCORDINGLY,** based on the above, the Court should order that before anything, Goebel and Szegda shall first provide to Plaintiffs all Documents in their possession, custody and control relating to Baystone, Midtown, and other cases relating to Plaintiffs, Pfeiffer and Defendants from inception to present that belong to Plaintiffs or entitled under the law, etc.

87. **ACCORDINGLY,** based just on the above, the Court should order and declare that Justice Ramos's Order of May 16, 2005 is Still in Full Force and Effect,  that the Contract between Jericho and Midtown is Still in Full Force and Effect, that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract, that Plaintiffs never cancelled the Contract, that the prior Judgments are vacated, and Order that Mid-town and Defendants should specifically perform and close and transfer title of the Property to Plaintiffs under the terms of the Contract, that Defendants return to Plaintiffs the $250,000 deposit and the $150,000 deposit and award that Defendants pay damages, in an amount to be determined, but at-least $200,000,000, punitive damages, sanctions plus statutory trebling of its damages under 487, in an amount to be determined.


## PRELIMINARY SECOND STATEMENT

88. Plaintiffs are brining this Complaint also because:

89. Plaintiffs have recently discovered that there was some kind of collusion and conspiracy involving Baystone (including Angelos Slabakis),  Michael Szegda (Plaintiffs' Contract Attorney in Baystone and Midtown), Edward Imperatore (Mid-Town's Owner, Midtowns' Contract Attorney and Midtowns' litigation Attorney), Maurice Stone (Midtowns' Contract Attorney), Robert Goebel (Plaintiffs', litigation Attorney), Mr. Marrase (allegedly Plaintiffs' litigation Attorney), and others to commit fraud on Plaintiffs, on the Justices of

14

the Supreme Court, on the Justices of the Appellate Division, First Department, on the Justices of the Court of Appeals, on other Courts, on the Justices of the Disciplinary Committee for the First Judicial Department and on the District Attorney ("DA"), etc. in the Midtown case, Baystone case and other cases.

90. Plaintiffs have recently discovered that Defendants have committed fraud, perjury, extortion, blackmail, mail fraud, wire fraud, forgery, conversion, grand larceny, obstruction of Justice, contempt of Court, and cover-up, etc and that they have willfully and deliberately committed actionable fraud on Plaintiffs, on the Justices of the Supreme Court, on the Justices of the Appellate Division, First Department, on the Justices of the Court of Appeals, on other Courts, on the Justices of the Disciplinary Committee for the First Judicial Department and on the District Attorney, etc.

91. Imperatore, Defendants, Goebel and Marasse, have willfully and deliberately misrepresented, lied and committed fraud on the Honorable Justice Ramos and directly on the Honorable Justices of the Appellate Division, First Department, by representing that Jericho had Cancelled the Contract and that:

92. Imperatore and Defendants have willfully and deliberately misrepresented and lied to Justice Ramos and to the Appellate Division , First Department:

> **that Jericho sent to Midtown  a "Notice of Cancellation" that Jericho cancelled the Contract, that Jericho sent to Midtown a "Notice" to wire the $250,000 deposit to Szegda,** that Jericho received back the $250,000 deposit **and that Jericho did noting since September 12, 2002 for 2 years and only woke up 2 years later in September 2004 and filed a Complaint to vacate a *valid* cancellation that Jericho had <u>*elected* to cancel 2 years before.</u>**

Imperatore, Defendants and Goebel, all knew that it is false, that they are committing perjury, that they are committing Fraud on Plaintiffs, that they are committing Fraud on Justice Ramos and Fraud directly on the of the Appellate Division , First Department, and that they will and that they did mislead Justice Ramos, that they will mislead the Justices of the Appellate Division, First Department, that they will mislead the Justices of the Court of Appeals and they made a mockery of the Justice and Court.

15

93.  Imperatore, Defendants and Goebel, knew plus they had "documentary evidence" that proved that Jericho never cancelled the Contract, that Jericho never sent to Midtown a "Notice of Cancellation" of the Contract, that Midtown never received a "Notice of Cancellation" of the Contract, that Jericho never sent to Midtown a "Notice to wire the $250,000 deposit" to Szegda, and that Jericho sent many letters and made many phone calls to Defendants with letters commencing September 18, 2002 and thereafter including February 16, 2004, requesting to proceed to Closing because Jericho had never cancelled the Contract, never sent to Midtown a "Notice of Cancellation" and never requested that they wire the deposit to Szegda, and that Jericho always told Midtown that they are ready, willing and able to proceed and close title under the terms of Contract.

94.  Plaintiffs had retained Goebel in mid 2002 specifically to claim the above and more (See below).

**BUT INSTEAD GOEBEL AN "OFFICER OF THE COURT" AND THE "ATTORNEY FOR JERICHO" HAD WILLFULLY AND DELIBERATELY COMMITTED FRAUD ON PLAINTIFFS AND WILLFULLY AND DELIBERATELY COMMITTED FRAUD ON THE COURT BECAUSE HE REPRESENTED TO THE COURTS "JUST THE OPPOSITE" <u>THAT JERICHO CANCELLED THE CONTRACT,</u>**

95.  Plaintiffs not knowing that Goebel had committed the above **acts**,  requested from Goebel many times throughout 2005 and 2006 for over 2 years to argue and to prove to the through "Documentary Evidence" that Jericho has never cancelled the Contract, that Jericho never sent to Defendants a "Notice of Cancellation" and that Defendants never received from Jericho a "Notice of Cancellation" and much more, as also spelled out in many letters and E-Mails sent to Goebel (they are "documentary evidences") since 2004 until late 2006, and even requested from Goebel even on August 16, 2006, just one day before the AD's Ruling of August 17, 2006, Goebel always pushed off with different reasons but promised that he will file a SAC or Motion the Court to allow to amend the prior AC with the above Claims, but Goebel never did.

96.  But the recent Admissions by Goebel and the recent discovered "Evidence" confirmed why Goebel never filed the above claims and documents, and why he claimed **Just the Opposite**, because he was in Conspiracy with Defendants to defraud and they defrauded

Supreme Court Records OnLine Library - page 16 of 145

Plaintiffs, the Honorable Justice Ramos and the Honorable Justices of the Appellate Division.

97.  Had Defendants and others not been in a collusion and or not committed fraud, etc, (as mentioned herein) on Plaintiffs, on Justice Ramos and directly on the Justices of the Appellate Division, then Goebel would have filed and argued the real claims, whereby Imperatore and Defendants would have never filed a Motion to Dismiss but even if they would have filed Justice Ramos would have not only denied it but would have ruled that documentary evidence prove that Jericho never cancelled the contract.

98.  But even if they would have appealed to the Appellate Division, the Appellate Division would have denied their Appeal and would have also ruled that documentary evidence prove that Jericho never cancelled the contract.

99.  But even if for some reason Justice Ramos and or the Justices of the Appellate Division would have directed to precede to trial the trial Judge or Jury would have ruled that documentary evidence prove that Jericho never cancelled the contract.

100.      Accordingly, *But for*, Defendants perjury's, misrepresentations, and fraud, etc, (as mentioned herein) on Plaintiffs, and directly on Justice Ramos and directly on the Justices the Appellate Division, the Courts would have ruled that documentary evidence prove that Jericho never cancelled the Contract and that Mid-Town and Defendants must specifically perform under the terms of the Contract and close and transfer title to Jericho under the terms of the Contract.

101.      **ACCORDINGLY,** just based on the above reasons the Court should Order that Mid-town and Defendants  should specifically perform and close title with Plaintiffs under the terms of the Contract and that Defendants should pay to Plaintiffs for all the damages, cost, expenses that Plaintiffs incurred relating to the Mid-Town and Midtown cases from 2001 to present, plus punitive damages, Sanction and treble damages under Judiciary Law 487, etc, in an amount to be determined at trial.

## PRELIMINARY THIRD STATEMENT

102.      Plaintiffs are brining this Complaint also because:

17

103.      Szegda, has recently admitted: that he was in collusion with officers of Baystone to defraud Plaintiffs (but he did not reveal with whom at Baystone[7]) in the Baystone case, to steal from Plaintiffs and from others Millions of dollars, that he was an **Imposter**, that he was not only the Contract Attorney of Baystone, that he was actually the vice President and owner of Baystone, that he personally stole from Plaintiffs $150,000, that he stole Plaintiffs $150,000 deposit from the Escrow account.

104.      Szegda has recently admitted that he was in collusion with Defendants (But he did not reveal with which Defendants[8]) to defraud the below and that they have willfully and deliberately defrauded Plaintiffs, the Justices of the Supreme Court, the Justices of the Appellate Division, First Department and the Justices of the COA and others.

105.      Szegda refused even in 2013 to return to Plaintiffs, Plaintiffs own documents plus refused even in 2013 to provide to Plaintiffs copies of his files relating to the Midtown and Baystone cases that would prove even more the above (Plaintiffs requested many times the above documents from Szegda since 2002 but he never provided them[9]).

106.      Goebel has recently admitted that he was in collusion with Defendants and others, (But he did not reveal with which individuals [10]) to defraud the below and that they have willfully and deliberately actually defrauded Plaintiffs, the Justices of the Supreme Court, the Justices of the Appellate Division, First Department, the Justices of the COA and others from inception to present.

107.      Goebel refused even in 2013 to return to Plaintiffs, Plaintiffs own documents plus refused even in 2013 to provide to Plaintiffs copies of his files relating to the Midtown and Baystone cases that would prove even more the above. (Plaintiffs requested many times the above documents from Goebel since 2005 but he never provided[11]).

108.      Goebel committed in 2013, Extortion, Blackmail, holding Hostage Plaintiffs own Documents, refusing to provide critical documents, claiming that he destroyed critical

---

[7] Plaintiffs and the Court will only be able to find out through Discovery process with whom they were in collusion, and or conspiracy when and until when they, what was the deal and what was the reward or promise, etc.

[8] Plaintiffs and the Court will only be able to find out through Discovery process with whom they were in collusion, when and until when, what was the deal and what was the reward or promise, etc.

[9] Plaintiffs will only be able to obtain those critical documents that belong to Plaintiffs only through a Court Order.

[10] Plaintiffs and the Court will only be able to find out through Discovery process with whom they collusion, when and until when they were in collusion, what was the deal and what was the reward or promise, etc.

[11] Plaintiffs will only be able to obtain those critical documents that belong to Plaintiffs only through a Court Order.

Supreme Court Records OnLine Library - page 18 of 145

documents in 2012, claiming to Court Reporter that he only destroyed copies, threatening to destroy critical documents, Fraud, Obstruction of Justice collusion to block the Court Reporter to provide information, and other unethical actions and tactics, plus to manipulate to block and prevent Plaintiffs from filing a new Complaint or Motions based on the newly discovered "Evidence", to force Plaintiffs to retain him as the Supervising Attorney and allow him to continue and to expand their prior fraud and to cover-up their prior fraud plus to allow him to prepare and to file the new Complaint or Motion with stupid and crazy claims to again defraud the Courts and help Defendants and himself in their continuing collusion and cover-up.

109.      As part of their collusion and fraud was that they represented to the Courts, that Jericho had cancelled the Contract, that Plaintiffs sent to Midtown a "Notice" cancelling the Contract, that Plaintiffs elected to cancel the Contract, that Plaintiffs sent to Midtown a "Notice" to return and wire the $250,000 deposit to Szegda, that Plaintiffs received back the $250,000 deposit, that that Plaintiffs deposited the $250,000 in its own bank account and that Plaintiffs  did nothing for 2 years and that Plaintiffs woke up 2 years later. (See herein).

110.      As part of their collusion and fraud was that, even though, Documentary Evidence Proved: that Defendants have willfully and deliberately breached the Contract; that Plaintiffs have requested the critical Exhibits relating to the Amtrak Agreement much before September 2, 2002; that Plaintiffs have requested the critical Documents relating to the oil spill on Midtowns' own Property much before August 30, 2002, that Plaintiffs did not "Elect" to Cancel the Contract;  that Imperatore and Defendants have willfully and deliberately committed Actionable Fraud on Plaintiffs at signing of the Contract and thereafter;  that Defendants have willfully and deliberately committed Fraud on the Court in their MTD and in their Memo of Law;  that Imperatore had willfully and deliberately committed fraud on the Court in his Affirmation in support of Midtowns' Motion to Dismiss; and EVEN THOUGH;

111. Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005 that Defendants have willfully and deliberately breached the Contract; Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005 that Plaintiffs have requested the critical Exhibits relating to the Amtrak Agreement much before September 2, 2002; Sherman, Geremia and Goebel have admitted to Justice Ramos

19

at the Hearing of May 12, 2005 that Plaintiffs did not "Elect" to Cancel the Contract; Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005 that Imperatore and Defendants have willfully and deliberately committed Actionable Fraud on Plaintiffs at signing of the Contract and thereafter; Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005 that Defendants have willfully and deliberately committed Fraud on the Court in their MTD and in their Memo of Law; Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005, that Imperatore had willfully and deliberately committed fraud on the Court in his Affirmation in support of Midtowns' Motion to Dismiss; Sherman, Geremia and Goebel have admitted to Justice Ramos at the Hearing of May 12, 2005 that even if Plaintiffs cancelled the Contract (which it never did) it was not a *valid* cancellation, and EVEN THOUGH,

112. Justice Ramos stressed in the Second Part of the Hearing of May 12, 2005, that

## "LET ME FRAME THE QUESTION IF I CAN FOR MY PURPOSES AND FOR PURPOSES OF THE RECORD"

- **THE COURT:**       **Let me frame the question if I can for my purposes and for Purposes of the RECORD.**

- **From what counsel has told me, he put some meat on the bone now, he said DURING the 75-day period [July 2002] they asked for a copy of the lease [exhibits] with Amtrak because obviously if they didn't have a right to build above. The Amtrak tracks, the property could be used for what, a PARKING LOT, and that would be it.**

113.       Whereby Justice Ramos has confirmed (See below), that Defendants have willfully and deliberately breached the Contract;  that Plaintiffs have requested the critical Exhibits relating to the Amtrak Agreement much before September 2, 2002;  that Plaintiffs did not *elect* to cancel the Contract: that even if Plaintiffs cancelled the Contract (which it never did) it was not a *valid* cancellation; that Defendants have willfully and deliberately committed

20

Actionable Fraud on Plaintiffs at signing of the Contract and thereafter;  that Defendants had committed actionable fraud on the Court in their MTD and in their Memo of Law; that Imperatore had willfully and deliberately committed fraud on the Court in his Affirmation in support of Midtowns' Motion to Dismiss, and

114.    Even though, Justice Ramos, stressed, **"For Purposes of The Record** ",and

115.    Even though Sherman and Geremia and Goebel have never retracted their admissions that they have admitted to Justice Ramos at the Hearing of May 12, 2005, and

116.    Even though Defendants never filed a Re-argument Motion with Justice Ramos,

117.    Defendants filed a Notice of Appeal and their 2005 Appeal Briefs, claiming that the Appellate Division, should reverse Justice Ramos's Order because:

1.  Because Justice Ramos **"HYPOTHESIZED"**, because Justice Ramos **"FIXATED"** because Justice Ramos made up a *"new law"* because Justice Ramos **ERRONEOUSLY MADE A MISTAKE IN THE *LAW*** and because **"THERE IS NO LAW TO SUPPORT THE LOWER COURT'S RATIONALE."**, they also misled the Appellate Division, in essence claiming or admitting, that

2.  Defendants and Jericho both agree and admit that the issue before the AD is only if Jericho could wake up two years later after they had *elected* to cancel the Contract to try to vacate a *valid cancellation*, based on a claim that they have discovered new facts after two years,

3.  That Defendants and Jericho both agree and admit that the reason that Justice Ramos denied Midtowns MTD was because he stated that there may be circumstance under the law where a Court could vacate a *valid cancelled* Contract and reinstate the Contract even though the purchaser had previously *elected* to cancel the Contract and that the Jericho Case may fit that circumstances.

4.  That Defendants and Jericho both agree and admit that there was no other reason why Justice Ramos denied Midtowns MTD.

5.  That Defendants and Jericho both agree and admit that Jericho sent to Defendants on September 12, 2002, a "Notice" cancelling the Contract, and that is not an issue before the Court,

Supreme Court Records OnLine Library - page 21 of 145

6.   That Defendants and Jericho both agree and admit that Jericho cancelled the Contract on September 12, 2002, and that is not an issue before the Court,

7.   That Defendants and Jericho both agree and admit that Jericho never complained and never sent any letters to Midtown since September 12 2002 to September 2, 2004 that Jericho never canceled the Contract and that Jericho wants to proceed to closing, and only woke up for the first time in late 2004 to claim they want to vacate a *valid* cancellation, and that is not an issue before the Court, and that is not an issue before the Court,

8.   That Defendants and Jericho both agree and admit that Jericho sent to Defendants a "Notice" on September 3, 2002, requesting the return of the $250,000 deposit, and that is not an issue before the Court,

9.   That Defendants and Jericho all agree and admit that Defendants sent back to Jericho on September 13, 2002, the $250,000 deposit, and that is not an issue before the Court,

10.   That Defendants and Jericho both agree and admit that Jericho received back the $250,000 deposit and Plaintiffs never complained to Defendants, and that is not an issue before the Court,

11.   That Defendants and Jericho all agree and admit that Jericho has *elected* to cancel the Contract, and that is not an issue before the Court,

12.   That Defendants and Jericho both agree and admit that it was a *valid* cancellation, and that is not an issue before the Court,

13.   That Defendants and Jericho both agree and admit that Midtown did not willfully and deliberately breached the Contract specifically par 29c) of the Contract, and that is not an issue before the Court,

14.   That Defendants and Jericho both agree and admit that Plaintiffs only requested from Defendants for the first time the exhibits relating to an Amtrak Agreement only on September 2, 2002, and that is not an issue before the Court,

15.   That Defendants and Jericho both agree and admit that Plaintiffs never requested from Midtown and Amtrak to set up a meeting relating to the Contract with Midtown and to provide the exhibits and other critical document and never sent letters to Amtrak in July and August 2002 requesting the above, and that is not an issue before the Court,

22

16. That Defendants and Jericho both agree and admit that all requests to Defendants were made only by Szegda and only by letters, but no requests were ever made by Plaintiffs, and that is not an issue before the Court,

17. That Defendants and Jericho both agree and admit that Plaintiffs only requested from Defendants for the first time information, representation or documents relating to *an* oil spill only on August 30, 2002, and that is not an issue before the Court,

18. That Defendants and Jericho both agree and admit that "by e-mail dated August 23, 2002, Midtown volunteered and informed Jericho that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase", and that is not an issue before the Court,

19. That Defendants and Jericho all agree and admit that by e-mail dated August 23, 2002, Midtown did not admit for the first time, to Emmet and Jericho that Imperatore had defrauded Jericho from inception until August 23, 2002, because he admitted on August 23, 2002, that there was actually an oil spill on *the land* Jericho sought to purchase and it was not even cleaned up as of August 23, 2002, and that is not an issue before the Court,

20. That Defendants and Jericho both agree and admit that Plaintiffs requested documents relating to an oil spill on *the land* near the Property that Jericho sought to purchase (when in fact they knew that Plaintiffs requested documents relating to an oil spill on *the land* that Jericho sought to purchase, starting in June, July and August 2002 and specifically on August 21, 2002), and that is not an issue before the Court,

21. That Defendants and Jericho both agree and admit that Plaintiffs (not Szegda) never requested from Midtown to extend the due diligent Period to December 31, 2002, and that is not an issue before the Court,

22. That Defendants and Jericho both agree and admit that Defendants never extended to Plaintiffs (not to Szegda) the due diligent Period to December 31, 2002, and that is not an issue before the Court,

23. That Defendants and Jericho both agree and admit that Imperatore was not the owner of Midtown but simply an Attorney at Harwood Lloyds that he happened to be the Contract attorney to a client of Harwood (Midtown), (when in fact he was an Imposter

23

and committed fraud on Plaintiffs before, during and after signing of the Contract because he was the Owner of Midtown ), and that is not an issue before the Court,

24. That there was no letters, emails and oral requests made by Plaintiffs to Defendants relating to the exhibits to the Amtrak Agreement, Documents relating to the oil spill, requests relating to extensions and that Plaintiffs (not Szegda), never requested any documents etc, from Defendants since signing of Contract until September 12, 2002.

118. They have willfully and deliberately lied and misled the Appellate Division "That Defendants and Jericho both agree and admit to the above" when they knew that Jericho does not agree to any of the above and that documentary evidence prove that all the above is false.

119. They have lied, misrepresented and misled the AD why Justice Ramos denied Midtown's MTD, and that the issue before the AD is that the AD should Rule if Justice Ramos had the right to pause the "hypothetical question" and deny Midtown's MTD based on that "hypothetical question"?

120. Defendants have committed Major Fraud on the Court and specifically on the Appellate Division (**Unprecedented in the History**) by filing an Appeal and Appealing Justice Ramos's "**HYPOTHETICAL QUESTION**" that Justice Ramos posed at the "First Part" of the Hearing on May 12, 2005, before Sherman and Geremia were forced to and admitted in the "Second Part" of the Hearing on May 12, 2005 that their MTD was fraud on the Court and that Midtown had willfully and deliberately breached the Contract, etc.

121. Defendants and Goebel have subsequently committed numerous frauds specifically o**n** the Appellate Division.

122. The "Evidence" proves that the "*Reason*" why Justice Ramos did not actually Rule on May 12, 2005, that "documentary evidence" proves that Plaintiffs had never cancelled the Contract, was because Imperatore, Goebel, Marrase and Defendants have committed fraud on Justice Ramos, by representing to him that Plaintiffs have cancelled the Contract by Plaintiffs sending to Mid-Town a "Notice of Cancellation". (See herein )

123. Documentary evidence proves that Defendants Attorneys never retracted their admissions to Justice Ramos, and never appealed the finding of facts of Justice Ramos on May 12, 2005 nor the Affirmation of Pfeiffer in Opposition to MTD of February 2005.

24

124.     Documentary evidence proves that the same is true also re: Oil Spill Documents.

125.     They have lied and misrepresented and did not tell the Appellate Division the real reason why Justice Ramos denied Midtowns MTD, what they had admitted to Justice Ramos at the Hearing of May 12, 2005 and what the real documentary evidences proves, and instead they have completely contradicted what they themselves had admitted to Justice Ramos at the Hearing of May 12, 2005 and what the real documentary evidences proves.

126.     **ACCORDINGLY,** documentary evidence proves beyond a doubt that the Contract was never cancelled, and that the Contract was always in effect and in good standing and that it is still in full force and effect and in good standing in 2013,

127.     **ACCORDINGLY,** even if one could somehow hypothetically argue that Plaintiffs had somehow cancelled the Contract, even so, documentary evidence proves, plus Sherman and Geremia, **admitted** to Justice Ramos on May 12, 2002,  1) that Midtown had willfully and deliberately breached the Contract, 2) that Midtown had committed actionable fraud on Jericho, 3) that Plaintiffs (not Szegda) requested the Exhibits relating to the Amtrak Agreement much earlier than September 2, 2002, 4) that the Exhibits relating to the Amtrak Agreement always *Existed*, 5) In addition, that anybody who read the "Amtrak Agreement" would know that the **Exhibits** always **Existed** and that Defendants had them in their Possession throughout 2002, In fact, Justice Ramos also confirmed same, on May 12, 2002, even though he did not see the Amtrak Agreement (because Defendants have willfully and deliberately hid the Amtrak Agreement from the Courts See also FN 18 herein), 6)  that AMTRAK, CRC, plus Defendant; Arthur Imperatore, Ross, and the other Defendants in this Case Affirmed under Oath and Notarized that the **Exhibits**, were attached to the "Amtrak Agreement," 7) that nobody would close title without the Exhibits the Property because only used would be a "Parking lot", 8) Defendants Attorneys admitted that Plaintiffs did not *elect* to cancel the Contract, and  8) that it was not a *valid* cancellation of the Contract, Accordingly, even on the "hypothetically argument" the Court should reinstate the Contract.

128.     **ACCORDINGLY,** for the above reasons the Court should Order:

129.     That Mid-town and Defendants should specifically perform and close title with Plaintiffs under the terms of the Contract.

25

Supreme Court Records OnLine Library -  page 25 of 145

130.     That Defendants should not enter into any Contract or agreement sell the Property(s).

131.     That Midtown and Defendants should return to Plaintiffs or put into escrow with an agreed escrow agent the $250,000 deposit relating to the Midtown Contract.

132.     That Szegda and Defendants should return to Plaintiffs the $150,000 deposit relating to the Baystone Contract.

133.     That the Defendants should pay to Plaintiffs for all the damages, cost, expenses that Plaintiffs incurred relating to the Midtown and Baystone cases from 2001 to present, plus punitive damages, etc, in an amount to be determined at trial.

134.     To sanction some Defendants for all the fraud that they have committed on Plaintiffs from 2001 to present plus treble damages under Judiciary Law 487.

135.     The Court should also sanction some of Defendants for all the fraud that they have committed directly on the Justices of the Supreme Court, on the Justices of the Appellate Division, First Department, on the Justices of the COA, on the Justices of the Disciplinary Committee for the First Judicial Department and on the District Attorney since 2000 to present.

## PRELIMINARY FOURTH STATEMENT

136.     Plaintiffs are bringing this Complaint also because:

137.     Plaintiffs have recently discovered for the first time, an E-Mail dated August 21, 2002.

138.     The E-Mail was sent by defendant Emmet to Defendant Edward Imperatore, on August 21, 2002, the E-Mail stated as follows:

**"Dear Ed {Imperatore}:**

**Sam Pfeiffer of Jericho wondered if you might send him the papers documenting the successful clean-up of the oil spill Caused (emphasis added) by the neighboring property.**

**My best**

26

**Elaine"**

139.　　This one E-mail by itself proved that:

1. Defendants have willfully and deliberately withheld and hid from Plaintiffs, from the Lower Court, from the Honorable Justice Ramos and from the Honorable Justices Mazzarelli, J.P., Saxe, Nardelli, Sweeny, McGuire, JJ of the Appellate Division, First Department, and from all the subsequent Honorable Justices of the Appellate Division and from the Honorable Justices of the COA this Critical E-Mail.[12]

2. Defendants have willfully and deliberately committed fraud on Plaintiffs from inception to present.

3. Defendants have willfully and deliberately committed fraud on the Justice Ramos, on the Justices of the Appellate Division and on all the subsequent Justices of the AD and COA from inception to present.

4. Defendants have willfully and deliberately committed perjury in their Affirmations in the Midtown case from inception to present that the first time Jericho requested information and documents relating to an oil spill was only on August 30, 2002.

5. This E-mail is "documentary evidence" that proves that Midtown and Defendants had willfully and deliberately breached the Contract, that Jericho never *elected* to cancel the Contract, that Jericho has *never* cancelled the Contract, that the Contract between Jericho and Midtown was always in effect and is still in effect, and that Defendants always knew the above but willfully and deliberately committed fraud on the Courts.

140.　　The discovery of the above E-mail resulted in subsequent recent **discoveries of additional extremely critical evidence,** including but not limited, **many E-mails, Documents, Evidence, information, Critical Depositions, Admissions,** and Critical

---

[12] Upon information and believe, Goebel also did not subpoena Szegda, Stone, Amtrak, the 3 officers of Amtrak that Plaintiffs sent letters to them, Shafran, partners of Midtown, NYDEC, officers of NYDEC, filed from the City agencies, a representative of City agencies, Environmental experts, Plaintiffs Architects, Joseph Kennedy, and others (or did but hid them from Plaintiffs ) even though requested many times by Plaintiffs and even though promised many times by Goebel and even whom he and or Defendants did subpoena and even if got from them documents and deposition they hid them from Plaintiffs and the Court.

27

**Affirmations** of Defendants Agent, Recording of many conversation with Defendants, ("**Evidence**" ), whereby they Prove the Claims in this Complaint and much more.

141.     Plaintiffs have recently discovered that critical "Evidence" are still being withheld from Plaintiffs by Defendants and by Goebel and Szegda, as part of their ongoing and continued fraud and cover up of their "blatant fraud", that they have committed on plaintiffs, on Justice Ramos, on the of the Appellate Division and on the subsequent Justices of the Appellate Division, etc.

142.     The "Evidence" that Plaintiffs obtained and discovered recently is only the tip of the iceberg, because Plaintiffs were not yet provided with the documents and "Evidence" from Szegda and Goebel.

143.     The "Evidence" obtained so far, already proves that Imperatore and Defendants have willfully and deliberately committed fraud on Plaintiffs from inception and thereafter to present.

144.     The "Evidence" obtained so far, already proves that Imperatore and Defendants have willfully and deliberately committed perjury and blatant fraud directly on the Courts from inception and thereafter to present.

145.     The "Evidence" proves that Goebel has willfully and deliberately committed fraud on Plaintiffs from inception and thereafter to present.

146.     The "Evidence" proves that Goebel has willfully and deliberately committed perjury and blatant fraud on the Courts from inception and thereafter to present.

147.     The statements of the Justices of the AD, in their August 17, 2006 Ruling, proves that Imperatore, Defendants and Goebel have completely misled the Justices of the AD .

148.     The statements of the Justices of the AD in their August 17, 2006 12 page Ruling, proves that the Justices of the AD did not know;

    a.  What the facts of the Case was,

    b.  What Plaintiffs claims were,

    a.  What the real documentary evidence prove,

    b.  What fraud Imperatore, Defendants and Goebel have committed on Justice Ramos at the "first part" of the Hearing on May 12, 2005,

    c. What took place at the "second part" of the Hearing on May 12, 2005,

28

d.  What Defendants and Goebel admitted to Justice Ramos at the "second part" of the Hearing of May 12, 2005,

e.  Why Justice Ramos really dismissed Midtown's MTD, and

f.   What Documents were provided, what was discovered, what was admitted and what was contradicted?  They fact is that they proved, that everything claimed to the Appellate Division before the August 17, 2006 Ruling was false.

### Recent Admissions of Robert Goebel

149.      The recently discovered "Evidence" resulted that Robert Goebel had recently reluctantly admitted and or claimed that he  was in collusion with Defendants to defraud Plaintiffs and that they have together willfully and deliberately committed fraud on Plaintiffs in the Midtown case from inception to present.

150.      The recently discovered "Evidence" resulted that Robert Goebel had recently reluctantly admitted to Plaintiffs, that Goebel was in collusion with Defendants to defraud the Courts and that they have together willfully and deliberately committed fraud on the Supreme Court, on Justice Ramos on the Justices of the AD and on the Justices of the COA in the Midtown case from inception to present.

151.      The recently discovered "Evidence" resulted that Robert Goebel had recently admitted to Plaintiffs, that he had and still has in his possession even in 2013, extremely critical Documents that he had willfully and deliberately withheld and hid from Plaintiffs and from the Courts since inception to present.

152.      Robert Goebel had recently also admitted to Plaintiffs; **"that the Documents that he has in his possession that he had withheld and is still withholding from the Plaintiffs and from the Courts, are:**

i.   **Explosive**, are

ii.  **Dynamites**, are

iii. **Atomic bombs**, are

iv.  **Bombs, bombs and bombs**,

v.   **That if and when he will provide those Documents to Plaintiffs, then Plaintiffs will put on their Dancing Shoes,**

29

vi. **That if and when he will provide those Documents to Plaintiffs, then Plaintiffs will dance in middle of the Street,**

vii. **That those Documents will Prove to the Courts, that Imperatore, and Defendants, have committed Fraud on Plaintiffs, Fraud on Justice Ramos, Fraud directly on the Justice of the Appellate Division and on the Justice of the Court of Appeals,**

viii. **That if Plaintiffs will file a Motion or Complaint based on those Documents, Defendants will not dare to file any Motion, Reply, Answer or Opposition because they are so Powerful, but instead they will run to settle with Plaintiffs,**

ix. **That those Documents are so Powerful that if he would be the Plaintiff in this case he would immediately run to the Bank and borrow from the bank $1,000,000 and immediately retain one of the biggest Park Avenue Law-firms, and give them the $1,000,000 as a Retainer.**

153.    Goebel however refused to provide those critical documents to plaintiffs, <u>unless Plaintiffs will first comply with Goebel's Extortion and Blackmail, etc.</u>[13]

### GOEBEL HAD COMMITTED ON PLAINTIFFS IN 2013 FRAUD, EXTORTION, BLACKMAIL, OBSTRUCTION OF JUSTICE AND UNETHICAL ACTIONS AND TACTICS TO COVER-UP AND TO FURTHER THEIR FRAUD

154.    The recently discovered "Evidence" also shows that Goebel in 2013, used extortion, blackmail, fraud, obstruction of justice and other unethical actions and tactics, to:

1. manipulate, block and prevent Plaintiffs from filing a new Complaint or Motions based on the newly discovered "Evidence",

2. Goebel requested in 2013 that Plaintiffs should retain Goebel as the Supervising Attorney of Plaintiffs,

3. Goebel requested that Plaintiffs immediately provide to Goebel $100,000 that he should be able to hire an assistant Attorney to help him prosecute a new Complaint or

---

[13] Plaintiffs will only be able to obtain those "extremely critical documents" that belong to Plaintiffs only through a Court Order.

Supreme Court Records OnLine Library - page 30 of 145

Motions based on his alleged four to five undisclosed "new ideas" that he claimed only became *valid* after the year 2008,

4. Goebel claimed that he wants to make sure that the Court should not find out about the newly discovered "Evidence", that Plaintiffs discovered because that will turn off the Court,

5. Goebel claimed that he may attach to his new Complaint or Motions some undisclosed documents that Goebel claimed he had only recently discovered that he believes that they are newly discovered evidence and prove something ,

6. Goebel claimed that if Plaintiffs will comply with Goebel's extortion and blackmail then he will argue to the Courts and present the documents mentioned in the prior paragraph.

7. Goebel did all the above and much more in order to cover-up Imperatores', Goebel's, Szegdas' and Defendants collusion and fraud on Plaintiffs, on Justice Ramos and on the Justices of the AD from inception to present and to further their collusion and fraud on plaintiffs, on Justice Ramos on the Justices of the AD even in 2013.

155. Goebel refused even as late as 2013 to return to Plaintiffs the documents and evidence that Plaintiffs provided to Goebel in 2004, 2005 and 2006 in the Baystone and Midtown cases, with the condition that he will make copies but immediately return the original to plaintiffs, but never did even though Plaintiffs requested the return of their critical documents in 2005 -2006 and even in 2013.

156. Plaintiffs have discovered that Goebel had willfully and deliberately not returned those documents in 2005-2006 and thereafter and willfully and deliberately withheld them from the Courts.

157. Goebel refused even in 2013 to provide to Plaintiffs the documents and evidence in his files and or his entire file relating to the Baystone and Midtown cases even though Plaintiffs requested those documents many times and even in 2013.

158. **Goebel denied even in 2013 that he ever represented Szegda or any entity where Szegda was an officer or owner of that entity**.

159. Goebel denied even in 2013 that Szegda was an officer or owner of Baystone, that he never heard that Szegda was an officer or owner of of Baystone and that he never filed

31

any documents with any Court that showed that Szegda was an officer or owner of Baystone.

160.      Plaintiffs have recently discovered that this representation by Goebel was false, because documentary evidence shows that,:

1.  That Goebel commenced a case in August 2004 captioned, Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C., No. 0602745/2004 (N.Y. Sup. Ct. 2004) ("Baystone I") and a related case Baystone Equities Inc v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C.,  No. 105732/2005 (N.Y. Sup. Ct. 2005) ("Baystone II") before the Honorable Justice Walter B. Tolub,

2.  Goebel represented Baystone in connection with an action by Baystone alleging fraud and malpractice against the former lawyers of the defendant in Gerel in Baystone V Gerel Corp.., #601235/01, involving a contract to sell three parcels of real estate valued at one hundred million dollars for allegedly "fail[ing] to disclose certain facts allegedly known to her, [and] intentionally mislead the Court,"

3.  The court sanctioned Baystone in the 2004 action and sanctioned Goebel and Baystone in the 2005 action for filing what it determined was a "frivolous action".

4.  Goebel had also filed an appeal, Record of Appeal and Appeal briefs in the same case on March 3, 2005, before the AD, First Department,

161.      The cases Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C.,  clearly showed that Goebel knew that Szegda is the Vice President and owner of Baystone and that he represented Szegda.

162.      Goebel has committed fraud on Plaintiffs from inception for not disclosing to Plaintiffs before being retained by Plaintiffs that he represents Szegda, that Szegda is an officer and partner in Baystone,

163.      Goebel has committed fraud on Plaintiffs from inception for misrepresenting to Plaintiffs that he has no conflict of interest or potential conflict of interest with any of the parties in the Midtown case including Szegda.

164.      Goebel has committed fraud on Plaintiffs from inception for misrepresenting the reason why he did not sue Szegda in the Midtown case and in the Baystone case.

Supreme Court Records OnLine Library - page 32 of 145

165.     Goebel has committed fraud on Plaintiffs by not disclosing throughout his representation of Plaintiffs that he represents Szegda, that he is actually a partner with Szegda and that at the same time (2004-2006) he is representing Szegda in litigation before the Honorable Justice Walter B. Tolub, in New York County in the two cases of Baystone plus that he is representing Szegda in the Appeal of Baystone before the Justices the AD, First Department as in the Midtown cases.

166.     Goebel has committed fraud on Plaintiffs by not disclosing to Plaintiffs throughout his representation of Plaintiffs, and thereafter, that Baystone, Szegda and Goebel were actually sanctioned by Justice Tolub and by the Justices of AD, First Department, in 2005-2006, at the same time that Defendants and Goebel are filing appeals before the same Justices of the AD, relating to the actions and credibility of Szegda and Goebel, whereby the  credibility of Szegda and Goebel in the eyes of the Court was completely shattered in 2005-2006, and automatically affected the credibility of Plaintiffs the client of Szegda and Goebel in the Midtown case before the AD, First Department.

### Recent Admissions of Michael Szegda

167.     Michael Szegda, Plaintiffs Contract Attorney, had recently admitted to Plaintiffs that:

1. He was actually the vice president and owner of Baystone:

2. He actually allegedly was a Partner with Plaintiffs!

3. He was an **Imposter** and that he had personally stole from Plaintiffs in the Baystone transaction in 2001-2002, $150,000, plus caused expenses and damages for Plaintiffs well over $500,000.

4.  He had conspired together with his partners (including Angelos Slabakas) and representatives in Baystone in 2001 and thereafter to steal from Plaintiffs more than $500,000, in the Baystone and other transactions.

5. That he tried to steal from Richard Scharf over the $1,000,000. See Baystone v. Scharf # 605085/00.

6. He stole hundreds of thousands or even millions of dollars from his own clients and from his own escrow account.

33

7.   He had plead guilty to a criminal Indictment brought against him by the District Attorney in 2005, for Grand Larceny for stealing hundreds of thousands of dollars or Millions of dollars from some of his clients.

8.   He was permanently disbarred in 2005 by the Departmental Disciplinary Committee for the First Judicial Department, from practicing law.

9.   That even when he pled guilty in 2005 he committed further fraud on the District Attorney, the Sentencing Judge and the Honorable Justices of the Departmental Disciplinary Committee for the First Judicial Department, because he did not disclose to them that he had stolen from Plaintiffs$150,000 plus caused Plaintiffs damages in excess of $500,000,

10.  That even when he pled guilty in 2005 he further committed fraud on the District Attorney, the Sentencing Judge and the Honorable Justices of the Departmental Disciplinary Committee for the First Judicial Department, because he did not disclose to them that he had stolen from Plaintiffs$250,000 and caused damaged Plaintiffs much more than $5,000,000 in the Midtown transaction,

11.  That even when he pled guilty in 2005 he committed fraud on the District Attorney, the Sentencing Judge and the Honorable Justices of the Departmental Disciplinary Committee for the First Judicial Department, because he did not disclose to them that he had willfully and deliberately committed fraud on Plaintiffs by faxing an unauthorized and fraudulent letter to Imperatore on September 12, 2002, purportedly cancelling Jericho's $28,000,000 Contract that Plaintiffs had with Midtown,

12.  That he did not disclose to the DA, the Sentencing Judge and the Disciplinary Committee for the First Judicial Department, that he was holding Jericho hostage by refusing to return and to provide to Jericho the files that Jericho requested from him since 2002 in the Midtown transaction, and thereby obstructing Justice and committing fraud on Plaintiffs plus on the Courts.

168.    Plaintiffs has subsequently discovered that in September 20, 2005 Szegda was suspended from the practice of law "By order entered September 20, 2005, this Court suspended respondent from the practice of law pursuant to 22 NYCRR 603.4(e)(1)(i) and (iii) for failure to cooperate with the Committee's investigation into two complaints, one concerning escrowed real estate downpayment funds totaling more than $350,000 and the other concerning escrowed funds being held on behalf of a film producer, and based upon

34

uncontested evidence of professional misconduct (i.e., **conversion of escrowed funds**) (Matter of Szegda, 22 A.D.3d 103, 804 N.Y.S.2d 50 [2005]□), and that in 2007 Szegda was automatically and retroactively disbarred as of the date of his felony conviction. See In re Szegda, 42 A.D.3d 193, 194 (1st Dep't 2007).

169.     Plaintiffs has subsequently discovered that "On or about December 2, 2005, an indictment was filed in New York County, Supreme Court, charging respondent with grand larceny in the second degree in violation of Penal Law § 155.40(1), for stealing property valued in excess of $50,000 (**the escrowed real estate downpayment funds**) from his client *during the period February 2001 through March 2003.*   On December 13, 2005, respondent pleaded guilty to the indictment, grand larceny in the second degree (Penal Law § 155.40[1]□), a class C felony.   That on the same day respondent was sentenced to 100 hours of community service and five years probation."

170.     Szegda has recently also admitted to Plaintiffs that there was an understanding between him and Defendants that he would send to them an unauthorized letter purporting to cancel the Contract between Jericho and Defendants and for that Defendants would wire from their New Jersey bank directly to Szegda's Bank account in New York, $250,000 which Defendants were holding in escrow as the deposit on the Jericho/Midtown contract.

171.     Szegda admitted that if Defendants will send to Szegda's Bank account in New York the $250,000 he would get control of the $250,000 and be able to steal the $250,000 from Jericho, as he had stolen from Plaintiffs in the Baystone matter and from other clients,

172.     Szegda admitted further that he knew and Midtown knew that they had no right to wire the $250,000from their New Jersey bank to his bank in New York.

173.     Szegda admitted further that he knew and Midtown knew and he told Midtown that Jericho did not want to cancel the Contract and did not authorized him to cancel the Contract.

174.     Szegda admitted further that he knew and Midtown knew that  no cancellation could be effective unless it is sent by "Notice" from Jericho 155 Lee Avenue and signed by Samuel Pfeiffer or a principle of  Jericho,

175.     Szegda admitted further that he knew and Midtown knew that the September 12, 2002 faxed letter even if it would have been sent by "Notice" from Jericho and signed by

Supreme Court Records OnLine Library - page 35 of 145

Samuel Pfeiffer or a principle of Jericho would not have constituted a cancellation of the Contract, because it was a request to provide the requested documents not a cancellation of the contract as his letters prove.

176.     Szegda admitted further that the documents and information in his file proves that what Defendants argued to the Court in the Midtown case was false.

177.     Szegda admitted further that he had the file of Jericho-Midtown in 2002-2006 and still has them even in 2013 contrary to what he told Plaintiffs in 2002 -2006.

178.     Szegda admitted further that Goebel and Defendants have never subpoenaed him for "Production of documents Request or for his deposition".

179.     Plaintiffs requested from Szegda to be allowed to review his files and or provide to Plaintiffs copies of his Baystone and Midtown files **but S**zegda refused.

180.     **Szegda also denied even in 2013 that he or any entity where Szegda was an officer or owner of that entity was ever represented by Goebel**.

181.     Szegda admitted for the first time in 2013 that he was an officer and owner of Baystone, but claimed that he had never heard of a Goebel and that Goebel never represented Baystone and that Goebel never filed anything on behalf of Baystone or Szegda.

182.     As indicated above in regards to Goebel this representation by Szegda was false, because Plaintiffs discovered that:

1.   That Goebel commenced a case in August 2004 captioned Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C., No. 0602745/2004 (N.Y. Sup. Ct. 2004) ("Baystone I") and a related case Baystone Equities Inc v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C., No. 105732/2005 (N.Y. Sup. Ct. 2005) ("Baystone II") before the Honorable Justice Walter B. Tolub, Goebel represented Baystone in connection with an action by Baystone alleging fraud and malpractice against the former lawyers of the defendant in Gerel involving a contract to sell three parcels of real estate valued at one hundred million dollars for allegedly "fail[ing] to disclose certain facts allegedly known to her, [and] intentionally mislead the Court," the

36

court sanctioned Baystone in the 2004 action and Goebel and Baystone in the 2005
action for filing what it determined was a "frivolous action".

2. Goebel had also filed an appeal, Record of Appeal and Appeal briefs in the same case
on March 3, 2005, before the AD, First Department,

183.    The cases Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H.
Kahan, Esq, and Sperber, Denenberg & Kahan, P.C., clearly showed that Szegda knew that
Baystone and Szegda were represented by Goebel.

184.    Thus,

**THE RECENT NEWLY DISCOVERED "EVIDENCE" AND
ADMISSIONS PROVE THAT SZEGDA WAS IN
COLLUSION WITH MIDTOWN TO DEFRAUD
PLAINTIFFSTO HELP SZEGDA TO STEAL AN
ADDITIONAL $250,000FROM PLAINTIFFS AND TO HELP
MIDTOWN TO KEEP THE PROPERTY IN ORDER TO
SELL THE PROPERTY TO OTHERS FOR A  MUCH
HIGHER PRICE THAN THE $28,000,000 WITH JERICHO**

**THE RECENT NEWLY DISCOVERED "EVIDENCE" AND
ADMISSIONS PROVE THAT GOEBEL WAS IN
COLLUSION WITH DEFENDANTS TO DEFRAUD
PLAINTIFFS AND THE COURTS IN ORDER TO HELP
MIDTOWN TO KEEP THE PROPERTY AND THAT
DEFENDANTS AND SZEGDA SHOULD NOT HAVE TO
PAY BACK TO PLAINTIFFSTHE $400,000 DEPOSITS IN
THE BAYSTONE AND MIDTOWN CASES AND NOT
HAVE TO PAY TO PLAINTIFFSTHEIR EXPENSES AND
DAMAGES, ETC**

**THE RECENT NEWLY DISCOVERED "EVIDENCE" AND
ADMISSIONS PROVE S THAT DEFENDANTS, GOEBEL
AND SZEGDA WERE ALL IN COLLUSION TO DEFRAUD**

37

**PLAINTIFFS, TO DEFRAUD JUSTICE RAMOS, TO DEFRAUD THE JUSTICES OF THE AD, FIRST DEPARTMENT, IN THE BAYSTONE AND MIDTOWN CASES, TO DEFRAUD THE DISTRICT ATTORNEY THE SENTENCING JUDGE AND THE JUSTICES OF THE DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT TO PROTECT SZEGDA, GOEBEL AND DEFENDANTS**

185. Accordingly, had Imperatore, Defendants and Goebel and Szegda not been in a collusion to defraud Plaintiffs, the Courts and the AD, etc, and did not willfully and deliberately committed fraud on Plaintiffs, on the Courts, and the AD, etc, then Goebel would have claimed in the complaint he filed on behalf of Plaintiffs, the real claims that Plaintiffs retained him to claim, and which he was specifically requested to claim and instructed to do,

**Goebel did not claim in his Complaint the claims, that he was retained to claim, that he was requested to claim, and what he was supposed to claim**

186. Including but not limited that;

  i. that documentary evidence prove that Jericho has never cancelled the Contract,

  ii. that documentary evidence prove Jericho has never sent to Defendants a "Notice" cancelling the Contract

  iii. that documentary evidence prove that Defendants always knew that Jericho has never cancelled the Contract,

  iv. that documentary evidence prove that Jericho has never sent to Defendants a "Notice" requesting the return of the deposit.

  v. that documentary evidence prove that Jericho has never sent to Defendants a "Notice" that they should wire the deposit to Szegda,

  vi. that documentary evidence prove that Midtown never returned to Jericho the $250,000 deposit,

38

vii. that Szegda never returned to Plaintiffs the $250,000 deposit in the Midtown case,

viii.     that Szegda never returned to Plaintiffs the $150,000 deposit in the Baystone case,

ix. that documentary evidence prove that Jericho has told Defendants in August and throughout September 2002 and thereafter up to 2004 that Jericho is ready willing and able to close and does not want and will not cancel the Contract,

x. that documentary evidence prove that Jericho has not elected to cancel the Contract,

xi. that documentary evidence prove that Defendants were told that Jericho has not *elected* to cancel the Contract,

xii. that documentary evidence prove that Defendants had multiple times willfully and deliberately breached the Contract specifically par. 29c) of the Contract,

xiii.     that documentary evidence prove that Defendants had willfully and deliberately refused to provide to Plaintiffs the requested critical Exhibits and Documents relating to the Amtrak Agreement and the critical Documents relating to the actual oil spill on Midtown's own Property, on the 90,000 SF Property that Midtown was in Contract with Jericho for $28,000,000, much before the 71st day of the expiration of the 75 day due diligent period,

xiv.     that documentary evidence prove that Defendants had the requested critical Exhibits and Documents relating to the Amtrak Agreement and the critical Documents relating to the actual oil spill on Midtown's own Property in their possession and control before, during and after signing of the Contract,

xv. that documentary evidence prove that Defendants had committed actionable fraud on Plaintiffs before, during and after signing of Contract,

xvi.     that documentary evidence prove that Plaintiffs have not authorized Szegda to send to Defendants the letters dated September 3 and September 12, 2002,

xvii.     that documentary evidence prove that Defendants knew that Plaintiffs has not authorized Szegda to send the letters dated September 3 and September 12, 2002,

Supreme Court Records OnLine Library - page 39 of 145

xviii.      that documentary evidence prove that Defendants knew that the letters dated September 3 and September 12, 2002 from Szegda is not a cancellation of the Contract or request to return the deposit,

xix.      that documentary evidence prove that Plaintiffs have complained to Szegda on September 12, 2002 that Szegda had no right to send the letters dated September 3 and September 12, 2002, but in any event they are not "Notices" as required under the Contract,

xx.  that documentary evidence prove that Plaintiffs had sent letters and correspondences to Defendants commencing on September 18, 2002 and thereafter for the next eighteen months up to February 16, 2004 that Plaintiffs did not cancel the Contract that Defendants had no right to wire the $250,000 to Szegda, that Defendants provide to Plaintiffs copies of any "Notice" they received from Plaintiffs cancelling the Contract and any Notice they received from Jericho to wire the $250,000 to Szegda,

xxi.      that documentary evidence prove that Defendants lied to Plaintiffs during the first eighteen months that they had received "Notices" from Plaintiffs and also separately from Szegda cancelling the Contract and "Notices" to wire the $250,000 to Szegda,

xxii.      that documentary evidence prove that Defendants have never produced copies of any "Notice" they received from plaintiffs (and not even from Szegda), because they never received any "Notice" from plaintiffs,

xxiii.      that documentary evidence prove that the Contract was and is in full force and effect,

xxiv.      that Defendants should return or credit Plaintiffs with the $250,000 deposit in the Midtown case,

xxv.      that Defendants should return or credit Plaintiffs with the $150,000 deposit in the Baystone case,

xxvi.      that Defendants should pay to Plaintiffs the expenses and damages that Plaintiffs incurred in both cases, including interest, attorneys fees, professional fees, brokers fee, expenses, damages plus punitive damages and sanctions, etc.

Supreme Court Records OnLine Library  -  page 40 of 145

## BUT HE NEVER MADE THESE CLAIMS,

187.     Had Goebel argued the above in his Complaint and or in his AC, then Defendants would not have been able to file a MTD (because what would they have argued), whereby Midtown would have had to specifically perform under the terms of the Contract and close title with Jericho and transfer the Property to Jericho plus Defendants would have either had to pay back or credit Plaintiffs for the $400,000 deposit and expenses and damages incurred by Plaintiffs in the Baystone and Midtown cases

188.     Had Goebel would filed the real claims that he was retained to file, and argued what he was requested and was supposed to argue he would have also sued Szegda together with Defendants in the Midtown case for the fraud Szegda committed on Plaintiffs in the Baystone and Midtown cases, or sued Szegda in the Midtown case only for the fraud Szegda committed on Plaintiffs in the Midtown case and sued Szegda separately in a separate case for the fraud Szegda committed on Plaintiffs in the Baystone case, and also reported Szegda to the Departmental Disciplinary Committee for the First Judicial Department as Plaintiffs had requested.

189.     Then the Disciplinary Committee for the First Judicial Department and the District Attorney would have investigated Szegda also for the fraud that Szegda committed on Plaintiffs in the Baystone and Midtown cases.

190.     Whereby Szegda would have had to reveal to them the fraud that Szegda committed on Plaintiffs in the Baystone case in 2001-2002, and the fraud that Szegda together with the Defendants committed on Plaintiffs in the Midtown case in 2002 -2004, plus the fraud that Defendants were committing on Plaintiffs and specifically on Justice Ramos and the Justices of the Appellate Division.

191.     That would have resulted that the Disciplinary Committee for the First Judicial Department and the District Attorney would have investigated Defendants which would have resulted that their fraud on Plaintiffs and on Justice Ramos and the Justices of the Appellate Division would have been exposed and Jericho would have gotten the Property and the damages.

192.     That would have led to additional claims and charges against Szegda whereby Szegda would have had to admit to the fraud that he committed on Plaintiffs in the

41

Baystone and Midtown cases that would have then resulted in much harsher sentencing and harsher sanctions, etc.

193.    That would have probably also led to claims and charges against Defendants by the Disciplinary Committee for the First Judicial Department and the District Attorney.

194.    That would have probably also led to the discovery by the Attorneys for Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C of the fraud that Szegda and Goebel committed on them and on Justice Tolub and the AD, First Department in the Handel-Harbour case, whereby Goebel and Szegda would have definitely lost that case and Justice Tolub would have Sanctioned Goebel much harsher plus Szegda.

195.    That would have probably also led to investigation and claims and charges against Goebel and Szegda by the Disciplinary Committee for the First Judicial Department and the District Attorney also relating to the Handel-Harbour case.

196.    Upon information and belief the collusion was also to protect Defendants, Szegda, Goebel and others from any investigation by the Disciplinary Committee for the First Judicial Department and the District Attorney, to help Szegda to stay with the stolen $400,000 deposit he received in the Baystone and Midtown cases, that he not be sued for the fraud he committed on Plaintiffs in the Baystone and Midtown cases, because if Szegda will be dragged into any law-suit then he will expose the fraud that Midtown and Defendants committed on plaintiffs, to protect Szegda and Goebel in the Handel-Harbour case where as partners they could defraud Justice Tolub and or the AD and win the case against Handel-Harbour et al for millions of dollars, to protect Szegda and Goebel interest in the Midtown case by making sure that Plaintiffs lose the case, to protect Defendants and make sure they stay with the Property and make a lot of money for themselves and Szegda and Goebel, to protect all of them from the Disciplinary Committee for the First Judicial Department and the District Attorney.

## The Case would have never reached the AD

197.    The Case would have never reached the AD but if for some reason it would have reached the AD,

Supreme Court Records OnLine Library - page 42 of 145

198.     The AD would have probably stated and Ruled on August 17, 2006, or already in January 2006 or even before, that Midtown's Appeal is denied because their Notice of Appeal, their Appeal, their Appeal Briefs, are frivolous, false, misrepresentation and fraud on the Court.

199.     The AD would have confirmed the Lower Court Order denying Midtown's MTD.

200.     The AD would have probably also ruled then that documentary evidence prove that Jericho never cancelled the Contract.

201.     The AD would have probably also ruled then that documentary evidence prove that Midtown had willfully and deliberately breached the Contract specifically par. 29c).

202.     If the case would have gone to trial the trial court would have confirmed Jericho never cancelled the Contract, that that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract and that it was not a *valid* cancellation, that Defendants must pay back the $400,000 deposit plus pay damages, etc.

### That based on the above the Court should Order

203.     That based on the above the Court should Order that Midtown should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

204.     That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

### HISTORY

205.     In 2001 Angelos Slabakas approached Plaintiffs that he is in Contract through his entity Baystone with Gerel to purchase from them Property and asked Plaintiffs to join in the transaction and become a partner in Baystone.

206.     Slabakas represented to Plaintiffs that Michael Szegda is his Contract Attorney.

43

207.    Szegda represented to Plaintiffs that he has no interest in the Contract, has no relationship to Slabakas, has no relationship to Baystone and that he is a simple the Attorney representing Slabakas and Baystone.

208.    Based on Szegda's representation Plaintiffs agreed that Szegda represent both parties in the agreement between Slabakas and Plaintiffs that Plaintiffs be a partner or shareholder of Baystone interest.

209.    Based on Szegda's representation Plaintiffs deposited with Szegda $150,000 to be held in escrow by Szegda.

210.    The check of $150,000 was made out to "Szegda & Gerbing as Attorney".

211.    It was agreed that Szegda will provide to Plaintiffs information and documents relating to the transaction.

212.    Sometimes in 2002 Plaintiffs discovered that Szegda released the $150,000 from escrow.

213.    Szegda apologized and claimed that he released the $150,000 from escrow by mistake and that he gave by mistake the $150,000 to Baystone.

214.    Szegda subsequently prepared an Agreement that Slabaks signed that Baystone assigns 50% of Baystone interest in the contracts to Plaintiffs, that no litigation could take place by Baystone without Plaintiffs written approval, Slabaks also signed that he personally is liable to Plaintiffs the $150,000 and that he will pay Plaintiffs the $150,000 and that he waives all defenses.

215.    On or about March 2002 Midtown's agents and brokers Shafran and Emmet approached Plaintiffs relating to two property's ("property") consisting of more than 93,812 square feet of land at 1[th] Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York, that Midtown owed and was interested to sell.

216.    Imperartore, Stone, Shafran and Emmet have represented to Plaintiffs that Midtown had gone through all City Agencies and Public Hearings, and obtained zoning, FAR, permits and approvals on the Property, to build, "as of right", three buildings, consisting of 419,745 sf, mixed use, 43 story residential tower, 243,000 sf, 300 +room hotel, 65,625 sf, 500+car garage, total 728,904 square feet.

44

217.       Defendants have Represented to Plaintiffs that all the Zoning, Variances, and
Approvals that Midtown obtained from City Agencies to build as of right 728,904 square
foot were Still in Place; that all Agreements with Amtrak were still in place and that they
could be Transferred to any purchaser; that there are No Environmental Problem or
Hazardous material on the Properties; that there was No Oil Spill on the Properties or
Affecting the Subject Property and that they have an Environmental Report that Proves the
above and that they will Provide to Plaintiffs together with the Contract, the Environmental
Report, and all Agreements with Amtrak and all Filings with all City Agencies Proving the
above. (See also prior drafts of Contract and transcripts of Depositions, etc).

218.       Defendants represented to Plaintiffs that the Property was "Shovel Ready" and
that Plaintiffs will be able to Begin Construction on the Property Immediately upon Closing
of title. Those were Condition of Negotiation and offers and signing of the Contract. (See
also prior drafts of Contract and transcripts of Depositions, etc).

219.       After lengthy negotiations and based on their representations plaintiff's offered to
pay for the Property $28 million and Midtown accepted.

220.       Plaintiffs retained Szegda on or about May 2002 to review and correct the
language in the proposed Contract and to obtain title report, etc.

221.       It was made clear to Imperatore and Stone by Plaintiffs and Szegda from the
beginning and was it a condition of the Contract, and Plaintiffs also made clear the same to
Szegda from the beginning and it was a condition of retaining Szegda that he has No Power
of Attorney and that All Dealings Must be done with Samuel Pfeiffer or other officers of
Plaintiff's and that all Letters and Notices must be sent to Jericho at 155 Lee Avenue and
that all Notices to Midtown must be from Jericho at 155 Lee Avenue and signed by Samuel
Pfeiffer or officer of Plaintiffs .

222.       Plaintiffs have negotiated before signing of Contract, during the 75 Days Due
Diligent Period, almost on a daily basis, and thereafter and requested information,
documents, extensions etc, directly from Imperatore, Stone and Harwood and or also
through Midtown's Agents and brokers including but not limited Shafran, Capin
Associates, Emmet and BHS. (as the recently discovered "Evidence" proves that there were
many emails between Midtown and their agents back and forth relating to requests made by
Samuel Pfeiffer and officers of Plaintiffs (not Szegda).

45

Supreme Court Records OnLine Library - page 45 of 145

223.    That Szegda was told many times by plaintiffs orally and in writing and was a condition of retaining him, that he is not allowed to send any letters or correspondence to Midtown without Pfeiffer's written approval.

224.    The Contract was dated June 18, 2002 and was originally scheduled to close title on or about September 18, 2002.

225.    That Midtown and Defendants represented in the Contract and or together with the Contract that there was no oil spill on Midtown's own Property or affecting Midtown's own Property, that they provided the "true" and complete Agreement with Amtrak, and all filings and agreements with the City Agencies.

226.    But Plaintiffs, Plaintiffs Architects, Zoning Attorneys Subsequently Discovered that it was not true and in fact, Defendants Subsequently Admitted that they it was not true and admitted that they Defrauded Plaintiffs.

227.    Plaintiffs requested from Defendants in July 2002 and thereafter if there was any Environmental problem (oil spill, etc) on Midtown's Property after they bought the Property, and to provide documents, they represented that there were none Plaintiffs also in July 2002 and thereafter the critical Exhibits to the Amtrak Agreement, the signed Permits etc from Amtrak,, all filings relating to Permits and Approval and filings with the City Agencies, Defendants promised to provide them to Plaintiffs (not Szegda), but they never did.

228.    Plaintiffs discovered in July 2002 through their Architects and Zoning Attorneys that the zoning, permits etc, expired and not renewable that Defendants had and their zoning Attorneys, etc got Notice from the City Agency;s but Defendants had misled and willfully and deliberately defrauded Plaintiffs.

229.    Based on the above Plaintiffs (not through Szegda) told Defendants in July 2002, that either, they provide all the critical documents and information requested by Plaintiffs and Plaintiffs Architects and zoning Attorneys plus to cooperate with them and because of the above to also extend the Due Diligent Period to December 31, 2002, and if not, then Plaintiffs will cancel immediately the Contract and Midtown shall pay all expenses and damages of Plaintiffs.

46

230.     Defendants agreed that it was their fault and they promised to provide all those requested critical documents and information as soon as possible and they also agreed to extend the Due Diligent Period to December 31, 2002, because of the above. Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18.

231.     Based on Defendants agreement and promises to Plaintiffs, (not to Szegda), Plaintiffs did not cancel the Contract and continued to proceed with the Contract, with the Architects and zoning Attorneys, with the investigation and study, and continued with Plaintiffs investors, partners, plus negotiating with new investors, joint ventures and new partners. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

232.     Plaintiffs also marketed the Property through the biggest Real Estate Brokerage Firms and Brokers, including Defendants and their Brokers and Agents, at a value of **well above "$50,000,000.00"**, for additional investors, joint ventures and new partners, but specifically told them that Plaintiffs will not outright sell the Property because Plaintiffs intends to close title and develop the Property. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

233.     Plaintiffs received offers from prospective purchasers to purchase outright the Property for value **well above $50,000,000.00**, but Plaintiffs refused, because Plaintiffs wanted to keep the Property. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

234.     Plaintiffs actually took it off the Market on or about August 10, 2002, because Plaintiffs completed their Joint Venture and Partnership Agreement and the financing for the closing of the Property. Plaintiffs immediately notified the Brokerage Firms and

Supreme Court Records OnLine Library - page 47 of 145

Brokers, including Defendants and their Brokers and Agents that the Property is off the market and they should not market anymore the Property. Plaintiffs also notified Defendants that Plaintiffs are ready, willing and able to proceed and to close title on the Property under the terms of the Contract. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

235. In Mid August Plaintiffs discovered another fraud that there was a major oil spill on Midtown's own Property (started from a Neighboring Property), but Plaintiffs believed that it was fully cleaned up, before 2002, Plaintiffs requested from Defendants directly and through Emmet, As is also evident from the "Newly Discovered "e-mail dated August 21, 2002", to provide all Documents relating to the oil spill and cleanup on Midtown's own Property and to provide a Certificate from the NYDEC and or also from the Environmental Company, confirming that it was fully cleaned up and that it is good standing. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

236. Defendants replied and admitted for the first time, in a Reply "E-mail dated August 22, 2002", from Imperatore to Emmet, that there actually was an oil spill on Midtown's own Property, on the 90,000 SF in Contract with Plaintiffs, but shockingly they also revealed and admitted, for the first time, that it was not even fully cleaned up and because of that they don't have a Certificate, but they promised that they will provide as soon as possible all documents relating to the oil spill and cleanup but they never did.

237. Plaintiffs discovered on September 12, 2002, that Szegda had committed Outrageous Fraud on Plaintiffs by sending on September 12, 2002, an unauthorized and stupid letter by fax to Defendants purportedly cancelling the Contract if Midtown still refuses and will not provide to Jericho the "Requested Critical Documents requested much before August 30, 2002" that Midtown was obligated to provide under par. 29c) of the Contract, etc.

48

238.     Plaintiffs immediately called Szegda on September 12, 2002, complained and screamed and yelled that he had no right to send that letter or any letter to Defendants without Plaintiffs written consent and especially the fraudulent September 12, 2002 letter.

239.     Plaintiffs immediately on or about September 12, 2002 fired Szegda as Attorney of Jericho.

240.     Plaintiffs immediately contacted Defendants and told them to disregard Szegda's fax because he was not authorized to send the letter and requested that they should immediately provide the "requested critical documents" that Plaintiffs requested many times from Defendants.

241.     On or about September 15, 2002 Midtown claimed that Jericho canceled the Contract and told their agents and brokers that they could market the Property to other prospective purchaser because Jericho cancelled the Contract.

242.     Recently discovered "Evidence" proves that Defendants promised in September 2002, to their agents and brokers that they will provide to new purchasers the Documents relating to the oil spill on their own Property and the exhibits and document relating to the Amtrak Agreement. Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs.  See also FN 18.

243.     Recently discovered "Evidence" proves that based on Defendants promises the prospective purchasers gave offers to Defendants to purchase the Property already on or before September 20, 2002.  (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and the Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs.  See also FN 18).

244.     Recently discovered "Evidence" proves that Imperatore and Emmet met with some of those prospective purchasers after September 12, 2002 in 2002. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because

49

of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

245.       Recently discovered "Evidence" that proves that Defendants turned down in 2002 an offer of **$34,000,000** from a prospective purchaser, because they wanted already in 2002, much more than **$34,000,000.00**. (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

246.       Defendants subsequently entered into a Contract to sell the Property, for over **$100,000,000.00**! (Defendants had willfully and deliberately hid from the Courts and Plaintiffs the "Evidence" and Depositions relating to the above in order to defraud the Courts and Plaintiffs and because of that they were able to defraud even more and defrauded even more the Courts and the Plaintiffs. See also FN 18).

247.       Incredible, Defendants claimed to the Court in their MTD, MOL, and at the Hearing of May 12, 2005, to Justice Ramos on May 12, 2005 and in their Appeals Briefs that the Court should dismiss Jericho's claim for Specific performance because of *Latches*, because Defendants had to absorb in the two years from September 2002 to September 2004 a few hundred thousand dollars of real estate taxes.

248.       Even though Plaintiffs told them in September 2002 and thereafter in 2002, 2003 and 2004, that Plaintiffs are ready to proceed with the Contract and close title and even though they turned down in 2002 $34,000,000 with a profit of $6,000,000 above the $28,000,000, and even though they entered into a Contract to sell the Property for over $100,000,000.00, yet they made this Bogus and Hoax Claim to Justice Ramos and to the Justices of the Appellate Division of *Latches*.

249.        Plaintiffs spoke to Defendants and also sent many letters and Notices to Midtown commencing on September 18, 2002 and thereafter up to February 16, 2004, that Jericho has never cancelled the Contract, that Jericho has never requested that they return and send the deposit to Szegda, that they knew that Szegda could not request to return and send the deposit to Szegda, that Szegda could not cancel the Contract, that a cancellation must be sent by formal "Notice" from Jericho c/o Wasserman at 155 Lee Avenue, signed by Pfeiffer and sent by Certified Mail RRR to Midtown and copies to Imperatore and Szegda,

50

that even the letters of Szegda are not a request to return the deposit or to cancel the Contract, but a request to comply with par. 29c) of the Contract to provide the requested documents, that Midtown should advise Plaintiffs how they want to proceed with the Contract in order to close title according to the terms of the Contract.

250.    Defendant Stone claimed that they had received written and formal "Notices" as required under the Contract, from Jericho and also from Szegda cancelling the Contract plus written and formal "Notices" as required under the Contract, from Jericho and also from Szegda to send the deposit to Szegda,

251.    But after Jericho requested many times including in letters dated January 23, 2004 and February 16, 2004, that Midtown produce the "Notices" that they received from Jericho they were not able to provide them because they never received any "Notice" from Jericho and not even from Szegda.

252.    Plaintiffs recognized after they did not respond to the letters dated January 23, 2004 and February 16, 2004 and after many phone messages that all efforts by Plaintiffs to try to resolve the situation lead no place even though they knew that they had never received any Notice from Jericho and not even from Szegda.

253.    Plaintiffs had no choice but to sue Midtown and others involved in the fraud on Plaintiffs.

254.    Plaintiffs interviewed many Attorneys including Goebel and spelled out to them and to Goebel the reasons why Plaintiffs believe that they have a very strong case (as mentioned herein)

255.    Plaintiffs also provided to Goebel a written "Outline" of the case and claims Contract, the letters and correspondences from inception until that time, including the letters sent to and received from Defendants, since September 12, 2002 until February 16, 2004.

256.    Plaintiffs also explained to Goebel, that the face of the Contract stated:

**THIS AGREEMENT** made the 18th day of June ... BETWEEN

Midtown Development L. P. a New York Limited partnership with an office 40 Arcorp Properties, Pershing Road, Weekawken, New Jersey hereinafter described as the Seller, and

51

Jericho Group, Ltd c/o Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, NY, 11211 hereinafter described as the Purchaser"

257. That the Contract provided in paragraph 29 that *on or before September 3, 2002,*

"The "Purchaser" (i.e., Jericho) shall have the right to cancel the Contract upon written **Notice** to the Seller [Midtown] and the Escrowee [Midtown's law firm] ... Upon *timely* receipt of such **Notice of cancellation** the Ecrowee shall promptly return to "Purchaser" (i.e., Jericho) the monies paid upon execution hereof."

258. That the Contract also provided that if the "Purchaser" (i.e., Jericho) dose not cancel the Contract *on or before September 3, 2002,* then the Contract stays in full force and effect and then *Jericho could not cancel anymore the Contact* and that the closing shall take place on or about September 18, 2002.

259. That the Contract provided in paragraph 32,

"Closing shall take place on the fifteenth (15th) day after the conclusion of the Study Period, at the offices of Purchaser's lending institution or such lending institution's attorneys. If Purchaser does not close by such date, Seller shall be entitled to *set a* date for closing by giving fourteen (14) days written Notice to Purchaser which date shall be Time of the Essence. ... The parties agree that fourteen (14) days shall be a reasonable notice period and failure by Seller to send such notice to Purchase shall not be deemed to be a waiver of Seller's rights to get a time of the essence closing date."

260. That the Contract further provided, in paragraph 42:

This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing *signed by the party* against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

261. That the Contract further provided, in paragraph 44:

52

All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice. At the same time any Notice is given to either party, a copy shall be sent to its attorney. For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:
Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ 07601


Attorney for Purchaser:
Szegda & Gerbing
300 East 42nd Street
New York, New York 10017
Attn: Michael A. Szegda, Esq.

262.      That Plaintiffs sent to Maurice Stone, immediately on September 18, 2002, a letter stating as follows:

Dear Mr. Stone:

**...Please be informed that Jericho has not authorized Michael Szegda, to cancel the contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(b) and 42, that only the "Purchaser" could cancel the Contract. Please inform Jericho in writing, by certified mail, when and how you want to proceed with the Contract.**

263.      That Plaintiffs sent a copy of the September 18, 2002 letter, to Defendants, by Certified Mail, Return Receipt Requested, again on October 18, 2002, that stated as follows:

Please respond to my letter dated September 18, 2002 (Copy attached). ...

264.      That Stone responded in a letter dated January 19, 2004 that they received "Notices" from Jericho and its attorney, Mr. Szegda, cancelling the Contract.

265.      That Plaintiffs responded on January 23, 2002:

53

"**I received your letter dated Jan. 19, 2004 where you stated "we returned the Deposit <u>to Jericho</u> in accordance with <u>the specific instruction given us by Jericho</u> and its attorney, Mr. Szegda."**

**I respectfully request that you please provide us a copy (front and back) of the Check, that reflects the return of the Deposit. Please also provide us a copy of the document that had "specific instruction given to you by Jericho" (emphasis added)."**

266.    That Plaintiffs sent another letter to Stone dated February 16, 2004, as follows:

<u>**I respectfully request that you please respond to our letter to you dated Jan. 23, 04. We have mailed our Jan. 23, 04, letter to you, by Regular Mail, by Fax, and by Certified Mail, Return Receipt Requested, Postage Prepaid, as provided under the Contract.**</u>

<u>**You have also not responded to our specific claim in our letter to you, dated September 18, 02. "Please be informed that Jericho has not authorized Michael Szegda, to cancel the Contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(a) and 42, that only the "Purchaser" could cancel the Contract.**</u>

The Contract specifically states in par. 29(a)
The Purchaser (i.e., Jericho or owner of Jericho) shall have the right to cancel this Contract upon written Notice to the Seller [Midtown] and the Escrowee [Imperatore and his  law firm]". ..Upon timely receipt of such of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.".

In par. 42, it is stated
"This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the Party (i.e., Jericho or owner of Jericho) against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party (i.e., Jericho or

54

owner of Jericho) claimed to have given, consented or suffered the waiver."

In par. 44, it is stated
"All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney.  For the purposes of this paragraph 44 the attorneys for the parties are as follows:"

I respectfully request that you please respond immediately to the above letters plus to Jericho's letters to you dated, October18, 02 and January 5, 04. You have never responded directly or refuted our specific claims, raised in our letter to you dated, October 18, 02 and January 5, 04.

**Please inform Jericho, by certified mail, when and how you want to proceed with the Contract, between Midtown Development, LLC (Midtown) and Jericho Group Ltd (Jericho)."**

267.     That the above "Documentary evidence" actually the "Contract", proves that the Contract was never cancelled and proves that Szegda, Imperatore and Stone, Harwood and Midtown (all Attorneys) knew from day one that the Contract was not cancelled and they always knew that the Contract was and is in full Force and Effect.

268.     Plaintiffs asked Goebel if he has any conflict of interest, potential conflict or any hesitation to sue any of the parties involved, including but not limited, Midtown, Imperatore, Stone and Szegda.

269.     Goebel represented that he has no conflict of interest, no potential conflict and no hesitation to sue any of the parties involved, including but not limited, Midtown, Imperatore, Stone and Szegda.

270.     Plaintiffs requested that Goebel sue the above parties based also on the above.

271.     Goebel agreed to take the case and to claim the above and based on that representation Plaintiffs retained Goebel.

55

272.     Goebel then filed a Summons and Complaint against Midtown in September 2004, Index number 11374/04 and subsequently filed an Amended Complaint ("AC") in November 2004.

273.     Goebel has committed fraud on Plaintiffs and on the Court in his AC because he did not claim that Jericho has never cancelled the Contract, that Jericho never sent a "Notice" as required under the Contract cancelling the Contract, that Defendants have never receive a "Notice" from Jericho or even from Szegda cancelling the Contract, that Szegda's letter of September 3, and September 12, 2002 were not authorized plus those letters did not request to return the deposit nor cancelling the Contract, But Instead claimed to the Court that "Jericho had actually Cancelled the Contract!

274.     Goebel has committed fraud on Plaintiffs and fraud on the Court in his AC because he did not claim that Jericho sent letters to Midtown immediately commencing September 18, 2002 and up to February 16, 2004 that Jericho never cancelled the Contract that Midtown knew that Jericho never cancelled the Contract that Midtown should provide the "Notices" they claimed that they received that Jericho cancelled the Contract, that after eighteen months of correspondences and communication Defendants never produce any "Notice" But willfully and deliberately together with Defendants hid those critical letters from the Court and misled the Justices of the Appellate Division.

275.     But even so Goebel did claim in the AC, that he allegedly filed with the Court that:

"Midtown failed to disclose the oil spill as discussed below. .. [Shows that Midtown committed actionable fraud]

Paragraph 30 b) of the Original Contract of Sale states that Purchaser is required fee simple title to the Property subject to, in part, "(iii)  Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller, Jerrart Venture and Amtrak which is attached hereto as Exhibit B) (the "Amtrak Agreement")." Paragraph 31 of the Original Contract of Sale states: "Seller represents that annexed hereto, as Exhibit B, is a *true copy* of its agreement(s) with Amtrak Corporation *permitting* development of the premises over Amtrak's railroad tracks." [Shows that Midtown committed actionable fraud]

56

As stated above, the exhibits were not attached to the back of the Amtrak Agreement annexed to the Original Contract of Sale and were not included in any submission to Plaintiff by Midtown. ... This was solely the result of Midtown's misrepresentation. [Shows that Midtown committed actionable fraud]

Upon information and belief, Midtown's submissions to Jericho did not include numerous due diligence items ... the oil spill and environmental matters related to the property. [Shows that Midtown committed Actionable fraud]

Upon information and believe; Midtown had in its possession and/or control all of the missing information and materials to allow Jericho to complete its due diligence and willfully refused to deliver same to Jericho. Midtown breached its covenants and Obligations under the Original Contract of Sale and Jericho reasonably and foreseeably relied upon the expected complete performance by Midtown, to Jericho's material detriment. [Shows that Midtown committed actionable fraud & had Willfully and deliberately breach the Contract]

Midtown purposely and willfully materially breached the Original Contract of Sale as follows: ... Prior to the execution and delivery of the Original Contract of Sale and during nearly the, entire Study Period, Midtown and its exclusive broker wrongfully failed to disclose the occurrence of a prior oil spill...[Shows that Midtown committed Actionable fraud]

Upon information and belief Midtown knowingly failed to attach the exhibits to the Amtrak Agreement to the Original Contract of Sale and Midtown misrepresented that a true copy of the Amtrak Agreement was attached as Exhibit B. ....[Shows that Midtown committed actionable fraud]

Upon information and believe; Midtown had in its possession and/or control the Exhibits to the Amtrak agreement; and the environmental materials and files regarding the oil spill and willfully failed to deliver the same to Jericho in order to coerce Jericho into canceling the Original Contract of Sale. [Shows that Midtown committed actionable fraud & that Midtown had willfully and deliberately breached the Contract]

Szegda wrote that "**unless**" the oil spill could be dealt with by Midtown and Midtown provided Jericho with the "requested due diligence documents" (emphasis added), Jericho was requesting a return of its Downpayment. [Shows that Midtown had willfully and deliberately breached the Contract &

Supreme Court Records OnLine Library - page 57 of 145

Shows that Jericho did not *elect* to cancel Contract and was not a *valid* cancellation]

Imperatore responded that Midtown was not willing to return Jericho's Downpayment unless Midtown received a general release of Midtown from Jericho by September 6, 2002 and that Midtown expected that its refund of the Downpayment to Jericho would constitute a termination of the contract in all respects. ... Jericho was unwilling to agree to release Midtown and was unwilling to agree to an "accord and satisfaction of any kind. *After protesting this issue*, Midtown ultimately conceded this point, and withdrew its requirement for a general release and refunded the Downpayment. ....[Shows that Midtown was specifically told that Jericho will sue them for willfully and deliberately breaching the Contract by refusing to provide the requested critical documents, and *for forcing* Jericho to cancel the Contract]

On September 2, 2002, Szegda wrote Imperatore, again requesting a copy of Exhibits A-1, A-2, A-3, B-1 and C-1 to the "Amtrak Agreement". [Shows that Jericho claimed that Szegda had requested the Exhibits before September 2, 2002!]

Consistent with Midtown's refusal to perform its obligations under the Original Contract of Sale, on several occasions Midtown offered Jericho the right to an early termination of the contract with an early return of the Downpayment. However, this was not what Jericho had bargained for and not what Midtown had agreed to. (emphasis added) [Shows that Jericho did not *elect* to cancel Contract and it was not a *valid* cancellation]

Despite, Midtown's demand for a general release Jericho properly refused to release Midtown in exchange for the return of the Downpayment and the parties understood that the return of the Downpayment to Jericho and the cancellation of the contract did not constitute a release or an accord and satisfaction with respect to Jericho's claims under the Original Contract of Sale. (emphasis added) [Shows that (even Goebel claimed in the) AC that even Szegda did not *elect* to cancel the Contract and that it was not a *valid* cancellation and that Midtown knew that it was not a valid cancellation because the documentary evidence prove that Szegde told Midtown that it was not a *valid* cancellation]

As a result of the foregoing, the Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the Original Contract of Sale

58

including a reasonable extension to the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair.".

276.     Goebel requested in the AC that the Court should reinstate the Contract and grant specific performance and alternatively damages.

277.     Even that AC met the requirements under CPLR 3211(a)(1) and CPLR 3211(a)(7) and was more than enough that Defendants should not be able to file a MTD.

278.     Defendants filed a Motion to Dismiss and a MOL dated January 6, 2005. (Defendants knew that everything they argued in the MTD and MOL was false).

279.     Imperatore provided an Affirmation under penalty of perjury in Support of Midtown's Motion to Dismiss (but not notarized). Imperatore also attached many letters to and from Szegda to and from Imperatore and Stone and claimed that those letters are documentary evidence what was requested by Jericho and when they were requested by Jericho, (Imperatore knew, Defendants knew and Goebel knew that everything that Imperatore claimed and affirmed in his Affirmation in Support of Midtown's MTD was false).

280.     Their main claim was that:

i.   That Jericho actually sent to Midtown and Defendants a "Notice" on September 3, 2002, requesting that they return the $250,000 deposit to Jericho  and that Midtown  actually returned the $250,000 to Jericho on September 13, 2002, the $250,000 deposit (They knew it was false),

ii.  That Jericho actually sent to Midtown and Defendants a "Notice of Cancellation" on September 12, 2002, notifying Midtown and Defendants that it is cancelling the Contract,  (They knew it was false),

iii. That Jericho only requested for the first time from Midtown and Defendants on August 30, 2002 information if there was *an* oil spill and if the answer is yes then Midtown should provide to Jericho documents relating to the oil spill, (They knew it was false),

iv.  That had Jericho requested the same requests from Midtown and Defendants before August 30, 2002 then Defendants would have provided the information and Documents because otherwise they would have willfully and deliberately breached of the Contract, specifically of par. 29c) of the Contract, (They knew it was false),

59

Supreme Court Records OnLine Library  -  page 59 of 145

i.    That had Jericho requested from Defendants, specifically Documents not representations relating to the oil spill for the first time even only on August 30, 2002 then Midtown would have provided the Documents (They knew it was false),

ii.  That Jericho only requested for the first time from Defendants the exhibits to the Amtrak Agreement only on September 2, 2002, (They knew it was false),

iii. That had Jericho requested the Exhibits from Defendants before August 30, 2002 then Defendants would have provided the Exhibits because otherwise they would have willfully and deliberately breached of the Contract, specifically of par. 29c) of the Contract, (They knew it was false),

iv. That Midtown did not breach the Contract, (They knew it was false),

v.  That Midtown did not commit any actionable fraud on Jericho, (They knew it was false),

vi. That Midtown provided to Jericho all documents that Jericho requested before August 30, 2002, (They knew it was false),

vii. That Jericho had simple *elected* to cancel the Contract on September 12, 2002, (They knew it was false),

viii.    That it was a *valid* cancellation, (They knew it was false),

ix. That Jericho did not complain to Defendants and did nothing for two years relating to the Contract and relating to the Property and that Jericho only woke up two years later from nowhere and served them with a Complaint in September 2004, (They knew it was false).

281.      Goebel then filed a reply MOL on or about February 23, 2005

282.      Pfeiffer a principle of Jericho signed an Affirmation under penalty of perjury, (notarized), in Support of Jericho's Opposition to Midtown's Motion to Dismiss Pfeiffer attached critical letters from Szegda to and from Imperatore and Stone, plus the letters from Plaintiffs to and from Imperatore and Stone from September 18, 2002 to February 16, 2002 plus other Critical Documents.

283.      The attached letters and documents in the Affirmation it was claimed also that:

1. That Pfeiffer dealt directly with Imperatore, Stone, and Defendants brokers BHS, Capin Associates, Emmet and Shafran and others before signing of the contract and during the 75 days due diligent period, and requested directly from Imperatore, Stone and also

60

through BHS, Capin Associates, Emmet and Shafran from Imperatore, Stone and they responded directly to Pfeiffer or through BHS, Capin Associates, Emmet and Shafran

2. That Pfeiffer communicated directly with the above, in essence, that the letters sent by Szegda to Imperatore and Stone is not a reflection what was requested by Jericho from Defendants and not a reflection when it was first requested by Jericho from Defendants, and that letters sent by Imperatore and Stone to Szegda is not a reflection that it was the first time they responded to Jericho's and no reflection that they did not respond before or differently to similar or different requests from Jericho. (as the E-mail of August 21, 2002 and Imperatore's Reply E-Mail of August 22, 2002 (Documentary Evidence) prove beyond a doubt , plus much more than 10 and maybe more than 100 similar E-mails between Defendants relating to specific requests made by Pfeiffer (not Szegda) to Midtown and Defendants before and throughout the 75 days due diligent period).

3. Accordingly Imperatore and Defendants claims in their MTD that documentary evidence proves so and so was a hoax, misleading, false and fraud on the Court,

4. That even the letters they introduced between Szegda and Imperatore and Stone is also not a reflection even when Szegda requested the first time, because even Szegda first made oral requests but sometimes if they did not respond or provided the requested information or documents, etc, then Szegda would later put that into a letter,

5.  Accordingly Imperatore's and Defendants claims in their MTD that documentary evidence proves so and so was misleading and false,

6. That Jericho asked from Defendants agent BHS, already in July 2002 or already even in June 2002 if there was or there is any oil spill on Midtowns own Property or affecting Midtowns own Property, and if yes to provide all Documents "**much before August 30, 2002**",

7. That Defendants agent BHS have falsely represented to Jericho in July and even in June and August 2002, that there was no oil spill on Midtowns own Property or affecting Midtowns own Property.

8. That proves that Defendants had committed "actionable fraud" on Plaintiffs,

9. That proves that Defendants had "willfully and deliberately breached the Contract",

10. That the E-mail dated August 23, 2002, that Imperatore attached to his Affirmation in support of Midtowns MTD proved that Imperatore had reluctantly admitted, FOR THE

61

FIRST TIME, (Imperatore was Forced to Admit, because of the newly discovered "E-mail dated August 21, 2002"), only after 64 days of the Due Diligent Period" to Emmet, Shafran and Plaitiffs, that there actually was an oil spill on Midtowns' own Property on the 90,000 SF Property and also admitted that as of August 23, 2002 it was not yet even fully cleanedup,

11. That shows that Imperatore (always knew) knew as of August 23, 2002, that Defendants must immediately provide to Plaintiffs the requested critical documents relating to the oil spill on Midtowns' own Property,

12. That even after their admission on August 23, 2002, Defendants have not provided the requested critical documents, that also proves that Defendants had willfully and deliberately breached the Contract by not providing the requested critical documents that they had in their possession.

13. That Defendants knew on and before August 23, 2002 that it takes 4-6 weeks to obtain an appointment to NYDEC, to review the file and obtain copies and not one day or seven days yet they did not provide the requested critical documents.

14. That Defendants knew that Plaintiffs knew that Defendants have those critical documents relating to an oil spill on their own 90,000 SF Property in their possession and that they must provide them to Plaintiffs before September 3, 2002, yet they did not provide the requested critical documents.

15. That Midtown committed "actionable fraud" on Plaintiffs before, at signing of Contract, and thereafter because they knew that there was an oil spill on their own 90,000 SF Property and was not even cleaned up and yet did not tell Plaintiffs and did not provide the critical documents to Plaintiffs before, during and after signing of the Contract plus willfully and deliberately breached the Contract by not providing those critical documents even after they were requested by Plaintiffs from Defendants in June, July, August and even after they were again requested by Plaintiffs from Defendants on August 30,2002,  September 3, 2002 and thereafter,

16. That Midtown represented in the Contract that attached is a true copy of the Contract, but did not attaché the critical Exhibits, That proved that Defendants had committed "actionable fraud" on Plaintiffs in the Contract,

62

17. That it impossible that Defendants did not have before and throughout the due diligent period the critical Exhibits in their possession or control, that also proves that Defendants had committed "actionable fraud" plus have willfully and deliberately breached the Contract,

18. That it impossible that Defendants did not have before and throughout the due diligent period the critical documents relating to an oil spill on Midtowns' own Property that was not even fully cleanedup as of August 23, 2002, that also proves that Defendants had committed "actionable fraud" plus also proves that Defendants have willfully and deliberately breached the Contract,

19. That Szegda wrote to Defendants on September 2, 2002, that Plaintiffs had already requested those critical Exhibits much before September 2, 2002 from Amtrak including from "Three Officers of Amtrak" (Already in July 2002), and that the "three officers of Amtrak" responded to Plaintiffs and confirmed that "**the Exhibits exists**" but that Plaintiffs should request **the Exhibits** from Midtown *that Midtown should "Provide to Jericho those critical Exhibits" that Midtown has in their possession* , that Szegda's September 2, 2002 letter to Defendants was "documentary evidence" that Jericho requested the Exhibits from Midtown and Amtrak much before September 2, 2002.

20. That Szegda's September 2, 2002 letter also proves that Defendants have willfully and deliberately breached the Contract.

21. That Szegda's letter contradicts and proves that Imperatore's and Defendants claims to the Court in their MTD and Affirmation that Jericho requested the Exhibits from Midtown the first time only on September 2, 2002 and that Jericho never requested the Exhibits from Amtrak was false.

22. That Szegda wrote to Defendants on September 2, 2002, that without Defendants providing those exhibits the Property may have No Value (or could only be used only as a Parking lot!),

23. That Szegdas' letter dated September 2, 2002 proves *that Plaintiffs did not elect to cancel the Contract, and that Szegda's letter was not a valid cancellation.*

24. That the letters attached to Pfeiffers' Affirmation show that Imperatore and Defendants have willfully and deliberately misled the Courts in their MTD and in Imperatores'

63

Affirmation that documentary evidence prove so and so, because they have willfully and deliberately not provided the letters that were attached to Pfeiffers' Affirmation.

284. The Affirmation of Pfeiffer and those letters that Goebel left attached to Pfeiffers' Affirmation was more than enough for Imperatore and Defendants to withdraw their MTD and not to proceed to the Hearing to Justice Ramos on May 12, 2005.

285. Imperatore, BHS, Defendants and Defendants have never filed any Affirmation or other letters or documents to contradict the claims, evidences, documentary evidence and the Affirmation under penalty of perjury of Pfeiffer.

286. Upon information and believe Goebel had fraudulently removed and added different claims in the Affirmation of Pfeiffer including but not limited "that Jericho never cancelled the Contract and that Midtown never received a "Notice" from Jericho cancelling the Contract".

287. Upon information and believe Goebel or together with Defendants have fraudulently removed many critical letters and documents from the Affirmation of Samuel Pfeiffer including but not limited the letters and correspondences of September 18, 2002 and thereafter including February 16, 2004, etc.

288. A Hearing was held before the Honorable Justice Charles Ramos on May 12, 2005.

289. Defendants completely contradicted the real documentary evidence and completely ignored the Affirmation of Pfeiffer and willfully and deliberately lied and misrepresented the facts of the case and the documentary evidence plus lied that Jericho had actually cancelled the Contract and that Jericho had actually sent to Defendants a "Notice of Cancellation" and *elected* to cancel the Contract.

290. Defendants had willfully and deliberately lied and misrepresented to the Court throughout the first half of that Hearing the facts of the case.

291. Goebel did not argue on behalf of Jericho in the first half of that Hearing but acted as an outside Observer.

292. But instead he had a person allegedly named Mr. Marasse represent to Justice Ramos that he is the representative of Jericho and this Mr. Marasse argued the case allegedly on behalf of Jericho.

64

293.    Goebel committed perjury and fraud on Plaintiffs and on the Court, by having Mr. Marasse argue the case, by allowing him to claim that he represents Jericho and to falsley represent to Justice Ramos, that *that Jericho had actually Cancelled the Contract*.

294.    But even though Mr. Marasse claimed that Jericho cancelled the Contract he stressed to the Court that Jericho did not *elect* to cancel the Contract but was forced because Midtown did not provide the critical requested documents. Accordingly, he stressed to the Court that it was not a *valid* cancellation.

295.    Mr. Marasse argued the first part of the Hearing.

296.    During the first part of the Hearing Justice Ramos asked a **hypothetical question** that, if Jericho could prove (that they discovered after 2 years) that Midtown committed "fraud" in performing its contractual obligations, could Jericho be allowed to rescind its **Notice of Cancellation** as a remedy for fraud and then proceed, on the strength of the same allegations, to seek specific performance as a remedy for breach of contract.

297.    But that was just a " **HYPOTHETICAL QUESTION**"?

298. But that was in the First Part of that Hearing, but there was the Second Part of the Hearing.

299. Upon information and believe Justice Ramos must have recognized that something is not right and asked from Mr. Marasse to explain a certain claim in the AC. (See below).

300. Goebel was caught off guard whereby Goebel was forced to admit to Justice Ramos that he is really the Attorney of Jericho (because Mr. Marasse had no idea what the case is about),

301. Goebel was not prepared for that eventually and was forced to explain Jericho's claims to Justice Ramos on the Record whereby he had to respond with the truth to the questions of Justice Ramos.

302. That is when Justice Ramos grasped the situation and asked questions from Goebel and Sherman where they were forced to respond and to make major Admissions as is reflected in the transcript from page 19 until the end of the Hearing. (See below)

303. Defendants and Goebel's have admitted to Justice Ramos:

  i.   That Defendants have willfully and deliberately committed fraud on the Court in their MTD and MOL,

Supreme Court Records OnLine Library - page 65 of 145

    ii.  that Mid-Town and Defendants had willfully and deliberately breached the Contract,

    iii.  that Imperatore had willfully and deliberately committed fraud on the Court in his Affirmation in support of Mid-Town' MTD,

    iv.  that Defendants, had willfully and deliberately committed actionable fraud on Plaintiffs when they signed the Contract and continued throughout the 75 days due diligent Period,

    v.  that Plaintiffs(not Szegda) had requested the critical documents from Defendants much before August 30, 2002 ,

    vi.  that the letters that Imperatore and Defendants introduced in their MTD and claimed that those letters are documentary evidence and prove so and so was a Hoax and fraud on the Court,

    vii.  That Mid-Town knew that without those Documents the Property could only be used for a Parking lot, and Mid-Town knew that Jericho or any other purchaser will know that without those Documents the Property could only be used for a Parking lot,

    viii.  That Jericho knew that without those Documents the Property could only be used for a Parking lot,

    ix.  That Jericho did *not elect* to cancel the Contract (but had no choice, because Mid-Town refused to provide those critical Documents and without that the Property's value is about $5,000,000 not $28,000,000),

    x.  That it was not a *valid* cancellation,

    xi.  That "documentary evidence" in the record prove that Jericho did *not elect* to cancel the Contract and that it was not a *valid* cancellation.

304. Thus Justice Ramos stated :

## THE COURT: LET ME FRAME THE QUESTION IF I CAN FOR MY PURPOSES AND FOR PURPOSES OF THE RECORD

- **THE COURT:**     **Let me frame the question if I can for my purposes and for Purposes of the RECORD.**

- 

- **From what counsel has told me, he put some meat on the bone now, he said DURING the 75-day period [July 2002] they asked for a copy of the lease [exhibits] with Amtrak**

- 

66

- because obviously if they didn't have a right to build above. The Amtrak tracks, the property could be used for what, a PARKING LOT, and that would be it.

- 

- THE COURT:  The fraud of the deceit is when you are asked to turn over [with the Contract] a document, instead of turning over [with the Contract] the complete document you turn over half the document [but represent in the Contract that you had turned over the true and complete document]. ...[14]


- THE COURT:  This is a motion under-3211, not 3212,

- without those exhibits in my possession I have to assume that those exhibits would permit the owner of the property to build as high as the local regulations would permit, or those exhibits would say no, You cannot build at all.

- 

- So those exhibits would really determine to me what the value of the property is. ...

- 

- THE COURT:  How can I decide this?   Either the – from what the plaintiff is alleging I think the plaintiff has at least a valid cause of action....

- 

- THE COURT: The answer is yes, DURING the 75-day period [not the first time only on September 2, 2002] they requested the exhibits...

- 

- THE COURT:   It dose strike me as somewhat odd that the owner of the property would not have a full copy of the lease [Amtrak Agreement]...

- 

- THE COURT:   indeed it strikes me as not credible.

---

[14] Paragraph 31 of the Contract states, "Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

67

- **The motion is denied, get your answer in.**

305. Justice Ramos had before him before he signed the Order, dated May 16, 2005, Denying Midtown's Motion to Dismiss, the Affirmation of Imperatore in support of Motion to Dismiss and the Exhibits that he attached and the Affirmation of Plaintiffs in support of Jericho's Opposition to Motion to Dismiss and the Exhibits Plaintiffs attached to it, *whereby he knew even just from those Affirmations and the Exhibits Attached,* that Imperatore's Affirmation in support of Midtowns' Motion to Dismiss and the Defendants Motion to Dismiss and Memo of Law were frivolous, false and fraud on the Court.

306. On May 16, 2005, Justice Ramos signed an Order denying Mid-Town's Motion to Dismiss the Complaint based on the Admissions of Sherman and Geremia and of Goebel and even without the Affirmations of Imperatore and Pfeiffer and the exhibits attached.

307. **That should have been the end of the Case. But instead,**

308. On July 5, 2005 Defendants filed a Notice of Appeal and Pre Argument Statement as though the Second Part of the Hearing before Justice Ramos never took place.

309. Defendants have lied to the Appellate Division what the reason was why Justice Ramos denied their MTD plus completely contradicted what they themselves have actually already admitted to Justice Ramos in the Second Part of the Hearing of May 12, 2002, (See herein)

310. Justice Ramos held a Preliminary conference Stipulation dated September 18, 2005, relating to Discovery, and ordered that all discoveries be completed by December 2005.

311. Defendants filed their Appellate Brief with the Appellate Division, on or about November 8, 2005 and their Appellate Reply Brief on or about December 15, 2005. (See partial quotes below)

312. Defendants have again lied to the AD what the reason was why Justice Ramos denied their Motion to Dismiss plus completely contradicted what they themselves have actually admitted to Justice Ramos in the Second Part of the Hearing of May 12, 2002,

313. Documentary Evidence proves that Everything that Defendants claimed and represented in their 2005 Appellate Brief and Appellate Reply Brief was false and direct fraud on the Five Justices of the Appellate Division.

68

314.     Defendants have also represented in their Appeal Briefs of 2005, that:

> "**These cases are readily distinguishable, …. because Rather, Midtown is relying on, the fact that Jericho *expressly cancelled* the contract by sending Midtown a *Notice of cancellation*. … Jericho's *Notice of cancellation* is what precludes its claims for specific performance, not the mere return of the downpayment.** "

315.     This was plain Perjury and blatant Fraud on the Appellate Division, because Jericho never sent to Midtown a ***Notice of cancellation*** and Midtown never received from Jericho a ***Notice of cancellation,***

> "**Midtown did not "default" in its performance under the contract The only reason it was "unable to convey title in accordance with the terms of this contract … was that Jericho had *elected* to cancel the contract before the scheduled closing. Indeed, Midtown twice informed Jericho that Midtown was ready, willing, and able to close by September 18   in accordance with the terms of the contract."**

316.     This was also plain Perjury and blatant Fraud on the AD, because Jericho had never *elected* to cancel the contract and because Midtown has never informed Jericho that they were ready, willing, and able to close by September 18 in accordance with the terms of the contract.

317.     In fact, documentary evidence proves that Mid-Town was never ready, willing, and able to close by September 18, 2002 and Mid-Town was never ready, willing, and able to close with Jericho even though Jericho informed them since mid August 2002 and thereafter that Jericho is ready, willing, and able to close in accordance with the terms of the contract.

318.     Goebel filed his Respondent Brief to the Appellate Division on or about December 7, 2005.

319.     Goebel did not point out that Defendants have again lied to the AD in their Appellate Briefs what the reason was why Justice Ramos denied their MTD plus that they have completely contradicted what they themselves and Goebel have actually admitted to Justice Ramos in the second part of the Hearing of the May 12, 2002 plus the real documentary evidence,

69

Supreme Court Records OnLine Library - page 69 of 145

320.     Goebel at extreme pressure from Plaintiffs finally Claimed in his December 2005, "Respondent Brief" that Jericho never cancelled the Contract, that Jericho never sent a "Notice" cancelling the Contract as required under the specific terms of the Contract, that even Szegda never sent a "Notice" cancelling the Contract, that Szegda was not authorized to cancel the Contract, that Szegda was not authorized to request back the deposit and request Defendants to wire the deposit to his own account, that Plaintiffs sent to Defendants a letter relating to the above and complaining relating to the above immediately, already on September 18, 2002 and not as Defendants claimed and lied to the Courts that only woke up "two years later", that accordingly to the specific terms in the Contract, "documentary evidence" the Contract was never cancelled and that the Contract was and is still in full force and effect,

321.     That in essence, Midtown's Motion to Dismiss, MOL, Imperatore's Affirmation in support of MTD and their 2005 Appeal Briefs are false.

322.     Defendants filed their Reply Brief to the Appellate Division on or about December 15, 2005.

### GOEBEL COMMITTED PERJURY AND FRAUD ON PLAINTIFFS AND DIRECTLY ON THE APPELLATE DIVISION BY FRAUDULENTLY WITHDRAWING HIS CRITICAL CLAIM "THAT JERICHO NEVER CANCELLED THE CONTRACT, ETC" AND HIS CRITICAL "MOTION TO SUPPLEMENT THE RECORD"

323.     Unbeknown to Plaintiffs, Goebel subsequently "Committed Fraud on Plaintiffs." because Goebel somehow notified the Appellate Division that Jericho does not want to proceed with the above Claims and that Jericho withdraws those Critical Claims and his "Motion to Supplement the Record".

324.     Unbeknown to Plaintiffs, Goebel subsequently "Committed Perjury and Fraud directly on the Appellate Division", because Goebel somehow notified the Appellate Division that Jericho does not want to proceed with the above Claims and that Jericho withdraws those Critical Claims and his "Motion to Supplement the Record".

325.     **DOCUMENTARY EVIDENCE PROVES**, the statements of the Justices of the AD in their August 17, 2006 Ruling, proves that the Justices of the Appellate Division, completely ignored Geoebel's New Critical Claims in his December 2005 "Respondent Brief" and his "Motion to Supplement the Record", because Goebel fraudulently withdrew

Supreme Court Records OnLine Library - page 70 of 145

them from consideration as part of Defendants conspiracy and fraud and on Plaintiffs and direct fraud on the Appellate Division.

326.  This was even more egregious because Plaintiffs sent many emails to Goebel warning him that:

**"Please do not file any motions, send any letters ... until you meet first with me. Plus without my written and signed consent".**[15]

327.  Had Goebel not withdrawn those Claims in December 2005 or January 2006, the Appellate Division would have not only not reversed Justice Ramos but probably granted in their Ruling of 2006 Summary Judgment in favor on Jericho.

328.  Discovery took place during September 2005 and June 2006.

329.  Defendants filed on or about July 7, 2006 a SJM with the Lower Court, and attached Defendants Affirmation under penalty of perjury in Support of Mid-Towns' Summary Judgment Motion.

330.  Defendants contradicted what they have claimed in their Motion to Dismiss, in their MOL and what they have admitted to Justice Ramos at the May 12, 2005 Hearing and what they have claimed in their 2005 Appellate Briefs, plus their new claims and defenses in the Summary Judgment Motion were completely false, perjury, and direct fraud on the Court.

331.  Defendants attached to their Summary Judgment Motion a new Affirmation from Imperatore under penalty of perjury in Support of Mid-Towns' Summary Judgment Motion.

332.  Imperatore's new Affirmation complete contradicted his prior Affirmation under penalty of perjury to the Court in Support of Mid-Towns' Motion to Dismiss, plus his new claims and defenses were completely false.

333.  Defendants did not inform the Appellate Division  before filing their Summary Judgment Motion  or immediately thereafter that they have now changed their story and

---

[15] Goebel refused to meet with Plaintiffs since before filing the Complaint in 2004 until after the Appellate Divisions Ruling of August 17, 2006 even though Plaintiffs requested constantly to meet and warned him not to file anything with the Court.

Supreme Court Records OnLine Library - page 71 of 145

claims and that they want to withdraw or amend their Motion to Dismiss and to withdraw or amend their 2005 Appeal Briefs and that Imperatore new Affirmation completely contradicts reality, plus his 2005 Affirmation and that the AD should disregard his 2005 sworn Affirmation and assertions, and that the Appellate Division should not consider and not Rule on their 2005 Appeal Briefs because that is defective and false.

334.     Goebel did not inform the Appellate Division immediately after he received their SJM that they have now changed their story and claims and that the Appellate Division not consider and not Rule on their 2005 Appeal Briefs because the SJM and their new Affirmations contradicts what they have argued in their MTD, in their MOL, to Justice Ramos on May 12, 2005, in their 2005 Appeal Briefs.

335.     In fact, Goebel has willfully and deliberately hid from Plaintiffs, Defendants Summary Judgement Motion and did not even tell Plaintiffs that he received s SJM or that they filed a SJM despite Plaintiffs being in contact with Goebel at that time on a daily basis plus requesting on a daily basis to meet with Goebel which he refused.

336.     Even when Plaintiffs subsequently discovered that Mid-Town filed a SJM and confronted Goebel he refused to provide them to Plaintiffs only under tremendous pressure did he subsequently provide their SJM to Plaintiffs.

337.     Plaintiffs immediately requested an emergency meeting with Goebel but he refused.

338.     Plaintiffs immediately requested that he immediately notify the AD of this major development but Goebel refused.

339.     The Appellate Division, First Department, issued their 12 page Ruling on August 17, 2006, reversing Justice Charles Ramos Order, "unanimously reversed on the *Law*"..

340.     The Appellate Division stated in their Ruling of August 17, 2005:

Order, Supreme Court, New York County (Charles Edward Ramos, J.), entered May 18, 2005, which denied defendant's CPLR 3211 (a) (7) motion to dismiss the amended complaint, unanimously reversed, ***on the law***, with costs, the motion granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly. [but Justice Ramos denied their MTD not on the *law* but based on the facts based on the

Supreme Court Records OnLine Library - page 72 of 145

admissions of Sherman and Geremia and of Goebel, and based on the unopposed Affirmation of Pfeiffer and the letters attached]

On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, **Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase**.

However, Midtown gave Jericho the name of a contact person at the New [*3]York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, *so that Jericho could find out the status of any spill and/or cleanup.*

*On the day before the study period expired*, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits.

*It also reminded Jericho* that it had 75 days during the study period *to request the exhibits from Amtrak*, or to meet with employees of Amtrak to discuss any issues regarding its easement.

On September 3, 2002, *counsel* for Jericho sent Midtown a letter stating: "Be advised **that, unless you advise us** in writing th[at] Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the Study Period for a sufficient time to allow Jericho to investigate this matter, and, *in any case provide Jericho with the requested due diligence documentation*, Jericho requests that the monies paid upon execution of the contract be *returned to it* in accordance with the Contract's terms." Midtown responded by requesting an express statement *from Jericho* as to whether it intended to cancel the contract. It indicated that in the absence of such express statement it would presume that Jericho intended to proceed to closing on September 18, 2002 pursuant to the terms of the contract.

73

On September 12, 2002, *Jericho sent Midtown a letter* stating: "*Although Jericho's principals felt, and still feel*, that, under the circumstances which came to light in the month of August, **either some affirmative response with respect to the oil spill** or an extension of the study period *and the request for production of documents was warranted*, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of J0ericho's down payment **was intended** as the exercise of Jericho's right under paragraph 29 (a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof." ***Midtown returned the $250,000 down payment the next day***.

On September 3, 2002, the last day of the study period, ***Jericho requested*** return of its down payment **unless it received certain "due diligence" *information* from Midtown.** Midtown advised Jericho that it would not return the down payment unless, pursuant to the terms of the contract, **Jericho *acknowledged in writing* that the contract was cancelled.** On September 13, ***Jericho sent* a letter stating that it was exercising its option to cancel the contract, and *it demanded* the return of its down payment**.

The assertions in this complaint, *brought two years* subsequent to the ***cancellation of the agreement*, do *not support Jericho's allegation that* Midtown breached the contract to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*.** …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]

An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[**specific performance unavailable where a contact for sale of real estate *was validly cancelled***]

"**Had Midtown willfully or deliberately breached its obligations under paragraph … of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment** (*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]). ..

**However, none of these allegations *constitute actionable fraud***

74

Further, **the *record is plain* that *Midtown provided Jericho* with *information* in its possession and that *it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill.***

**It should also *be noted* that *Jericho made requests for documents on the eve of the expiration period which could have been made much earlier.***

341.    The statements of the Justices of the AD in their August 17, 2006 Ruling , proves that the Justices of the AD did not know what the facts of the case was, what Plaintiffs claims were, what the real documentary evidence prove, what took place at the Hearing before Justice Ramos on May 12, 2005, what Sherman and Geremia and Goebel admitted to Justice Ramos on May 12, 2005, why Justice Ramos dismissed Midtowns" MTD and what took place and what was discovered between May 12, 2005 and August 1, 2006.

342.    Plaintiffs had retained Goebel specifically to claim that Jericho never cancelled the Contract and that Jericho never sent to Defendants a "Notice of Cancellation" and that Defendants never received from Jericho a "Notice of Cancellation". In addition, that Jericho sent letters to Defendants commencing September 18, 2002 and thereafter up to February 16, 2004 that Jericho never cancelled the Contract and that Defendants were never ever able to produce the "Notice of Cancellation" yet Goebel did not claim this critical claim in the AC.

343.    In addition, even though Plaintiffs have requested from Goebel many times orally and in writing, including but not limited by many letters and e-mails even on August 16, 2006 even the day before the AD's Ruling of August 17, 2006, to file a SAC or to Motion the Court to allow to amend the prior AC, and to argue that Jericho claim that Jericho never cancelled the Contract and that Jericho never sent to Defendants a "Notice of Cancellation" and that Defendants never received from Jericho a "Notice of Cancellation" and much more as also spelled out in the above e-mails but Goebel always pushed off but promised that he will file a SAC or to Motion the Court to allow to amend the prior AC with the above claims, but never did.

344.    Those letters and e-mails also that Plaintiffs requested that he also claim and stress the Affirmation of Pfeiffer of February 2005, and the admissions made to Justice Ramos by Defendants Attorneys at the "second part" of the May 12, 2005 Hearing, that

75

Plaintiffs (not Szegda) made request for the critical Exhibits and documents related to the Amtrak Agreement already in July 2002 and made requests for the critical documents relating to the oil spill on Midtown's own Property already in July 2002, much before August 30, 2002, plus to claim the Main Claim, that Jericho never cancelled the Contract, that Jericho never sent to Defendants any "Notice of Cancellation" and that Defendants never received from Jericho any "Notice of Cancellation", but Goebel always pushed off but promised that he will file a SAC or to Motion the Court to allow to amend the prior AC with the above critical Claims, but Goebel never did.

345.     Goebel also refused to meet with Plaintiffs since before he filed his Complaint in 2004 until after the AD's Ruling of August 17, 2006 even though Plaintiffs requested throughout to meet and warned him not to file anything until he meets with Plaintiffs.

346.     **When Plaintiffs received the AD's Ruling dated "August 17, 2006", Plaintiffs asked Goebel why the AD did not mention and completely ignored in their 12 page Ruling his above claims and "Documentary Evidence" and not only did they completely ignore them but the Appellate Division wrote Just the Opposite of his claims and of the undisputed "Documentary Evidence" ?**

347.     **Goebel replied that he has no idea why the AD ignored his critical claim and the undisputed "Documentary Evidence"!**

348.     But we now know that the Appellate Division did not have those claims and "Documentary Evidence" before them because Goebel had willfully and deliberately withdrawn those critical claim and critical "Documentary Evidence" from consideration by the Appellate Division, because of the Fraud and Conspiracy of Goebel and Defendants.

349.     Goebel had willfully and deliberately "put a knife in the back of Plaintiffs" by willfully and deliberately committed Fraud on Plaintiffs, Fraud on Justice Ramos and on the Justices of the Appellate Division by withdrawing those claims, by intentionally misrepresenting to the Court "that Jericho cancelled the Contract", and by removing the "Documentary Evidence" and the Motion to supplement the Record and removing the critical letters and documents from Pfeiffer's' Affirmation, etc.

350.     But we now know and we have recently discovered that Goebel was in a collusion and conspiracy with the Defendants to defraud Plaintiffs, Justice Ramos and the

Supreme Court Records OnLine Library - page 76 of 145

Justices of the AD from inception to present and that Goebel and the Defendants had willfully and deliberately committed fraud on the AD and misled the AD.

351.     Defendants spelled out in their Affirmation in Opposition, dated September 25, 2006, to the Appellate Division the *reason* why the five Justices of the Appellate Division, reversed Justice Ramos Order, in their Ruling, dated on August 17, 2006, and why the five Justices dismissed Jericho's Complaint and AC,  (through a "Motion to Dismiss" even before issues were joined", which is very unusual), they affirmed the reasons as follows:

"Midtown moved to dismiss the complaint on, among other grounds, that Jericho may not seek to enforce a contract **that it cancelled**....

the Court (the Appellate Division} noted that Jericho did not even ask Midtown for these exhibits until "the day before the study period expired," a fact that **shows Jericho manufactured this issue as a pretext for bringing its meritless lawsuit**. Final Order at 39.

As the Court's Final Order later noted—in support of its alternative holding that there was no "actionable fraud" in this case—"**Jericho made requests for documents *on the* eve of the expiration [of the study] period which could have been made much earlier**." *Id* at 45-46

**As the Court noted in its Final Order, Jericho waited until the last day of the study period to ask Midtown for the exhibits to the Amtrak agreement, and Midtown promptly responded (the next day) that it did not have them:**

**On the day before the study period expired, Jericho asked Midtown for the exhibits** to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits.

Final 'Order at 39.   The Midtown letter to which the Court referred stated, in pertinent part, "Midtown does not now (and did not at the commencement of the Contractual 'Study Period') have the Exhibits referred [to] in your letter, so it could not provide those Exhibits to Jericho...

Only *four days* before the study period expired, Jericho asked Midtown to "advise, underline immediately, if there is any truth to [the] *information*," which Jericho characterized as "scuttlebutt," that "there may-have been an oil spill on the properties which may or may not have been cleaned up" and also to "advise"

77

whether Midtown had ever "received any **notice,** written or oral about the spill front the City of New York or any agency thereof or-from any third party" about the spill and its disposition…

At the threshold, Jericho signed a contract in which it expressly agreed that Midtown "has made *no representations and is unwilling to make any representations"* about the property or its condition. … Accordingly, Midtown was not contractually obligated to make the *requested representations* about the oil spill or "advise" Jericho in any manner, let alone "immediately." For this reason alone, the Court did not err in holding that "[t]he assertions in this complaint [including Jericho's allegations about the oil spill] … do not support Jericho's allegation that Midtown breached the contract." Final Order at 42.    '

Nevertheless, as the Court's Final Order noted, Midtown informed Jericho **during the study period {on** August 23**, 2002} that there had been an oil spill** *on* **properties neighboring Midtown's sites** and gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup.  Final Order at 39….

 This is a "misreading of Midtown's obligations," **as the Court correctly ruled**. Final Order at 43.  The Contract provides that **Midtown  was obligated to disclose** only those "documents" in its current possession or control **that Jericho "reasonably requests**," not everything that Jericho might *silently imagine* to be "due diligence" material…

Third, even if Jericho's request concerning the oil spill night be considered a "reasonabl[e] request[]" for "documents" **(and it was not)**, **Jericho was asking Midtown to "advise" about "any notice"** to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.123) *There is no such document*, because, as discovery showed, Midtown has never received any **notice** from the City, State, any City or State agency, or any "third party" about the oil spill….

**The Court similarly and accurately ruled that "Jericho made requests for documents on the eve of the expiration period which could have been made much earlier.". Final Order at 45-46. As noted, Jericho did not ask Midtown for the exhibits to the Amtrak agreement until the day before the study period expired, and it first raised the issue of the oil spill only four days before the**

78

**study period expired.** (R.119, 8.123) The documents in the record on appeal thus refute Jericho's conclusory allegations that information about the oil spill and the exhibits to the Amtrak agreement were "*absolutely crucial*" or "*materially relevant*" to Jericho (R.37, Comp1.1 5), **and therefore support the court's order dismissing the complaint** ... ("dismissal of the complaint was warranted" where "Plaintiffs allegations in this action for . . . specific performance of contracts for the sale of real property" *were* **"refuted by the Documentary Evidence").**

As Midtown argued in its briefs on appeal—**and the Court agreed—this limitation- of-liability provision is directly applicable here. Midtown could not "convey title in accordance with the terms of this contract" because Jericho cancelled the contract** before the title was to be conveyed at the closing. *See also* Final Order at 46"

352.      ACCORDINGLY, Defendants s affirmed under penalty of perjury the reason, why the five Honorable learned Justices of the Appellate Division, reversed Justice Ramos's Order and why they dismissed Jericho's AC.

353.      But the "Evidence" proves that all the above was false, and that *everything* they affirmed from inception to 2010 was false, that Defendants lied, misrepresented, and misled and specifically committed fraud directly on the Appellate Division, and because of their direct fraud on the Appellate Division, did the Appellate Division reverse Justice Ramos's Order and dismissed Jericho's AC.

## FIRST CAUSE OF ACTION
**(For Declaratory Judgment that Justice Ramos's Order dated May 16, 2005, was never appealed by Mid-Town and therefore the Parties Proceed to Trial and the Notice of Pendency be reinstated)**

354.      Plaintiffs repeat the allegation of paragraphs 1 through 353 above and in the paragraphs below as if fully set forth at length herein.

355.      Defendants filed a Notice of Appeal and a Pre Argument Statement dated July 5, 2005, and asserted that,

"The Order appealed from should be reversed on the ground that the court eared as a *matter of law* in denying Midtown's motion to dismiss the amended complaint. All of Midtown's causes of actions should be dismissed on the *settled law* that, having *elected* to cancel the contract at issue ... Jericho may

Supreme Court Records OnLine Library - page 79 of 145

not now assert claims for either specific performance or damages under a contract it *elected* to cancel....."

356.　　　Defendants asserted in their Appeal Brief, that the reason they are appealing Justice Ramos Order and the reason the Justices of the Appellate Division should reverse Justice Ramos's Order is because Justice Ramos "**hypothesized**", because Justice Ramos "**fixated**" because Justice Ramos made up a "*new law*" because Justice Ramos erroneously made a mistake in the *law* and because "there is no law to support the lower court's **rationale**." they claimed that:

In ruling from the bench on Midtown's motion, the lower court stated that this was an "interesting point," but then wondered whether there is an exception to it. The court **hypothesized** that, if Jericho could prove that Midtown committed "fraud" in performing its contractual obligations, Jericho should be allowed to rescind its ***notice of cancellation*** as a remedy for *fraud* and then proceed, on the strength of the same allegations, to seek specific performance as a remedy for *breach of contract.* There is no law to support this notion. ... The exception that the lower court **hypothesized** simply does not exist in the law...

The lower court noted in response, "That is an interesting point." (R.18) But the court then **fixated** on the notion that it could not, on a motion to dismiss, decide whether Midtown had fully responded to Jericho's various requests for due diligence materials, as alleged by the complaint. (R.15-17) The court reasoned that, if Midtown had committed "fraud" in fulfilling its contractual obligations, Jericho should be entitled to rescind its cancellation as a remedy for that "fraud" and then seek specific performance for breach of contract. (R.19)

The lower court responded to Midtown's invocation of this rule by stating, "That is an interesting point." (R.18) But the court then proceeded to wonder whether there should be an exception to it in this case if Midtown could be said to have committed a fraud in performing under the contract:
[L]et's assume for purposes of this motion that there was a fraud committed .... [W]ouldn't the plaintiff be entitled, if they were successful in proving the fraud, wouldn't they be entitled to rescind their rejection of the contract and compel specific performance?

Supreme Court Records OnLine Library - page 80 of 145

(R.19) Without invoking any legal authority to support this speculation, the court later ruled that Jericho's specific performance claims should not be dismissed because "the complaint sets forth that potential" that Midtown committed fraud in performing its disclosure obligations under the contract. (R,22; *see also* R.,20)… there is no law to support the lower court's **rationale**.".

357.   They also claimed that Jericho cancelled the Contract, that Jericho *elected* to cancel the Contract, that Jericho did nothing since they cancelled the Contract on September 12, 2002 until they filed the Complaint 2 years later in September 2004, that Jericho could not wake up two years later and try to vacate a *valid* cancellation that Jericho *elected* to cancel the Contract, that the reason that Mid-Town did not provide to Jericho information about an oil spill was because Jericho only requested from Mid-Town for the first time, information about an oil spill only on August 30, 2002 and the reason that Midtown did not provide to Jericho the exhibits to an Amtrak agreement was because Jericho only requested from Mid-Town for the first time exhibits to an Amtrak agreement only on September 2, 2002 that showed that Jericho really did not need them, plus that Mid-Town did not have on the eve of the expiration of the due diligent period the information about an oil spill and not the exhibits relating to the Amtrak, but had Jericho requested the above on or about August 23, 2002 than Mid-Town would have had to provide and would have provided to Jericho the information about an oil spill and the exhibits, etc. (See below).

358.   That was a major fraud on Justice Ramos and even a bigger fraud on the AD, because they knew that Justice Ramos denied Midtown's motion to dismiss, based on the responses and Admissions of Sherman and Goebel in the second part of the Hearing (and also on the Affirmation of Pfeiffer).

> THE COURT:      Explain to me what this claim of deceit that you set forth, which is your fifth cause of action. I am not sure if I quite follow, plaintiff.
>
> MR. GOEBEL:    I am Robert Goebel.
>
> THE COURT:     I would rather have the attorney.

Supreme Court Records OnLine Library - page 81 of 145

MR. GOEBEL:      I am the attorney, Robert Goebel.

THE COURT:        Stand up, please ...

MR. GOEBEL:Paragraph 31, Your Honor, of the contract states that annexed to the contract is a true and complete Amtrak Agreement. It turns out -- the Amtrak Agreement is basically an agreement that the seller purportedly had with Amtrak, and basically the agreement was to provide for allowance of the seller, of the owner of the property to build above the railways, the railroad tracks. Without an agreement that provides for that there is no way you can develop the site because the tracks run right through the property. So it's basically worthless property that can't be developed, or it is not worth nearly as much. but it cannot be developed.

MR. GOEBEL:   That is correct. They, told us when we signed the contract they represented in paragraph 31A that annexed thereto is a true and complete copy of the Amtrak Agreement. It turns out that there were many of the exhibits were missing.

THE COURT: So they didn't give you complete copy of-the Amtrak Agreement?

MR. GOEBEL:  We [Pfeiffer] tried to get copies of the exhibits from both the seller and also from Amtrak, and Amtrak bounced us around. They basically said go back to the seller. The seller said we've given you everything we, are required to give you, and then near the very end of the study period, about 70 days into the study period, Your Honor, they told us they didn't have the exhibits.

**THE COURT: Let me frame the question if I can
for my purposes and for PURPOSES OF THE RECORD.**

THE COURT:          **Let me frame the question if I can for my purposes and FOR PURPOSES OF THE RECORD.**

**From what counsel has told me, he put some meat on the bone now, he said DURING the 75-day period [July 2002] they asked for a copy of the lease [exhibits] with Amtrak because obviously if they didn't have a right to build above. The Amtrak tracks, the**

82

**property could be used for what, a PARKING LOT, and that would be it.**

Did you supply a copy of the Amtrak contract to the purchaser during that 75-day period?

MR. SHERMAN:    The copy that we have was supplied on the day of the execution of the contract, and it's an exhibit to the Contract.

THE COURT:  Was it complete?

MR. SHERMAN:      It didn't contain exhibits.

THE COURT:  This is a motion under-3211, not 3212, without those exhibits in my possession I have to assume that those exhibits would permit the owner of the property to build as high as the local regulations would permit, **or those exhibits would say no, You cannot build at all.**

   **So those exhibits would really determine to me what the value of the property is. …**

THE COURT:  How can I decide this?   Either the – from what the plaintiff is alleging I think the plaintiff has at least a valid cause of action.

MR. SHERMAN:  Let's assume for moment, you think it's a valid cause of action for breach of representation that they got a copy of the contract, how does that become deceit or fraud in this action?  Why is that not a breach of contract, how does he turn it into a fraud issue?

THE COURT:  The fraud of the deceit is when you are asked to turn over [with the Contract] a document, instead of turning over [with the Contract] the complete document you turn over half the document [but represent in the Contract that you turned over the complete document]. …[16]

---

[16] Paragraph 31 of the Contract states, "Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

83

THE COURT: Was it clear from the Amtrak contract that was attached to the purchase and sale agreement, **that the Amtrak contract was incomplete?**

MR. SHERMAN: **YES, because it didn't have some of these exhibits**.

THE COURT:    Did they then request those exhibits?

MR. SHERMAN: After 60 days, two months into the so-called study period. It is not as-though they read it on day one and say we need those exhibits.

THE COURT:The answer is yes, DURING the 75-day period they requested the exhibits.

THE COURT: It dose strike me as somewhat odd that the owner of the property would not have a full copy of the lease [agreement]…

THE COURT: Indeed it strikes me as not credible.

The motion is denied, get your answer in.

Thank you very much."

359.      Accordingly, Justice Ramos denied Midtown's motion to dismiss not on the LAW but on the FACTS and the major Admission of Sherman and Geremia and of Goebel.

360.      Defendants did not deny that Plaintiffs requested from Amtrak and from Midtown the Exhibits already in July 2002.

361.      In fact, even Sherman and Geremia had actually admitted to Justice Ramos that Plaintiffs requested the exhibits from Midtown much before September 2, 2002, much before the "eve"

362.      Accordingly, Sherman and Geremia admitted to Justice Ramos that Midtown had committed fraud on the Court, in their "Motion to Dismiss" and Imperatore committed fraud on the Court in his Affirmation where they represented to the Court that documentary evidence, proves that Jericho only requested the exhibits from Midtown for the first time,

84

only on the 74th day of the due diligent period on September 2, 2002. Sherman and Geremia also admitted to Justice Ramos that Midtown had willfully and deliberately breached the Contract, specifically par. 29c) of the Contract, by not providing to Plaintiffs the critical exhibits requested by Plaintiffs from Midtown and from Amtrak already in July 2002.

363.      Accordingly, Sherman and Geremia also admitted to Justice Ramos that without the exhibits Plaintiffs and Defendants knew that Plaintiffs will only be able to use the Property only for a Parking Lot (at a value of $5,000,000 not the Contract price of $28,000,000).

364.      Accordingly, Sherman and Geremia also admitted to Justice Ramos that Plaintiffs did not *elect* to cancel the Contract but was *forced* by Midtown to cancel the Contract.

365.      Accordingly, Sherman and Geremia also admitted to Justice Ramos that it was not a *valid* cancellation.

366.      Accordingly, Sherman and Geremia also admitted to Justice Ramos that Midtown had committed fraud on the Court in their "Motion to Dismiss" where they represented to the Court that Jericho *elected* to cancel the Contract and that it was a *valid* cancellation.

367.      Sherman and Geremia also admitted to Justice Ramos that anybody reading the "Amtrak Agreement" would know that the exhibits were missing and even so Midtown did not attach the exhibits to the Contract and not provided the exhibits to Jericho during the 75 days due diligent period.

368.      Sherman and Geremia also admitted to Justice Ramos that it was impossible that Defendants did not have the Exhibits, since they marketed the Property to the entire the world for many years to sell for over $30,000,000.

369.      Accordingly, Defendants' Attorneys Sherman and Geremia again admitted to Justice Ramos that Defendants had committed "Actionable fraud" on Jericho when Defendants signed the Contract and thereafter.

370.      In fact, Justice Ramos explained to Defendants' Attorneys Sherman and Geremia why it was an "actionable fraud" and why it was not a simple breach and Defendants' Attorneys subsequently agreed that it was an "actionable fraud".

Supreme Court Records OnLine Library - page 85 of 145

371.     Accordingly, Defendants' Attorneys Sherman and Geremia also admitted to Justice Ramos that Defendants had committed fraud on the Court in their "Motion to Dismiss" where they represented to the Court that a promise to provide documents is only a breach and not "actionable fraud", even though they knew that this was not a promise to provide documents but a representation in the Contract that attached to the Contract is a true and complete Amtrak Agreement when they knew that it was false because they did not attach the critical exhibits.

372.     In addition, Justice Ramos made a fact finding that it was not believable that Defendants did not have the exhibits when they signed the Contract, when Plaintiffs requested the exhibits from Defendants and Amtrak in July 2002, when Plaintiffs again requested the exhibits from Defendants on or about August 17, 2002, when Szegda requested the exhibits from Midtown on September, 2, and again on September 3, 2002.

373.     The same finding was also true re the documents requested relating to the oil spill on Mid-Towns' own Property as the Record that was before Justice Ramos on May 12 and May 16, 2005 proved.

374.      Accordingly Justice Ramos denied Defendants MTD based on Defendants' Attorneys Sherman and Geremia and Goebel's responses and admissions and not as Defendants asserted in their Appeal Brief, that they are appealing Justice Ramos Order because Justice Ramos "hypothesized", because Justice Ramos "fixated" because Justice Ramos made up "new law" because Justice Ramos erroneously made a mistake in the "law", because "there is no law to support the lower court's **rationale**".

375.     Defendants filed their Notice of Appeal and Appeal Briefs misrepresenting to the AD why they are entitled to Appeal, what the reason why Justice Ramos denied Midtowns MTD and why the AD should reverse Justice Ramos's Order.

376.     In fact, Defendants  were not even allowed to appeal the findings of Justice Ramos that was based on their representations and Admissions of the facts and their Admissions that Mid-Town, Imperatore and Defendants have committed fraud on the Court in their MTD.

377.     In fact, Defendants were not even allowed to appeal since they have admitted to Justice Ramos that they have committed fraud on the Court in their MTD.

86

378.     In fact, Defendants were not even allowed to appeal to contradict their own admissions to Justice Ramos, without first disclosing to the AD what they have admitted and why they are now repudiating what they had admitted to Justice Ramos.

379.     Defendants contradicted in their Appeal briefs of 2005, what Defendants attorneys Sherman and Geremia responded, represented, explained and admitted together with Goebel at the May 12, 2005 Hearing and the reason why Justice Ramos denied their MTD.

380.     Had the Justices of the AD not been lied to and not misled willfully and deliberately by Defendants and Goebel the Justices of the AD would have never written anything that they wrote in their 12 page Ruling dated August 17, 2006 and they would have never reversed Justice Ramos's Order of May 2005.

381.     The Appellate Division would have probably also sanctioned Defendants for bringing such a frivolous Appeal plus for committing such outrageous fraud on the Court.

382.     Whereby the Lower Court would have found at trial that documentary evidence prove the above and Ordered that Midtown specifically perform under the terms of the Contract and close title with Jericho and transfer the Property to Jericho, plus that Defendants pay to Plaintiffs the $400,000 deposit plus all expenses and damages incurred by Plaintiffs in the Baystone and Midtown cases, plus interest, attorneys fees, and probably punitive damages and sanctions,

383.     The Appellate Division  in their August 17, 2006, Ruling did not even mention any of the findings, statements and the reasons of Justice Ramos Order nor the Admissions of Defendants' Attorneys Sherman and Geremia and Goebel.

384.     Accordingly, Jericho is entitled to a declaration of judgment that Justice Ramos Order of May 16, 2005 is in full force and effect.

385.     That the parties proceed to Trial.

386.     That the Notice of Pendency be reinstated.

387.     That the Plaintiffs are entitled to specific performance and damages.

388.     Jericho has no adequate remedy at law.


## SECOND CAUSE OF ACTION

87

**(For Fraud committed by Mid-Town and Defendants including Appealing Justice Ramos's Order dated May 16, 2005)**

**(For Declaratory Judgment that Order of Justice Ramos dated May 16, 2005, is still in full force and effect, the Parties Proceed to Trial plus Damages etc)**

389.    Plaintiffs repeat the allegation of paragraphs 1 through 388 above and in the paragraphs below as if fully set forth at length herein.

390.    The elements of Fraud as set forth below and throughout are as follows: the plaintiff must show that the defendant made a false representation of material fact; the defendant must know at the time he is making the representation that it is false, in other words, the defendant intentionally misrepresented a material fact to the plaintiff; the plaintiff justifiably relied on the defendant's misrepresentation;  the plaintiff must show that as a result of relying on defendant's misrepresentation, he has suffered a financial injury.

391.    The elements of Fraud as stated above should be considered as though spelled out and repeated in each and every paragraph below as if more fully stated therein. These requirements are amply and fully proven by the assertions and allegations made in the Cause of Action based in Fraud.

392.    Mid-Town and Defendants have willfully and deliberately committed fraud on the Court when they asserted to the AD in their Notice of Appeal and a Pre Argument Statement dated July 5, 2005 that, "The Order appealed from should be reversed on the ground that the court eared as a *matter of law* in denying Midtown's motion to dismiss the amended complaint.  All of Midtown's causes of actions should be dismissed on the *settled law* that, having *elected* to cancel the contract at issue … Jericho may not now assert claims for either specific performance or damages under a contract it *elected* to cancel…. And (c) the deceit cause of action is duplicative of Jericho's breach of contract causes of action" .

393.    Mid-Town and Defendants  have also willfully and deliberately committed fraud on the Court when they asserted in their Appeal Brief, that the reason they are appealing Justice Ramos Order and the reason the Justices of the Appellate Division should reverse Justice Ramos's Order is because Justice Ramos "**hypothesized**", because Justice Ramos "**fixated**" because Justice Ramos made up a "*new law*" because Justice Ramos erroneously made a mistake in the *law* and because "there is no law to support the lower court's **rationale**".

88

394.    Because they knew that is not the reason of Justice Ramos Order, that Justice Ramos Order was based on the responses and Admissions of Sherman and Geremia and Goebel and the underlying Record that was before Justice Ramos on May 12 and May16, 2005.

395.    Plaintiffs specifically repeat the allegation in the First as if fully set forth at length herein.

396.    Accordingly, Jericho is entitled to a declaration of judgment that Justice Ramos Order of May 16, 2005 is in full force and effect.

397.    That the parties proceed to Trial.

398.    Mid-Town and Defendants should specifically perform under the terms of the Contract and close title with Jericho and transfer the Property to Jericho and,

399.    That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

400.    Jericho has no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(For Fraud committed by Goebel on Plaintiffs and separately on the Court relating to Midtown and Defendants Appealing Justice Ramos Order dated May 16, 2005)**

**(For Declaratory Judgment that Order of Justice Ramos dated May 16, 2005, is still in full force and effect, The Parties Proceed to Trial, plus Damages etc)**

401.    Plaintiffs repeat the allegation of paragraphs 1 through 400 above and in the paragraphs below as if fully set forth at length herein.

402.    Mid-Town and Defendants have willfully and deliberately committed fraud on Plaintiffs and the Courts when they asserted to the AD in their Notice of Appeal and a Pre Argument Statement dated July 5, 2005 that, "The Order appealed from should be reversed on the ground that the court eared as a *matter of law* in denying Midtown's motion to dismiss the amended complaint. All of Midtown's causes of actions should be dismissed on the *settled law* that, having *elected* to cancel the contract at issue … Jericho may not

89

now assert claims for either specific performance or damages under a contract it *elected* to cancel....".

403.    Mid-Town and Defendants have also willfully and deliberately committed fraud on the Court when they asserted in their Appeal Brief, that the reason they are appealing Justice Ramos Order and the reason the Justices of the Appellate Division should reverse Justice Ramos's Order is because Justice Ramos "**hypothesized**", because Justice Ramos "**fixated**" because Justice Ramos made up a "*new law*" because Justice Ramos erroneously made a mistake in the *law* and because "there is no law to support the lower court's **rationale**".

404.    Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because Goebel knew that Justice Ramos denied Midtowns MTD, based on the responses and Admissions by Sherman and Geremia and also the underlying Record that was before Justice Ramos on May 12 and May16, 2005, but he did not make any Motion to the AD to argue that Defendants are misleading and lying to the AD, plus he did not raised them or argued them in his Respondent Brief of December 2005.

405.    Plaintiffs specifically repeat the allegation in the First and Second Cause of Action as if fully set forth at length herein.

406.    Accordingly, Jericho is entitled to a declaration of judgment that Justice Ramos Order of May 16, 2005 is in full force and effect.

407.    That the parties proceed to Trial.

408.    That Goebel should pay the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

409.    Jericho has no adequate remedy at law.


## FOURTH CAUSE OF ACTION

Supreme Court Records OnLine Library - page 90 of 145

**(For Conspiracy and Fraud committed by Defendants on Plaintiffs and separately on the Court relating to Mid-Town and Defendants Appealing Justice Ramos Order dated May 16, 2005)**

**(For Declaratory Judgment that Order of Justice Ramos dated May 16, 2005, is still in full force and effect, The Parties Proceed to Trial plus Damages etc)**

410.     Plaintiffs repeat the allegation of paragraphs 1 through 409 above and in the paragraphs below as if fully set forth at length herein.

411.     Mid-Town and Defendants have willfully and deliberately committed fraud on the Court when they asserted to the AD in their Notice of Appeal and a Pre Argument Statement dated July 5, 2005 that, "The Order appealed from should be reversed on the ground that the court eared as a *matter of law* in denying Midtown's motion to dismiss the amended complaint.  All of Midtown's causes of actions should be dismissed on the *settled law* that, having *elected* to cancel the contract  at issue … Jericho may not now assert claims for either specific performance or damages under a contract it *elected* to cancel…."

412.     Mid-Town and Defendants have also willfully and deliberately committed fraud on the Court when they asserted in their Appeal Brief, that the reason they are appealing Justice Ramos Order and the reason the Justices of the Appellate Division should reverse Justice Ramos's Order is because Justice Ramos "**hypothesized**", because Justice Ramos "**fixated**" because Justice Ramos made up a "*new law*" because Justice Ramos erroneously made a mistake in the *law* and because "there is no law to support the lower court's **rationale**".

413.     Goebel has admitted that he was in collusion with Defendants  to defraud Plaintiffs and the Court and that they have actually willfully and deliberately committed fraud on Plaintiffs and the Court, in addition, that the "Evidence" also shows that Goebel together with Defendants have willfully and deliberately committed fraud on Plaintiffs and the Court,

414.     They knew the reason why Justice Ramos denied Mid-Town' and Defendants MTD, but they have willfully and deliberately lied, misrepresented and misled the AD, what the reason of Justice Ramos was in denying Midtowns' and Defendants' MTD.

415.     Plaintiffs specifically repeat the allegation in the First to Third Causes of Actions as if fully set forth at length herein.

Supreme Court Records OnLine Library - page 91 of 145

416.     Accordingly, Jericho is entitled to a declaration of judgment that Justice Ramos Order of May 16, 2005 is in full force and effect.

417.     That the parties proceed to Trial.

418.     That based on the above the Court should Order that Mid-Town should Specifically Perform and close title with Jericho on Mid-Town's two property's ("Property

419.     That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

420.     Jericho has no adequate remedy at law.

**(For Conspiracy and Fraud committed by Defendants on plaintiffs, etc.)**

**(For Declaratory Judgment that Order of Justice Ramos dated May 16, 2005, is still in full force and effect, The Parties Proceed to Trial, plus Damages etc)**

421.     Plaintiffs repeat the allegation of paragraphs 1 through 420 above and in the paragraphs below as if fully set forth at length herein.

422.     Mid-Town and Defendants have willfully and deliberately committed fraud on the Court when they asserted to the AD in their Notice of Appeal and a Pre Argument Statement dated July 5, 2005 that, "The Order appealed from should be reversed on the ground that the court eared as a *matter of law* in denying Midtown's motion to dismiss the amended complaint. All of Midtown's causes of actions should be dismissed on the *settled law* that, having *elected* to cancel the contract at issue … Jericho may not now assert claims for either specific performance or damages under a contract it *elected* to cancel…."

423.     Mid-Town and Defendants have also willfully and deliberately committed fraud on the Court when they asserted in their Appeal Brief, that the reason they are appealing Justice Ramos Order and the reason the Justices of the Appellate Division should reverse Justice Ramos's Order is because Justice Ramos "**hypothesized**", because Justice Ramos "**fixated**" because Justice Ramos made up a "*new law*" because Justice Ramos erroneously made a mistake in the *law* and because "there is no law to support the lower court's **rationale**".

92

424.     That Goebel has admitted that he was in collusion with Defendants to defraud
Plaintiffs and the Court and that they have actually willfully and deliberately committed
fraud on Plaintiffs and the Court, in addition, that the "Evidence" also shows that Goebel
together with Defendants ahave willfully and deliberately committed fraud on Plaintiffs
and the Court,

425.     That Szegda has admitted that he was in collusion with Defendants to defraud
Plaintiffs and the Courts and that they have actually willfully and deliberately committed
fraud on Plaintiffs and the Court.

426.     That the "Evidence" shows that Defendants were in collusion to defraud
plaintiffs, the Courts in the Mid-Town case, Baystone case, Attorneys Jacqueline Handel-
Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C, the
Disciplinary Committee for the First Judicial Department and the District Attorney, and the
Justice that sentenced Szegda, etc,

427.     They knew the reason why Justice Ramos denied Midtowns and Defendants
MTD, but they have willfully and deliberately lied, misrepresented and misled the
Appellate Division, what the reason of Justice Ramos was in denying Midtowns and
Defendants MTD.

428.     Plaintiffs specifically repeat the allegation in the First to Fourth Causes of Actions
as if fully set forth at length herein.

429.     Accordingly, Jericho is entitled to a declaration that Justice Ramos Order of May
16, 2005 is in full force and effect.

430.     That the parties proceed to Trial.

431.     That the Notice of Pendency be reinstated.

432.     That based on the above the Court should Order that Mid-Town and Midtown
should "Specifically Perform" and close title with Jericho on Mid-Town's two property's
("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17
in Manhattan, New York,

433.     That Defendants should return the $400,000 deposit, pay all damages they caused
Plaintiffs and their officers, members and shareholders since 2001 to present, interest,

93

Supreme Court Records OnLine Library - page 93 of 145

punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

434.     Jericho has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

### (For Declaratory Judgment, Against Mid-Town)

### (that the Contract was never cancelled and that Mid-Town Specifically Perform)

435.     Plaintiffs repeat the allegation of paragraphs 1 through 434 above and in the paragraphs below as if fully set forth at length herein.

436.     Plaintiffs have entered into a contract with Mid-Town **and** Midtown in June 2002.

437.     The face of the Contract stated:

THIS AGREEMENT made the 18th day of June … Between Midtown Development L. P. a New York Limited partnership with an office 40 Arcorp Properties, Pershing Road, Weekawken, New Jersey hereinafter described as the Seller, and

Jericho Group, Ltd c/o Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, NY, 11211 hereinafter described as the Purchaser"[17]

438.     The Contract provided in paragraph 29 that on or before September 3, 2002, "the "Purchaser" (i.e., Jericho) shall have the right to cancel this Contract upon written "Notice" to the Seller [Midtown] and the Escrowee [Midtown's law firm]".

---

[17] Documentary Evidence prove that Defendants did not send a single letter or a single "Notice" to Plaintiffs from the date of signing of the Contract until October 25, 2002. Documentary Evidence also prove that Plaintiffs did not send a single letter or a single "Notice" to Defendants from the date of signing of the Contract until September 18, 2002.

Documentary Evidence that were hidden from Plaintiffs and from the Court until recently, including but not limited, 10 to 100 or more E-mails between Imperatore and Stone with Emmet and Shafran relating to requests made by Samuel Pfeiffer and responses by Imperatore and Stone to Samuel Pfeiffer's requests, prove that Plaintiffs were in contact with Defendants (not Szegda or through Szegda) almost on a daily basis from before the signing of the Contract and thereafter until September 18, 2002 and were dealing directly with Samuel Pfeiffer not with or through Szegda.

94

Supreme Court Records OnLine Library -  page 94 of 145

439.     The Contract also provided that if the "Purchaser" (i.e., Jericho) dose not cancel the Contract on or before September 3, 2002, then the Contract stays in full force and effect and Jericho could not cancel anymore the Contact and that the closing shall take place on or about September 18, 2002.

440.     The Contract provided in paragraph 32:

"Closing shall take place on the fifteenth (15th) day after the conclusion of the Study Period, at the offices of Purchaser's lending institution or such lending institution's attorneys. If Purchaser does not close by such **date, Seller shall be entitled to *set a* date for closing by giving fourteen (14) days written Notice to Purchaser which date shall be TIME OF THE ESSENCE.** ... The parties agree that fourteen (14) days shall be a reasonable notice period and failure by Seller to send such notice to Purchase shall not be deemed to be a waiver of Seller's rights to get a time of the essence closing date."

441.     The Contract further provided, in paragraph 42:

This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing *signed by the party* against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

442.     In addition, paragraph 44 of the Contract provided:

All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney.  For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:
Edward Imperatore, Esq.
Harwood Lloyd, LLC


Attorney for Purchaser:
Szegda & Gerbing

443.     Plaintiffs have received from Goebel in 2013 by mistake, a copy of a Critical letter that Szegda sent to Stone in June 14, 2002, with the Contract. (That Goebel and Defendants have willfully and Deliberately withheld from Plaintiffs and the Courts), this was a "condition" of the Contract.

95

444.     Szegda wrote to Stone in the June 14, 2002 letter, as follows:

Dear Maurice:

Enclosed please find our copies of the referenced contract executed by Jericho Group Ltd, together with a check in payment of the downpayment thereunder….

**Please also note that I have changed the Purchaser's address on the face of the Contract from my office to the office of one of the principals of the Purchaser.** *This is to assure that notices are sent to the two places.*

The Purchaser's address on the face of the Contract was changed from Jericho Group c/o Szegda & Gerbing, 300 East 42nd Street, New York, NY, to Jericho Group c/o Wasserman, 155 Lee Avenue, Brooklyn, NY.

445.     The Purchaser's address on the face of the Contract was changed in order to make sure that all Notices and correspondences must be sent to Jericho at 155 Lee Avenue, to make sure that Defendants know that all dealings must be with Purchaser, with Samuel Pfeiffer, and not with Szegda.

446.     Goebel had recently also sent by mistake the transcript of the deposition of Defendant Edward Ross, a major Partner in Mid-Town, dated March 29, 2006, (That Goebel and Defendants have willfully and Deliberately withheld from Plaintiffs and the Courts), that stated as follows:

Q   This exhibit is a letter, dated June 14, 2002 from Michael Szegda to Maurice Stone. Are you familiar with this letter, sir?
A   No.

Q   Doesn't this letter state that the purchaser's address was changed?

MR. SHERMAN:  Objection to the form.
Mr. Goebel, the letter says what it says.  If it's important to you, you can read what it says.  Getting the witness to agree that the printed words are on the page --

96

MR. GOEBEL:  I'll read it into the record.

Q    It says, Dear Maurice, enclosed please find our copies of the referenced contract executed by Jericho Group, Ltd., together with a check and payment of the down payment there under.

Please note the contract should be dated and the study period should begin on the date of the copies of the contract executed by the seller are returned to us.

Please also note that I have changed the purchaser's address on the face of the contract from my office to the office of one of the principals of the purchaser. This is to assure that notices are sent to the two places. And then it's signed sincerely Michael Szegda?

Q    Is this letter clear to you, sir?

A    I think so.

Q    Do you think this letter would be crystal clear to your counsel?

MR. SHERMAN:  Objection to the form.

A    State that again, please.

Q    Do you think this letter would be crystal clear to Imperatore?

MR. SHERMAN:  Objection to the form.

A    I would think he's got enough intelligence to understand that.

447.    Szegda had recently admitted there were many letters from him to Mid-Town making clear, that all letters and "Notices" from Midtown and Mid-Town must be sent to Jericho at 155 Lee Avenue, and any "Notice" from Jericho to Midtown must be sent from Jericho at 155 Lee Avenue, and must be signed by Samuel Pfeiffer or a principle of Jericho and not by Szegda.

448.    Szegda had recently admitted that he knew and Midtown and Mid-Town knew and was told by Szegda that no cancellation could be effective unless they receive a cancellation "Notice" from Jericho at 155 Lee Avenue, and signed by Samuel Pfeiffer.

449.    Documentary evidence proves that Jericho never sent a "Notice" to Midtown and Mid-Town cancelling the Contract.

450.    Midtown and Mid-Town had an option or choice under the terms of the Contract at any time after 15 days after the expiration of the due diligent period or anytime thereafter

97

in 2002, or throughout 2003 and 2004 to send a "Notice" to Jericho 155 Lee Avenue setting a 14th days Time of Essence.

451.    Documentary evidence proves that Midtown and Mid-Town never sent such "Notice" to plaintiffs.

452.    The recent newly discovered "Evidence" proves that Midtown and Mid-Town never returned to Jericho the $250,000 deposit of the Midtown Contract.

453.    Accordingly, just based on this one newly discovered "Evidence" the Contract was never cancelled because Midtown and Mid-Town never returned to Jericho the $250,000 deposit.

454.    Accordingly, "Documentary evidence" proves that the Contract was never cancelled and that the Contract was and is in full force and effect.

455.    Plaintiffs and Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property remains in full force and effect.

456.    That Jericho is entitled to specific performance that Midtown and Mid-Town should specifically perform according to the terms of the Contract and damages and punitive damages.

457.    Jericho was always ready and is ready willing and able to purchase the Property in accordance with the terms of the Contract.

458.    Jericho has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

**(For Fraud committed by Midtown and Defendants on Plaintiffs and separately on the Courts)**

**(For Declaratory Judgment, that the Contract was never cancelled for Specifically Perform plus Damages etc)**

459.    Plaintiffs repeat the allegation of paragraphs 1 through 458 above and in the paragraphs below as if fully set forth at length herein.

460.    Plaintiffs repeat specifically the allegation of the Sixth Cause of Action as if fully set forth at length herein.

98

461.　　　Defendants  knew that Jericho never cancelled the Contract, that Plaintiffs never sent a "Notice" of cancellation of the Contract.

462.　　　Mid-Town and Defendants knew that they had no right to send "Notices" only to Szegda that Szegda should send to Defendants a "Notice" that Jericho is cancelling the Contract.

463.　　　Mid-Town and Defendants had no right to claim to Plaintiffs that the Contract was cancelled when they knew it was false.

464.　　　Midtown and Defendants had no right to tell their agents to market the Property to others prospective purchaser because Plaintiffs cancelled the Contract on September 12, 2002, because they knew it was false.

465.　　　Midtown and Defendants had no right to market the Property in September 2002 and thereafter to then enter into Contract to sell the Property for $120,000,000 when they knew that Jericho has never cancelled the Contract and that they must close title and transfer the Property to Jericho.

466.　　　Midtown and Defendants had no right to lie to Plaintiffs for over 18 months that Jericho canceled the Contract because they received a "Notice" from Jericho (and also from Szegda) when they knew that it was false.

467.　　　Mid-Town and Defendants had no right to file MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter and claim that Jericho cancelled the Contract because Jericho sent a "Notice" to Defendants on September 12, 2002, cancelling the Contract, that Jericho elected to cancel the contract, that it was a valid cancellation, when they knew that it was false.

468.　　　Mid-Town and Defendants had no right to file their MTD, MOL's and Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter that Jericho requested the return of the deposit because Jericho sent "Notice" to Defendants on September 3, 2002, requesting the return of the deposit and that based on that "Notice" they sent to Jericho on September 13, 2002 the $250,000 deposit and Jericho received it on September 13, 2002, when they knew that all of the above was false.

99

469.     Mid-Town and Defendants had no right to file MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter that Jericho never complained in the two years since September 12, 2002, that Jericho only woke up in September 2004 to claim that they want to rescind two years later a valid canceled Contract that Jericho elected to cancel, when they knew that all of the above was false.

470.     Mid-Town and Defendants had willfully and deliberately committed the above fraud on Plaintiffs since 2002 and continued thereafter and are continuing with their fraud on Plaintiffs even in 2013.

471.     Mid-Town and Defendants had willfully and deliberately committed the above fraud on the Lower Court and on the AD since 2004 and continued thereafter and are continuing with their fraud on the Courts even in 2013.

472.     Accordingly, Documentary evidence proves that the Contract was never cancelled and the Contract was and is in full force and effect.

473.     Accordingly, the "Evidence" proves and Documentary evidence proves that Midtown and Defendants had willfully and deliberately committed the above fraud on Plaintiffs and on the Courts.

474.     Plaintiffs and Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property remains in full force and effect.

475.     That based on the above the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

476.     That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

477.     Plaintiffs have no adequate remedy at law.

100

## EIGHTH CAUSE OF ACTION

**For Fraud committed by Goebel** on Plaintiffs and **separately on the** Courts)

**(For Declaratory Judgment that the Contract was never cancelled and Midtown Specifically Perform plus for Damages)**

478.     Plaintiffs repeat the allegation of paragraphs 1 through 477 above and in the paragraphs below as if fully set forth at length herein.

479.     Plaintiffs repeat specifically the allegation of the Sixth and Seventh Causes of Actions as if fully set forth at length herein.

480.     Mid-Town and Defendants have willfully and deliberately committed fraud on Plaintiffs and the Courts in their MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter as mentioned above that Jericho cancelled the Contract because Jericho sent a "Notice" to Defendants on September 12, 2002, cancelling the Contract, that Jericho requested the return of the deposit because Jericho sent "Notice" to Defendants on September 3, 2002, requesting the return of the deposit and that Jericho never complained in the two years since September 12, 2002, and that Jericho only woke up in September 2004 to claim that they want to rescind two years later a valid canceled Contract that Jericho elected to cancel.

481.     Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because Goebel knew that what they have represented and argued is all false and Goebel had documentary evidence that prove that all their above claims is false.

482.     But Goebel had willfully and deliberately not raised or argued to the Courts in any of his filings, motions, briefs and oral arguments that they are committing fraud on the Court or it is an "issue of fact", because Plaintiffs deny all their above claims.

483.     But Goebel had willfully and deliberately not raised or argued to the Courts in any of his filings, motions, oral arguments that they are committing fraud on the Court because documentary evidence prove that all their above claims is false.

484.     Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because Goebel was specifically retained to argue and show the documentary evidence that prove that Jericho never cancelled the Contract, that Jericho never sent a

Supreme Court Records OnLine Library - page 101 of 145

"Notice" to Defendants cancelling the Contract, that Jericho never requested the return of the deposit,  that Jericho never sent a "Notice" to Defendants to return of the deposit and that Jericho complained immediately on September 12, 2002, and sent letters on September 18, 2002 and thereafter up to February 16, 2004 complaining that Jericho never cancelled the Contract and that Jericho was always and is still ready willing and able to proceed to close title on the Property, but Goebel never argued it to the Court even though Plaintiffs requested from Goebel many times throughout 2005-2006 that he argue it and prove it through the documentary evidence.

485.    In fact, Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because he lied and represented to the Court "that Jericho cancelled the Contract".

486.    But even when Plaintiffs pressured Goebel and he finally added in his Respondent Brief dated December 7, 2005 a claim "that Jericho never cancelled the Contract".

487.    But unbeknown to Plaintiffs Goebel somehow subsequently withdrew that critical claim "that Jericho never cancelled the Contract", etc and the "Motion to Supplement the Record".

488.    That was Fraud on Plaintiffs  but "direct" Fraud on the Justices of the Appellate Division.

489.    Goebel's letter or notice to the AD to withdraw was even more egregious because Plaintiffs have sent many E-mails to Goebel requesting and warning that:

> "Please do not file any motions, send any letters ... until you meet
> first with me. Plus without my written and signed consent".

490.    Accordingly, Documentary evidence proves that the Contract was never cancelled and the Contract was and is in full force and effect.

491.    Accordingly, the "Evidence" proves and documentary evidence proves that Goebel had willfully and deliberately committed the above fraud on Plaintiffs and on the Courts.

492.    Plaintiffs and Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property remains in full force and effect.

Supreme Court Records OnLine Library - page 102 of 145

493. That based on the above the Court should Order that Midtown should "Specifically Perform" and close title with Jericho on Midtown's two property's ('Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

494. That Goebel should pay the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

495. Jericho has no adequate remedy at law.

## NINTH CAUSE OF ACTION

**For Conspiracy and Fraud committed on Plaintiffs and separately on the Courts)**

**(For Declaratory Judgment, that the Contract was never cancelled)**

496. Plaintiffs repeat the allegation of paragraphs 1 through 495 above and in the paragraphs below as if fully set forth at length herein.

497. Plaintiffs repeat specifically the allegation of the Sixth to Eight Causes of Actions as if fully set forth at length herein.

498. Goebel has admitted that he was in collusion with Defendants to defraud Plaintiffs and the Court and that they have actually willfully and deliberately committed fraud on Plaintiffs and the Court, in addition, that the "Evidence" also shows that Goebel together with Defendants have willfully and deliberately committed fraud on Plaintiffs and the Court,

499. Defendants knew that Jericho never cancelled the Contract but Defendants had willfully and deliberately committed fraud on the Courts and Plaintiffs by misrepresenting and misleading the Courts that Jericho cancelled the Contract by sending a "Notice" to Midtown cancelling the Contract.

500. Accordingly, Documentary evidence proves that the Contract was never cancelled and the Contract was and is in full force and effect.

103

501.     Accordingly, the "Evidence" proves and documentary evidence proves That Midtown and Defendants had willfully and deliberately committed the above fraud on Plaintiffs and on the Courts.

502.     Plaintiffs and Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property remains in full force and effect.

503.     That based on the above the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

504.     That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

505.     Plaintiffs have no adequate remedy at law.

## TENTH CAUSE OF ACTION

**(For Conspiracy and Fraud committed by Defendants on plaintiffs, etc, ,)**

**(that the Contract was never cancelled and Midtown Specifically Perform plus for Damages)**

506.     Plaintiffs repeat the allegation of paragraphs 1 through 505 above and in the paragraphs below as if fully set forth at length herein.

507.     Plaintiffs repeat the allegation of the Sixth to Ninth Causes of Actions as if fully set forth at length herein.

508.     Goebel has admitted that he was in collusion with Defendants to defraud Plaintiffs and the Court and that they have actually willfully and deliberately committed fraud on Plaintiffs and the Court, in addition, that the "Evidence" also shows that Goebel together with Defendants have willfully and deliberately committed fraud on Plaintiffs and the Court,

104

Supreme Court Records OnLine Library - page 104 of 145

509.     Szegda has admitted that he was in collusion with Defendants to defraud Plaintiffs and the Courts and that they have actually willfully and deliberately committed fraud on Plaintiffs and the Court,

510.     That the "Evidence" shows that Defendants were in collusion to defraud Plaintiffs and the Courts in the Midtown and Baystone case, Attorneys Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C, the Disciplinary Committee for the First Judicial Department and the District Attorney, and the Justice that sentenced Szegda, etc,

511.     Goebel and Szegda refused even now in 2013 to return to Plaintiffs their own documents and to provide the files or copies of the files relating to the Midtown and Baystone cases even though under the law they must provide them to plaintiffs.

512.     They have recently admitted that those documents will prove that Defendants and others had committed fraud on plaintiffs, the Lower Court, the AD and on the COA.

513.     Defendants knew that Jericho never cancelled the Contract but Defendants had willfully and deliberately committed fraud on the Courts and Plaintiffs by misrepresenting and misleading the Courts that Jericho cancelled the Contract by sending a "Notice" to Midtown cancelling the Contract.

514.     That the recent newly discovered "Evidence" and admission of Szegda proves that Midtown never returned to Jericho the $250,000 deposit of the Midtown Contract.

515.     Accordingly, just based on this one newly discovered "Evidence" the Contract was never cancelled because Midtown never returned to Jericho the $250,000 deposit.

516.     Accordingly, Documentary evidence proves that the Contract was never cancelled and the Contract was and is in full force and effect.

517.     Accordingly, the "Evidence" proves and documentary evidence proves that Midtown and Defendants had willfully and deliberately committed the above fraud on Plaintiffs and on the Courts.

518.     Plaintiffs and Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property remains in full force and effect.

Supreme Court Records OnLine Library - page 105 of 145

519.     That based on the above the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

520.     That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

521.     Plaintiffs have no adequate remedy at law.

## ELEVENTH CAUSE OF ACTION

**(For Declaratory Judgment, that Midtown and Defendants had willfully and deliberately Breached the Contract (and that Midtown Specifically Perform)**

522.     Plaintiffs repeat the allegation of paragraphs 1 through 521 above and in the paragraphs below as if fully set forth at length herein.

523.     The recently discovered "Evidence" proves that Plaintiffs had requested from Midtown the exhibits and documents relating to the Amtrak agreement already in July 2002 and documents relating to any oil spill on Midtown's Property since July 2002.

524.     Pfeiffer affirmed in his Affirmation in Opposition to Midtown's MTD, in February 2005, that Pfeiffer had requested from BHS and Defendants documents and information relating to any oil spill on Midtown's Property already in July 2002 and that BHS lied to Plaintiffs that there was no oil spill on Midtown's Property.

525.     Defendants have never disputed the claims and facts in the Affirmation of Pfeiffer.

526.     Pfeiffer affirmed in his Affirmation in Opposition to Midtown's MTD, in February 2005, that Pfeiffer and Plaintiffs had dealt directly with Imperatore, Stone, Emmet and Shafran and that Pfeiffer requested information and documents from them much before the letters Szegda sent the letters dated August 30, 2002 and September 2, 2002.

106

527.     Recently discovered "Evidence" proves that Plaintiffs had requested the critical
exhibits and documents relating to the Amtrak agreement from Defendants and from
Amtrak already in July 2002.

528.     Evidence prove that Plaintiffs had requested the critical exhibits relating to the
Amtrak agreement from Defendants and from Amtrak already in July 2002, because
Sherman and Geremia admitted it to Justice Ramos on May 12, 2005.

529.     Recently discovered "Evidence" proves that Plaintiffs requested a meeting with
Amtrak already in July 2002.

530.     Recently discovered "August 21, 2002 E-Mail" that is Documentary evidence,
proves that Plaintiffs have requested critical documents relating to the actual oil spill on
Midtown's own Property before August 21, 2002.

531.     Emmet wrote to Edward Imperatore in an E-Mail dated August 21, 2002, as
follows:


**Dear Ed {IMPERATORE}:**


**Sam Pfeiffer of Jericho wondered if you might send him the
papers documenting the successful clean-up of the oil spill
CAUSED (emphasis added) by the neighboring property.**


My best

Elaine

532.     Documentary evidence proves that Edward Imperatore Responded to Plaintiffs
Request in E-Mail August 21, 2002 by Imperatore's Reply E-Mail dated August 22, 2002,
as follows:


107

**"We have no papers confirming the successful cleanup of the oil spill from the properties neighboring the Sites [onto Midtown's Property]....**

**EDWARD G. IMPERATORE ..."**

533.    Accordingly, Imperatore admitted that Pfeiffer requested the critical Documents relating to the Oil Spill on Midtown's own Property by E-Mail already on August 21, 2002 and Imperatore confirmed it his reply E-Mail dated August 22, 2002, plus confirmed that he has hundreds of documents about the oil spill on Midtown's own Property plus that not yet fully cleaned-up on August 22, 2002.

534.    Midtown's Agent has recently affirmed that there were emails and promises from Imperatore that Imperatore promised to provide the oil spill documents on Midtowns property and the exhibits and documents relating to the Amtrak Agreement to Samuel Pfeiffer.

535.    The recent "Evidence" proves that Defendants had in their possession the documents relating to the oil spill on Midtown's own Property and the exhibits and documents relating to the Amtrak agreement because they told their brokers in August 2002 that they will provide them to Plaintiffs.

536.    The recent "Evidence" proves that Defendants had in their possession the documents relating to the oil spill on Midtown's own Property and the exhibits and documents relating to the Amtrak agreement because they told their brokers in September 2002 to market the property and that they will provide them to the prospective purchaser the above documents.

537.    Documentary evidence proves that Defendants had in their possession the documents relating to the oil spill on Midtown's own Property and the exhibits and documents relating to the Amtrak agreement because they received offers from reputable purchasers in September 2002 to purchase the Property for well over $28,000,000.

Supreme Court Records OnLine Library - page 108 of 145

538.    Justice Ramos stated at the Hearing on May 12, 2002 that he does not believe Defendants that they did not have in their possession those Critical Exhibits to the Amtrak Agreement.

539.    Documentary evidence proves that Midtown had willfully and deliberately breached the Contract because they knew that under the terms of the Contract they will have to provide to Jericho the exhibits and the documents relating to the Amtrak agreement and assign them to Jericho before closing of Title.

540.    Documentary evidence proves that Midtown had willfully and deliberately breached the Contract because they always knew that nobody will close title on the Property without Midtown first providing to them the critical Exhibits and the documents relating to the Amtrak Agreement and assign them to the new purchaser.

541.    Given the facts as set forth herein, Midtown had a duty to comply with Plaintiffs requests for providing the requested Documents.

542.    Accordingly, Documentary evidence prove that Midtown had willfully and deliberately breached the Contract, specifically par. 29c) of the Contract, by not providing when requested or thereafter on or before September 3, 2002, and on or before or after September 12, 2002, the requested critical documents.

543.    Paragraph 29c) of the Contract, stated:

> **Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which purchaser reasonably requests.**

544.    485. The AD ruled in page 42 of their Ruling dated August 17, 2006,

> **Had Midtown willfully or deliberately breached its obligations under paragraph ... of the contract, Jericho's first two causes of action would not have been bar0red by its termination of the contract and recovery of its down payment (*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]).**

545.    Accordingly, the Appellate Division, First Department, has already ruled on August 17, 2006 and the Appellate Division, Second Department, has also ruled in *Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958], that under these circumstances, (Jericho and Plaintiffs are entitled to specific performance.

Supreme Court Records OnLine Library - page 109 of 145

546.     In fact, Defendants claimed to the Court that the reason that they did not provide the requested documents was because Jericho  only requested the documents relating to the oil spill for the first time, only on the 71st day August 30, 2002, and the exhibits for the first time, only on 74th day, September 2, 2002, but had Plaintiffs requested those documents earlier then on the "eve" then Defendants would have had to provide them to Plaintiffs, and if Midtown would not have provided them to Plaintiffs, Midtown would have willfully and deliberately breach par. 29c) of the Contract.

547.     That was a Judicial Admission by Defendants.

548.     Jericho and Plaintiffs are entitled to declaration that Midtown and Defendants had willfully and deliberately breached the Contract.

549.     Jericho and Plaintiffs are entitled to specific performance.

550.     Jericho is entitled to a declaration that Jericho's right to purchase the Property remains in full force and effect.

551.     Jericho was and is ready, willing and able to purchase the Property in accordance with the terms of the contract.

552.     Jericho has no adequate remedy at law.

## TWELFTH CAUSE OF ACTION

**(For Fraud committed by Midtown and** Defendants on Plaintiffs and **separately on the** Courts)

**(For Declaratory Judgment, that Midtown and Defendants had willfully and deliberately breached the Contract (and that Midtown Specifically Perform plus Damages)**

553.     Plaintiffs repeat the allegation of paragraphs 1 through 552 above and in the paragraphs below as if fully set forth at length herein.

554.     Plaintiffs also repeat the allegation of the Eleventh Cause of Action as if fully set forth at length herein.

555.     Defendants knew and had the evidence and documentary evidence that Plaintiffs had requested the critical exhibits to the Amtrak Agreement and Documents relating to any oil spill on Midtown's Property much before August 30, 2002 in fact already in July 2002.

110

Supreme Court Records OnLine Library - page 110 of 145

556.        Mid-Town and Defendants had willfully and deliberately committed fraud on the Lower Court, on the AD and on Plaintiffs in their MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter, where they asserted that Jericho only requested the exhibits to the Amtrak Agreement, for the first time, only on September 2, 2002 and Documents relating to any oil spill on Midtown's Property, for the first time, only on August 30, 2002,  and had Jericho requested the above before August 30, 2002 they would have provided them to Jericho.

557.        Jericho and Plaintiffs are entitled to a declaration of judgment that Midtown and Defendants had willfully and deliberately breached the Contract.

558.        Jericho and Plaintiffs are entitled to specific performance.

559.        That based on the above the Court should Order that Mid-Town and Defendants should Specifically Perform and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

560.        That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

561.        Plaintiffs have no adequate remedy at law.


## THIRTEENTH CAUSE OF ACTION

**(For Fraud committed by Goebel and** Defendants on Plaintiffs and **separately on the** Courts)

**(For Declaratory Judgment, that Midtown and Defendants had Willfully and Deliberately Breached the Contract (and that Midtown Specifically Perform)**

562.        Plaintiffs repeat the allegation of paragraphs 1 through 561 above and in the paragraphs below as if fully set forth at length herein.

563.        Plaintiffs also repeat the allegation of the Eleventh and Twelfth Cause of Action as if fully set forth at length herein.


111

564.      Mid-Town and Defendants had willfully and deliberately committed fraud on the Lower Court, on the AD and on Plaintiffs in their MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter, where they asserted that Jericho only requested the exhibits to the Amtrak Agreement, for the first time, only on September 2, 2002 and Documents relating to any oil spill on Midtown's Property, for the first time, only on August 30, 2002,  and had Jericho requested the above before August 30, 2002 they would have provided them to Jericho.

565.      Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because Goebel knew that what they have represented and argued is all false and Goebel had the evidence and maybe also documentary evidence that prove that Plaintiffs requested the critical exhibits to the Amtrak Agreement and Documents relating to any oil spill on Midtown's Property much before August 30, 2002 in fact already in July 2002. Goebel had willfully and deliberately committed fraud on Plaintiffs and the Courts because Goebel was specifically requested many times to argue and show the documentary evidence proving the above.

566.      Goebel had willfully and deliberately hid from Plaintiffs and the Courts some critical Evidence that proved that Midtown and Defendants had willfully and deliberately Breached the Contract.

567.      Plaintiffs had retained Goebel specifically to claim that Jericho had never cancelled the Contract and that Jericho never sent to Defendants a "Notice of Cancellation" and that Defendants never received from Jericho a "Notice of Cancellation". In addition, that Jericho sent letters to Defendants commencing September 18, 2002 and thereafter up to February 16, 2004 that Jericho never cancelled the Contract and that Defendants were never ever able to produce the "Notice of Cancellation".

568.       Defendants have willfully and deliberately lied and misrepresent to the Court that Jericho cancelled the Contract and that Jericho sent to Defendants a "Notice of Cancellation", etc.

569.      Goebel had willfully and deliberately allowed Defendants and Defendants Attorney to claim and represent to the Court **Just the Opposite** that Jericho cancelled the Contract and that Jericho sent to Defendants a "Notice of Cancellation", etc.

112

570.      Goebel had willfully and deliberately never claimed to the Court that Jericho had never cancelled the Contract and that Jericho never sent to Defendants a "Notice of Cancellation" and that Defendants never received from Jericho a "Notice of Cancellation". and that Jericho sent many letters to Defendants commencing September 18, 2002 and thereafter up to February 16, 2004 that Jericho has never cancelled the Contract and never sent any Notice.

571.      **BUT INSTEAD GOEBEL WILLFULLY AND DELIBERATELY COMMITTED FRAUD ON PLAINTIFFS AND COMMITTED DIRECT FRAUD ON THE COURT BY MISREPRESENTING TO THE COURT "JUST THE OPPOSITE", THAT JERICHO CANCELLED THE CONTRACT (Even though he also claimed that Jericho did not *elect* to cancel the Contract)**.

572.      Plaintiffs not knowing that Goebel had committed the above **Acts** had requested from Goebel many times orally and in many letters and e-mails in 2005 and throughout 2006 including but not limited, even on August 16, 2006, the day before the AD's Ruling of August 17, 2006, that he file a Second Amended Complaint or file a Motion with Justice Ramos to allow to Amend the prior AC, and to argue to the Court and to prove to the Court through "Documentary Evidence" that Jericho has never cancelled the Contract, that Jericho has never sent to Defendants a "Notice of Cancellation" and that Defendants have never received from Jericho a "Notice of Cancellation" and to argue much more as they are also spelled out in the letters and e-mails, to Goebel, but Goebel pushed off with all kind of different reasons and answers but he always promised that he will file them as soon as possible but Goebel never did.

573.      But the recent admissions by Goebel and the recent discovered "Evidence" confirmed why Goebel never filed the above request and never claimed them and why he Affirmed " **Just the Opposite** " because he was in collusion and conspiracy with Defendants to Defraud and they Defrauded Plaintiffs, the Honorable Justice Ramos and the Honorable Justices of the AD.

574.      The recent admissions and recent "Evidence" prove that Goebel had willfully and deliberately never claimed to the Court that Jericho had never cancelled the Contract and that Jericho never sent to Defendants a "Notice of Cancellation" and proves that Goebel had willfully and deliberately lied and defrauded the Courts from inception to present.

113

Supreme Court Records OnLine Library - page 113 of 145

575. The recent admissions and recent "Evidence" proves that Defendants had willfully and deliberately lied, committed Perjury and misrepresented to the Court "**Just the Opposite**" that Jericho had cancelled the Contract and that Jericho sent to Defendants a "Notice of Cancellation". They also prove that Goebel and Defendants have willfully and deliberately lied and defrauded Plaintiffs and the Courts from inception to present in 2013.

576. Jericho and Plaintiffs are entitled to a declaration that Defendants had Willfully and Deliberately Breached the Contract

577. Jericho and Plaintiffs are entitled to specific performance.

578. That Goebel and Defendants should pay the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

579. Jericho has no adequate remedy at law.

### FOURTEENTH CAUSE OF ACTION

**(For Conspiracy and Fraud committed** on plaintiffs, etc.)

**(For Declaratory Judgment, that Midtown and Defendants had willfully and deliberately breached the Contract)**

580. Plaintiffs repeat the allegation of paragraphs 1 through 579 above and in the paragraphs below as if fully set forth at length herein.

581. Plaintiffs also repeat the allegation of the Eleventh and Thirteenth Cause of Action as if fully set forth at length herein.

582. Defendants had willfully and deliberately committed fraud on the Lower Court, on the AD and on Plaintiffs in their MTD, MOL's Affirmation in support of their MTD in January 2005, Notice of Appeals, Appeal Briefs in 2005, SJM, Affirmations in support of their SJM in July 2006 and thereafter, that Jericho only requested the exhibits to the Amtrak Agreement, for the first time, only on September 2, 2002 and Documents relating to any oil spill on Midtown's Property, for the first time, only on August 30, 2002.

583. Goebel has admitted that he was in collusion with Defendants to defraud and that they have willfully and deliberately committed fraud on Plaintiffs and the Court,

114

584.    Szegda has admitted that he was in collusion with Defendants and that they have willfully and deliberately committed fraud on Plaintiffs and the Court,

585.    The "Evidence" shows that Defendants were in collusion to defraud Plaintiffs and the Courts in the Midtown and Baystone case, Attorneys Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C, the Disciplinary Committee for the First Judicial Department and the District Attorney, and the Justice that sentenced Szegda, etc,

586.    Jericho and Plaintiffs are entitled to a declaration of judgment that Midtown and Defendants had Willfully and Deliberately Breached the Contract

587.    Jericho and Plaintiffs are entitled to specific performance.

588.    That based on the above the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

589.    That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

590.    Plaintiffs have no adequate remedy at law.


### FIFTEENTH CAUSE OF ACTION

**(For Fraud committed** on Plaintiffs and the Courts by Defendants)

**(For Specifically Performance and damages, etc)**

591.    Plaintiffs repeat the allegation of paragraphs 1 through 590 above and in the paragraphs below as if fully set forth at length herein.

592.    Defendant Imperatore an Officer of the Court submitted an Affirmation dated January 6, 2005 in support of defendant Midtown's Motion to Dismiss Jericho's AC, everything that he affirmed was perjury, false, and fraud on the Court, thus Imperatore affirmed under penalty of Perjury that:

Supreme Court Records OnLine Library - page 115 of 145

*I am a member of the law firm* Harwood Lloyd, LLC in Hackensack, New Jersey. *Our firm represented Midtown* Development, L.P. in connection with its negotiation' with plaintiff Jericho Group, Ltd. for the sale of the real property that is the subject of this dispute. I submit this affirmation in support of Midtowns motion to dismiss the complaint and am fully familiar with the facts set forth herein. [Recent "Evidence" shows that Imperatore was the Owner of Midtown and the Property... False. See also FN 18]

A *true and correct copy* of the Contract between Jericho and Midtown, including a rider to it: is attached hereto as Exhibit A: [False. See also FN 18]

On September 3, 2002—the very day that the study period expired in accordance with the terms of the Contract—*Jericho wrote to* Midtown to cancel the Contract and request the return of its down payment. ….[False. See also FN 18]

By letters dated September 5, 2002 and September 10, 2002, Harwood Lloyd, acting as appointed Escrow Agent under the Contract, stated *that Jericho* was not entitled return of its down payment unless it provided clear notice that Jericho was canceling the Contract. ….[False. See also FN 18]

On September 10, 2002, Harwood Lloyd *wrote to both Jericho* and Jericho's counsel by certified mail, requesting a response to Harwood Lloyd's September 5 letter. ….[False. See also FN 18]

On September 12, 2002, *Jericho finally responded* by making clear that it had indeed intended to cancel the Contract…[False. See also FN 18]

On September 13, 2002, Midtown returned Jericho's down payment……[False. See also FN 18]

116

JERICHO'S ELEVENTH-HOUR REQUESTS FOR
DOCUMENTS AND MIDTOWN'S RESPONSES

As the study period came to a close, Jericho made several requests
for documents that Jericho now claims Midtown concealed."

The parties' contemporaneous correspondence shows that
Midtown did not conceal any documents from Jericho. ....[False.
See also FN 18]

Only one day before the study period expired, Jericho asked
Midtown for the exhibits to a development agreement between
Amtrak and Midtown.. *The Amtrak agreement was attached to the
Contract; but the exhibits to it were not*. The day after Jericho
asked for these exhibits, Midtown informed Jericho by letter that
Midtown did not have the exhibits and did not have them when the
parties executed the Contract either. .. [False.  See also FN 18]

On August 30—only a few days before the study period was to
expire—*Jericho informed* Midtown by letter of "scuttlebutt" it
had heard that there may have been an oil spill **on the Property**
and **asked Midtown for *any* documents relating to it**.
On August 23, 2002. Midtown's broker transmitted to Jericho's
broker an e-mail from Midtown's counsel noting that "[w]e
have no papers **confirming the successful cleanup** of the oil
spill *from* properties neighboring the Sites {**Onto The Subject
Property**}". ....[ False.  See also FN 18]

593.    Defendants filed in 2005 their MOL's in support of their MTD.

594.    Defendants  also filed in 2005  their Notice of Appeal and Pre Argument
Statement where they claimed:

The Order appealed from should be reversed on the
ground that the court eared as a *matter of law*...[False. See also
FN 18]

117

595.     Defendants also filed in 2005  their Appeal Briefs where they claimed that:

The most fundamental ground, however, is that *Jericho cancelled the contract* years before it brought this action. ..    New York law is absolutely clear that a party may not seek specific performance of a contract for real property that it "*elected*" to cancel. .. New York's law of contracts is clear and unequivocal, however, that a party may not seek specific performance of a contract that it has cancelled." [False.  See also FN 18]

"In ruling from the bench on Midtown's motion, the lower court stated that this was an "interesting point," but then wondered whether there is an exception to it. The court *hypothesized* that, if Jericho could prove that Midtown committed "fraud" in performing its contractual obligations, Jericho should be allowed to rescind its *notice of cancellation* as a remedy for *fraud* and then proceed, on the strength of the same allegations, to seek specific performance as a remedy for *breach of contract.* There is no law to support this notion. … The exception that the lower court *hypothesized* simply does not exist in the law… [False.  See also FN 18]
The lower court noted in response, "That is an interesting point." (R.18) But the court then *fixated* on the notion that it could not, on a motion to dismiss, decide whether Midtown had fully responded to Jericho's various requests for due diligence materials, as alleged by the complaint. (R.15-17) The court reasoned that, if Midtown had committed "fraud" in fulfilling its contractual obligations, Jericho should be entitled to rescind its cancellation as a remedy for that "fraud" and then seek specific performance for breach of contract. (R.19) [False.  See also FN 18]

The lower court responded to Midtown's invocation of this rule by stating, "That is an interesting point." (R.18) But the court then proceeded to wonder whether there should be an exception to it in this case if Midtown could be said to have committed a fraud in performing under the contract:

[L]et's assume for purposes of this motion that there was a fraud committed …. [W]ouldn't the plaintiff be entitled, if they were successful in proving the fraud, wouldn't they be entitled to rescind their rejection of the contract and compel specific performance?
(R.19) Without invoking any legal authority to support this speculation, the court later ruled that Jericho's specific performance claims should not be dismissed because "the complaint sets forth that potential" that Midtown

118

committed fraud in performing its disclosure obligations under the contract. (R,22; *see also* R.,20)... there is no law to support the lower court's **rationale**." [False.  See also FN 18]

On September 3, 2002, the day the study period ended, *Jericho exercised* its right to cancel the contract and requested return of its downpayment. *Jericho wrote* to Midtown to "request that the monies paid upon execution of the Contract be returned *to it* in accordance with the Contract's terms, ...[False.  See also FN 18]

On September 12, *Jericho made clear* that our letter on behalf of Jericho dated September 3, 2002, was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of monies paid upon execution thereof" . [False. See also FN 18]

 The Parties' Proposals and Counterproposals to Extend the Study Period (relating to letters sent and received from July 15, 2002 to August 29, 2002). [False. See also FN 18]

On September 3, 2002—the day the study period expired and only six days after Jericho attempted to "accept" a proposal to extend it—*Jericho wrote to Midtown* to exercise its right to cancel the contract and request the return, of its downpayment ... [False.  See also FN 18]

By *letters to Jericho* dated September 5 and September 10, Midtown's counsel (which also served as the escrow agent under the contract) [**Imperatore**] wrote that Jericho was not entitled to return of its downpayment unless Jericho provided clear **NOTICE** that it was canceling the contract.  On September 12, 2002, *Jericho finally responded* with a crystal-clear statement that it had intended to cancel the contract..." [False. See also FN 18]

 First, *only one day* before the study period expired, *Jericho asked* Midtown for the exhibits to a development agreement between Amtrak. [False.  See also FN 18]

Supreme Court Records OnLine Library - page 119 of 145

…. But *Jericho did not* request those exhibits from Midtown *until nearly two and a half months later*, on the *eve* of the expiration of the study period.  The day after *Jericho asked* Midtown for these exhibits, Midtown informed Jericho that *Midtown did not have* the exhibits and also did not have them when the parties executed the contract.". [False. See also FN 18]

Second, on August 30—*only a few* days before the study period was to expire—Jericho informed Midtown of "scuttlebutt" it had heard that there may have been an oil spill on the property that "may or may not have been cleaned up" and asked Midtown to make *representations* to Jericho about whether there had been such a spill on the property and, if so, whether it had been cleaned. [False .  See also FN 18]

By September 3, Midtown had *informed Jericho* that it did not have *any documents confirming whether an oil spill "from neighboring properties" had been cleaned* … [False.  See also FN 18]

These cases are readily distinguishable, …. because Rather, Midtown is relying on, the fact that Jericho *expressly cancelled* the contract by sending Midtown a **Notice of cancellation**. … *Jericho's* **Notice of cancellation** is what precludes its claims for specific performance, not the mere return of the downpayment… [False. See also FN 18]

*Midtown did not* "default" in its performance under the contract The only reason it was "unable to convey title in accordance with the terms of this contract  … was that *Jericho* had *elected* to cancel the contract before the scheduled closing. Indeed, *Midtown twice informed Jericho that Midtown was ready, willing*, and able to close by September 18   in accordance with the terms of the contract. [False.  See also FN 18]

**By canceling the contract on September 3, 2002, *Jericho plainly induced* Midtown to believe that the contract was cancelle**d. ……. …. Midtown, meanwhile, in *good faith reliance on Jericho's* September 12 letter *canceling the contract*, returned Jericho's down payment, [False. See also FN 18]

Thus, unlike the cases on which Jericho relies, *Midtown did not create any barrier to closing*. [False. See also FN 18]

120

Finally, the entire complaint should be dismissed because Jericho is estopped from enforcing a contract that *it cancelled*. [False. See also FN 18]

As Midtown pointed out in its opening brief, by canceling the contract, *Jericho plainly induced* Midtown to believe that the contract was cancelled and that the parties would no longer be bound by its terms. [False. See also FN 18]

596.    Defendants filed in July 2006 their Summary Judgment Motion with Justice Ramos and attached the Affirmations of Imperatore and Defendants in support of their SJM. Almost every claim and every paragraph in those Affirmation are false and perjuries.

597.    The recent discovered "Evidence" and the documentary evidence proves that Imperatore, Defendants, and Goebel knew that the above claims in all those filings were false. See also Footnote 18 herein that is part of this Complaint. [18]

---

[18] <u>**Defendants have also committed the below Frauds and Defendants have no Answers WHY**</u>:

1. Why Defendants have willfully and deliberately lied to Plaintiffs on or about September 18, 2002 and thereafter that Plaintiffs canceled the Contract?

2. Why Defendants have lied to Plaintiffs in response to Plaintiffs complaints in many phone calls and letters commencing with the letter dated September 18, 2002 and thereafter including the letter dated February 16, 2004 (for over 18th months), (that Plaintiffs never sent a "Notice" cancelling the Contract and that the parties should proceed to closing) that Defendants had received from Plaintiffs, a "Notice" cancelling the Contract?

3. Why Defendants have willfully and deliberately lied to the Courts that Plaintiffs canceled the Contract?

4. Why Defendants have willfully and deliberately lied to the Courts that Plaintiffs sent to Defendants a "Notice" on or about September 12, 2002 cancelling the Contract?

5. Why Defendants have willfully and deliberately lied to the Courts that Plaintiffs did nothing from September 2002 to September 2004 and only woke up in September 2004 to try to vacate a valid cancellation?

6. Why Defendants have willfully and deliberately breached the Contract?

7. Why Defendants have lied to the Courts that Defendants have not willfully and deliberately breached the Contract even after they admitted to Justice Ramos the opposite?

8. Why Defendants have willfully and deliberately lied to the Courts that Defendants have not even breached the Contract even after they admitted to Justice Ramos the opposite?

9. Why Defendants have willfully and deliberately committed actionable fraud on Plaintiffs?

121

10. Why Defendants have willfully and deliberately lied to the Courts that Defendants have not committed actionable fraud on Plaintiffs, even after they admitted to Justice Ramos the opposite?

11. Why Defendants have willfully and deliberately lied to the Courts that all requests to Defendants were made only by Szegda and only by letters, even after they admitted to Justice Ramos the opposite?

12. Why Defendants have lied to the Courts that Plaintiffs only requested documents relating to *an* oil spill only on the "eve" (after 71 days) of the expiration of the due diligent period and especially that they had the newly discovered E-mail dated August 21, 2002?

13. Why Defendants have lied to the Courts that Plaintiffs only requested exhibits relating to the Amtrak Agreement only on the "eve" (after 74 days) of the expiration of the due diligent period, even after they admitted to Justice Ramos the opposite?

14. Why Defendants have lied to the Courts plus gave multiple different and contradictory reasons why Defendants did not provide the critical documents relating to *the* oil spill on Mid-Towns own Property to Plaintiffs ?

15. Why Defendants did not provide together with the Contract the critical documents relating to *the* actual oil spill on Midtown's own Property (that was not even cleanedup on June 19, 2002according to Imperatores' admission on August 22, 2002)?

16. Why Defendants did not provide together with the Contract the critical exhibits relating to the Amtrak Agreement, when they knew that without those exhibits the Property could only be used for a Parking Lot?

17. Why Defendants misrepresented to Plaintiffs in the Contract that they had provided the true and complete Amtrak Agreement when they knew that they did not attach the critical exhibits that was part and parcel of the Amtrak Agreement, and thereby committed actionable fraud on Plaintiffs?

18. Why Defendants did not provide to Plaintiffs during the 75 days due diligent period or thereafter the critical exhibits that was part and parcel of the Amtrak Agreement when they knew that without the exhibits the Property could only be used for a "Parking lot"?

19. Why Defendants misrepresented to Plaintiffs in the Contract that there was no oil spill on Midtown's own Property or affecting Midtown's own Property and thereby committed actionable fraud on Plaintiffs?

20. Why Defendants did not provide to Plaintiffs during the 75 days due diligent period or thereafter the critical documents relating to *the* oil spill on Midtown's own Property especially after Imperatore admitted on August 22, 2002 that there was an actual oil spill on Midtown's own Property and that it was not even cleaned up on August 22, 2002?

21. Why Defendants have willfully and deliberately hid from the Court the Critical "Amtrak Agreement" and thereby committed actionable fraud on the Court?

22. Why Defendants have willfully and deliberately lied to the Court in their MTD and Imperatores' in his Affirmation that attached to Imperatore' Affirmation is a true and complete copy of the Contract between

122

Midtown and Jericho even though they knew that the "Amtrak Agreement" was part and parcel of the Contract between Midtown and Jericho, and thereby committed actionable fraud on the Court?

23.  Why Defendants have willfully and deliberately hid from the Court the "Amtrak Agreement" and lied to the Court in their MTD and Imperatores' Affirmation that attached is a true and complete copy of the Contract between Midtown and Jericho even though they knew that the "Amtrak Agreement" is the most or second most critical document in the Case before the Court, and thereby committed actionable fraud on the Court?

24. Why Defendants have willfully and deliberately hid from the Court the critical "Exhibits to the Amtrak Agreement", and thereby committed actionable fraud on the Court?

25. Why Defendants have willfully and deliberately lied to the Court in their MTD and in Imperatores' Affirmation that attached is a true and complete copy of the Contract between Midtown and Jericho even though they knew that the critical "Exhibits to the Amtrak Agreement" that was part and parcel of the of the Contract between Midtown and Jericho plus was the most or second most critical document in the case, and thereby committed actionable fraud on the Court?

26. Why Defendants have willfully and deliberately hid from the Court the "hundreds of documents relating to the oil spill on Midtown's own Property" that they had in their possession, and thereby committed actionable fraud on the Court?

27.  Why Defendants have willfully and deliberately lied to the Court in their MTD and in Imperatores' Affirmation that "documentary evidence" prove that they did not have the documents requested, even though they knew that they had "hundreds of documents relating to the oil spill on Midtown's own Property" in their possession, and thereby committed actionable fraud on the Court?

28. Why Defendants have willfully and deliberately hid from the Court in their MTD, MOL's, Imperatores' Affirmation, at the Hearing before Justice Ramos on May 12, 2002 and thereafter in the Appeal Briefs and thereafter, the letters from Plaintiffs to Defendants from September 18, 2002 and the many letters thereafter including the February 16, 2002 letter, and thereby committed actionable fraud on the Court?

29. Why Defendants have willfully and deliberately hid from the Court in their MTD and Imperatores' Affirmation and thereafter to present between 10 and maybe over 100 E-mails between Imperatore, Stone and Harwood with Emmet, BHS, Shafran and Capin Associate, relating to requests made by Pfeiffer directly to Imperatore, Stone and Harwood and or also through Emmet, BHS, Shafran and Capin Associate , and or also requests made by Emmet, BHS, Shafran and Capin Associate to Imperatore, Stone and Harwood at the request of Samuel Pfeiffer and the responses by Imperatore, Stone and Harwood directly to Samuel Pfeiffer or to Emmet, BHS, Shafran and Capin Associate, those are "documentary evidence", that proves that their  MTD, MOL, Affirmations of Imperatore, Affirmations of Defendants and their Appeal and Appeal Briefs were false and a hoax, and thereby committed actionable fraud on the Court?

123

598        Accordingly, the "Evidence" proves and documentary evidence proves that
Defendants and Goebel had willfully and deliberately committed the above fraud on
Plaintiffs and on the Courts.

---

30.  Why Defendants have willfully and deliberately withheld the above e-mails from Plaintiffs, the Courts
that are "documentary evidence" that prove that they have willfully and deliberately breached the
Contract and committed actionable fraud on Plaintiffs and on the Court?

31.  Why Defendants have willfully and deliberately hid the above critical E-mails and did not provide them
in response to Court Ordered "Production of Document Requests", and thereby committed actionable
fraud on the Court and on Plaintiffs?

32.  Why Defendants have willfully and deliberately hid the above critical E-mails and never provided the
above mentioned critical E-mails to Plaintiffs or to the Courts since 2005 to April 2010 and thereafter
and instead lied and misrepresented and affirmed to the Courts JUST THE OPPOSITE in all their filings
since 2005 to April 2010, and thereby willfully and deliberately committed actionable fraud on
Plaintiffs?

33.  Why Defendants have willfully and deliberately hid the above critical E-mails and never provided the
above mentioned critical E-mails to Plaintiffs or to the Courts since 2005 to April 2010 and thereafter
and instead lied and misrepresented and affirmed to the Courts JUST THE OPPOSITE in all their filings
since 2005 to April 2010, and thereby willfully and deliberately committed actionable fraud on the
Court?

34.  Why Defendants have willfully and deliberately hid from Plaintiffs and from the Courts, the Documents
that some of the Defendants and or others produced during Discovery, the Documents that some or all of
the Defendants had not produced during Discovery, the transcript of depositions taken during discovery,
that proves that everything Defendants claimed and represented in their MTD, MOL, Affirmations of
Imperatore, Affirmations of Defendants and their Appeal and Appeal briefs were all false, and also
proves that Defendants have willfully and deliberately committed fraud on the Courts and on Plaintiffs?

35.  Why Defendants have willfully and deliberately hid from Plaintiffs and from the Courts the Critical
Deposition of Midtowns' Agent Ben Shafran and the critical documents that he produced during
Discovery, that proves that everything Defendants claimed and represented in their MTD, MOL,
Affirmations of Imperatore, Affirmations of Defendants and their Appeal and Appeal briefs were all
false, and also proves that Defendants have willfully and deliberately committed fraud on the Courts and
on Plaintiffs?

36.  Why Defendants have willfully and deliberately hid from Plaintiffs and the Courts the relationship
between the Defendants, the agreements and understanding and the cases that they were involved in
relating to the above?

124

599.　　　That based on the above the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

600.　　　That Defendants should return the $400,000 deposit, pay all damages they caused Plaintiffs and their officers, members and shareholders since 2001 to present, interest, punitive damages, plus to sanction them for what they have done to the Court and Plaintiffs since 2001 to present plus treble damages under Judiciary Law 487.

601.　　　Plaintiffs have no adequate remedy at law.

## SIXTEENTH CAUSE OF ACTION

### (for Tortuous Interference and Damages Against All Defendants)

602.　　　Plaintiffs repeat the allegation of paragraphs 1 through 601 above and in the paragraphs below as if fully set forth at length herein.

603.　　　The recently newly discovered documents, evidence and admissions, as mentioned above, demonstrate that Defendants knowingly, willfully and intentionally interfered with the contract between Jericho and Midtown.

604.　　　The recently newly discovered documents, evidence and admissions, as mentioned above, demonstrate that Defendants knowingly, willfully and intentionally engaged in suppression and spoiliation of documentary evidence, constituting tortuous interference with the contract in existence between Jericho and Midtown.

605.　　　Upon information and belief, critical documents, evidence and admission were withheld from some or most of the partners of Midtown and continue to be withheld from the partners of Midtown thereby frustrating the closing of title.

606.　　　The suppression and spoiliation of the recently discovered documents, evidence and admission, withheld from the partners of Midtown, constitute Tortuous Interference in the parties' contract rights, thereby frustrating the closing of title therein.

607.　　　Upon information and belief, Defendants engaged in suppression and spoiliation of documentary evidence knowing that it would be impossible for Plaintiffs to close title.

Supreme Court Records OnLine Library - page 125 of 145

608.     Upon information and belief, Defendant Imperatore, acting as a third party, engaged in suppression and spoiliation of documentary evidence by withholding such documents, evidence and admissions from Midtown thereby causing Midtown to willfully and deliberately breach the contract; not produce requested documents, evidence and admissions and not close title.

609.     Upon information and belief, had Defendant provided to Midtown the recently discovered documents, evidence and admissions, they would have specifically performed and closed title with Jericho.

610.     As a result of the interference of Imperatore and Emmet, Midtown has marketed, and continues to do so, the subject property for sale; although a valid contract between Jericho and Midtown remains in full force and effect.

611.     Imperatore and Defendants and others stood to financially profit from the frustration of Midtown and Jericho to close.

612.     The Contract for the purchase of the subject property constitutes, standing alone, the intention of MIDTOWN to sell the subject property to JERICHO.

613.     Jericho and Plaintiffs have no adequate remedy at law.

614.     By virtue of Defendants fraudulent conduct, Plaintiffs are entitled to damages and punitive damages, the amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION

### (For Declaratory Judgment that Contract was not cancelled)

### (because they never returned the Deposit to Jericho)

615.     Plaintiffs repeat the allegation of paragraphs1 through 614 above and in the paragraphs below as if fully set forth at length herein.

616.     The recent newly discovered "Evidence" proves that Midtown never returned to Jericho the $250,000 deposit of the Midtown Contract.

617.     Accordingly, based on this one newly discovered "Evidence" the Contract was never cancelled because Midtown never returned to Jericho the $250,000 deposit.

126

618.     Accordingly, newly discovered evidence proves that the Contract was never cancelled and that the Contract was and is in full force and effect.

619.     That based on the above newly discovered evidence the Court should Order that Mid-Town and Defendants should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

620.     Plaintiffs have no adequate remedy at law.

## EIGHTEENTH CAUSE OF ACTION

### (For Fraud and Declaratory Judgment that Contract was not cancelled)

### (because Defendants never returned the Deposit to Jericho)

621.     Plaintiffs repeat the allegation of paragraphs 1 through 620 above and in the paragraphs below as if fully set forth at length herein.

622.     The recent newly discovered "Evidence" proves that Midtown never returned to Jericho the $250,000 deposit of the Midtown Contract.

623.     The recent newly discovered "Evidence" was withheld from Plaintiffs because of the Fraud and collusion and conspiracy of Defendants on Plaintiffs.

624.     The recent newly discovered "Evidence" was withheld from the Honorable Justice Ramos and from the Honorable Justices Mazzarelli, J.P., Saxe, Nardelli, Sweeny, McGuire, JJ of the Appellate Division, First Department, and from all the subsequent Honorable Justices of the Appellate Division and from the Honorable Justices of the COA Court because of the Fraud and conspiracy of Defendants on the Courts.

625.     Accordingly, just based on this newly discovered "Evidence" the Contract was never cancelled because Midtown never returned to Jericho the $250,000 deposit.

626.     Accordingly, newly discovered evidence proves that the Contract was never cancelled and that the Contract was and is in full force and effect.

627.     That based on the above the Court should Order that Midtown should "Specifically Perform" and close title with Jericho on Midtown's two property's ("Property") at 11th Avenue between 36 and 38 Street, Block 708 Lot 1 and Block 709 Lot 17 in Manhattan, New York,

127

628.     That Defendants should return the $400,000 deposit, pay damages, punitive damages, plus sanction for what they have done to the Court and Plaintiffs since 2001 to present the amount to be determined at trial.

629.     Plaintiffs have no adequate remedy at law.

## NINTHEENTH CAUSE OF ACTION
### (for Willful and Intentional Frustration of
**Plaintiff's Right to Discovery and Specific Performance, and Damages Against All Defendants)**

630.     Plaintiffs repeat the allegation of paragraphs 1 through 629 above and in the paragraphs below as if fully set forth at length herein.

631.     On September 26, 2005 Plaintiffs attorney Robert Goebel served defendant Midtown with its' "First Request for Production of Documents, evidence and admissions from the Defendant," which stated, in part; Unless otherwise indicated, the time  frame for each Document request herein is January I, 1988 to date."

632.     Defendant Midtown provided together with their response of on or about October 24, 2005, 188 documents, evidence and admissions. Almost all of those documents were already in the Record and/or mentioned in the Record, but they willfully and deliberately withheld hundreds upon hundreds of critical documents that they had in their own possession control and custody, that were requested from them in the "Production of Document Request".

633. Defendant Midtown represented to plaintiff that they have complied with the "Production of Documents Request".

634. The recently discovered documents, evidence and admissions shows that Defendant Midtown did not included amongst defendant Midtown's responsive documents, the recently discovered documents and evidence.

635. Plaintiffs' attorney Robert Goebel served Defendants with it's' "First Request for Production of Documents".

636. Defendant Midtown and others as their response turned over on October 24, 2005, 188 documents, evidence and admissions.

128

Supreme Court Records OnLine Library - page 128 of 145

637. Defendants represented to plaintiff that they have complied with the "Production of Documents Request". The recently discovered documents, evidence and admissions shows that Defendants did not included amongst defendants responsive documents, the recently discovered documents and evidence.

638. Defendants made representations that all documents, evidence and admissions had been turned over to the plaintiff.

639. Defendants took action to misdirect the plaintiff and the Court by continuously diverting attention to their false allegation that plaintiff "had not requested" or had not "timely" requested certain documents, evidence and admissions prior to the litigation and plaintiff's discovery demands.

640. While these claims are patently false in any case, and the lie is put to such claims by the recently discovered documents, evidence and admissions; defendant full well knows that all documents, evidence and admissions must be turned over during discovery.

641. Actions prior to litigation do not serve as a block or excuse to absent material from discovery in ongoing litigation.

642. Had Defendants these recently discovered "Evidence" which they, would have been before the Court would have produced a far different result.

643. Parenthetically, prior to the litigation and during the period between the signing of the contract and the date set for closing, plaintiffs continuously made proper demands for documents, evidence and information as required of defendants under what is referred to as "Par. 29c) of the Contract".

644. It is these very demands dating even prior to litigation discovery, that form much of the subject matter of these recently discovered "Evidence" which were the subject of suppression and spoiliation by defendant.

645. Defendants, acting true to form, did not provide the properly and timely requested documents, evidence and admissions.

646. Not only did defendants willfully and intentionally violate plaintiff's right to discovery by their actions in suppression and spoilation of these recently discovered "Evidence"; they proceeded to lie about it in representations in Court and at depositions under oath.

129

647.    Imperatore, lied at his Deposition in November 2005:

> "Q    Aside from written requests for materials from time to time, **were there oral requests, verbal requests, made by Jericho, their counsel?**
>
> A    Generally, **I recall written requests**.
>
> Q    But there may have been some verbal?
>
> **A    No.  I don't recall any verbal requests. I recall written requests**."

648.    The recently discovered critical "E-mail dated August 21, 2002" proves that Imperatore lied and that she willfully and deliberately committed perjury and fraud at his deposition, and that he has willfully and deliberately hid and did not provide this critical "E-mail dated August 21, 2002".

649.    The recently discovered "Evidence" proves that Imperatore lied and that he has willfully and deliberately committed perjury and fraud at her deposition, and that he has willfully and deliberately hid and did not provide the recently discovered "Evidence".

650.    Goebel also served Subpoenas for Production of Documents, on Defendants Edward Imperatore, BHS, Emmet, Stone, Ross, Arthur Imperatore, Harwood Lloyds, LLC.

651.    These defendants, as well, failed to provide the recently discovered critical "E-mail dated August 21, 2002" and the recently discovered "Evidence".

652.    Emmet lied at her Deposition in January 2006 where she testified at her deposition that the first time Samuel Pfeiffer made inquiries of her relating to the oil spill was only in September 2002, and it was only for *information*. In addition, that she never spoke to Pfeiffer before September 2002.

653.    The recently discovered critical "E-mail dated August 21, 2002" proves that Emmet lied and that she willfully and deliberately committed perjury and fraud at her deposition, and willfully and deliberately hid and did not provide this critical "E-mail dated August 21, 2002".

654.    The recently discovered "Evidence" proves that Emmet lied and that she willfully and deliberately committed perjury and fraud at her deposition. , and willfully and deliberately hid and did not provide the recently discovered "Evidence".

Supreme Court Records OnLine Library -  page 130 of 145

655.     Defendants acted willfully and intentionally to deny plaintiff their discovery. Had defendant not engaged in this pattern of denial, deceit, retaining, suppression and spoiliation of discoverable items plaintiff would have been successful in its litigation.

656.     Plaintiff asserts that its rights as to discovery are ongoing and re-asserts its demands for documents, evidence and admissions previously undisclosed, evidence and admissions.

657.     In light of the foregoing, all Sanctions available under the Law and CPLR should be levied against the defendants, including but limited to, damages and all damages, cost and expenses sustained by plaintiffs since inception to present In addition, any and all sanctions available under the law; that the original Contract of Sale should be declared to be in full force and effect; that Midtown should be ordered to specifically perform its obligations under said contract and that Damages should be awarded plaintiffs.

658.     Plaintiffs have no adequate remedy at law.

659.     By virtue of Defendants fraudulent conduct, Plaintiffs are entitled to specific performance.

660.     By virtue of Defendants fraudulent conduct, Jericho and plaintiffs are entitled to damages and punitive damages, the amount to be determined at trial.

661.     Plaintiffs have no adequate remedy at law.


## TWENTIETH CAUSE OF ACTION

**(for Wiilful and Deliberate Actions in Disregard of A Court Order and Contempt of ,and Specific Performance, and Damages Against All Defendants)**


662.     Plaintiffs repeat the allegation of paragraphs 1 through 661 above and in the paragraphs below as if fully set forth at length herein.

663.     In their continuous and intentional refusal to cooperate with discovery and to provide the documents, evidence and admissions properly requested by plaintiff, the defendants have clearly acted in disregard of Court Orders and are thereby, also, in contempt of Court.

131

664.     Plaintiff's requests are reasonable, timely and within the proper bounds of discovery.

665.     Discovery was specifically set down in the Preliminary Conference Order of Justice Charles E. Ramos dated September 8, 2005 directing that all parties' disclosure "...shall be completed in accordance with the C.P.L.R., by the times prescribed by the C.P.L.R......All such disclosure unless otherwise noted herein, shall be .....served by 9/26/05. Responses including documents, evidence and admissions not otherwise objected to by 10/24/05."

666.     On September 26, 2005, Goebel served Defendant Midtown as compliance with Justice Ramos' P.C. Order, "Plaintiff's first request for Production of Documents, evidence and admissions from the Defendant."

667.     Defendant Midtown, as their response to Justice Ramos' Order, turned over on October 24, 2005, 188 documents, evidence and admissions, not including the critical documents, evidence and admissions referred to hereinabove.

668.     Imperatore, lied at his Deposition in November 8, 2005

"Q    Aside from written requests for materials from time to time, **were there oral requests, verbal requests, made by Jericho, their counsel?**

A    Generally, **I recall written requests**.

Q    But there may have been some verbal?

**A    No.  I don't recall any verbal requests. I recall written requests.**"

669.     Imperatore knew the above to be false because of the recently discovered documents, and/or evidence and/or admissions as stated above.

670.     Imperatore testified at his Deposition in November 8, 2005:

"Q    And also <u>29(c)</u> at the bottom of the page 5 of the rider, 83 is the Record on Appeal page? **29(c) says, immediately upon execution of this agreement, seller shall make available to purchaser or its representatives documents within seller's current custody or**

132

**control relating the condition of the property, which purchaser
reasonably requests.
Did you comply with that?**

A   **Yes.".**

671.       Imperatore knew the above to be false because of the recently discovered

documents, including but not limited the August 21, 2002 and the Reply email of August

22, 2002, and all the other emails as proven in "**Evidence**".

672.       Imperatore, admitted at his Deposition in November 8, 2005:


**"Q   Did you send them any of the renewal material for the
permits and approvals?
A   No.
Q   The applications and the results renewed permit or approval?
A   I don't recall that we did."**

673.       Imperatore actually admitted that Midtown and Defendants did not provide those

critical Documents with the Contract accordingly that was Actionable Fraud.

674.       Imperatore and Defendants did also not provide them in response to the Court

Ordered "Production of Document Request".

675.       Imperatore, admitted and lied at his Deposition in November 8, 2005:


"Q   Who knows the most on behalf of Midtown regarding the
factual issues pertaining to the oil spill?
MR. SHERMAN:  Objection to the form.
THE WITNESS:  Could you read that back, please.
(The requested portion was read back.)
MR. SHERMAN:  My objection is to form.
A   I don't know.
Q   How familiar are you with the oil spill?
MR. SHERMAN:  Objection to the form.
Q   What was your general understanding regarding the oil spill?
MR. SHERMAN:  Objection to the form.
Q   Did you have an understanding of the facts pertaining to the oil
spill?

133

MR. SHERMAN:  Objection to the form.

Q   Do you have knowledge of any facts pertaining to the oil spill?

MR. SHERMAN:  Objection to the form.

Q   **Apparently before we signed the contract, there was an oil spill in the vicinity of your – in the vicinity of Midtown's property. Do you know anything about it?**

MR. SHERMAN:  Objection to the form.

Q   Do you know anything about it?

MR. SHERMAN:  Objection to the form.

Q   Will you answer the question?

A   **I knew that in 1997, there had been some oil spilled on an advice adjacent property, which was an automobile repair shop. Probably through a blocked – probably through a blocked drain and some of that oil in 1997 leeched out on a rock wall.  And then down under Eleventh Avenue.  I later learned that in 1998.**

Q   **Did any of the oil impact the property?**

A   I don't understand the word impact.

Q   Did any of the oil effect the property?

A   **It crossed over a small corner of the property** through Eleventh Avenue.     And that was in 1998.[19]

Q   **Did you disclose the oil spill to the plaintiff buyer before the contract was signed?**

A   **The existence of that prior –**

Q   **The existence of the oil spill?**

A   **No.**

Q   **But you had knowledge when the contract was signed?**

A   **I didn't know what the status of this alleged spill, the spill was in 2002.  I did not know."** [20]

676.      Imperatore lied when he testified,  1) that "**It crossed over a small corner of the property**" because it contaminated over 15,000 SF of Midtown's Property, Imperatore lied when he testified 2) I didn't know what the status of this alleged spill, because he of course knew since it contaminated over 15,000 SF of Midtown's own Property that he marketed to

---

[19] This was also false because oil was spilled on more than 15,000 SF of Midtown's own Property.  In addition, the oil spilled Midtown's own Property was not even completely cleaned up in June 2002.

[20] This was also false because if he did not know "the status of this alleged spill" on Midtown's own Property, he was obligated to tell Midtown's brokers and Jericho and not lie and mislead them?   In addition, Imperatore was the "Property Owner" and was marketing the property for the entire Real Estate market for $40,000,000, since 2000 so how did not know "the status of this alleged spill"?  In addition it was not an "alleged spill" but it was an ACTUAL massive spill on Midtown's own Property.

134

the entire world to sell for over $28,000,000 plus he had in his possession hundreds of documents relating to the oil spill on Midtown's own Property, 3) the recently discovered critical "E-mail dated August 21, 2002" proves that Imperatore responded in his "Reply E-Mail dated August 22, 2002" that oil was spilled on Midtown's own Property and as of August 22, 2002 it was not cleaned up yet and Imperatore implied in the "Reply E-Mail dated August 22, 2002" that Midtown's entire 90,000 SF Property had been contaminated, plus he promised to provide them in 2002 to other prospective purchaser.

677.    Imperatore, admitted at his Deposition in November 8, 2005, that:


**"Q   Were you concerned about it at all?**
**A   No. It must be remediated by the State of New York."**

678.    Imperatore had actually admitted that he and Midtown knew that the State of New York had remediated some of the oil spill on Midtown's own Property without any cost to Midtown and that the State of New York will remediated all the oil spilled on Midtown's own Property without any cost to Midtown, because they received such documents and letters from the State of New York, yet Imperatore, did not provide them to Pfeiffer in "Imperatore' Reply E-mail of August 23, 2002", that critical documents and the other critical letters from the State of New York, and never after August 23, 2002 or before September 3, 2002 or before September 12, 2002, or thereafter even though, requested by Plaintiffs before August 21, 2002, and requested by Emmet from Imperatore in the recent discovered "E-Mail dated August 21, 2002"!

679.    The above Answer in itself also proves that Defendants had willfully and deliberately Breached the Contract, and that Imperatore and Defendants had committed fraud in their Motion to Dismiss, MOL, Appeal Briefs on the Justices of the Court and specifically on the Justices of the Appellate Division.

680.    Imperatore testified at his Deposition in November 8, 2005:

"Q   What files do you have pertaining to the oil spill?

135

A   I would actually characterize them as a relative handful of documents, sir, from the 1998 period.[21]

Q   Did you produce them in discovery?

A   Yes. [22]

Q   Was there any governmental sign offs on the cleanup?

A   **I don't know**.

Q   You don't have copies?

A   **I don't know**.

Q   So your answer is, **no?**"

681.   False because it was on his own Property and he did't know in 2002 and neither in 2005!  Imperatore also testified at his Deposition in November 8, 2005:

"Q      Do you state in your affirmation { dated January 6, 2005, in support of Midtown's "motion to dismiss} on page 2 of your affirmation, page 65 of the Record on Appeal, **you state that a true and correct copy of the contract between Jericho and Midtown including the rider to it is attached here to as Exhibit A.  Is that a correct statement?  I looked at Exhibit A and it's missing the exhibits.**

(Imperatore and Defendants  had willfully and deliberately not attached those critical documents, he "Exhibits" to the "Amtrak Agreement and even the

---

[21] This was also false because Imperatore and Defendants had in their possession hundreds upon hundreds of Documents relating to the Oil Spill.

Defendants and Imperatore knew that Imperatore was willfully and deliberately Committing Perjury and that Imperatore was willfully and deliberately Obstructing Justice and Violating and being in Contempt of the Court Order.

[22] This was also false because Imperatore and Defendants had not provided even one Documents of the hundreds upon hundreds of the Critical Documents relating to the Oil Spill.

Defendants and Imperatore knew that Imperatore was willfully and deliberately Committing Perjury and that Imperatore was willfully and deliberately Obstructing Justice and Violating and being in Contempt of the Court Order.

Supreme Court Records OnLine Library - page 136 of 145

"Amtrak Agreement" but falsely Affirmed under penalty of perjury to the Court that attached is a "true and correct copy". They committed a bigger fraud on the Court in the Affirmation then the fraud they committed on Plaintiffs in par. 31 of the Contract!!).

A   We're working from the Record on Appeal.

Q   That's correct.

A   So I -- not have in front of me, sir, my actual affirmation.

Q   It's right here.  It starts on page 64 in the Record on Appeal.  That's your actual affirmation, is it not?

A   The affirmation is --

Q   It is the affirmation in the record of appeal, is the affirmation?

A   Yes.

Q   The question is, is it an accurate representation in the affirmation that a true and correct copy of the contract between Jericho and Midtown including a rider on it is attached hereto as Exhibit A.  If you notice Exhibit A is missing the exhibits.  So is this an accurate statement?

A   At the time the affirmation was submitted, the exhibits in the Record on Appeal, which I for the first time this morning.

**Q   So you're saying your affirmation, the original affirmation has the exhibits to the contract of sale?**

**A   I think it may.  I think it does.**

**Q   Was that produced?**

**A   It's in the record in the case, sir.** [False]

Q   That's right, it is.

MR. SHERMAN:  Do you know the answer?

137

MR. GOEBEL:  Do I know the answer?  The answer Bates upon your

Bates stamping is that **it's not included in the affirmation**.

MR. SHERMAN:  I don't understand that.

I mean, the question is assuming there's a question at all, is have we

Misprinted something in the Record on Appeal.

MR. GOEBEL:  **NO YOU DIDN'T MISPRINT. THERE'S NO**

**EXHIBITS ATTACHED TO THE CONTRACT OF SALE,**

**WHICH IS ATTACHED AS EXHIBIT A TO HIS**

**AFFIRMATION."**

682.       Accordingly, Defendants and Goebel knew that Imperatore committed fraud in

his in paragraph 2 of his Affirmation Under Oath, dated January 6, 2005, in Support of

Midtown's "Motion to Dismiss" because he knew that he has willfully and deliberately

omitted from the Contract the critical "Amtrak Agreement" and he knew that he is lying

when he affirmed that a true and complete Contract is attached to his Affirmation as

Exhibit A.

683.       Even after this question and answers neither Imperatore, Defendant nor Goebel

Corrected this fraud Committed directly on the Court, to correct and include the Critical

"Amtrak Agreement" plus the Critical "Exhibits" that were attached to the Amtrak

Agreement, that Defendants had in their possession or control in November 2005!

684.       This also shows that Defendants and Goebel were in collusion to defraud

Plaintiffs and the Appellate Division.

Supreme Court Records OnLine Library -  page 138 of 145

685.     The recently discovered evidence, documents and admissions prove that Imperatore's testimony was false and also proves that Imperatore and Defendants committed fraud on the Court.

686.     Goebel served Defendants as compliance with Justice Ramos' P.C. Order, "Plaintiff's first request for Production of Documents, evidence and admissions from the Defendant."

687.     Defendants, as their response to Justice Ramos' Order, turned over some documents, but not the recently discovered critical "E-mail dated August 21, 2002" and nor other critical emails and "Evidence".

688.     Emmet lied at her Deposition in January 2006 as mentioned above.

689.     Had the Defendants provided Plaintiff with the recently discovered critical "E-mail dated August 21, 2002" and the critical "Evidence", Defendant would have had no basis on which to proceed in their effort to prevent the closing of title for the subject property.

690.     In light of the foregoing, all Sanctions available under the Law and CPLR should be levied against the Defendants, including but limiting, damages and all damages, cost and expenses sustained by plaintiffs since inception to present, in addition, any and all sanctions available under the law, plus that the original Contract of Sale should be declared to be in full force and effect, Midtown should be ordered to specifically perform its obligations under said contract, Damages should be awarded plaintiff,

691.     Plaintiffs have no adequate remedy at law.

692.     By virtue of Defendants fraudulent conduct, Jericho and plaintiffs are entitled to specific performance.

693.     By virtue of Defendants fraudulent conduct, Jericho and plaintiffs are entitled to damages and punitive damages, the amount to be determined at trial.

## TWENTY FIRST CAUSE OF ACTION

139

**(Obstruction of Justice, Extortion, Blackmail,
Perjury, Cover-up Grand Larceny etc)**

694.      Plaintiffs repeat the allegation of paragraphs 1 through 693 above and in the

paragraphs below as if fully set forth at length herein

695.      That based on the above the Court should Order that Midtown should

"Specifically Perform" and close title with Jericho.

696.      That Defendants should return the $400,000 deposit,

697.      That Defendants should pay damages, the highest punitive damages allowed, plus
the highest Sanction available for what they have done to Plaintiffs including but not
limited fraud, obstruction of Justice, extortion, blackmail, perjury, cover-up grand larceny
etc, plus the fraud they committed on Justice Ramos, on the Justices of the AD since
inception to present the amount to be determined at trial.

698.      Plaintiffs have no adequate remedy at law.


## TWENTY SECOND CAUSE OF ACTION

**(Goebel and Szegda first return and Provide the Documents)**

699.      Plaintiffs repeat the allegation of paragraphs 1 through 698 above and in the

paragraphs below as if fully set forth at length herein.

700.      That the Court should order that Goebel and Szegda first return to Plaintiffs all

the documents they received from Plaintiffs.

701.      That Goebel and Szegda first provide to Plaintiffs all Documents in their files,

custody and control relating to Baystone and Midtown. Plaintiffs, and Defendants from

inception to present.

702.      Plaintiffs will only be able to find out through obtaining the above documents

what fraud was committed on Plaintiffs and what evidence they have that helps Plaintiffs as

they recently admitted.

703.      Plaintiffs will only be able to find out through obtaining the above documents

with whom they were in collusion to defraud Plaintiffs and the Court, when they started

and until when, what was the deal and what was the reward or promise, etc.

704.      Plaintiffs have no adequate remedy at law.

140

## TWENTY THIRD CAUSE OF ACTION
### (CONVERSION)

705.      Plaintiffs repeat the allegation of paragraphs 1 through 704 above and in the paragraphs below as if fully set forth at length herein

706.      Szegda had recently admitted that he stole from Plaintiffs the $150,000 in the Baystone case.

707.      Based on Szegdas' recently admissions Szegda did not return to Plaintiffs any of the $250,000 of the Midtown case.

708.      Based on Szegdas' recently admissions Midtown and Defendants did not return to Plaintiffs any of the $250,000 of the Midtown case.

709.      Plaintiffs are entitled that Szegda, Defendants and Midtown return and or pay to Plaintiffs the $400,000.

710.      That based on the above the Court should order that Szegda, Defendants and Midtown return and or pay to Plaintiffs the $400,000 deposits plus interest.

711.      That Defendants should pay damages in an amount to be determined, but at-least $200,000,000, and punitive damages to Plaintiffs, the amount to be determined at trial.

712.      Plaintiffs have no adequate remedy at law.

## TWENTY FOURTH CAUSE OF ACTION
### (NEGLIGENT)

713.      Plaintiffs repeat the allegation of paragraphs 1 through 712 above and in the paragraphs below as if fully set forth at length herein.

714.      Some of the Defendants that were not directly involved in the above cases may be were only negligent and not willfully or deliberately committed fraud or breached the contract, etc.

715.      To be determined through discovery or trial.

716.      That those Defendants should return or pay the $400,000 deposit, pay damages, expenses, etc, the amount to be determined at trial.

717.      Plaintiffs have no adequate remedy at law.

141

## TWENTY FIFTH CAUSE OF ACTION

### (Against certain Defendants - Judiciary Law §487

718.  Plaintiffs repeat the allegation of paragraphs 1 through 717 above and in the paragraphs below as if fully set forth at length herein.

719.  As a result of the aforementioned misconduct of certain Defendants, including deceit and collusion with the intent to deceive the Court and Plaintiffs, while acting as attorneys, Plaintiffs have been injured in an amount to be determined at trial, which sum is trebled pursuant to statute.

WHEREFORE, Plaintiffs demands judgment (a) declaring that Justice Ramos Order dated May 16, 2002 is still in full force and effect; (b) declaring that the Contract was never cancelled; (c) declaring that the Contract is in full force and effect; (c) declaring that Midtown had willfully and deliberately breached the Contract; (d) declaring that the Contract has been reinstated; (e) compelling Mid-Town and Defendants to specifically perform under the terms of the Contract; (f) compelling Mid-Town and Defendants to sell the Property Block 708 Lot 1 ((533 W. 36th Street) and Block 709 Lot 17 (525 W. 37th Street) in Manhattan, New York, to Jericho in accordance with the terms of the Contract; (g) order that Defendants should not enter into any agreement or Contract to sell the Property(s); (h) order that the prior Judgments are vacated, (i) order that before anything, Goebel and Szegda shall first return immediately to Plaintiffs all Documents that they had received from Plaintiffs and their representatives; (j) order that before anything, Goebel and Szegda shall first provide, to Plaintiffs all Documents relating to Baystone, Midtown, Plaintiffs, Pfeiffer, Plaintiffs representatives and Defendants from inception to present; (k) awarding to Plaintiffs damages in an amount to be determined; (l) awarding Plaintiffs, cost, expenses, fees, interest and damages in an amount to be determined, but at-least $200,000,000, (m) order that Defendants should return to Plaintiffs the $250,000 deposit plus interest; (n) order that Szegda and Defendants should pay to plaintiffs, the $150,000 deposit plus interest; (o) order Sanctions against Defendants that are available under the Law and CPLR in an amount to be determined; (p) for punitive damages, in an

142

amount to be determined; (q) plus statutory trebling of its damages under 487;  and (r) for such other and further relief as the Court may deem just and proper, together with costs and disbursements.

DATED:  November 17, 2013

Samuel Pfeiffer for Plaintiffs
c/o Jericho Group, Ltd & Jericho Co.
519 Flushing Avenue
Brooklyn, NY 11205
(718) 564-4733
jericho4200@gmail.com

143

Supreme Court Records OnLine Library -  page 143 of 145

## Verification

STATE OF NEW YORK

COUNTY OF NEW YORK

Samuel Pfeiffer, being duly affirmed, deposes and says;

That deponent is the Vice-President of Jericho Group, Ltd, and Jericho Co., the plaintiffs in the within action; that he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge except those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

Samuel Pfeiffer

Affirmed before me this
___ day of November 2013

_____
Notary Public

SOLOMON ITZKOWITZ
Notary Public, State of New York
No. 01IT4795441
Qualified in Kings County
Commission Expires July 31, 2014

Index No. 101105/13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

JERICHO GROUP, LTD., and JERICHO CO.,

                             *Plaintiffs,*

     *-against-*

                                        **VERIVIED COMPLAINT**

    *Defendants*

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP,
MIDTOWN DEVELOPMENT. L.P., EDWARD G.
IMPERATORE, MAURICE L. STONE, EDWARD W.
ROSS, ARTHUR E. IMPERATORE, WR WEST SIDE
ASSOCIATES, HADRIAN PROPERTIES LTD,
FANFARE ENTERPRISE INC, ARCORP PROPERTIES,
JERRART PROPERTIES, HARWOOD LLOYD LLC,
BROWN HARRIS STEVENS LLC, ELAINE OSBORN
EMMET, MICHAEL A. SZEGDA, BAYSTONE EQUITIES
INC, ROBERT B. GOEBEL, MARASSE, LISA SOLOMON,
CBRE INC, JOHN DOE 1-10 and XYZ CORPORATION 1-10.
-------------------------------------------------------------------X

**FILED**

**NOV 2 9 2013**

**COUNTY CLERK'S OFFICE NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**VERIVIED COMPLAINT**

# SUMMONS WITH NOTICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Jericho Group, Ltd.
Jericho Co.
519 Flushing Avenue
Brooklyn, NY 11205
(718) 643-4200
jerichogroup@gmail.com