UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

JERICHO GROUP LTD. and JERICHO CO.,

                Plaintiffs,

      -against-

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP, MIDTOWN DEVELOPMENT. L.P., EDWARD G. IMPERATORE, MAURICE L. STONE, EDWARD W. ROSS, ARTHUR E. IMPERATORE, WR WEST SIDE ASSOCIATES, HADRIAN PROPERTIES LTD, FANFARE ENTERPRISE INC, ARCORP PROPERTIES, JERRART VENTURE PROPERTIES, HARWOOD LLOYD LLC, GEORGE BERGER, JEFFREY SHORE, PHILIPS NIZER LLP, FREDRICK E. SHERMAN, TODD R. GEREMIA, JONES DAY, BROWN HARRIS STEVENS LLC, ELAINE OSBORN EMMET, MICHAEL A. SZEGDA, BAYSTONE EQUITIES INC, ROBERT B. GOEBEL, RICHARD MARASSE, LISA SOLOMON, JOHN DOE 1-10 and XYZ CORPORATION 1-10.

                Defendants.

--------------------------------------- X

**CIVIL ACTION NO.:** 1:14-cv-02329 DLI-VMS

**JURY TRIAL DEMANDED**

# AMENDED VERIFIED COMPLAINT

Dated:  New York, New York
        November 14, 2014

                The Law Offices of Bradley S. Gross
                Attorney for Plaintiffs
                *JERICHO GROUP LTD. and JERICHO CO.*
                45 Rockefeller Plaza – Suite 2000
                New York, New York 10111
                (212) 732-7412

## Table of Contents

**INTRODUCTION** ............................................................................................ **5**

**SUBJECT MATTER JURISDICTION AND VENUE** ......................................... **12**

**THE PARTIES** ................................................................................................ **14**

**FACTS COMMON TO ALL CLAIMS** .............................................................. **17**
    Nature of the Action .................................................................................. 17
    The Pattern of Racketeering Activity ....................................................... 28
    The Property................................................................................................ 32
    The Introduction and Midtown's Marketing Representations ................. 33
    Szegda's Background and His Complicity in the Baystone Matter as Part of the
    Scheme to Defraud .................................................................................... 36
    Midtown and Midtown's Representatives, Imperatore and Stone .............. 38
    The Countersigned Contract and Midtown's Contract Representations .......... 40
    Relevant Contract Provisions ................................................................... 41
    Plaintiffs' Successful Marketing Efforts ................................................. 43
    Plaintiffs Discover that Midtown has been Holding Back ..................... 43
    "Seller's Remorse" and Midtown's Scheme to Kill the Deal ................. 49
    Szegda and his Lack of Authority ............................................................ 51
    The False "Cancellation" and Midtown's  Knowledge of its Falsity ......... 52
    The Bogus September 12, 2002 Letter was Issued in Furtherance of the
    Racketeering Scheme to Defraud ............................................................. 56
    Plaintiffs Protest the Efficacy of the Purported Cancellation and Discharge Szegda
    .................................................................................................................... 58
    Szegda, Goebel and Angelo's Slobakis ................................................... 67
    Absent any Further Response from Midtown or its Representatives – or the
    Scheduling of a Closing – Plaintiffs Retained Litigation Counsel Goebel to Pursue
    Their Rights in the Contract and the Property......................................... 69
    Goebel was Retained by Plaintiffs but Worked Instead for the Parties That the
    Plaintiffs Had Hired Him to Sue............................................................... 70
    Goebel Forged the Complaint and the Amended Complaint ................. 71
    Midtown's Fraudulent Motion to Dismiss.............................................. 73
    The Defendants Admitted That They Brought A False Motion To Dismiss; That They
    Had Engaged In Actionable Fraud; That They Were In Willful And Deliberate
    Breach Of The Contract; That Plaintiffs Had Requested The Exhibits To The Amtrak
    Agreement As Of July, 2002; That Plaintiffs Did Not Elect To Cancel The Contract
    And That There Was No Valid Cancellation Of The Contract............................ 77
    Midtown's Fraudulent Motion to Dismiss is Denied ............................. 84
    Midtown Repeats the Fraud From its Motion to Dismiss in the Form of an Appeal 87
    Midtown Appeals the Denial of its January 2005 Motion to Dismiss ......... 88
    The Appellate Division Decided the Case Based Upon the Fraud Perpetrated on
    them by Goebel, Midtown, Jones Day, Sherman and Geremia, and Not on the True
    Facts and Circumstances Underlying the Contract Transaction and Supporting the
    Plaintiffs' True Claims in Issue ..............................................................102
    Goebel is Fired and Plaintiff's Retain Herzfeld and Rubin to Pursue Their Claims
    ..................................................................................................................105

Motion to Reargue the Appeal ......................................................................106

The Trial Court Vacated the Judgment of Dismissal to Avoid being a Party to
Midtown, Jones Day, Sherman and Geremia's Fraud on the Court ...........................112

The Fraudulent Attempt to Remove the 2007 Action to Federal Court.................114

The Dismissal Judgment was Reinstated Through Fraudulent Pretense ...............116

The Defendants Used the Fraudulently Obtained Dismissal Judgment in Defense of
the 2007 Action.............................................................................................126

Plaintiffs' Meritorious Claims Were Subverted - as Part of the Defendants'
Racketeering Scheme to Defraud .................................................................128

Midtown's Attorneys Had a Duty of Candor to the Court and were Otherwise
Complicit in the Scheme to Steal the Midtown Property ..................................135

The 2007 Action was Dismissed Because Plaintiffs Failed to Raise Their
Meritorious Claims in the 2004 Action ...........................................................136

Goebel Subverted the Plaintiffs' Interests From the .........................................137

Moment he Solicited Them as Clients .............................................................137

The Defendants' Web of Deceit ......................................................................139

Begins to Unravel .........................................................................................139

The Emmet Email Leads Plaintiffs Back to Goebel .........................................142

Goebel's 2013 Admission and Extortion ........................................................144

Szegda's Recent Admissions ........................................................................147

The Defendants Have Finally Admitted That the Contract is Still in Full Force and
Effect and That the State Court Rulings were the Sole Product of Their Fraud on the
Court – Absent Which, Plaintiffs Would Have been Awarded Specific Performance
of the Contract.............................................................................................149

The 2014 Submissions ..................................................................................150

The January 8, 2013 Motion to Dismiss..........................................................150

Midtown Admits that it Willfully and Deliberately Breached the Contract ..........153

Midtown Admits that it Committed Actionable Fraud on the Plaintiffs ...............155

Midtown Admits that Plaintiffs Requested Oil Spill, Hazard and ......................156

Other Environmental Documents Before June 14, 2002 ..................................156

Midtown Admits that There Had Been an Oil Spill ..........................................157

Before the Contract was Countersigned and Returned....................................157

Midtown Admits that Plaintiffs Requested Documents ....................................159

Relating to the Oil Spill on or Before August 21, 2002 ....................................159

Midtown Admits that Plaintiffs Did Not Elect to Cancel ..................................161

the Contract and that there is No Valid Cancellation .......................................161

Midtown Admits Its Extortion, Blackmail and Acts of Intimidation ..................162

Midtown's Stunning Admissions and The 2014 Fraud .....................................164

The June 30, 2014 Motion to Dismiss by Philips Nizer, Berger and Shore ..........166

The June 30, 2014 Motion to Dismiss by Jones Day, Sherman and Geremia..........171

Philips Nizer, Berger and Shore July 24, 2014 Motion to Vacate the Lis Pendens .175

The Fraud on the Court .................................................................................176

The Defendants' Statements Were False and Known to be False When Made........182

The Plaintiffs Have Thus Far Been Deprived of their Rights in and to the Property,
and Have Been Left Instead to Fight Through the Court System and Against the
Ongoing Scheme to Defraud .........................................................................188

CLAIMS FOR RELIEF ......................................................................................189

FIRST CLAIM.................................................................................................189

2

**(Violations of RICO, 18 U.S.C. § 1962(c))** ....................................................................**189**
**(Against The RICO Defendants)** .......................................................................................**189**

**SECOND CLAIM** ................................................................................................................**197**
**(Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))** ...................................**197**
**(Against All RICO Defendants)** .........................................................................................**197**

**THIRD CLAIM** ...................................................................................................................**198**
**(Direct Fraud on the Plaintiffs)** ........................................................................................**198**
**(Against the Midtown Group Defendants)** .......................................................................**198**

**FOURTH CLAIM** ................................................................................................................**199**
**(Direct Fraud on the Plaintiffs)** ........................................................................................**199**
**(Against Goebel and Solomon)** .........................................................................................**199**

**FIFTH CLAIM** .....................................................................................................................**200**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**200**
**(Fraud on the Court by Jones Day, Sherman and Geremia)** ...........................................**200**

**SIXTH CLAIM** ....................................................................................................................**201**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**201**
**(Fraud on this Court by Jones Day, Sherman and Geremia)** ...........................................**201**

**SEVENTH CLAIM** ..............................................................................................................**206**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**206**
**(Fraud on the Court by Philips Nizer, Berger and Shore)** ...............................................**206**

**EIGHTH CLAIM** .................................................................................................................**207**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**207**
**(Fraud on this Court by Philips Nizer, Berger and Shore)** ...............................................**207**

**NINTH CLAIM** ...................................................................................................................**214**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**214**
**(Fraud on the Court by Goebel and Solomon)** .................................................................**214**

**TENTH CLAIM** ..................................................................................................................**216**
**(Indirect Fraud on Plaintiffs)** ...........................................................................................**216**
**(Fraud on the Court by Imperatore)** .................................................................................**216**
**ELEVENTH CLAIM** ............................................................................................................**217**

**(For Declaratory Relief Under the Federal Declaratory Judgment Act)** ...................**217**
**TWELFTH CLAIM** ..............................................................................................................**219**

**(Specific Performance against Midtown)** .........................................................................**219**
**THIRTEENTH CLAIM** ........................................................................................................**220**

**(Breach of Contract against Midtown)** .............................................................................**220**

**FOURTEENTH CLAIM** .......................................................................................................**220**
**(Bad Faith/Willful and Deliberate Breach)** ......................................................................**220**

(Claim against the Midtown Group Defendants) ..................................................................220

**FIFTEENTH CLAIM** .........................................................................................................221
**(Conversion against Goebel, Solomon and Szegda)**..................................................221

**SIXTEENTH CLAIM** .........................................................................................................222
**(Conversion against Szegda and Baystone)** .............................................................222

**SEVENTEENTH CLAIM** ....................................................................................................223
**(Tortious Interference With Contract)** .....................................................................223
**(Against the RICO Defendants – Other than Midtown)**...........................................223

**EIGHTEENTH CLAIM**.......................................................................................................224
**(Intentional Infliction of Emotional Distress Against Berger, Shore, Phillips Nizer
and the Midtown Group Defendants)**..........................................................................224

**NINETEENTH CLAIM** ......................................................................................................226
**(Violations of New York Judiciary Law§ 487)** .........................................................226
**(Against Goebel, Solomon, Sherman, Geremia)** ......................................................226
**(Jones Day, Berger Shore and Philips Nizer, Imperatore and Stone)** .....................226

**TWENTIETH CLAIM** ........................................................................................................227
**(Civil Action Under 42 U.S.C § 1983)**........................................................................227
**(Against the Attorney Defendants)** ...........................................................................227

**INTRODUCTION**

1.      This is a complex civil action for RICO civil remedies, for remedies arising out of the Defendants' violation of Plaintiffs' civil rights and for a declaratory judgment, all as authorized by the federal statutes at 18 U.S.C. 1961 *et seq.;* 42 U.S.C. § 1983; and 28 U.S.C. §§ 2201 and 2202, respectively.   Plaintiffs seek declaratory and injunctive relief; actual, consequential and exemplary damages; and for all other relief, which this honorable Court deems just and proper under all circumstances which have occasioned this Amended Complaint.

2.      In or about June 19, 2002, Plaintiffs became the buyers and beneficial parties in interest under a contract of sale (the "Contract"), to purchase certain real property owned by the defendant, Mid-Town Development Limited Partnership ("Midtown").

3.      The Contract has never been cancelled, but rather it remains in full force and effect as of today.

4.      The Plaintiffs are and always have been ready, willing and able to close title under and pursuant to the terms and conditions of the Contract; and Plaintiffs would have closed title thereunder, were it not for Midtown's continuing willful and deliberate breach of the Contract and ongoing fraud on Plaintiffs and the Court.

5.      In prior litigation, wherein Plaintiffs had previously sought specific performance of the Contract and damages, Midtown filed a motion to dismiss and introduced fraudulent documentary evidence, falsely representing that the fraudulent documents introduced by them proved that the Plaintiffs had elected to cancel the

Contract, that the Contract was cancelled, that there was a valid cancellation of the Contract and that Midtown had not willfully and deliberately breached the Contract.

6.      In their August 17, 2006 ruling, the Appellate Division dismissed the prior litigation and stressed that the documents fraudulently introduced by Midtown constituted documentary evidence which proved, as Midtown had falsely claimed, that Plaintiffs had elected to cancel the Contract, that the Contract was cancelled, that there was a valid cancellation of the Contract and that Midtown had not willfully and deliberately breached the Contract.

7.      Evidence discovered by Plaintiffs in May 2013, prove that the fraudulent documentary evidence Midtown introduced was incomplete and false, and known by Midtown to be incomplete and false when they introduced the documents and made false claims based upon the incomplete and false documents introduced by them to the Court.

8.      Evidence discovered by Plaintiffs in May 2013, including documentary evidence that had been in Midtown's possession during the prior litigation, prove just the opposite of that which Midtown had claimed to the Court, and the true documentary evidence proves that in fact Plaintiffs did not elect to cancel the Contract, that the Contract was not cancelled, and that Midtown had willfully and deliberately breached the Contract.

9.      In 2014, Midtown, its representatives and Attorneys, reluctantly admitted that Plaintiffs did not elect to cancel the Contract, that the Contract was not cancelled, and that Midtown had willfully and deliberately breached the Contract.

10.      In 2014, Midtown, its representatives and Attorneys, reluctantly admitted that the Contract remains in full force and effect as of today.

11.     But for the fraudulent documentary evidence and claims made by Midtown in the prior litigation, the Appellate Division would not have dismissed the prior litigation, and would have instead sustained Plaintiffs claims and directed Midtown to specifically perform the Contract.

12.     As a direct, proximate and foreseeable result of Midtown's introduction of the fraudulent evidence, and in clear reliance thereon, the Appellate Division ruled erroneously, relating to any cancellation of the Contract, as follows;

> **Jericho acknowledged in writing that the contract was cancelled. On September 13, Jericho sent a letter [dated September 12, 2002] stating that it was exercising its option to cancel the contract, and it demanded the return of its down payment.**
>
> **On September 13, 2002, Jericho sent Midtown a letter [dated September 12, 2002] stating: Although Jericho's principals felt, and still feel, that, under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29 (a) of the referenced contract to cancel said contract.**
>
> **An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a cancelled real estate contract (*Degree Sec. Sys., Inc. v F.A.B. Land Corp.*, 17 AD3d 402, 403 [2005] [specific performance unavailable where a contact for sale of real estate was validly cancelled].**

13.     The foregoing recitation of facts and statement of law, contained in the August 17, 2006 decision, are based upon the September 12, 2002 letter referred to in the decision, which, as it turns out, was a bogus letter, fabricated as part of a conspiracy with Midtown and its representatives, to steal the Contract, the Two Hundred Fifty Thousand

($250,000) Dollar down payment being held under the Contract, and the Plaintiffs interest in the Property. Plaintiffs never acknowledged that the Contract was cancelled, there never has been any valid cancellation of the Contract, and the Plaintiffs have never requested a return of the down payment.

14.     As a direct, proximate and foreseeable result of Midtown's introduction of the fraudulent evidence, and in clear reliance thereon, the Appellate Division ruled erroneously, relating to Midtown's willful and deliberate breach of the Contract, that;

> **The rider also provided, at paragraph 29 (c) that if Jericho made a "reasonable request", Midtown was to provide Jericho with "documents relating to the condition of the property during the study period".**

> Plaintiffs made many "reasonable request[s]" whereupon Midtown was contractually obligated to provide Jericho with the requested "documents relating to the condition of the property during the study period." but willfully and deliberately did not provide those requested critical documents and have willfully and deliberately  breached paragraph 29 (c) of the Contract.

> **On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or near the property. It requested that Midtown inform it about the alleged oil spill and whether or not it had been cleaned up. This was not the first correspondence between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase.**

> Plaintiffs had discovered, on or before August 21, 2002, that there was an oil spill on the 93,000 square foot Midtown Property and immediately thereafter requested documents regarding the oil spill. On August 22, 2002, and for the first time, Midtown acknowledged that there was a massive oil spill on their property, that it wasn't fully cleaned up, that they had many documents pertaining to the clean up and that they would provide the documents relating to the oil spill and the cleanup of the oil spill on their property, as soon as possible, and as required under paragraph 29(c) of the Contract.  On August 29, 2002, in contravention of their contractual obligation and independent promises, Midtown notified Plaintiffs that they were refusing to provide those requested critical documents.

**On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak.**

Plaintiffs asked Midtown for the exhibits to a development agreement between Midtown and Amtrak already in July and August 2002 and Midtown promised to provide those requested critical documents to Plaintiffs as soon as possible, and as required under paragraph 29(c) of the Contract.   On August 29, 2002, in contravention of their contractual obligation and independent promises, Midtown notified Plaintiffs that they were refusing to provide those requested critical documents.

**Had Midtown willfully or deliberately breached its obligations under paragraph 29 (a) of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment (*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]). However, Jericho's allegations, to the extent they allege willful or deliberate breach of contract, are either contradicted by the documentary evidence submitted on the motion  (*see Arnav, supra*) or premised on a misreading of Midtown's obligations under paragraph 29 (a). Thus, the rule articulated in *Mokar* is inapplicable to these facts.**

Documentary evidence discovered in 2013 proves that Midtown willfully and deliberately breached its obligations under paragraph 29 (c) of the Contract, and thus Plaintiffs' first two causes of action were not barred, and would not have been barred even if Plaintiffs had terminated the contract recovered of its down payment.

**Further, the record is plain that Midtown provided Jericho with information in its possession**,

The true documentary evidence, discovered in 2013, proves that midtown willfully and deliberately failed and refused to provide the requested critical documents and information in their possession.

**. . . and that it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill.**

The true documentary evidence, discovered in 2013, proves that Midtown feigned their assistance, but Midtown knew that Plaintiffs had already approached the additional sources of information, and they also knew that the additional sources of information were impractical, at a time when Midtown could have merely provided Plaintiffs with the documents which they had in their possession and

which they were contractually obligated to provide.  Moreover, Midtown had documents making a request for information from the NYDEC themselves, and they knew it would take four to six weeks to get the requested information.

**It should also be noted that Jericho made requests for documents on the eve of the expiration period, which could have been made much earlier.**

Plaintiffs requested these documents even before signing the contract, in June 2002, and in then again in July 2002, and thereafter.

15.     The newly discovered documentary evidence and admissions of 2013 and 2014 proves that everything the Appellate Division stated regarding the facts of the case and what the plaintiffs had been claiming, as set forth in the August 17, 2006 decision, was false, and the product of the Scheme to Defraud as herein complained of.

16.     The foregoing recitation of facts and statement of law are based entirely upon Midtown's fraudulent documentary evidence, giving rise to the Appellate Division's false and erroneous August 17, 2006 ruling.

17.     Midtown avoided an adverse finding that the Plaintiffs never elected to cancel the Contract, that Plaintiffs never cancelled the Contract, that the Contract has never been cancelled and that Midtown had willfully and deliberately breached the Contract, and thereby wrongfully evaded a specific performance judgment, by withholding documentary evidence that proves Plaintiffs had requested documents relating to the oil spill on the Property much earlier than Midtown fraudulently claimed to the Court.

18.     In late, 2012, Plaintiffs discovered an internal email dated August 21, 2002 (the "Emmet Email"), sent to Midtown from Midtown's exclusive broker, Elaine Osborn Emmet ("Emmet") of Brown Harris Stevens.

19.     The Emmet Email proves that Plaintiffs had discovered, on or before
August 21, 2002, that there was an actual oil spill on Midtown's 93,000 square foot
Property, which Plaintiffs had contracted to purchase for $28,000,000; that Midtown
committed actionable fraud on Plaintiffs when they represented from March 2002,
through August 21, 2002, that there was no oil spill on the Property and that they had no
documents relating to any oil spill on the Property; that Midtown committed actionable
fraud upon Plaintiffs when they returned the countersigned Contract and misrepresented
that there was no oil spill or hazardous materials on Midtown's Property; that as of
August 21, 2002, Plaintiffs had been requesting documents relating an actual oil spill on
Midtown's Property; and that Midtown willfully and deliberately breached paragraph
29(c) of the Contract, when they promised to provide the requested documents on and
after August 21, 2002, but instead on August 29, 2002, in contravention of their
contractual obligation and independent promises, Midtown instead notified Plaintiffs that
they were refusing to provide the requested critical documents.

20.     Had Midtown or their Attorneys, who also had the Emmet Email, not lied
to the Court by claiming that Plaintiffs only requested information or documents relating
to an oil spill on the Property for the first time on August 30, 2002, after Midtown sent
Plaintiffs the notice of August 29, 2002; and not mislead the Court that the oil spill was
not on Midtown's property but on some neighbors property (i.e. the Javits center 2 blocks
away); or if Midtown or their Attorneys had merely provided the Emmet Email to the
Court before the August 17, 2006 Appellate Division ruling, or anytime before the
January 16, 2008 Appellate Division ruling, or any time before the November 5, 2009
Appellate Division ruling, the Appellate Division would have ruled on the true

11

documentary evidence and would necessarily have found that the Plaintiffs never elected to cancel the Contract, that the Plaintiffs never cancelled the Contract, that the Contract was not cancelled, that Midtown had willfully and deliberately breached paragraph 29(c) of the Contract, and that Midtown had committed fraud on plaintiff in the underlying transaction and on the Court in all their submissions with regard thereto.

21.    Based upon their wrongful conduct, Midtown, its representatives and Attorneys, have deprived Plaintiffs of their rights in and to the Property herein at issue, and they have violated Plaintiffs constitutional rights to due process and to have and enforce the Contract.

22.    Based upon the foregoing, the Plaintiffs respectfully request that the Court exercise its equitable jurisdiction and issue a judgment declaring that the Contract between Jericho and Midtown is Still in Full Force and Effect, that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract, and that Plaintiffs never cancelled the Contract, the Court should direct Midtown to specifically perform and transfer title of the Property to Plaintiffs under the terms of the Contract, and award the Plaintiffs compensatory damages in an amount to be proven at trial, believed to be at least Two Hundred Fifty Million ($250,000,000) Dollars, in addition to damages on Plaintiffs' State Law Claims, together with punitive damages, sanctions plus statutory trebling of its damages under 18 U.S.C. § 1964(c) and Judiciary Law § 487, in an amount to be determined.

## SUBJECT MATTER JURISDICTION AND VENUE

23.    This is an action brought, *inter alia*, pursuant to the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, et seq.; as a Civil Action for

Deprivation of Rights, pursuant to 42 U.S.C. § 1983; and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, based upon an actual controversy between the parties, to declare that the Contract is valid, subsisting and in full force and effect, and that Plaintiffs are entitled to specific performance thereof.

24.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331.

25.     This Court has subject matter jurisdiction over Plaintiffs' claims for relief arising under 18 U.S.C. § 1961, et seq., as hereinafter more fully appears.

26.     This Court has subject matter jurisdiction over the Plaintiffs' claims under 42 U.S.C. § 1983, in that the acts and conduct of the Defendants as herein complained of, taken under color of the law and with a significant nexus to the powers and authority granted to the Attorney Defendants by the State of New York, and utilizing the New York State Court's in furtherance of their scheme to defraud the Plaintiffs, deprived Plaintiffs of due process, and thereby violated plaintiff's constitutional and civil rights.

27.     This Court has subject matter jurisdiction over the Plaintiffs' claims, in that the Court has the inherent power to oversee the conduct of the attorneys who come before it, including the witness tampering in this action by recent threat of intimidation aimed at Plaintiffs, and also the false and perjurious statements made by the Defendants, to this Court, which statements and threats were consistent with and in furtherance of the fraud, collusion and the pattern of activity herein complained of.

28.     This Court has subject matter jurisdiction over the Plaintiffs' claims, in that the defendants, including plaintiffs' former litigation attorney, perpetrated intrinsic fraud and extrinsic fraud on the State Court, on this Court and on the Plaintiffs.

29.    This Court has subject matter jurisdiction over the Plaintiffs' claims, in that the Court has already noted the default of the Defendant, Michael A. Szegda and Baystone Equities Inc., including said parties' admissions of fraud, collusion and the pattern of activity herein complained of.

30.    Plaintiffs' state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

31.    Venue is proper in this District under 28 U.S.C. § 1391 (b)(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

## THE PARTIES

32.    Jericho Group, Ltd. (hereinafter referred to as "Jericho" or "Plaintiff(s)"), is a domestic corporation organized and existing under the laws of the State of New York with a principal place of business in Brooklyn, New York, in the County of Kings, State of New York.

33.    Jericho Co, (hereinafter referred to as "Jericho Co" or "Plaintiff(s)"), is a d/b/a existing under the laws of the State of New York with a principal place of business in the County of Kings, State of New York.

34.    Upon information and belief, Defendant, Mid-Town Development Limited Partnership (hereinafter referred to as "Mid-Town" or "Defendant(s)) is a Limited

Partnership, organized and existing under the laws of the State of New York with a place of business at Weehawken, New Jersey and or Hackensack, New Jersey.[1]

35.    Upon information and belief, Defendant, Midtown Development L.P (hereinafter referred to as "Midtown" or "Defendant(s))" resides in Weehawken, New Jersey and or Hackensack, New Jersey.[2]

36.    Upon information and belief, Defendant, Edward Imperatore (hereinafter referred to as "Imperatore" or "Defendant(s)") was and is a principal and counsel to Mid-Town Development Limited Partnership, since 1987 to present, was a partner at Harwood Lloyd, LLC, is presently a partner at Philips Nizer LLC and is a resident of the State of New Jersey and his principal place of business is in Hackensack New Jersey.

37.    Upon information and belief, Defendant Maurice Stone (hereinafter referred to as "Stone" or "Defendant(s)") is an attorney, was counsel to Mid-Town Development Limited Partnership and a Partner at Harwood Lloyd and is residing in the State of New Jersey and his principal place of business is in Teaneck, New Jersey.

38.    Upon information and belief, Defendant Edward W. Ross (hereinafter referred to as "Ross" or "Defendant(s)") is a principal and partner to Mid-Town Development Limited Partnership, from 1987 to present, residing in the State of Illinois and his principal place of business is in Chicago, Illinois.

39.    Upon information and belief, Defendant Arthur E. Imperatore (hereinafter referred to as "Arthur Imperatore" or "Defendant(s)") is a principal and partner to Mid-

---

[1] "Mid-Town Development Limited Partnership" is listed in the Land Records as the owner of the Property.
[2] "Midtown Development, L.P." is only added herein because Defendants used the name "Midtown Development, L.P." as the Seller in the June 18, 2002 Contract of Sale.

Town Development Limited Partnership, 1987 to present, a resident of the State of New Jersey and his principal place of business is in Weehawken, New Jersey.

40.    Upon information and belief, Defendant, Jerrart Venture Properties, (hereinafter referred to as "Jerrart" or "Defendant(s)") has their office in Weehawken, New Jersey.

41.    The Defendants, Mid-Town, Midtown, Imperatore, Stone, Ross, Arthur Imperatore, WR West, Hadrian, Fanfare, Arcorp and Jerrart are also hereinafter sometimes referred to collectively as the "Midtown Group Defendants", or "MGD".

42.    Upon information and belief, Defendant, Michael Szegda (hereinafter referred to as "Szegda" or "Defendant(s)" is a resident and lives in Old Tappan, in the State of New Jersey.

43.    Upon information and belief, Defendant, Baystone Equities Inc., (hereinafter referred to as "Baystone" or "Defendant(s)") was or still is a corporation existing under the laws of the State of New York had a principal place of business in New York County, New York.

44.    Upon information and belief, Defendant, Robert A. Goebel (hereinafter referred to as "Goebel" or "Defendant(s)" is a resident of Scarsdale, New York, and has his principal place of business in Scarsdale, New York.

45.    Upon information and belief, Defendant, Lisa Solomon, (hereinafter referred to as "Solomon" or  "Goebel" or "Defendant(s)" is an attorney affiliated with Goebel, including but not limited to the time during which Goebel purported to represent Plaintiffs, and has her principal place of business in New York County, New York.

46.     Upon information and belief, Defendant Fredrick E. Sherman (hereinafter referred to as "Sherman" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

47.     Upon information and belief, Defendant Todd R. Geremia, (hereinafter referred to as "Geremia" or "Defendant(s)") is a resident of the State of New York, and his principal place of business is in New York, New York.

48.     Upon information and belief, Jones Day, was and is a general partnership engaged in the practice of law, with an office located in New York, New York.

49.     The Defendants, Berger, Shore, Philips Nizer, Sherman, Geremia, Jones Day, Goebel, Solomon, Imperatore and Stone are also hereinafter sometimes referred to collectively as the "Attorney Defendants".

50.     Upon information and belief, the Defendants, John Doe 1-10, (hereinafter referred to as "John Doe" or "Defendant(s)") are residing in the State of New York or New Jersey (or any other State of USA) their principal place of business is either New York or New Jersey, (or any other State of USA).Upon information and belief, Defendants, XYZ Corporation 1-10, (hereinafter referred to as "XYZ" or "Defendant(s)") are entities in the State of New York or New Jersey (or any other State of USA) their principal place of business is either New York or New Jersey, (or any other State of USA).

## FACTS COMMON TO ALL CLAIMS

### Nature of the Action

51.     This action concerns an ongoing scheme to deprive Plaintiffs of their rights under a contract (the "Contract") to purchase certain real property (the "Midtown

Property") owned by the defendant, Mid-Town Development Limited Partnership ("Midtown")

52.     Plaintiffs seek redress on account of the manner in which the Defendants colluded to effect such depravation, as well as a final adjudication, *inter alia*, that the Contract remains in full force and effect and that the Plaintiffs are entitled to specific performance thereof.

53.     In furtherance of their scheme to steal the Midtown Property from Plaintiffs, and to avoid the consequence of Midtown's willful and deliberate breach of the Contract as hereinafter described (the "Scheme to Defraud"), the Defendants fabricated and then supported through a pattern of racketeering activity, a scenario whereby they claimed that Plaintiffs had cancelled the contract.

54.     Upon information and belief, Midtown, acting through its transactional attorneys, Edward Imperatore ("Imperatore") and Maurice Stone ("Stone"), conspired and agreed with each other, and with the Plaintiffs' transactional attorney, Michael Szegda ("Szegda"), to engage, and did in fact engage in a plot to steal the Contract, the Property and the escrowed down payment under the Contract, by means of the issuance of a letter from Szegda (the "September 12, 2002 Letter"), purportedly acknowledging that the Plaintiffs had already cancelled the Contract.

55.     The September 12, 2002 Letter was the bogus product of an illicit agreement amongst Szegda, Midtown, Imperatore and Stone.

56.     Midtown and its representatives have since falsely maintained that the Contract has been cancelled.

18

57.     The Contract has never been cancelled, but rather it remains in full force and effect, even as of today.

58.     Plaintiffs hired Attorney Robert B. Goebel ("Goebel") to prosecute their claims against Midtown, Imperatore, Stone and Szegda, arising out of the underlying Contract transaction.

59.     As a condition of his retention, Goebel falsely represented and assured Plaintiffs that he had no prior relationship with Szegda, Midtown, Imperatore and/or Stone.

60.     As a condition of his retention, Goebel falsely represented and assured Plaintiffs that he had no conflict of interest or other predisposition against pursuing any and all claims Plaintiffs had against Szegda, Midtown, Imperatore and/or Stone.

61.     From and even before the time he was retained by the Plaintiffs, Goebel was not serving as their attorney, but rather he was acting in collusion with Szegda, Midtown, Imperatore and Stone, to undermine the Plaintiffs' interest in the Contract and the Midtown Property, and also to cover up and conceal the Scheme to Defraud these Defendants had embarked upon.

62.     As a condition of his retention, Goebel was to sue Midtown for specific performance and set forth Plaintiffs' meritorious claim that the Contract had never been cancelled.

63.     Goebel was hired by Plaintiffs to interpose their claim that Plaintiffs never cancelled the Contract and that the Contract was never cancelled, but he represented just the opposite to the Court, just the opposite of the truth and just the opposite of what the documentary evidence before him proved.

64.     Acting as part of the conspiracy to defraud the Plaintiffs, Goebel instead represented to the Court that the Contract had been cancelled.

65.     Goebel prepared and had the Plaintiffs verify a Complaint on September 2, 2004 (the "2004 Action") which represented and claimed that Plaintiffs did not cancel the Contract and that the Contract was never cancelled.

66.     Goebel prepared and had the Plaintiffs verify an Amended Complaint on November 29, 2004, which represented and claimed that Plaintiffs did not cancel the Contract and that the Contract was never cancelled.

67.     Goebel prepared and displayed a Memorandum of Law and even had Plaintiffs sign a supporting Affidavit on February 23, 2005, each of which represented and claimed that Plaintiffs did not cancel the Contract and that the Contract was never cancelled.

68.     Goebel then deceived Plaintiffs by serving and filing forged copies of the Complaint, the Amended Complaint, the February 23, 2005 Memorandum of Law and the Plaintiffs' supporting Affidavit, falsely representing just the opposite to the Court, that the Plaintiffs had cancelled the Contract and that the Contract was cancelled.

69.     On May 12, 2005, in Goebel's presence and at his direction, Goebel's associate Richard Marrassa represented in open Court, that the Plaintiffs had cancelled the Contract and that the Contract was cancelled.

70.     Plaintiffs' claims were extinguished, and the case was over, there and then, because of Goebel's fraudulent judicial admission to the effect that the Plaintiffs had affirmed, under penalties of perjury, that they had cancelled the Contract and that the Contract was cancelled.

71.     In January, 2006, Goebel prepared an affidavit to be signed by Plaintiffs, under penalties of perjury, where Plaintiffs represented that that Plaintiffs did not cancel the contract and that Szegda wasn't authorized to cancel the Contract.

72.     The January 2006 Affidavit reads, in pertinent part, as follows:

> It is Jericho's contention that the September 3, 2002 letter sent on Jericho's behalf is not a cancellation.  In fact, a letter sent by Defendant's counsel dated September 5, 2002, stated that the September 3 letter was not a cancellation.
>
> Furthermore, the Michael Szegda letter of September 12, 2002 was not in accordance with the terms of the contract and was not authorized by Jericho.  This could not be a proper and formal notice of termination according to the provisions of the contract. Furthermore, it is Jericho's position that this kind of convoluted backwards cancellation required by Defendant does not work.

73.     During the early months of 2006 the Plaintiffs and their partners were deposed, while being represented at the depositions by Goebel, at which time they all testified that plaintiffs didn't cancel the Contract, that Szegda was not authorized to cancel the Contract, and that the Contract was never cancelled.

74.     From in or about  about July 2005, through August 17, 2006, Plaintiffs repeatedly requested of Goebel that he amend the Amended Complaint in accordance with the statements in Plaintiffs January 2006 Affidavit.

75.     Typical of these ongoing requests, on July 25, 2006 at 6:15 PM, Plaintiffs sent an email to Goebel stating as follows:

> Please respond immediately, ASAP, to my many letters and requests that either you immediately file a Motion to Amend the Complaint (based mainly that Szegda, Esq. had "No Power of Attorney or apparent Power of Attorney" and that the Seller and his Attorney knew that from inception, So had no right to cancel the Contract and Seller had no right to accept a cancellation

from Szegda. Plus that Szegda never even cancelled the Contract), or spell <u>out in writing</u> why you believe that we should not file such a Motion and also spell out the Law or case law. TIME IS OF ESSENCE.

POWER OF ATTORNEY
(See my prior e-mail of today). The terms spelled out in par. 29(e) and (b) and par. 42 and 44, etc., as spelled out in our letter of Sept. 18, 02 and Feb. 18 04, were specifically put into the Contract at our request. (that is not the language or norm in the average Contract, So Sellers and their knew when they prepared the Contract that it is the condition of this Contract that the Attorney could not cancel the contract or request that the deposit money be wired to Szegda, plus knew then that Szegda has No Power Of Attorney in this contract (He could ask for documents or extensions etc., but not change the terms of the Contract or cancel the Contract. Plus I specifically told this to Ed Imperatore during the Due Diligent Period. So they had no right to accept a cancellation by Szegda, accordingly the Contract was never cancelled and is still in effect."

76. Goebel repeatedly promised to do what was requested of him by Plaintiffs, from and after July 2005 through August 17, 2006, (to amend the Amended Complaint and interpose the claims that Plaintiffs didn't cancel the Contract and that the Contract wasn't cancelled), but he never did.

77. It wasn't until July 25, 2006, approximately twenty-one months after Goebel commenced the 2004 Action, that the Plaintiffs first learned that not only had he failed to argue that the Plaintiffs didn't cancel the Contract and that the Contract wasn't cancelled, but that Goebel had misrepresented to the Court, from inception and throughout, just the opposite of reality and what he was hired to do, that the Plaintiffs had cancelled the Contract and that the Contract was cancelled.

78. By email at 10:45 pm July 25, 2006, Plaintiffs emailed Goebel as follows:

A follow-up to my e-mail to you of today, I now recognize problems. Because you have not raised them in the original

Complaint as I have requested you to do, but instead you claimed in the Complaint, it seems just the opposite.

Why did you claim in the Complaint and throughout that JERICHO canceled the Contract? I have given you my "OUTLINE" before you were hired, I specifically stated and stressed that I did not authorize to cancel the Contract and that Szegda had "No Power of Attorney" nor apparent Power of Attorney, plus that the Sept. 3, letter was not even a cancellation nor was the Sept. 12, letter, plus that the terms of the Contract specifically stated that only Principle could cancel (not Szegda) and only by specific Notice, (only) and only before expiration of Due Diligence, and only by certified mail with RRR from Principle to Principle with copy to Attorney's. I am shocked because I have provided to you before you were hired, our letters dated Sept.18, 02 and Feb. 16, 04, that stated "that we did not cancel and not authorized Szegda to cancel".

79.     From and after July 25, 2006 through August 17, 2006, Goebel repeatedly promised to amend the Amended Complaint, not only to interpose the claims that Plaintiffs didn't cancel the Contract and that the Contract wasn't cancelled, but also to explain that when he wrote that "Jericho" cancelled the Contract he meant "Szegda", but again, he never did.

80.     Goebel's representations to the Court that Plaintiffs had cancelled the Contract and that the Contract was cancelled, and his failure to amend the Amended Complaint to interpose the true claims that the Contract was never cancelled, as he had repeatedly promised to do, was undertaken in furtherance of the racketeering Scheme to Defraud the Plaintiffs, by which he willfully and deliberately committed fraud on the Plaintiffs and the Court.

81.     As a foreseeable, proximate and direct result of his willful and deliberate fraud on the Plaintiffs and on the Court, through his misrepresentation that the Plaintiffs

had cancelled the Contract and that the Contract was cancelled, the Appellate Division deemed these facts to have been judicially admitted when it dismissed the 2004 Action.

82.     Subsequent lawyers were retained to represent Plaintiffs to interpose those claims that Goebel was hired and promised repeatedly to do, but never did.

83.     In 2007, a new case was filed (the "2007 Action") raising the claims that the Plaintiffs did not cancel the Contract, that the Contract was not cancelled, that Szegda was not authorized to cancel the Contract, that Midtown knew there was no valid cancellation and that the Contract was never cancelled.

84.     When the claims in the 2007 Action went up to the Appellate Division on review, the Court acknowledged the merit of the claims, but declined to hear them because, as they stated, these claims had never been heard before and they could have been raised in the earlier case.

85.     The Appellate Division First Department, by decision and order dated November 5, 2009, ruled:

> "…with respect to plaintiff's claims that it is entitled to specific performance because   it cancelled the contract as a result of defendants' alleged willful and deliberate misconduct and its attorney did not have the authority to cancel the contract, those claims are barred under the doctrine of res judicata because they could have been raised in the prior action. *(emphasis added)*The Appellate Division confirmed in their ruling of November 5, 2009, that those claims were not before the Appellate Division in the First Action and that the Appellate Division did not consider nor Rule on those claims in the First Action.

86.     Plaintiffs' discovery that Goebel had claimed that the Contract was cancelled, when Goebel was specifically hired and given evidence to show that it wasn't cancelled, and his unexplained failure to correct and clarify the Amended Complaint, despite his repeated promises to do so from July 2005, through August 17, 2006, was

shocking at the time, but it wasn't until May, 2013 that Plaintiffs discovered the much more shocking reality, that Goebel had never been working for them, but rather everything he said, and every claim he made to the Court, was said and made as part of his collusion with others, including the very people he was hired to sue.

87.     In 2013, and for the first time, Plaintiffs learned the reason the claims that the Plaintiffs didn't cancel the Contract, that the Contract wasn't cancelled, that Szegda wasn't authorized to cancel the Contract, that Midtown knew there was no valid cancellation and that the Contract was never cancelled weren't previously raised, was because Goebel willfully and deliberately committed fraud on the Plaintiffs and the Court, in collusion with Szegda, Midtown, Imperatore and Stone, when he made the fraudulent judicial admissions that the Plaintiffs cancelled the Contract and that the Contract was cancelled.

88.     Attorney Frederick Sherman ("Sherman"), Attorney Todd Geremia ("Geremia"), Jones Day, Attorney George Berger ("Berger"), Attorney Jeffery Shore ("Shore") and Philips Nizer (hereinafter sometimes collectively referred to as "Midtown's Litigation Counsel"), represented Midtown during the litigation that ensued.

89.     Midtown's Litigation Counsel willfully and knowingly offered false evidence and suborned perjury, in furtherance of the Scheme to Defraud.

90.     Midtown's Litigation Counsel thereby became complicit and willing participants in the Scheme to Defraud.

91.     The Defendants' conduct, including Goebel's participation and complicity in Szegda, Midtown, Imperatore and Stone's scheme to steal the Contract, the Plaintiffs' interest in the Property and the downpayment under the Contract, has deprived Plaintiffs

of their fair day in Court, of their constitutional rights, of due process under the law, and have thus far deprived Plaintiffs of their valuable rights in and to the Contract and the Property.

92.     Prior State Court rulings, that Jericho cancelled the Contract, that Jericho elected to cancel the Contract and that there was a valid cancellation of the Contract, and the orders to vacate the prior notices of pendency placed upon the Midtown Property, are the direct and proximate result of the Defendants' Scheme to Defraud, in the absence of which, Plaintiffs would have been sustained on their claims, the notices of pendency undisturbed, and specific performance of the Contract would have already been directed by the Court.

93.     Midtown and its representatives, including Imperatore, Stone and members of Midtown's Litigation Counsel have also employed threats and intimidation resulting in further obstruction of justice and witness tampering in this matter.

94.     Imperatore's threats made to Plaintiffs' principal, Samuel Pfeiffer ("Pfeiffer"), so instilled fear in him, as to have delayed Plaintiffs from commencing litigation from September 2002 through September 2004.

95.     In 2013, Goebel admitted to Plaintiffs, for the first time, that the reason he did not seek to correct and amend the Amended Complaint, as he had promised to do from July 2005 through August 17, 2006, was because the Midtown representatives had threatened him too, and chilled him into inaction.

96.     On September 22, 2014, Pfeiffer's son Hershi (Yaacov) Pfeiffer, was the victim of a horrific and violent crime on the streets of Brooklyn Heights, when he was

stabbed several times in an attempted murder, including twice in the neck cutting two arteries.

97.     The Hershi Pfeiffer stabbing received considerable news coverage and was the subject of regional interest as he miraculously pulled through a life saving surgery.

98.     On October 8, 2014, during a conversation between counsel concerning the allegations against the attorney defendants in this litigation, and any possible disciplinary action which may arise here from, Attorney Berger specifically asked that Pfeiffer be told that he is happy to hear that Pfeiffer's son survived the recently attempted murder, but that Pfeiffer should always remember if he doesn't withdraw his claims, that he [Attorney Berger] "has a long memory".

99.     Mr. Pfeiffer understood that Attorney Berger was there and then threatening his person, his family and his financial wellbeing, should plaintiffs not withdraw their claims, and that Plaintiffs should instead allow Midtown to steal the Property and rights under the Contract from the Plaintiffs.

100.     Mr. Pfeiffer has experienced similar warnings in the past, and similar prior threats against himself, his wife and children, which prior warnings and threats, unheeded by Pfeiffer, resulted in Pfeiffer's loss of property, his being injured during a gunpoint attempt on his life, and the gunpoint threat to one of his sons and that son's loss of life, just 13 years of age at the time of his death.

101.     Berger's threatening message to Pfeiffer, at a time when he was going through a family crisis over his son Hershi's stabbing, was extreme and outrageous conduct which, upon information and belief, was intended by Berger to cause Pfeiffer

severe emotional distress and also impede Plaintiffs in their prosecution of their meritorious claims in this action.

102.    By this action, the Plaintiffs do not seek to re-litigate claims adjudicated in any prior action[3], but rather they seek equitable relief from the prior results, a declaration that the Contract remains in full force and effect and that Plaintiffs are entitled to specific performance thereof.  Plaintiffs also seek statutory, compensatory and punitive damages on account of the manner in which the Defendants attained the results in the prior litigation.

103.    The Plaintiffs learned of the facts object of this litigation within the four years prior to the filing of the present action. Moreover, as a result of the Defendants' fraudulent concealment, the applicable statutes of limitations have been tolled or have not yet begun to run.

**The Pattern of Racketeering Activity**

104.    The Midtown Group Defendants, acting together in concert and conspiracy, have participated in a continuously running scheme, dating from at least 2002 and lasting to the present time, in which, acting jointly and severally, they have, among other acts, committed fraud, wire fraud, mail fraud, extrinsic fraud on the courts, obstruction of justice, forgery, extortion and witness tampering through threats to harm Plaintiffs physically and financially, in order to achieve and conceal their Scheme to Defraud Plaintiffs and and steal their Contract and rights in and to the Property.

_____

[3] As set forth below, and on account of the fraud on the court herein complained of, the Plaintiffs' actual claims have yet to be litigated.

105.    Szegda, Goebel, Midtown and Midtown's representatives, including Imperatore, Stone, Jones Day, Sherman, Geremia, Philips Nizer, Berger and Shore have conspired, confederated and agreed with each other, as aforesaid, and in other ways, to have conducted and participated in a pattern of racketeering activities to defraud Plaintiffs and the Court, in a concerted effort to steal the Contract and the Plaintiffs' rights in and to the Property.

106.    At all relevant times, the Midtown Group Defendant, individually, and through their association-in-fact as the "Mid-Town Development Limited Partnership" operated as a RICO "enterprise" (hereinafter the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4).

107.    Upon information and belief, the Mid-Town Development Limited Partnership is a single asset entity, formed for the purpose of acquiring the Property as an investment vehicle, and to maximize the profits of the Enterprise, by exploiting the Property and its value.

108.    The Enterprise has maintained ownership, operation and control of the Property, in direct contravention of the Plaintiffs' interests and rights thereto, through the racketeering Scheme to Defraud herein complained of.

109.    Upon information and belief, the value of the Property has increased substantially during the time the Enterprise has continued to wrongfully deprive the Plaintiffs of the Property, and the Plaintiffs have been damaged thereby, in an amount believed to exceed $250,000,000.

110.    Upon information and belief, the Midtown Group Defendants and the other unnamed limited partners of the Mid-Town Development Limited Partnership, each

of who maintain beneficial economic interests in the value of the Property, reside in various States throughout the Country.

111.    The increased value of the Property has and continues to inure to the benefit of the Midtown Group Defendants and other unnamed members of the Mid-Town Development LLC, located throughout the Country, as part of the Scheme to Defraud, while the Plaintiffs have thus far and continue to be wrongfully deprived of their interest in and to the Property.

112.    Szegda, Goebel, Solomon, Berger, Shore, Philips Nizer, Sherman, Geremia, Jones Day, Imperatore and Stone formed and conducted an association-in-fact which knowingly, intentionally and unlawfully, planned, devised and concocted the fraudulent artifices that form part of the Scheme to Defraud defined herein, and aided and abetted and conspired with the members of the Enterprise in furtherance thereof.

113.    At all relevant times, and from at least July 2002 to the present time, the Midtown Group Defendants and their co-conspirators, Szegda, Goebel, Solomon, Berger, Shore, Philips Nizer, Sherman, Geremia, Jones Day, Imperatore and Stone (hereinafter collectively the "RICO Defendants") were associated with the Enterprise and conducted or participated, directly or indirectly, in the management and operation of the affairs of the Enterprise through a "pattern of racketeering activity" within the meaning of 18. U.S.C. § 1961(5).

114.    The acts constituting the "pattern of racketeering activity" were horizontally related to each other and were connected in their nature and purpose to each other and to other acts of racketeering by virtue of common participants, their relationship to the same Enterprise, a common victim (the Plaintiffs), a common method

of commission, and the common purpose and common result of defrauding and causing injury to the Plaintiff.

115.    The acts constituting the pattern of racketeering activity were also vertically related to the Enterprise.

116.    The pattern of racketeering activity engaged in and conducted by the Defendants has been continuous from at least 2002 to date. Moreover, the pattern of racketeering activity committed by the Defendants is open-ended, in that it has no predetermined end date, and is continuous in that the scheme is and was the RICO Defendants' regular way of operating and conducting themselves with regard to the subject matter of this action, and thus there exists the threat of continuing long-term racketeering activity.

117.    In furtherance of the Scheme to Defraud, the RICO Defendants and the other members of the Enterprise, knowingly, intentionally and unlawfully, aided and abetted, conspired and agreed, with each other, to attempt to commit, and each of them, in fact, did commit, as principals, the predicate acts of racketeering detailed hereunder, in violation of 18 U.S.C. § 1962(c).

118.    In addition, in furtherance of the Scheme to Defraud, and steal the Contract and the Plaintiffs' rights in and to the Property, each of the RICO Defendants, all of them members of the Enterprise and/or associated in fact with the Enterprise, conspired, confederated and agreed, with each other, to attempt to commit, and did commit, the predicate acts of racketeering detailed hereunder, and, in doing so, violated the RICO prohibitions, as defined in 18 U.S.C. § 1962(d).

119.    Whenever it is alleged in the complaint that any Defendant did any act or thing, it is meant that it, its Directors, Officers, agents, employees, or the Directors, Officers, agents or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant.

120.    In furtherance of the Scheme to Defraud, as explained hereunder, the RICO Defendants have conducted or participated, directly or indirectly, in the management and operation of the affairs of the Enterprise through a "pattern of racketeering activity" and through the commission of multiple acts of racketeering, including acts of "mail fraud" in violation of 18 U.S.C. 1341, "wire fraud" in violation of 18 U.S.C. § 1343, extortion and conspiracy to commit extortion and attempted extortion in violation of 18 U.S.C. § 1951 and Sections 105.00. 110.00 and 155.40(2) of the New York State Penal Law, witness tampering in violation of l8 U.S.C. § 1512 and obstruction of justice in violation of 18 U.S.C. § 1503, as more fully set forth below.

**The Property**

121.    The Contract concerns two parcels of real estate located in the Borough of Manhattan, County, City and State of New York.

122.    Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, consisting of more than 93,812 square feet of land located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York (hereinafter said lots are collectively referred to as the "Midtown Property").

123.    The Midtown Property and its location are unique, one of a kind, and special.

124.    The Midtown Property consists of development sites that are encumbered by railroad easements and rights of way in favor of Amtrak.  (the "Amtrak Agreement")

125.    The property and therefore the Enterprise benefits from the existence Amtrak Agreement and the value added by the interstate nature of Amtrak's business.

**The Introduction and Midtown's Marketing Representations**

126.    In or about March 2002, Midtown's agents and brokers, Benjamin A. Shafran ("Shafran") and Elaine Osborn Emmet ("Emmet"), approached Plaintiffs for the purpose of marketing Midtown's interest in selling the Property in the range of $30 million.

127.    In or about March 2002, and as part of its initial introduction of the Property to Plaintiffs, Midtown represented that it had gone through all City Agencies and Public Hearings, and obtained zoning, FAR, permits and approvals on the Property, to build, "as of right", three buildings, consisting of a 419,745 square foot mixed use space, a 43 story residential tower comprised of 243,000 square feet, a 300 room hotel and 65,625 square foot, 500 car garage, for a total development potential of 728,904 square feet.

128.    In or about March 2002, and as part of its initial introduction of the Property to Plaintiffs, Midtown represented[4] that

---

[4] Midtown mislead their brokers, Brown Harris Stevens, Elaine Emmet and Benjamin Shafran, with these same false representations, and thereby by extension made these false representations to the market at large.

    a.   All of the Zoning, Variances, and Approvals Midtown had obtained from City Agencies to build 728,904 square foot, as of right, were Still in Place;

    b.   That all Agreements with Amtrak were still in place and that they could be Transferred to any purchaser;

    c.   That the Property was "Shovel Ready"; and

    d.   That the Plaintiffs would be able to Begin Construction on the Property Immediately upon Closing of title.

129.    In or about March 2002, Plaintiffs' principal, Samuel Pfeiffer, ("Pfeiffer") asked Midtown if there was any environmental problem, including any oil spill or other hazardous material on or affecting the subject Property.

130.    In or about March 2002, Midtown represented to Plaintiffs, that there was no environmental problem, including any oil spill or other hazardous material on or affecting the Property.

131.    In or about March 2002, Pfeiffer asked Midtown for copies of any and all documents in their possession relating to, or otherwise concerning, any environmental condition on or affecting the subject Property, including any documents referring to any oil spill or other hazardous material on the Property.

132.    In response to Plaintiff's request, in or about March 2002, Midtown represented that they would provide copies of any and all documents in their possession relating to, or otherwise concerning, any environmental condition on or affecting the subject Property, including any documents referring to any oil spill or other hazardous material on the Property.

133.    In or about March 2002, Pfeiffer asked Midtown if they had all of the documents they filed with, or received from, the City Agencies, from the time they sought and obtained the represented zoning approvals and thereafter, to show that such approvals were still then in effect.

134.    In response to Plaintiff's request, in or about March 2002, Midtown represented that they would provide copies of any and all documents they filed with, or received from, the City Agencies, from the time they sought and obtained the represented zoning approvals and thereafter, to show that such approvals were still then in effect.

135.    In or about March 2002, Pfeiffer asked Midtown if they had a true and complete copy of the Amtrak Agreement, including all amendments, modifications, exhibits and any other document related thereto, from its inception and thereafter, to show the full terms and conditions of the Amtrak Agreement and that it was still then in effect.

136.    In response to Plaintiff's request, in or about March 2002, Midtown represented that they would provide copies of any and all documents related to the Amtrak Agreement, including a true and complete copy thereof, together with all amendments, modifications, exhibits and any other document related thereto.

137.    Based upon the foregoing representations, Plaintiffs entered into negotiations with Midtown, eventually agreeing to purchase the Property for the sum of $28 million.

138.    Midtown accepted Plaintiff's offer to purchase the Property, at a price of $28,000,000.

**Szegda's Background and His Complicity in the Baystone Matter as Part of the Scheme to Defraud**

139.    In or about May, 2002, Plaintiffs retained Szegda to review and correct the language in the proposed Contract, to obtain and assist in the reading of a title report, and to otherwise assist in gathering relevant documents and bringing the transaction along towards closing.

140.    Unbeknownst to Plaintiffs at the time, Szegda and Szegda's confederate Angelos Slobakis ("Slobakis"), had a history, using their position in the real estate market and acting in concert with others, of stealing contracts, interests in real estate and escrow deposits.

141.    In May 2013, Plaintiffs first learned that Szegda and Slobakis were partners.

142.    Szegda also represented Plaintiffs in relation to a transaction (the "Baystone Matter") between Plaintiffs and Baystone Equities Inc. ("Baystone").

143.    In or about 2001, Plaintiffs tendered and Szegda took possession of a $150,000 escrow deposit, to be held in escrow for Plaintiffs benefit, in relation to the Baystone Matter.

144.    When the Baystone escrow deposit went missing, Szegda claimed to Plaintiffs that the deposit had been released "by accident" to Baystone.

145.    Plaintiffs have since learned, in May 2013, that Szegda was a principal of Baystone, and that his accidental release of the funds was nothing more than Szegda, acting with others and, upon information and belief, possibly Slobakis and/or Goebel, stealing the money and misappropriating Plaintiffs escrow deposit.

36

146.    Szegda, acting with others and possibly Slobakis and/or Goebel, misappropriated other escrow funds belonging to Plaintiffs under a false time charge billing statement, when Plaintiffs did not have any such time based fee arrangement with said attorney.

147.    Szegda, acting with others and possibly Slobakis and/or Goebel, acted in contravention of others, including Richard Scharf, from whom he attempted to steal over $1,000,000. (See Baystone v. Scharf, Supreme Court, New York County Index No: 605085/00)

148.    By order entered September 20, 2005, Szegda was suspended from the practice of law pursuant to 22 NYCRR 603.4(e)(1)(i) and (iii) for failure to cooperate with the Disciplinary Committee's investigation into two complaints, one concerning escrowed real estate down payment funds totaling more than $350,000 and the other concerning escrowed funds being held on behalf of a film producer, and based upon uncontested evidence of professional misconduct (i.e., conversion of escrowed funds) (Matter of Szegda, 22 A.D.3d 103, 804 N.Y.S.2d 50 [2005] ).

149.    On or about December 2, 2005, an indictment was filed in New York County, Supreme Court, charging respondent with grand larceny in the second degree in violation of Penal Law § 155.40(1), for stealing property valued in excess of $50,000 (the escrowed real estate down payment funds) from his client *during the period February 2001 through March 2003*.

150.    On December 13, 2005, respondent pleaded guilty to the indictment, grand larceny in the second degree (Penal Law §  155.40[1] ), a class C felony and on the same

day respondent was sentenced to 100 hours of community service and five years probation.

151.    In 2007 Szegda was automatically and retroactively disbarred as of the date of his felony conviction. (See In re Szegda, 42 A.D.3d 193, 194 (1st Dep't 2007)).

**Midtown and Midtown's Representatives, Imperatore and Stone**

152.    The Defendants, Stone and Imperatore, were the lawyers who participated in the negotiations concerning the Contract, on Midtown's behalf.

153.    At all relevant times, and upon information and belief, the Defendants, Stone and Imperatore, were officers of Midtown.

154.    Imperatore had, at relevant times, an economic/principal interest in Midtown.

155.    Imperatore did not disclose that he was an owner, principal and partner in Midtown, or that he held an equity interest in Midtown.

156.    As part of the negotiations, Plaintiffs demanded that a party independent of Midtown be the escrow agent under the Contract.

157.    Imperatore represented that the law firm in which he was a partner, Harwood Lloyd, was independent of Midtown.

158.    Based upon Imperatore's representations and the nondisclosure of Imperatore's affiliation with Midtown, Jericho agreed that Harwood Lloyd be the escrow agent for the subject transaction.

**The Contract Formation and the Clear Limitation on Szegda's Authority**

159.    Pfeifer informed Imperatore, Emmet and Shafran that he was the person responsible for shepherding the information during the Study Period.

160.    Pfeifer informed Imperatore that Plaintiffs' counsel, Michael Szegda ("Szegda") was functioning only as counsel with respect to the drafting and the closing of the transaction.

161.    It was made clear to Midtown and its representatives, from the beginning, and it was a condition of the Contract, that Szegda had no power of attorney for the transaction, and that all dealings concerning the Contract must only be done with Samuel Pfeiffer or other officers of Plaintiffs and that all Letters and Notices must be sent to Jericho at 155 Lee Avenue and that all Notices to Midtown must be from Jericho at 155 Lee Avenue and signed by Samuel Pfeiffer or any other officer of Plaintiffs .

162.    It was made clear to Szegda, from the beginning, and was it a condition of his retention, that Szegda had no power of attorney for the transaction, and that all dealings concerning the Contract must only be done with Samuel Pfeiffer, or other officers of Plaintiffs', and that all Letters and Notices must be sent to Jericho at 155 Lee Avenue and that all Notices to Midtown must be from Jericho at 155 Lee Avenue and signed by Samuel Pfeiffer or any other officer of Plaintiffs.

163.    It was made clear to Midtown and its representatives, from the beginning, as a condition of entering into the Contract, that no change of substance could be made to the Contract unless written notice thereof was sent to the other party, by certified mail, return receipt requested, with copy to the receiving party's attorneys.

164.    As a further condition to entering the Contract, Midtown obligated itself and represented that it would send all due diligence documents relating to the Property,

including but not limited to the environmental, zoning and Amtrak Agreement documents discussed during the negotiations, when they returned the countersigned Contract back to Plaintiffs.

165.    Based upon the foregoing conditions, as well as the other terms and conditions therein contained, the Plaintiffs signed the Contract.

### The Countersigned Contract and Midtown's Contract Representations

166.    Plaintiffs signed the Contract on or about June 14, 2002.

167.    Midtown returned the countersigned contract, on or about June 19, 2002, together with two letters and what they declared to have been the "Diligence Materials".

168.    The "Diligence Materials" were comprised of a box of documents, including but not limited to an Environmental Study and Reports, and other documents relating to Zoning, FAR, Permits and Approvals, etc., and critical documents relating to the Amtrak Agreements, etc.

169.    The letters and "Diligence Materials" were part and parcel of the Contract and constitute affirmative representations by Midtown.

170.    The letters and "Diligence Materials" constitute an affirmative representation by Midtown, as of June 19 2002, that there was no environmental problems, including any oil spill, on the Property.

171.    The letters and "Diligence Materials" constitute an affirmative representation by Midtown that the documents then provided included all the documents Midtown sent to or received from the City Agencies, regarding the zoning, as of June 19, 2002.

172.   The letters and "Diligence Materials" constitute an affirmative representation by Midtown, that the documents then provided included a true and complete copy of the Amtrak Agreement, including all amendments, modifications, exhibits and any other document related thereto, from its inception and thereafter, to show the full terms and conditions of the Amtrak Agreement and that it was still then in effect.

**Relevant Contract Provisions**

173.   The Contract contains the following provisions, relevant hereto:

**THIS AGREEMENT** made the 18th day of June … BETWEEN Midtown Development L. P. a New York Limited partnership with an office 40 Arcorp Properties, Pershing Road, Weehawken, New Jersey hereinafter described as the Seller, and Jericho Group, Ltd c/o Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, NY, 11211 hereinafter described as the Purchaser"

"The "Purchaser" (i.e., Jericho) shall have the right to cancel the Contract upon written *Notice* to the Seller [Midtown] and the Escrowee [Midtown's law firm] … Upon *timely* receipt of such *Notice of cancellation* the Escrowee shall promptly return to "Purchaser" (i.e., Jericho) the monies paid upon execution hereof."

The Contract also provided that if the "Purchaser" (i.e., Jericho) does not cancel the Contract *on or before September 3, 2002*, then the Contract stays in full force and effect and then *Jericho could not cancel anymore the Contact* and that the closing shall take place on or about September 18, 2002.

The Contract provided in paragraph 32,

"Closing shall take place on the fifteenth (15th) day after the conclusion of the Study Period, at the offices of Purchaser's lending institution or such lending institution's attorneys. If Purchaser does not close by such date, Seller shall be entitled to *set a* date for closing by giving fourteen (14) days written Notice to Purchaser which date shall be Time of the Essence.   … The parties agree that fourteen (14) days shall be a reasonable notice period and failure by Seller to send such notice to Purchase shall not be

deemed to be a waiver of Seller's rights to get a time of the essence closing date."

The Contract further provided, in paragraph 42:

This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing *signed by the party* against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

The Contract further provided, in paragraph 44:

All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney. For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:
Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ  07601

Attorney for Purchaser:
Szegda & Gerbing
300 East 42nd Street
New York, New York  10017
Attn:  Michael A. Szegda, Esq.

Paragraph 29c) of the Contract, states:

Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which purchaser reasonably requests.

**Plaintiffs' Successful Marketing Efforts**

174.    From and after the time they executed the Contract, Plaintiffs began marketing the Property, looking for investors, and also received offers from prospective purchasers to outright purchase the Property from Plaintiffs, for well above the price in the Contract, but these offers were refused by Plaintiffs because Plaintiffs intended to remain involved to develop the Property.

175.    During this time frame, Midtown and its representatives became aware of the dramatically higher valued marketing and offers Plaintiffs were getting from third parties seeking to participate in the Property.

176.    During this time frame, Midtown and its representatives also became aware of certain impending zoning changes, which would greatly increase the value of the Property.

177.    In or about the first week of August, 2002, Plaintiffs completed a Joint Venture and secured their financing to acquire and develop the Midtown Property, Plaintiffs took the Property and its interest to find other co-venturors off the market, and immediately notified Midtown and its representatives that Plaintiffs were ready, willing and able to proceed and to close title on the Property under the terms of the Contract.

**Plaintiffs Discover that Midtown has been Holding Back**

178.    Plaintiffs discovered in July 2002 that Midtown and their representatives had withheld critical documents from their "Diligence Materials", relating to the environmental studies, etc., the Zoning, FAR, Permits and Approvals, etc., and to the Amtrak Agreements, etc.

179.   In addition to the representations they made when they returned the countersigned Contract, Midtown had an obligation under the Contract to provide documents reasonably requested by Plaintiffs and relating to the condition of the Property

180.   Paragraph 29(c) of the Contract, provides, as follows:

> Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which purchaser reasonably requests.

181.   In July 2002, Plaintiffs (not Szegda) requested the withheld documents from Midtown and their representatives.

182.   In response to Plaintiffs request (not Szegda's)   regarding the environmental documentation, Imperatore and Stone responded (to Plaintiffs not to Szegda) that they had already represented before and at the time the countersigned Contract was returned, that there was no environmental issues on the Property.

183.   In response to Plaintiffs request (not Szegda's) regarding missing parts of the Amtrak Agreement and documents related thereto, Imperatore and Stone responded (to Plaintiffs not to Szegda) that they had "misplaced" the missing critical documents, but that they would request them from Midtown and or their partners and that they would provide the critical documents to Plaintiffs, (not Szegda) "as soon as possible". Imperatore and Stone also suggested that Plaintiffs try to get the requested matter from Amtrak.

184.   Also in July 2002, Plaintiffs learned that the zoning, including the "as of right" permits Midtown represented during its marketing of the Property and during the Contract execution, had expired.

185.    Midtown had allowed the permits expire numerous times during the time it owned the Property, and managed to get them re-instated.

186.    Plaintiffs approached Midtown regarding this newly discovered information, (that Midtown had defrauded Plaintiffs because any buyer could not build three buildings, consisting of a 419,745 square foot mixed use space, a 43 story residential tower comprised of 243,000 square feet, a 300 room hotel and 65,625 square foot, 500 car garage, for a total development potential of 728,904 square feet and not even one square foot on the Property, "as of right"), and again requested the zoning documents.

187.    Confronted by Plaintiffs with what they had learned from the City Agencies, Midtown acknowledged that the permits had expired, but explained that it had been able to get the permits renewed in the past and Midtown stated further, that they would provide all the critical documents relating to the zoning and the reinstatement of the permits.

188.    Plaintiffs (not Szegda), through Midtown's brokers, offered to undertake the re-zoning and permitting process, de novo, and committed themselves to expend soft costs between one and two million dollars, but again reiterated that they needed all of the relevant documents, in addition of an extension of the closing date to December 31 2002.

189.    Imperatore, on behalf of Midtown, agreed to the request for a lengthy adjournment of the Closing, and again represented that he would provide all the requested zoning documents "as soon as possible".

190.   In or about July 2002, Midtown also agreed to toll the seventy-five day due diligence period in the Contract, until such time as Midtown provided the documents and information requested by Plaintiffs.

191.   In July 2002, Plaintiffs contacted Amtrak and requested documents related to the Amtrak Agreement and to set up a meeting with Amtrak at the offices of Plaintiffs Architects or at Amtrak's offices, but Amtrak responded that Plaintiffs should request those documents from Midtown and ask Midtown to request to set up a meeting for Plaintiffs with Amtrak.

192.   In August 2002, Plaintiffs again requested the withheld documents from Midtown and their representatives.

193.   In response to Plaintiffs request regarding missing parts of the Amtrak Agreement and documents related thereto, and the withheld zoning documents sent to and received from the City Agencies, Imperatore and Stone responded that they were looking for the documents and would provide them.

194.   On or before August 13, 2002, Plaintiffs again requested that Midtown provide Plaintiffs with the Environmental Study or Phase One study or report as soon as possible.

195.   Plaintiffs also asked, on or before August 13, 2002, if any environmental problem or oil spill on or affecting the Property, had occurred from the time Midtown acquired the Property, and if so, to provide Plaintiff with all documents and information related thereto.

196.   Midtown responded that they had nothing current and that there was no environmental problem or oil spill on or affecting the Property.

46

197.    By letter to Stone of August 13, 2002, Szegda made the following request:

> Please ascertain whether an environmental study of this property was done and whether any such report was prepared (whether for your client or any of the professionals retained by your client) and, if so, furnish our client a copy.  If no written report was prepared, kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property.

198.    By letter dated August 14, 2014, Stone responded, in essence, that there was no environmental problem or oil spill on the Property.

199.    On or before August 21, 2002, Plaintiffs discovered, that there was a massive oil spill on the 93,000 square foot Property that was caused from the neighboring property, and Plaintiffs thereby discovered, that Midtown had committed fraud on Plaintiffs from inception, in March 2002 to on or before August 21, 2002, by constantly and repeatedly represented that there was no oil spill on Midtown's Property.

200.    Plaintiffs immediately requested that Midtown and their representatives forthwith provide all documents and information relating to this massive oil spill on the Property.

201.    Stone apologized and stated that previously he had neither heard of any oil spill on the Property, nor had any documents about the oil spill, but that upon learning of the oil spill, he spoke with Midtown who confirmed that there was a massive oil spill on Property; that it was not fully cleaned up; and that Midtown would provide him with all the documents and information which he would in turn provide to Plaintiffs.

202.    Prior to that, Midtown's brokers Brown Harris Stevens, Emmett and Shafran had not heard about any oil spill or hazardous material affecting the Property.

203.    Upon learning from Plaintiffs (not Szegda) of the oil spill on Midtown's Property, Shafran agreed at the request of Plaintiffs (not Szegda) to do everything he could to obtain all information and documents about the oil spill and cleanup from Midtown and any other sources.

204.    Shafran contacted Elaine Osborn Emmet and requested that she immediately contact Imperatore on behalf of Pfeiffer and request that Imperatore immediately provide to Pfeiffer any and all documents and information relating to the oil spill on Midtown's property, from inception to that time.

205.    On August 21, 2002, Emmet advised Imperatore that Pfeiffer had discovered there was an oil spill on the Property, emanating from a neighboring property, and that Plaintiffs were requesting all documents relating to the oil spill.

206.    Emmet sent Imperatore an email dated August 21, 2002, as follows:

> Sam Pfeiffer wondered if you might send him the papers documenting the successful cleanup of the oil spill CAUSED (emphasis added) by the neighboring property.

> (hereinafter the "Emmet Email")

207.    Imperatore responded by admitting that Midtown defrauded Plaintiffs and their own brokers from inception to August 21, 2002, that there was indeed an oil spill on the Property, emanating from a neighboring property, that the oil spill on Midtown's Property had been partially cleaned but not yet fully cleaned up and that Midtown had documents relating to the oil spill on the Property.

208.    Emmet told Shafran on or about August 23, 2002 that Imperatore told her that he would provide to Pfeiffer, as soon as possible, all documents and information

relating to the oil spill on Midtown's property from inception to August 23, 2002 (how it happened, when it happened, who was responsible, how much of the 93,000 SF was affected, how much was already cleaned up, who paid for the cleanup, what has to be done to fully clean up, and the duration to successfully clean up and to obtain a certificate, etc.)

209.   Shafran informed Emmet on or about August 23, 2002, that he had already contacted the New York Department of Environment Control, ("NYDEC") and requested to review or obtain the file on the oil spill on Midtown's property; that NYDEC responded that it must be done through a FOIL Request, and that it would take four to six weeks from the time a FOIL Request is filed with NYDEC to obtain such information; Shafran told Emmet that he had already made the FOIL Request on Pfeiffer's behalf, but he needed the documents and information from Imperatore, immediately, absent which Pfeiffer would have to retain an Environmental Engineering firm to conduct an extensive Environmental Study (Phase I), including on site soil borings (Phase II) and that such testing would take at least 10 weeks.

210.   Shafran informed Pfeiffer, on or about Monday August 26, 2002, that Imperatore admitted there was an oil spill on the Property and that it was not fully cleaned up, and that Imperatore had promised to provide, as soon as possible, all of the documents and information relating to the oil spill on the Property.

211.   Midtown failed and otherwise refused to deliver the critical documents Plaintiffs reasonably requested, relating to the condition of the Property, and which were in Midtown and its representatives' custody or control.

**"Seller's Remorse" and Midtown's Scheme to Kill the Deal**

212.    Upon information and belief, Midtown and its representatives became aware of Plaintiffs' successful marketing and took steps to void the Contract and retain the Property for their own benefit, in derogation of Plaintiffs' rights.

213.    With a clear intent to force a termination of the Contract, the defendant, Midtown, willfully and deliberately breached the Contract, by withholding critical due diligence materials they were contractually obligated to turn over to the Plaintiffs.

214.    By letter to Szegda on August 29, 2002, Midtown and its representatives demanded that plaintiffs give notice, on or before September 3, 2002, as to whether or not plaintiffs were canceling the Contract, and if they wouldn't be canceling the Contract, Midtown and its representatives stated that they would immediately thereafter be releasing the Plaintiffs' $250,000 Contract deposit from escrow, to Midtown, and Plaintiffs would thereafter be required to close with the balance of the $28,000,000 purchase price, on or before September 18, 2002.

215.    Imperatore's August 29, 2002 letter to Szegda stated as follows:

> Midtown directs Jericho to proceed in accordance with the Contract in all respects, with the understanding that the Study Period expires next Tuesday September 3, 2002.
>
> Please be guided accordingly.

216.    Plaintiffs and Szegda spoke to Midtown and its representatives, numerous times and throughout the day on August 30, 2002, objecting to the ultimatum and questioning how Midtown and its representatives could place such restrictions on Plaintiffs at a time when Midtown and their representatives had yet to provide Plaintiffs the requested critical documents relating to the massive oil spill on the Property, to the zoning, FAR, permits and approvals, and relating to the Amtrak Agreement.

217.   Throughout the day on August 30, 2002, Midtown and its representatives acknowledged that they had not yet provided the critical documents, despite their representations and undertaking to do so, but again demanded that Plaintiffs notify them if they wanted to cancel the Contract or proceed to closing, and to do so, even without Midtown ever providing those documents to Plaintiffs.

218.   Plaintiffs reiterated that they would not cancel the Contract and that Midtown must provide the requested critical Documents, and complete the "Diligence Materials" to Plaintiffs as soon as possible.

219.   On September 3, 2002, Plaintiffs told Midtown and their representatives that they were not cancelling the Contract, and that Midtown should immediately provide Plaintiff with the requested critical Documents and "Diligence Materials" they had represented and undertook to provide, and that Plaintiffs would hold Midtown and its representatives responsible for their failure to comply.

**Szegda and his Lack of Authority**

220.   In or about the end of August, 2002, Pfeifer's trust in Szegda was waning because Szegda had then admitted to Plaintiffs that he had improperly released the $150,000 he had been holding in escrow for Plaintiffs benefit, in relation to the Baystone Matter.

221.   By letter dated September 3, 2002, as well as by other verbal and written notifications, Pfeifer wrote Szegda reiterating the limitation that Szegda was not authorized to act on Plaintiffs' behalf without first obtaining a signed written consent from Plaintiffs, in each such instance.

222.    Plaintiffs again also told Midtown and its representatives that all dealings must be with Pfeiffer, and not with Szegda, and reminded them, again, that Szegda could not cancel the Contract and that Szegda was not authorized to send any letter of cancellation or any other letter on behalf of Plaintiffs, without Pfeiffer's signature.

### The False "Cancellation" and Midtown's  Knowledge of its Falsity

223.    On September 3, 2002, Szegda, without Plaintiffs' authorization, sent a letter to Midtown and its representatives, stating that unless Midtown provided the requested critical due diligence documents, including those relating to the oil spill on Midtown's Property, which had been requested numerous times, which Midtown was required to provide under the Contract, and which they had willfully and deliberately not yet provided, then Midtown should wire the $250,000 deposit to Szegda.

224.    By letter dated September 5, 2002, Stone stated that Szegda's letter of September 3, 2002 was not a cancellation of the Contract because any cancellation had to be by formal Notice by Plaintiffs, pursuant to the Contract.

225.    Stone's September 5, 2002 letter stated as follows:

> Paragraph 29 of the Contract sets forth a specific procedure for Jericho to cancel the Contract.  Specifically, the Contract states:

> If prior to the conclusion of the Study Period, the Purchaser determined at its sole and absolute discretion that the Property was not suitable for its needs, the Purchaser [Plaintiffs] shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]… Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser [Plaintiffs] the monies paid upon execution hereof." [Emphasis added]."

> To this point, neither you nor Jericho has actually provided any notice that Jericho was canceling the Contract. In light

of your most recent letters, we cannot imagine that Jericho would seek a refund of its Downpayment and still rely on a Contract that it has repudiated.

Nevertheless, we must state that Jericho cannot have it "both ways". Either Jericho formally cancels the Contract by notice required by Paragraph 29 or it must proceed to close at its own risk: This Firm, as Escrow Agent under the Contact, requires Jericho (or you) to send *us* the requisite notice confirming Jericho's cancellation of the Contract.

226.   Stone's letter of September 5, 2002 memorializes his and Midtown's understanding concerning the requirements as to how to cancel the Contract.

227.   Stone's letter of September 5, 2002 memorializes his and Midtown's understanding that Szegda's September 3 letter was not a cancellation of the Contract.

228.   Stone's letter of September 5, 2002 memorializes his and Midtown's understanding that Szegda is not "Jericho".

229.   After Stone's letter of September 5, 2002, Szegda and Plaintiffs, by Pfeiffer, again told Imperatore and Stone that Plaintiffs were not cancelling the Contract, but demanded instead that Midtown provide the requested critical documents and proceed to closing in accordance with the terms of the Contract.

230.   Plaintiffs told Midtown and their representatives that they remained ready, willing and able to close, but that they still needed the critical documents Midtown had been withholding in order to do so, absent which, Plaintiffs would hold Midtown and their representatives responsible for specific performance and damages.

231.   Plaintiffs and Szegda subsequently spoke to Imperatore and Stone, and again told them that Plaintiffs would not cancel the Contract and that Plaintiffs were ready, willing and able to close under the terms of the Contract but that Midtown must

provide to Plaintiffs, as soon as possible, the requested critical documents and "Diligence Materials".

232.    Szegda knew and understood his direction from Plaintiffs was that the Contract not be cancelled, but should remain in effect, and that he was to obtain the critical documents relating to the oil spill on the Property that had been requested from Midtown and its representatives since before August 21, 2002.

233.    Unable to get the formal notice of cancellation Midtown and its representatives sought from Plaintiffs, and having been expressly told by Plaintiffs that they would not cancel the Contract, Szegda, Midtown, Imperatore and Stone instead entered into an agreement to commit fraud upon the Plaintiffs.

234.    On September 10, 2002, Stone solicited Szegda to write a letter stating that his prior letter of September 3, 2002 was intended as a cancellation of the Contract.

235.    In so doing, Midtown abandoned its request for a proper notice of cancellation from Plaintiffs, instead telling Szegda that if he would lie and write in a letter that when he wrote his September 3, 2002 letter, he/Plaintiffs really intended to cancel the Contract (but for some reason he forgot to write it in the September 3, 2002 letter) they would accept it as a cancellation by Plaintiffs;

> a. Even though they themselves had previously discredited the September 3, 2002 from being a valid cancellation;
>
> b. Even though the letter was from Szegda, and not the Plaintiffs;
>
> c. Even though their request was for a ratification from Plaintiffs not Szegda; and

       d.  Even though they themselves had previously identified that a letter from Szegda, and not the Plaintiffs, was ineffectual Notice under the law and the specific terms of the Contract.

236.    By letter of September 12, 2002, Szegda responded to Stone's September 10, 2002 letter, stating:

> Although Jericho's principals felt, and still feel, that under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof.

237.    Szegda's September 12, 2002 letter was sent without the Plaintiffs' knowledge, consent or authorization, and it was in direct contravention of Plaintiffs' express instructions not to cancel the Contract.

238.    Szegda's September 12, 2002 letter was sent as part of his illicit agreement with Midtown and its representatives, including Imperatore and Stone, to subvert Plaintiff's interests in furtherance of those of the RICO Enterprise.

239.    As Midtown's transactional attorneys, principals of the seller and also acting as escrow agent under the Contract, Midtown and its representatives, including Imperatore and Stone, used their control over the $250,000 down payment held in escrow to subvert Szegda's interests to those of the RICO Enterprise.

240.    Szegda sent the bogus September 12, 2002 Letter as a means of getting possession and control of the $250,000 down payment, and to cooperate with Midtown,

Imperatore and Stone, by securing for them the purported cancellation they could not legitimately get from Plaintiffs.

**The Bogus September 12, 2002 Letter was Issued in Furtherance of the Racketeering Scheme to Defraud**

241.    In furtherance of the scheme herein complained of, Plaintiffs' former transactional lawyer, Szegda, issued the bogus September 12, 2002 Letter, falsely claiming that Plaintiffs had cancelled the Contract.

242.    The bogus September 12, 2002 Letter from Szegda was neither a valid, nor effective cancellation of the Contract, but rather it was the product of the illegal and wholly improper pact between Szegda, Midtown and Midtown's representatives, including Imperatore and Stone.

243.    The Plaintiffs never elected to cancel the Contract.

244.    The Contract was never cancelled.

245.    The Contract remains viable to date.

246.    Midtown can and should be directed to specifically perform and consummate the closing of title contemplated under the Contract.

247.    Disbarred attorney and convicted felon, Szegda, admitted to Plaintiffs, in or about May 2013, that he had entered into an illicit agreement with Midtown and its representatives, including Stone and Imperatore, whereby he would assist them in securing a letter purporting to cancel the Contract, in exchange for their assistance in facilitating Szegda's theft of the $250,000 down payment Plaintiffs had previously tendered under the Contract.

248.    Szegda caused the improper, unauthorized and bogus September 12, 2002 Letter to be issued, and Midtown and Midtown's representatives, including Imperatore and Stone, then caused a wire transfer of the $250,000 down payment to Szegda.

249.    Szegda, Midtown and its representatives, including Imperatore and Stone, all knew that the Plaintiffs did not elect to cancel the Contract; that the Plaintiffs did not cancel the Contract; that Szegda was not authorized to issue the bogus September 12, 2002 Letter; and that Midtown had willfully and deliberately breached the Contract.

250.    Disbarred attorney and convicted felon, Szegda, admitted to Plaintiffs, in or about May 2013, that Szegda, Midtown and its representatives, including Imperatore and Stone, discussed and each understood, that the Plaintiffs did not elect to cancel the Contract; that the Plaintiffs did not cancel the Contract; that Szegda was not authorized to issue such correspondence; and that Midtown had willfully and deliberately breached the Contract.

251.    Thereafter, in 2002 through 2004, throughout the litigation which subsequently ensued (the "Prior Litigation"), and even in filings to this Court in June of 2014, Midtown and its representatives repeatedly committed fraud on the Courts and on the Plaintiffs, falsely claiming, *inter alia*:

> a. That the bogus September 12, 2002 Letter from Szegda was a valid and effective cancellation of the Contract;
>
> b. That Plaintiffs elected to cancel the Contract;
>
> c. That Plaintiffs cancelled the Contract; and
>
> d. That Midtown had not willfully and deliberately breached the Contract.

**Plaintiffs Protest the Efficacy of the Purported Cancellation and Discharge Szegda**

252.   On September 12, 2002, Plaintiffs discovered that Szegda had sent a letter to Midtown and its representatives, purportedly cancelling the Contract.

253.   Plaintiffs immediately called Szegda, on September 12, 2002, complained that he had no right to send any letter to Defendants without Plaintiffs written consent and that he especially did not have authority to send the fraudulent September 12, 2002 letter.

254.   Plaintiffs immediately, on or about September 12, 2002, fired Szegda as their attorney.

255.   Midtown and its representatives, including Imperatore and Stone knew that the bogus September 12, 2002 Letter from Szegda was not a cancellation of the Contract, they knew that Plaintiffs did not intend to cancel the Contract, they knew that Szegda could not cancel the Contract, and they knew that there was no notice of cancellation under the Contract, as they themselves specifically stated in their letter of September 5, 2002.

256.   Szegda's bogus September 12, 2002 Letter was sent without the Plaintiffs' knowledge or authorization, and it was in direct contravention of Plaintiffs' instructions not to cancel the Contract.

257.   Plaintiffs had advised Midtown on several occasions, that Szegda did not have authority to cancel the Contract.

258.   The bogus September 12, 2002 Letter did not comply with the requirements of the Contract for cancellation of the Contract.

259.    The bogus September 12, 2002 Letter was not signed by Plaintiffs, as the party against whom the cancellation was to be enforced, or even copied to them.

260.    The bogus September 12, 2002 Letter was not sent to "the party to be notified".

261.    The bogus September 12, 2002 Letter was not sent by certified mail, return receipt requested.

262.    Upon learning of Szegda's issuance of the unauthorized correspondence, Plaintiffs immediately contacted Defendants and told them to disregard Szegda's fax because he was not authorized to send the letter; that Plaintiffs never cancelled the Contract and that the Contract is not cancelled; and again requested that they immediately provide the critical documents Plaintiffs had requested many times from Midtown and its representatives.

263.    Plaintiffs notified Midtown and its representatives, Imperatore and Stone, shortly after September 12, 2002, that should Midtown fail to provide the requested critical documents and "Diligence Materials" or should Midtown or its representatives claim that Plaintiffs cancelled the Contract, then Plaintiffs would sue them for specific performance and damages.

264.    On or about September 15, 2002 Midtown formally declared that Plaintiffs canceled the Contract and told their agents and brokers that they could market the Property to other prospective purchasers.

265.    On or after September 16, 2002, Midtown and its representatives, including Imperatore and Stone, acting as the escrow agent under the Contract, wired the deposit of $250,000 to Szegda's account, not to Plaintiffs.

266.    Midtown assured its agents and brokers that in connection with any new marketing efforts, they would provide all of the requested Critical Documents and Diligence Materials they had withheld from Plaintiffs.

267.    Midtown immediately began receiving offers to purchase the Property at prices well in excess of the purchase price in the Contract.

268.    Midtown refused offers of $34 million because, upon information and belief, they then understood the value of the Property to be more than the purchase price in the Contract, and they then wanted to secure a much higher price.

269.    Midtown subsequently even negotiated and entered into a contract of sale for more than $100 million.

270.    Immediately upon learning of Szegda's unauthorized act, Plaintiffs contacted the Midtown Defendants and thereafter continued to correspond with the Midtown Defendants, orally and in writing, from September 18, 2002 through February 16, 2004, and thereafter, that Plaintiffs never cancelled the Contract, that Midtown knew the Contract was never cancelled and that they should advise as to how they wanted to proceed to closing.

271.    On September 18, 2002, Plaintiffs sent a letter to Stone, stating as follows:

Dear Mr. Stone:

… Please be informed that Jericho has not authorized Michael Szegda, to cancel the contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(b) and 42, that only the "Purchaser" could cancel the Contract. Please inform Jericho in writing, by certified mail, when and how you want to proceed with the Contract.

272.    On October 18, 2002, Plaintiffs sent a duplicate copy of their September

18, 2002 letter, to Midtown and its representatives, by Certified Mail, Return Receipt

Requested, stating as follows:

> Please respond to my letter dated September 18, 2002
> (Copy attached)

273.    Midtown and its representatives responded with written threats and

coercion, which scared Plaintiffs into inaction and into forbearing litigation at that time.

274.    Imperatore responded by letter dated October 25, 2002, wherein he stated:

> In any event, Jericho appears inclined to contend that its
> own attorney was not authorized to terminate a Connect
> that once existed between Midtown and Jericho with
> respect to the Sites. You acknowledge in your letter
> purportedly dated September 18, 2002 that Jericho's
> attorney, Michael Szegda, cancelled the Contract and
> accepted in return Jericho's Downpayment of $250,000.00
> in accordance with the Contract…

275.    Imperatore continued, in his October 25 response letter, as follows:

> In any event, we view Jericho's attempt now to assert some
> rights in a Contract that has long since been terminated to
> be nothing less than fraudulent.  Should Jericho persist in
> this attempt by, among other things, questioning Midtown's
> ownership of the Sites, misinforming third parties that
> Jericho has any interest in the Sites or in any other way
> interfering with Midtown's ownership of the Sites, we will
> have no alternative but to consider bringing an action
> against Jericho  and, if appropriate, Jericho's principals for
> fraud, slander of title, tortious interference with prospective
> economic advantage and all other proper claims and to seek
> in  such  action  consequential  and  punitive  damages,
> sanctions, attorneys' fees and costs against Jericho, its
> principals, if appropriate, and Mr. Szegda, if warranted.
>
> I trust Midtown's position is clear. Do not attempt to
> contact me or any Midtown representative, including its
> Broker.

276.    Pfeiffer also endured verbal threats from Imperatore, which he apprehended and understood to have been threats of physical harm and violence towards his person, and that of his family members.

277.    During telephone conversations, Imperatore threatened Pfeiffer forcibly telling him that Plaintiffs "better not come forward and claim that they had any interest in the property" and not to sue Midtown.

278.    Mr. Pfeiffer, has experienced similar warnings in the past, and similar prior threats against himself, his wife and children, which prior warnings and threats, unheeded by Pfeiffer, resulted in Pfeiffer's loss of property and also his being injured during a gunpoint attempt on his life, and the gunpoint threat to one of his sons and that sons loss of life, just 13 years of age at the time of his death.

279.    Coupled with his prior experience, Pfeiffer's fear and his being intimidated into inaction were a direct result of the threats made upon him by Midtown and its representatives, including Imperatore and Stone.

280.    Imperatore's threatening message to Pfeiffer, was extreme and outrageous conduct which, upon information and belief, was intended by Imperatore to cause Pfeiffer severe emotional distress and also to impede Plaintiffs, and did in fact impede Plaintiffs, in their prosecution of their meritorious claims for specific performance and damages under the Contract.

281.    Plaintiffs continue under the cloud of fear and intimidation from Imperatore's threats, even today.

282.    Unable to commence litigation at that time, on account of the fear and intimidation placed within Pfeiffer by Midtown and its representatives, including Imperatore and Stone, Plaintiffs instead tried to work out the deal through phone calls and letters.

283.    By letter dated January 5, 2004, Plaintiffs wrote to the Midtown Defendants, reiterating their frequent attempts to enforce their right under the Contract, and stated as follows:

Dear Mr. Stone:

I respectfully request that you please *respond* directly to Jericho's letters to you dated September 18, 2002 and October 18, 2002.  Mr. Michael Szegda, Esq., told us that the reason that he requested back the deposit was because Midtown did not comply with the terms of the contract and other representation and understandings. See the letters from Michael Szegda, dated July 17, 29, Aug. 13, 19, 28, 30, Sept. 2-4 and 12, of 2002, etc.

Please inform Jericho, by certified mail, when and how you want to proceed with the Contract, between Midtown Development, LLC (Midtown) and Jericho Group Ltd (Jericho).

Thanking you in advance.

284.    Stone responded by letter dated January 19, 2004, stating as follows:

Dear Mr. Pfeiffer:

We are in receipt of your January 5, 2004 letter and we are, in fact, amazed at your gall in sending it. Please be reminded that your group, Jericho, terminated the "Contract" to which you refer more then sixteen (16) months ago and we returned the Deposit to Jericho in accordance with specific instructions given us by Jericho and its attorney, Mr. Szegda.

285.    Stone lied in his response of January 19, 2004, because he knew that Plaintiffs did not terminate the Contract; he knew that the Deposit was not returned to Plaintiffs; he knew that he didn't receive any Notice from Plaintiffs regarding

cancellation of the Contract and return of the Deposit; and he knew that the Contract

was not cancelled.

286.     Stone continued, in his January 19, 2004 letter, as follows:

I believe that Edward Imperatore's October 25, 2002 response to your October, 2002 correspondence, a copy of which is attached, is very clear and absolutely controlling. There is not now, and *has not* been for more than sixteen (16) months, any Contract between Midtown and Jericho concerning the Property because Jericho cancelled that Contract pursuant to its terms in September 2002.

Should you, Jericho or its principals assert any claim or hold itself out as having any rights or interest concerning the Property, Midtown will consider bringing an action against Jericho and, if appropriate. Jericho's principals and agents for fraud, slander of title, tortious interference with prospective economic advantage and all other proper claims and to seek in such action consequential **and punitive damages, sanctions, attorneys' fees and costs against Jericho, its principals, if appropriate, and Mr. Szegda, if warranted.**

I trust Midtown's position remains clear. Please be guided accordingly.

287.     The foregoing constituted further and continued threats and coercion,

which once again scared Plaintiffs into forbearing litigation at that time.

288.     Plaintiffs instead again tried to work out the deal through phone calls and

letters.

289.     Plaintiffs responded on January 23, 2004, as follows:

I received your letter dated Jan. 19, 2004 where you stated "we returned the Deposit to Jericho in accordance with the specific instruction given us by Jericho and its attorney, Mr. Szegda."

I respectfully request that you please provide us a copy (front and back) of the Check that reflects the return of the Deposit. Please also provide us a copy of the document that had "specific instruction given to you by Jericho" (emphasis added)."

290.     The Midtown Defendants never responded to the January 23, 2004 letter.

291.   The Midtown Defendants did not provide documents to show that they returned the deposit to "Jericho", they did not provide any document containing any notice of cancellation they claimed to have received from Plaintiffs, and they did not provide a copy of any check showing that the deposit was returned to Plaintiffs.

292.   The Midtown Defendants could not respond, because such documents have never existed and they knew that they could no longer support their false claim that the Contract had been cancelled.

293.   Without any response from Midtown, Plaintiffs then sent another letter to Stone, dated February 16, 2004, as follows:

> Dear Mr. Stone:
>
> I respectfully request that you please respond to our letter to you dated Jan. 23, 04. We have mailed our Jan. 23, 04, letter to you, by Regular Mail, by Fax, and by Certified Mail, Return Receipt Requested, Postage Prepaid, as provided under the Contract.
>
> You have also not responded to our specific claim in our letter to you, dated September 18, 02. Please be informed that Jericho has not authorized Michael Szegda, to cancel the Contract and did not authorized Michael Szegda, to receive any money on behalf of Jericho. The Contract specifically states in par. 29(a) and 42, that only the "Purchaser" could cancel the Contract."
>
> The Contract specifically stated in par. 29(a), "the **Purchaser** shall have the right to cancel this Contract upon written notice to Seller and the Escrowee. ... Upon timely receipt of such notice of cancellation, the Escrowee shall promptly return to **Purchaser** the monies paid upon execution hereof.";
>
> In par. 42, it is stated
> "This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing

<u>signed by the Party</u> against whom the change, modification or discharge is claimed or sought to been enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be **effective or binding** <u>unless such waiver shall be in writing and signed by the **Party** claimed to have given, consented or suffered the waiver</u>.";

In par. 44, it is stated,
"All notices required under this Contract ("Notices") shall be in <u>writing and shall be sent by certified mail, return receipt requested, postage prepaid</u>, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice. At the time any Notice is given to **either party**, a copy shall be sent to its attorney. For the purposes of this paragraph 44, the attorneys for the parties are as follows: "

I respectfully request that you please respond immediately to the above letters plus to Jericho's letters to you dated, October18, 02 and January 5, 04. You have never responded directly or refuted our specific claims raised in our letter to you dated, October l8, 02 and January 5, 04.

Please inform Jericho, by certified mail when and how you want to proceed with the Contract, between Midtown Development, LLC (Midtown) and Jericho Group Ltd (Jericho).

Thanking you in advance.

294.     The February 16, 2004 letter detailed the Plaintiffs' position and efforts to close the Contract.

295.     The Midtown Defendants never responded to the February 16, 2004 letter, nor have they ever controverted any of the detailed and factually supported assertions therein contained, yet they refused and continue to refuse to proceed with the Contract.

296.    The Defendants successfully, albeit improperly, managed to sustain their fraudulent position throughout the Prior Litigation, by enlisting the succor of Plaintiffs' former litigation attorney, Robert B. Goebel ("Goebel").

**Szegda, Goebel and Angelo's Slobakis**

297.    Angelos Slobakis ("Slobakis") approached Plaintiffs and offered to assist them in seeking counsel qualified to pursue their claims for acquisition of the Midtown Property, under the Contract, and also to explore whatever other remedy might be available to them, arising out of Szegda's representation of Plaintiffs during the course of the underlying transaction.

298.    Slobakis was known to Plaintiffs, through their respective investments in Baystone Equities Inc. ("Baystone").

299.    Unbeknownst to Plaintiffs, Slobakis and Szegda had a history of acting together, and with others, to steal real estate contracts and escrow deposits from unsuspecting victims.

300.    Slobakis introduced Plaintiffs to litigation attorney Robert B. Goebel ("Goebel").

301.    Unbeknownst to Plaintiffs and contrary to their representations, Slobakis and Goebel had a pre-existing personal and professional relationship with Szegda.

302.    Unbeknownst to Plaintiffs, Szegda also was a principal of Baystone.

303.    At the time, and in direct contravention of his express representations to Plaintiffs, Goebel was simultaneously representing Szegda in a real estate litigation (the "Baystone Litigation") concerning the Defendant, Baystone Equities, Inc. ("Baystone")

304.     Upon information and belief, both Goebel and Slobakis also had a personal and financial interest in the outcome of the Baystone Litigation.

305.     Upon information and belief, the assertion of Plaintiffs' claims against Szegda, and the revelation of Szegda's participation in a scheme to steal the Contract, as well as Plaintiffs' interest in the Midtown Property and the escrow deposit being held under the Contract, would have had an adverse effect on Szegda's, Slobakis' and Goebel's likelihood of success in the Baystone Litigation

306.     Plaintiffs discovered in 2013 that Goebel had commenced in August 2004 a case entitled Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C.,  No. 0602745/2004 (N.Y. Sup. Ct. 2004) ("Baystone   I") wherein he represented Szegda, and a related case entitled Baystone Equities Inc. v Jacqueline Handel-Harbour, Esq, Erich H. Kahan, Esq, and Sperber, Denenberg & Kahan, P.C.,   No. 105732/2005 (N.Y. Sup. Ct. 2005) ("Baystone II") before the Honorable Justice Walter B. Tolub, wherein Goebel, on behalf of Szegda and Baystone alleged fraud and malpractice against the former lawyers of Gerel Corporation, involving a contract to sell three parcels of real estate valued at one hundred million dollars for allegedly "fail[ing] to disclose certain facts allegedly known to her, [and] intentionally mislead the Court".   The court sanctioned Baystone and Goebel in the foregoing actions, for filing what it determined was a "frivolous action".

307.     Slobakis' recommendation of Goebel was intended to place, and did in fact place, Goebel in a position to conceal Szegda's malfeasance towards Plaintiffs and to assist Szegda, Midtown, Imperatore and Stone in their scheme to steal the Contract and Plaintiffs' interest in and to the Midtown Property.

308.    Slobakis' recommendation of Goebel was not undertaken in good faith, but rather was in furtherance of the scheme engaged by Szegda, Midtown, Imperatore and Stone, to authenticate the bogus September 12, 2002 Letter, steal the Midtown Property and down payment, and to deprive Plaintiffs of their rights in and to the Midtown Property.

**Absent any Further Response from Midtown or its Representatives – or the Scheduling of a Closing – Plaintiffs Retained Litigation Counsel Goebel to Pursue Their Rights in the Contract and the Property**

309.    In or about May, 2004, Plaintiffs retained Goebel to represent them in connection with their claims against Midtown under the Contract and against Szegda, Midtown, Imperatore and Stone regarding any claims against said parties and otherwise relating to the underlying transaction, and to act on Plaintiffs' behalf in the litigation which thereafter ensued (the "Prior Litigation")

310.    Plaintiffs asked Goebel if he had any prior or existing conflict of interest, any potential conflict of interest, or any other hesitation to sue any of the parties involved, including but not limited, Midtown, Imperatore, Stone and Szegda.

311.    Goebel represented that he had no conflict of interest, no potential conflict of interest and no hesitation to sue any of the parties involved, including but not limited, Midtown, Imperatore, Stone and Szegda.

312.    Before Plaintiffs retained Goebel, and as a condition of his retention, Defendant Goebel expressly represented to Plaintiffs that he had no relationship with the Defendants, Midtown, Imperatore, Stone or Szegda.

313.    Goebel's representation that he had no relationship with Midtown, Imperatore, Stone or Szegda was integral to his retention

314.   Plaintiffs retained Goebel to commence litigation to secure the Property through an action for specific performance on the grounds that the Contract had never been cancelled, and to sue Midtown and various related parties, including Szegda, for damages.

315.   Goebel undertook his representation without regard for the best interests of the Plaintiffs, but rather he acted with the preconceived intent to protect his undisclosed client, Szegda, and to support the false conspiratorial position fabricated by Szegda, Midtown, Imperatore and Stone, by way of the bogus September 12, 2002 Letter; *to wit*, that Plaintiffs had cancelled the Contract.

**Goebel was Retained by Plaintiffs but Worked Instead for the Parties That the Plaintiffs Had Hired Him to Sue**

316.   Goebel was retained by Plaintiffs and undertook such representation for the specific and stated purpose of controverting Midtown and its representatives' contention that the Contract was cancelled.

317.   Goebel was retained by Plaintiffs and undertook such representation for the specific and stated purpose of showing the Court that Midtown always knew that the Plaintiffs never cancelled the Contract.

318.   Goebel assured Plaintiffs that he would present the documentary evidence provided by Plaintiffs, to the Court, which evidence proves that the Contract wasn't cancelled and that Midtown always knew that Plaintiffs never cancelled the Contract.

319.   Goebel's representation that he would present the documentary evidence provided by Plaintiffs, to the Court, was integral to his retention.

320.    On or about September 2, 2004, Goebel filed an action in the Supreme Court, New York County, entitled Jericho Group LTD –against- Midtown Development, L.P., bearing index number 113274/04.  (the "2004 Action").

**Goebel Forged the Complaint and the Amended Complaint**

321.    Goebel provided Plaintiffs with execution copies of the Complaint and subsequently the Amended Complaint, in the 2004 Action, and requested that they verify them under penalty of perjury.

322.    Goebel provided Plaintiffs with copies of his Memorandum of Law and an Affidavit in Opposition to Midtown's January 2005 motion to dismiss, and asked Plaintiffs' principal, Samuel Pfeiffer ("Pfeiffer") to swear to the contents of the Affidavit under the penalty of perjury.

323.    The execution copies of the Complaint, the Amended Complaint and the Affidavit in Opposition provided by Goebel set forth the claim that the Contract was never cancelled.

324.    After Plaintiffs approved and verified the Complaint and the Amended Complaint, and after Pfeiffer executed the Affidavit, Goebel forged copies of the Complaint, the Amended Complaint, the Memorandum of Law and the Affidavit in Opposition and then filed the forgeries with the Court.

325.    The forged copies of the Complaint the Amended Complaint, the Memorandum of Law and the Affidavit in Opposition contain the claim that the Plaintiffs had cancelled the Contract.

326.    During the Prior Litigation, both Midtown and Goebel falsely claimed that "Jericho cancelled the Contract".

71

327.    Goebel's representations were not made with regard to his clients' interests, but rather in furtherance of the conspiratorial scheme to steal the Midtown Property from the Plaintiffs.

328.    Goebel's false representation that the Plaintiffs cancelled the Contract were deemed to be judicial admissions.

329.    The forged Complaint, Amended Complaint, Memorandum of Law and Affidavit in Opposition were fraudulent judicial admissions by Plaintiffs, stating falsely, that Plaintiffs had cancelled the Contract.

330.    Goebel's false representation that the Plaintiffs had affirmed, under penalties of perjury, that they had cancelled the Contract was also deemed to be a judicial admission that Jericho cancelled the Contract.

331.    Midtown and their attorneys, Jones Day, Sherman and Geremia claimed to the Court that the admissions and sworn statements of Goebel and the Plaintiffs were judicial admissions, to the effect that Plaintiffs, and not Szegda, had cancelled the Contract.

332.    Except for the false and fraudulent judicial admissions created by Goebel, there is no evidence that the Contract was cancelled.

333.    Goebel supported the claim that "Jericho cancelled the Contract" as part of an agreement between Goebel, Szegda, Midtown and Midtown's representatives, including Imperatore and Stone, to steal the Property from Plaintiffs, and also to protect and conceal Szegda's pact with Midtown and its representatives, regarding the issuance of the bogus September 12, 2002 Letter.

**Midtown's Fraudulent Motion to Dismiss**

334.   In or about January, 2005, Midtown, represented by Jones Day, Sherman and Geremia, moved to dismiss the 2004 Action.

335.   The Midtown motion to dismiss was supported by the Affirmation of Imperatore, dated January 6, 2005.

336.   The January 6, 2005 Affirmation of Imperatore, submitted to the Court by Jones Day, Sherman and Geremia, contained false representations and misleading omissions of fact.

337.   The Memorandum of Law in Support of the Motion to Dismiss, submitted to the Court by Jones Day, Sherman and Geremia, contained false representations and misleading omissions of fact.

338.   The January 6, 2005 Affirmation of Imperatore set forth false representations and misleading omissions of fact to support their contention that the Plaintiffs had elected to cancel the Contract; that Plaintiffs cancelled the Contract; that the Contract was cancelled; that it was a valid cancellation; and that Midtown did not willfully and deliberately breach the Contract.

339.   By his Affirmation of January 6, 2005, submitted to the Court in support of the Midtown Defendants' Motion to Dismiss, Imperatore made false representations and omissions to the Court, including but not limited to;

> a. *I am a member of the law firm Harwood Lloyd, LLC* **in Hackensack, New Jersey.** *Our firm represented Midtown Development, L.P.* **in connection with its negotiation' with plaintiff Jericho Group, Ltd. for the sale of the real property that is the subject of this dispute.**

> By this statement, Imperatore concealed from the Court, as he had done from the Plaintiffs, that he was not just an attorney for Midtown,

but that he was a principal too.   As a principal, attesting to facts, and not simply an attorney involved in the litigation, Imperatore's "affirmation" was not even properly before the Court, in that it should have been in the form of an Affidavit, to be considered.

    **b.  A *true and correct copy* of the Contract *between Jericho and Midtown*, including a rider to it: is attached [to the Affirmation]**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because the copy of the Contract annexed to his Affirmation was not a true and correct copy, because it didn't contain a copy of the Amtrak Agreement and the exhibits to the Amtrak Agreement. Imperatore also failed to attach the transmittal letters which contained representations and which were part of the Contract and Directions as to the manner in which notice thereunder were to be given and received to and from Plaintiffs at 155 Lee Avenue by certified mail RRR and postage paid.

    **c.  On September 3, 2002—the very day that the study period expired in accordance with the terms of the Contract— *Jericho wrote to* Midtown to cancel the Contract and request the return of its down payment.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because ; Jericho did not write to Midtown to cancel the Contract; and Jericho did not request a return of the down payment.

    **d.  On September 12, 2002, *Jericho finally responded* by making clear that it had indeed intended to cancel the Contract.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because the September 12, 2002 Letter was sent by Szegda, and not Jericho; because Imperatore knew that Jericho did not intend to cancel the Contract; and because Imperatore knew that the bogus letter, purporting to cancel the Contract, was the product of the illicit deal amongst Szegda, Midtown Stone and himself.".

    **e.  On September 13, 2002, Midtown returned Jericho's down payment.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that Midtown did not return Jericho's down payment but instead they wired the down payment to Szegda, as

the product of the illicit deal amongst Szegda, Midtown Stone and himself to steal the deposit.

### f. JERICHO'S ELEVENTH-HOUR REQUESTS FOR DOCUMENTS AND MIDTOWN'S RESPONSES
**As the study period came to a close, Jericho made several requests for documents that Jericho now claims Midtown concealed.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that the Plaintiffs made requests for documents well before the study period came to a close, and also because he knew that in fact Midtown had been concealing the documents.

### g. The parties' contemporaneous correspondence shows that Midtown did not conceal any documents from Jericho.

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that he and Midtown had the requested documents in their possession, custody and control, at the time they were requested and thereafter, and that they willfully and deliberately concealed them.

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that when Plaintiffs asked for documents in July, 2002 and August, 2002, Midtown said they would provide them, and then in September 2002 they told their brokers they had all the relevant documents and would provide them to all prospective purchasers introduced by them.

### h. Only one day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Amtrak and Midtown.

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that the Plaintiffs made requests for these documents months before the study period expired.

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that when Plaintiffs asked for documents in June, 2002, before the Contract was executed, in July, 2002 and in August, 2002 and Midtown said they would provide them.

      **i.**  **The Amtrak agreement was attached to the Contract; but the exhibits to it were not. *The day after Jericho asked for these exhibits, Midtown informed Jericho by letter that Midtown did not have the exhibits and did not have them when the parties executed the Contract either.***

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that the Plaintiffs had asked for the Exhibits already in July, and the first time they said that they didn't have the Exhibits was only on September 3, 2002. In addition, they lied to the Court, because they had the Exhibits.

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that when Plaintiffs asked for documents in June, 2002, before the Contract was executed, in July, 2002 and in August, 2002 and Midtown said they would provide them; and then in September 2002 they told their brokers they had all the relevant documents and would provide them to all prospective purchasers introduced by them.

      **j.**  **On August 30—only a few days before the study period was to expire—*Jericho informed* Midtown by letter of "scuttlebutt" it had heard that there may have been an oil spill on the Property and asked Midtown for *any* documents relating to it.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that the Plaintiffs made requests for documents concerning any environmental or hazardous condition on the property, which included any possible oils spill, before Plaintiffs entered into the Contract, in July 2002 and August 2002, and then when the Plaintiffs discovered that there actually had been an oil spill on Midtown's Property, on or before August 21, 2002, they requested the documents relating the actual oil spill.

      **k.**  **On August 23, 2002, Midtown's broker transmitted to Jericho's broker an e-mail from Midtown's counsel noting that "[w]e have no papers confirming the successful cleanup of the oil spill *from* properties neighboring the Sites".**

By this statement, Imperatore committed willful and deliberate fraud on the Court that the oil spill was on a neighboring property, and not

the Midtown property, and that they didn't have any documents or information relating to the cleanup on a neighboring property, as is evidenced in the Appellate Court ruling of August 17, 2006 where they stated that "by e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase."   even thought they were requested to provide the documents as shown by the newly discovered Emmet Email dated August, 21, 2002.   In fact, there was a massive oil spill on the Midtown property which was not yet completely cleaned up and they had hundreds of documents in their possession, custody and control relating thereto, and they promised Plaintiffs, on or about August 23, 2002, that they would provide them, which they subsequently willfully and deliberately failed to provide them.

**l. By this email [the Imperatore Email] Midtown also gave Jericho all of the information necessary to obtain any such documents from the New York Department of Environmental Conservation.**

By this statement, Imperatore committed willful and deliberate fraud on the Court, because he knew that he must provide the hundreds of critical documents relating to the oil spill on Midtown's Property that they had in their possession and control under par. 29c) of the Contract since requested of them on or before August 21, 2002, as proven from the newly discovered Emmet Email dated August 21, 2002.   In addition, Imperatore knew that you had to file a FOIL request and that it takes four to six weeks from the time the request is filed to get an appointment and the documents from the NYDEC, and since he admitted that Midtown's 93,000 square feet was contaminated, he knew that Plaintiffs would have to retain an Environmental Company to perform a phase-1 and phase-2 study and report which would take six to ten weeks, or more. They knew and had documents in their possession, which show that a FOIL request had to be filed and that it takes four to six weeks from the time the request is filed to get an appointment and the requested documents from the NYDEC.

**The Defendants Admitted That They Brought A False Motion To Dismiss; That They Had Engaged In Actionable Fraud; That They Were In Willful And Deliberate Breach Of The Contract; That Plaintiffs Had Requested The Exhibits To The Amtrak Agreement As Of July, 2002; That Plaintiffs Did Not Elect To Cancel The Contract And That There Was No Valid Cancellation Of The Contract**

340.     The Motion to Dismiss was heard before Justice Ramos on May 12, 2005,

wherein they made major admissions to the Court.  At the second part of the hearing the

following transpired:

THE COURT:         Explain to me what this claim of deceit that you set forth, which is your fifth cause of action. I am not sure if I quite follow, plaintiff.

MR. GOEBEL:         I am Robert Goebel.

THE COURT:         I would rather have the attorney.

MR. GOEBEL:         I am the attorney, Robert Goebel.

THE COURT:         Stand up, please …

MR. GOEBEL:         Paragraph 31, Your Honor, of the contract states that annexed to the contract is a true and complete Amtrak Agreement. It turns out -- the Amtrak Agreement is basically an agreement that the seller purportedly had with Amtrak, and basically the agreement was to provide for allowance of the seller, of the owner of the property to build above the railways, the railroad tracks. Without an agreement that provides for that there is no way you can develop the site because the tracks runright through the property.  So it's basically worthless property that can't be developed, or it is not worth nearly as much. but it cannot be developed.

MR. GOEBEL:         That is correct. They, told us when we signed the contract they represented in paragraph 31A that annexed thereto is a true and complete copy of the Amtrak Agreement. It turns out that there were many of the exhibits were missing.

THE COURT: So they didn't give you complete copy of-the Amtrak Agreement?

MR. GOEBEL:  We [Pfeiffer] tried to get copies of the exhibits from both the seller and also from Amtrak, and Amtrak bounced us around. They basically said go back to the seller. The seller said we've given you everything we, are required to give you, and then near the very end of the study period, about 70 days into the study period, Your Honor, they told us they didn't have the exhibits.

**THE COURT: Let me frame the question if I can for my purposes and for PURPOSES OF THE RECORD.  From what counsel has told me, he put some meat on the bone now, he said DURING the 75-day**

78

period **[July 2002]** they asked for a copy of the lease [exhibits] with Amtrak because obviously if they didn't have a right to build above. The Amtrak tracks, the property could be used for what, a PARKING LOT, and that would be it.

Did you supply a copy of the Amtrak contract to the purchaser during that 75-day period?

MR.SHERMAN:      The copy that we have was supplied on the day of the execution of the contract, and it's an exhibit to the Contract.

THE COURT:           Was it complete?

MR. SHERMAN:      It didn't contain exhibits.

**THE COURT:       This is a motion under-3211, not 3212, without those exhibits in my possession I have to assume that those exhibits would permit the owner of the property to build as high as the local regulations would permit, or those exhibits would say no, You cannot build at all.  So those exhibits would really determine to me what the value of the property is. …**

**THE COURT:  How can I decide this?    Either** the – from what the plaintiff is alleging I think the plaintiff has at least a valid cause of action.

**MR. SHERMAN:**    Let's assume for moment, you think it's a valid CLAIM for breach of representation that they got a copy of the contract, how does that become deceit or fraud in this action?   Why is that not a breach of contract, how does he turn it into a fraud issue?

THE COURT:           The fraud of the deceit is when you are asked to turn over [with the Contract] a document, instead of turning over [with the Contract] the complete document you turn over half the document [but represent in the Contract that you turned over the complete document]. …[5]

THE COURT:           Was it clear from the Amtrak contract that was attached to the purchase and sale agreement, that the Amtrak contract was incomplete?

MR. SHERMAN:       YES, because it didn't have some of these exhibits.

---

[5] **Paragraph 31** of the Contract states, "Seller represents that annexed hereto, as Exhibit B, is a <u>true copy</u> of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

THE COURT:            Did they then request those exhibits?

MR. SHERMAN:      After 60 days, two months into the so-called study period. It is not as-though they read it on day one and say we need those exhibits.

**THE COURT:        The answer is yes, DURING the** 75-day period they requested the exhibits.

**THE COURT:        It dose strike me as some what** odd that the owner of the property would not have a full copy of the lease [agreement]…

**THE COURT:  Indeed it strikes me as not credible. The motion is denied, get your answer in.  Thank you very much."**

341.    The Defendants Sherman and Geremia admitted the falsity of the statements they themselves had submitted in support of their client's motion to dismiss.

342.    During the oral argument held before Justice Ramos, the Defendants Sherman and Geremia admitted the falsity of the statements contained in the Imperatore Affirmation.

343.    Accordingly, the Defendants Sherman and Geremia admitted that

a.  Plaintiffs requested from Amtrak and from Midtown the Exhibits already in July 2002 (But to the appellate division they argued the opposite);

b.  That the Amtrak exhibits existed and that Midtown had them (but when requested from Midtown in July, 2002, Midtown responded "We already gave the Exhibits to you at the signing of Contract, so they admitted in the reply of July, 2002, that there were Exhibits and Midtown has them but, already gave them to Plaintiffs with the letter of 6/19/02, but on 9/3/02 they responded, lied and claimed for

first time, that they misplaced the Exhibits and did not have the Exhibits on 6/19/02 and on 9/3/02. But on 7/11/06 in their Summary Judgment Motion to Justice Ramos, and thereafter, up to and including 4/1/10 they claimed to the Court that the Exhibits never existed);

c.  That Plaintiffs requested the exhibits from Midtown much before September 2, 2002, much before the "eve" of the expiration of the due diligence period (But to the appellate division they argued the opposite);

d.  That Midtown had committed fraud on the Court, in their "Motion to Dismiss" and Imperatore committed fraud on the Court in his Affirmation where they represented to the Court that documentary evidence, proves that Jericho only requested the exhibits from Midtown for the first time, only on the 74th day of the due diligent period on September 2, 2002(But to the appellate division they argued the opposite);

e.  That Midtown had willfully and deliberately breached the Contract, specifically par. 29c) of the Contract, by not providing to Plaintiffs the critical exhibits requested by Plaintiffs from Midtown and from Amtrak already in July 2002.(But to the appellate division they argued the opposite);

81

f.   That without the exhibits Plaintiffs and Defendants knew that Plaintiffs will only be able to use the Property only for a Parking Lot (at a value of $5,000,000 not the Contract price of $28,000,000) (But to the appellate division, they argued such change in valuation is immaterial);

g.   That Plaintiffs did not *elect* to cancel the Contract but were *forced* by Midtown to cancel the Contract on account of Midtown's willful and deliberate breach (But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because they had no other reason to have cancelled);and

h.   That there had not been a *valid* cancellation (But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because there was no other reason to cancel);

i.   That Midtown had committed fraud on the Court in their "Motion to Dismiss" where they represented to the Court that Jericho *elected* to cancel the Contract and that it was a *valid* cancellation;(But to the appellate division they argued the opposite, that Plaintiffs elected to cancel because there was no reason to cancel);

j.   That anybody reading the "Amtrak Agreement" would know that the exhibits were missing  and even so Midtown

82

did not attach the exhibits to the Contract and not provided
the exhibits to Jericho during the 75 days due diligent
period. (But they subsequently claimed that the exhibits
never even existed.)

344.    Accordingly, Defendants' Attorneys Sherman and Geremia again admitted
to Justice Ramos that Defendants had committed "Actionable fraud" on Jericho when
Defendants signed the Contract and thereafter because they knew the exhibits were not
attached.

345.    In fact, Justice Ramos explained to Defendants' Attorneys Sherman and
Geremia why it was an "actionable fraud" and why it was not a simple breach and
Defendants' Attorneys subsequently even they agreed that it was an "actionable fraud".

346.    Accordingly, Defendants' Attorneys Sherman and Geremia also admitted
to Justice Ramos that Defendants had committed fraud on the Court in their "Motion to
Dismiss" where they represented to the Court that a promise to provide documents is only
a breach and not "actionable fraud", even though they knew that this was not a promise to
provide documents but a representation in the Contract that attached to the Contract is a
true and complete Amtrak Agreement when they knew that it was false because they did
not attach the critical exhibits.

347.    In addition, Justice Ramos made a fact finding that it was not believable
that Defendants did not have the exhibits when they signed the Contract, when Plaintiffs
requested the exhibits from Defendants and Amtrak in July 2002, when Plaintiffs again
requested the exhibits from Defendants on or about August 17, 2002, when Szegda
requested the exhibits from Midtown on September, 2, and again on September 3, 2002.

348.    During a hearing held before Justice Charles E. Ramos, on May 12, 2005, Jones Day, Sherman and Geremia acknowledged the falsity of the misleading statements and omissions contained in the January 6, 2005 Affirmation of Imperatore, their Momarnum of Law and Motion to Dismsiss.

349.    During the May 12, 2005 hearing, Justice Ramos found a lack of credibility in Midtown's position and denied the January 2005 motion to dismiss.

### Midtown's Fraudulent Motion to Dismiss is Denied

350.    The Motion to Dismiss was heard before Justice Ramos on May 12, 2005, wherein Goebel, Geremia, and Sherman committed major fraud on the Court.

351.    At The Hearing Of May 12, 2005, Goebel, Geremia and Sherman represented to the Court:

      a.   That Jericho cancelled the Contract.

           i.   By this misrepresentation they knowingly committed fraud on the Court because they knew that Jericho did not cancel the Contract;

      b.   That Jericho did nothing for the 2 years, from September 12, 2002 letter until the complaint in the 2004 Action was filed in September 2004;

           i.   By this misrepresentation they knowingly committed fraud on the Court because they knew that Jericho complained throughout that time, sent letters and made phone calls reiterating that they never cancelled the Contract.

352.    The Motion to Dismiss was heard before Justice Ramos on May 12, 2005, wherein, under inquiry by the Court, Goebel, Geremia, and Sherman made reluctant but major admissions.

353.    At The Hearing Of May 12, 2005, Goebel, Geremia and Sherman admitted to the Court:

> a.  That the Plaintiffs had requested from Amtrak and from Midtown the Exhibits relating to the Amtrak Agreement already on or about July 2002;
>
> > i.  thereby they admitted that the Affirmation of Imperatore and their Memorandum of Law and Motion to Dismiss of January 2005, where they claimed that the first time Plaintiffs requested the Exhibits relating to the Amtrak Agreement was only after their notice of August 29, 2002, and only for the first time on September 2, 2002, was false and fraud on the Court;
>
> b.  That without the Exhibits to the Amtrak Agreement the Plaintiffs and Defendants knew that Plaintiffs would only be able to use the Property only for a Parking Lot [6](at a value of $5,000,000 not the Contract price of $28,000,000),

---

[6] . . . and not as represented by Midtown, that the Property could be developed, "as of right" to build three buildings, consisting of a 419,745 square foot mixed use space, a 43 story residential tower comprised of 243,000 square feet, a 300 room hotel and 65,625 square foot, 500 car garage, for a total development potential of 728,904 square feet.

and thereby they admitted that Plaintiffs did not *elect* to cancel the Contract but were *forced* by Midtown to cancel the Contract on account of Midtown's willful and deliberate breach,

    i.  thereby they admitted that the Affirmation of Imperatore and their Memorandum of Law and Motion to Dismiss of January 2005, when they claimed that Plaintiffs have *elected* to cancel the Contract and that it was a valid cancelation, was false and a fraud on the Court;

c.  That Midtown had willfully and deliberately breached the Contract, specifically par. 29(c) of the Contract, by not providing to Plaintiffs the critical exhibits requested by Plaintiffs from Midtown and from Amtrak already or about July 2002, which was a reasonable request,

    i.  thereby they admitted that the Affirmation of Imperatore and their Memorandum of Law and Motion to Dismiss of January 2005, when the claimed that they did not willfully and deliberately breached the Contract, was false and a fraud on the Court;

d.  Accordingly, Midtown's Attorneys Sherman and Geremia again admitted to Justice Ramos that Defendants had

committed "Actionable fraud" on Jericho when Defendants

signed the Contract and thereafter because they knew the

exhibits were not attached.

354.    Based upon the foregoing admissions, that Plaintiffs had requested the

Exhibits relating to the Amtrak Agreement much earlier than September 2, 2002; that

even though Plaintiffs requested the Exhibits relating to the Amtrak Agreement in July

2002, Midtown did not provide those critical exhibits: that the Plaintiffs did not elect to

cancel the Contract and that there was no valid cancellation; and that Midtown willfully

and deliberately breached the Contract, Justice Ramos denied the motion to dismiss.

**Midtown Repeats the Fraud From its Motion to Dismiss in the Form of an Appeal**

355.    Midtown and their Attorneys' admissions, and the fraud on the Court

Justice Ramos revealed, did not deter them from appealing the motion to dismiss and

claiming again the very same frauds and misrepresentations they had just recently

admitted.

356.    Midtown and its attorneys, Jones Day, Sherman and Geremia ignored their

culpability and instead accused Justice Ramos of having denied their motion to dismiss

because Justice Ramos "hypothesized"; because Justice Ramos "fixated" because Justice

Ramos made up "new law"; because Justice Ramos erroneously made a mistake in the

"law"; or because "there is no law to support the lower court's rationale".

357.    Whereas both parties falsely agreed that Plaintiffs elected to cancel the

Contract, that there was a valid cancellation of the Contract, that Plaintiffs only requested

the exhibits for the first time on September 2, 2002, that there was no willful and

deliberate breach by Midtown and that Plaintiffs did nothing for two years prior to the commencement of the 2004 Action, Midtown and its attorneys, Jones Day, Sherman and Geremia argued that Justice Ramos was wrong and made up new law when he ruled that there was a mechanism for the Plaintiffs to come back and vacate the cancellation.

358.    Acknowledging all of the foregoing, and that the statements of fact in their motion to dismiss were false, the Defendants did not correct the record, but rather they filed their Notice of Appeal and Appeal Briefs again misrepresenting the facts, and contradicting their own admissions they had just made to Justice Ramos. Justice Ramos ruled the way he did, based upon the admissions they made to him, and then they went to the Appellate Division, ignored their admissions and argued just the opposite.

**Midtown Appeals the Denial of its January 2005 Motion to Dismiss**

359.    Midtown filed an appeal brief dated November 7, 2005, and a Reply Brief dated December 15, 2005, wherein they falsely claimed:

   a.   That Jericho cancelled the Contract;

   b.   That Jericho elected to cancel the Contract;

   c.   That there was a valid cancelation of the Contract;

   d.   That Jericho did not do anything for the two years prior to commencement of the 2004 Action;

   e.   That midtown did not willfully and deliberately breach the Contract;

   f.   That Midtown did not breach the Contract

g.  That Jericho only requested for the first time Exhibits to the
Amtrak Agreement after the notice of August 29, 2002, on
September 2, 2002;

h.  That at that time, September 2, 2002, they misplaced the
Exhibits;

i.  That Jericho only requested for the first time documents or
information regarding an oil spill only after the notice of
August 29, 2002, and for the first time on August 30, 2002;

j.  That they did not have at that time, August 30, 2002, any
documents in their possession;

k.   That any documents requested by plaintiffs before August
29, 2002, had been provided; and

l.  That they didn't make any representation when they signed
the Contract.

360.    Midtown and their attorneys, Sherman and Geremia, knew that all of the
foregoing representations, claims and arguments were false.

361.    In their Appeal Brief dated November 7, 2005 and their Reply Brief of
December 15, 2005, the Midtown Defendants and the Defendants Sherman and Geremia,
made false representations and omissions to the Court, including but not limited to:

a.  **"The most fundamental ground, however, is that
*Jericho cancelled the contract* years before it brought
this action."**

By this statement, they committed willful and deliberate fraud on the
Court because they knew that Jericho never cancelled the contract.

**b. New York law is absolutely clear that a party may not seek specific performance of a contract for real property that it "*elected*" to cancel.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.

**c. In ruling from the bench on Midtown's motion, the lower court stated that this was an "interesting point," but then wondered whether there is an exception to it. The court *hypothesized* that, if Jericho could prove that Midtown committed "fraud" in performing its contractual obligations, Jericho should be allowed to rescind its *notice of cancellation* as a remedy for *fraud* and then proceed, on the strength of the same allegations, to seek specific performance as a remedy for *breach of contract*. There is no law to support this notion. …The exception that the lower court *hypothesized* simply does not exist in the law.**

By this statement, they committed willful and deliberate fraud on the Court because Justice Ramos based his decision on their admissions of the relevant facts.

**d. The lower court noted in response, "That is an interesting point." (R.18) But the court then *fixated* on the notion that it could not, on a motion to dismiss, decide whether Midtown had fully responded to Jericho's various requests for due diligence materials, as alleged by the complaint. (R.15-17) The court reasoned that, if Midtown had committed "fraud" in fulfilling its contractual obligations, Jericho should be entitled to rescind its cancellation as a remedy for that "fraud" and then seek specific performance for breach of contract.**

By this statement, they committed willful and deliberate fraud on the Court because Justice Ramos based his decision on their admissions of the relevant facts.

**e. But the court then proceeded to wonder whether there should be an exception to it in this case if Midtown could be said to have committed a fraud in performing under the contract:[L]et's assume for purposes of this motion that there was a fraud committed …. [W]ouldn't the**

> **plaintiff be entitled, if they were successful in proving the fraud, wouldn't they be entitled to rescind their rejection of the contract and compel specific performance?**

By this statement, they committed willful and deliberate fraud on the Court because Justice Ramos based his decision on their admissions of the relevant facts.

> **f.   Without invoking any legal authority to support this speculation, the court later ruled that Jericho's specific performance claims should not be dismissed because "the complaint sets forth that potential" that Midtown committed fraud in performing its disclosure obligations under the contract. there is no law to support the lower court's _rationale_."**

By this statement, they committed willful and deliberate fraud on the Court because Justice Ramos based his decision on their admissions of the relevant facts.

> **g.   On September 3, 2002, the day the study period ended, _Jericho exercised_ its right to cancel the contract and requested return of its down payment. _Jericho wrote_ to Midtown to "request that the monies paid upon execution of the Contract be returned _to it_ in accordance with the Contract's terms.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract. They also knew they wired the deposit to Szegda to steal the deposit, not to Plaintiffs, contrary to the Contract's terms.

> **h.   On September 12, _Jericho made clear_ that the letter on behalf of Jericho dated September 3, 2002, was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of monies paid upon execution thereof.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho made clear to them, before and after September 3, 2002, that they would not cancel the Contract, that Szegda did not have authority to cancel the Contract, that Plaintiffs never elected to cancel the Contract, that the Contract was never cancelled, and  that the September 12,

2002 Letter was a bogus letter and part of their illicit agreement to steal the Plaintiffs' rights in and to the Property and the downpayment under the Contract.

> i.   **On September 3, 2002—the day the study period expired and only six days after Jericho attempted to "accept" a proposal to extend it—*Jericho wrote to Midtown* to exercise its right to cancel the contract and request the return, of its down payment.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never wrote, Jericho never elected and never cancelled the contract.

> j.   **By *letters to Jericho* dated September 5 and September 10, Midtown's counsel (which also served as the escrow agent under the contract) [Imperatore] wrote that Jericho was not entitled to return of its down payment unless Jericho provided clear *NOTICE* that it was canceling the contract.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho is the Plaintiffs and not Szegda. By the September 5, 2002 letter, they confirmed that neither the September 3, 2002 letter nor the September 12, 2002 is not a cancellation of the Contract.

> k.   **On September 12, 2002, *Jericho finally responded* with a crystal-clear statement that it had intended to cancel the contract…"**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho didn't respond, and that Jericho never intended to cancel and never cancelled the contract By this statement, they committed willful and deliberate fraud on the Court, because the September 12, 2002 Letter was sent by Szegda, and not Jericho; and because they knew the September 12, 220 letter was a bogus letter and the product of the illicit deal between Szegda, Imperatore, Stone and Midtown, because they knew that Jericho did not intend to cancel the Contract; and because they knew that the bogus letter, purporting to cancel the Contract, was the product of the illicit deal amongst Szegda, Midtown Stone and Imperatore.

> l.   **Jericho Tries to Concoct a Claim that Midtown Breached Its Agreement to Make Documents Available to Jericho**

> **Unable to get an extension of the study period, Jericho tried to create the impression that Midtown had breached its contractual obligation to "make available" to Jericho certain documents relating to the condition of the property.   In fact, Midtown voluntarily provided Jericho with many documents related to the property on June 19, the day after the parties executed the contract, and made other documents available to Jericho during the month of July in response to specific requests by Jericho.   The parties' contemporaneous correspondence refutes each of Jericho's contentions in this regard.**

By this statement, they mislead the Court, because they knew that the requests referred to had nothing to do with an extension, because their claim that they provided all documents requested in July, 2002 was false, and because the parties did not execute the contract on June 18, 2002.

> m. **First, *only one day* before the study period expired, *Jericho asked* Midtown for the exhibits to a development agreement between Amtrak.**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs had asked for the Exhibits already in July and they had admitted such to Justice Ramos at the May 12, 2005 hearing, and they knew that Plaintiffs had asked for the Exhibits before they entered into the Contract and in July and August 2002.

> n. **…But *Jericho did not* request those exhibits from Midtown *until nearly two and a half months later*, on the *eve* of the expiration of the study period.   The day after *Jericho asked* Midtown for these exhibits, Midtown informed Jericho that *Midtown did not have* the exhibits and also did not have them when the parties executed the contract."**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs had asked for the Exhibits before they entered into the Contract and in July and August 2002, and they responded that they would provide the, and that the first time they said that they didn't have the Exhibits wasn't until September 3, 2002. In addition, they lied to the Court, because they had the Exhibits all the time, but simply refused to turn them over and they had admitted such to Justice Ramos at the May 12, 2005 hearing.

o. **Second, on August 30—*only a few* days before the study period was to expire—Jericho informed Midtown of "scuttlebutt" it had heard that there may have been an oil spill on the property that "may or may not have been cleaned up" and asked Midtown to make *representations* to Jericho about whether there had been such a spill on the property and, if so, whether it had been cleaned.**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs made requests for documents, and not representations, concerning the actual oil spill on Midtown's Property even before they entered into the Contract and in July and August 2002, and that after discovering that there was an actual massive oil spill on Midtown's Property they requested the documents on or before August 21, 2002.

p. **By September 3, Midtown had informed Jericho that it did not have any documents confirming whether an oil spill "from neighboring properties" had been cleaned …**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the email he refers to was a response to the Emmet Email which had been concealed by them, and which shows that he was instead admitted that there was an oil spill on the 90,000 square feet Midtown Property and that it was still contaminated and not cleaned up and that they had many documents in their custody possession and control. By this statement, they further committed willful and deliberate fraud on the Court, because they knew that the as of August 21, 2002, and before, Midtown was required to provide those critical documents because Plaintiffs had requested them and the requests were reasonable and because on or about August 23, 2002, they told their brokers to tell Plaintiffs that they would provide the documents.

q. **. . . and gave Jericho all of the information necessary to obtain any such documents from the New York Department of Environmental Conservation.**

By this statement, they mislead the Court, because they knew that they had documents in their possession, which shows that Plaintiffs would have had to file a FOIL request and that it would take 4-6 weeks to get an appointment and the documents from the NYDEC, and also because they had the documents in their possession, but didn't provide them.

r. **Third, on August 13, Jericho asked whether Midtown had a "Phase 1 environmental report" relating to the property. Midtown informed Jericho the day after Jericho made this request that no such report had been prepared for the property.**

By this statement, they mislead the Court, because Plaintiffs were asking on August 13, for documents relating to any possible oil spill or any possible environmental information concerning the Property, and they had hundreds of documents relating to the oil spill, the environmental problems the clean up.  By this statement, they mislead the Court, because they lied to the court saying that Plaintiffs only asked for the phase 1.

s. **These cases are readily distinguishable, …. because Rather, Midtown is relying on, the fact that Jericho *expressly cancelled* the contract by sending Midtown a Notice of cancellation. …**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract and they never received any notice.

t. ***Jericho's* Notice of cancellation is what precludes its claims for specific performance, not the mere return of the down payment…**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract and they never received any notice.

u. ***Midtown did not* "default" in its performance under the contract. The only reason it was "unable to convey title in accordance with the terms of this contract  … was that *Jericho* had *elected* to cancel the contract before the scheduled closing. Indeed, *Midtown twice informed Jericho that Midtown was ready, willing*, and able to close by September 18 in accordance with the terms of the contract.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.   In addition, Midtown was never ready, willing and able to close because they never provided the requested critical documents that they had to provide before closing.

95

     **v. By canceling the contract on September 3, 2002, *Jericho plainly induced* Midtown to believe that the contract was cancelled. ……. …. Midtown, meanwhile, in *good faith reliance on Jericho's* September 12 letter *canceling the contract*, returned Jericho's down payment.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract and they never returned the down payment to Plaintiffs, they sent it instead to Szegda.

     **w. Thus, unlike the cases on which Jericho relies, *Midtown did not create any barrier to closing*.**

     By this statement they committed willful and deliberate fraud on the Court because Midtown created many barriers to closing, because they refused to provide the critical documents requested much before September 3, 2002.

     **x. Finally, the entire complaint should be dismissed because Jericho is estopped from enforcing a contract that *it cancelled*.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.

     **y. As Midtown pointed out in its opening brief, by canceling the contract, *Jericho plainly induced* Midtown to believe that the contract was cancelled and that the parties would no longer be bound by its terms.**

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.

    362.   In their Reply Brief of December 15, 2005, the Midtown Defendants and the Defendants Sherman and Geremia, argued extensively that Plaintiffs cancelled the Contract, and that Plaintiffs couldn't escape the judicial admission that the Contract was cancelled.

363.    There has never been any judicial finding based upon the facts that the Contract has been cancelled.

364.    The only justification for the Court's finding that the Contract was cancelled, based upon judicial admissions, is because of the false, fraudulent and forged documents Goebel submitted to the Court, as if there was no controversy about this hotly controverted issue.

365.    After the Appeal had been fully briefed, but before it was decided, the Defendants filed a Summary Judgment Motion before Justice Ramos, in July 2006, containing the Affirmations of Imperatore and of Geremia.

366.    Almost every claim and every paragraph in the Affirmations submitted in support of the July 2006 Summary Judgment Motion are false and perjurious.

367.    Almost every claim and every paragraph in the Affirmations submitted in support of the July 2006 Summary Judgment Motion and contradicted the arguments they made in the Motion to Dismiss and the Appellate Briefs.

368.    Moreover, the Defendants had an obligation to inform the Appellate Division of their contradictory arguments and statements of fact, but never did.

369.    Responding to the appeal, Goebel either joined in the foregoing misrepresentations himself, or otherwise intentionally failed to controvert any of the false statement and arguments.

370.    Based upon Goebel having either joined in the foregoing misrepresentations himself, or otherwise failing to controvert Midtown's misrepresentations, the Appellate Division did not have to rule on any of these issues, because both parties seemed to be in agreement on them.

371.   On August 17, 2006, the Appellate Division reversed Justice Ramos'
denial of the Defendants motion to dismiss.

372.   In its decision of August 17, 2006, the Appellate Division defined the
claims as follows:

    a.   The first claim asserted breach of the contract of sale;

    b.   A second claim, also for breach of the sales contract;

    c.   The third cause of action alleged that Midtown wrongfully
         repudiated its July 15, 2002 offer to extend the study period
         through December 31, 2002;

    d.   The fourth claim mirrored the allegations in the third cause
         of action; and

    e.   In the fifth and final cause of action, Jericho claimed that
         Midtown defrauded it by failing to disclose (1) its business
         relationship with the escrow agent; (2) the unavailability of
         the exhibits to an agreement with Amtrak which would
         have clarified questions about the scope of the railway's
         easement; and (3) the occurrence and ramifications of an
         oil spill.

373.   Since the attorneys for both sides had fraudulently misrepresented their
agreement on the Appeal that the Contract was cancelled, that the Plaintiffs cancelled the
Contract, that the Plaintiffs had elected to cancel the Contract, that the cancellation was
valid, that Plaintiffs didn't request any documents regarding the oil spill on the Property
before August 30, 2002 and that Plaintiffs didn't ask for the Exhibits related to the

Amtrak Agreement before September 2, 2002, the Appellate Division ruled that Plaintiffs could not come to court thereafter and argue successfully that they could vacate a valid cancelation on the five claims in the Amended Complaint, because based upon what was before them there was no willful and deliberate breach.

374.    The Appellate Division supported their holding on the erroneous factual assertions that the Plaintiffs only asked for documents relating to an oil spill on or near Midtown's property, on the eve of the expiration of the study period, August 30, 2002, and for the Exhibits relating to the Amtrak Agreement on September 2, 2002; and as to the claim for actionable fraud, the Appellate Division reasoned upon erroneous factual assertions tht Midtown's failure to provide documents was only a breach under 29(a) and not a fraud, and that Midtown did not withhold any information because on August 23, 2002 they volunteered that they did not have information pertaining to an oil spill on the neighboring property

375.    Plaintiffs Requested from on or About July 2005 through August 17, 2006, for Goebel to amend the Amended Complaint to claim that Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs had requested documents about any environment condition or hazardous materials on the Property, including any oil spill, and documents relating to the oil spill on the Property when Plaintiffs learned on August 21, 2002, that there had been an oil spill on the Property, and Goebel repeatedly promised to do it, but he never did.

376.    Goebel's failure to amend the Amended Complaint to interpose the claims that Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs had requested documents about any environment

condition or hazardous materials on the Property, including any oil spill, and documents relating to the oil spill on the Property when Plaintiffs learned on August 21, 2002 that there had been an oil spill on the Property, as he had repeatedly promised to do, was undertaken in furtherance of the racketeering Scheme to Defraud the Plaintiffs, by which he willfully and deliberately committed fraud on the Plaintiffs and the Court.

377.    As a foreseeable, proximate and direct result of his willful and deliberate fraud on the Plaintiffs and on the Court, through his failure to interpose claims that Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs requested documents about any environmental condition or hazardous materials on the Property, including any oil spill, and documents relating to the oil spill on the Property when Plaintiffs learned on August 21, 2002, that there had been an oil spill on the Property, the Appellate Division relied instead on the false representations by Midtown and its Attorneys, that these documents were only requested on the eve of the diligence period, and deemed such facts to have been judicially admitted when it dismissed the 2004 Action.

378.    Subsequent lawyers were retained to represent Plaintiffs to interpose the claims that Goebel promised repeatedly to do, but never did.

379.    In the 2007 Action, Plaintiffs' new lawyers raised the claims, in support of an action against Midtown for willful and deliberate breach of the Contract, that Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs requested documents about any environment condition or hazardous materials on the Property, including any oil spill, and documents relating to the

oil spill on the Property when Plaintiffs learned on August 21, 2002, that there had been an oil spill on the Property.

380.    When the claims in the 2007 Action went up to the Appellate Division on review, the Court acknowledged the merit of the claims, but declined to hear them because, as they stated, these claims had never been heard before and they could have been raised in the earlier case.

381.    The Appellate Division, First Department by decision and order dated November 5, 2009, ruled:

> ...with respect to plaintiff's claims that it is entitled to specific performance because it cancelled the contract as a result of defendants' alleged willful and deliberate misconduct and its attorney did not have the authority to cancel the contract, those claims are barred under the doctrine of res judicata <u>because they could have been raised in the prior action</u>. *(emphasis added)*

382.    The Appellate Division confirmed in their ruling of November 5, 2009, that those claims were not before the Appellate Division in the First Action and that the Appellate Division did not consider nor Rule on those claims in the First Action.

383.    Plaintiffs' discovery that Goebel failed to claim that Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs requested documents about any environment condition or hazardous materials on the Property, including any oil spill, and documents relating to the oil spill on the Property when Plaintiffs learned on August 21, 2002 that there had been an oil spill on the Property, and Goebel's unexplained failure to correct and clarify the Amended Complaint, despite his repeated promises to do so from July 2005, through August 17, 2006, was shocking at the time, but it wasn't until May, 2013 that Plaintiffs discovered

the much more shocking reality, that Goebel had never been working for them, but rather everything he said, and every claim he made to the Court, was said and made as part of his collusion with others, including the very people he was hired to sue.

384.    In 2013, and for the first time, Plaintiffs learned the reason the claims that the Plaintiffs requested Exhibits and Documents related to the Amtrak Agreement already in July 2002, and that Plaintiffs requested documents about any environment condition or hazardous materials on the Property, including any oil spill, and documents relating to the oil spill on the Property when Plaintiffs learned on August 21, 2002, that there had been an oil spill on the Property weren't previously raised, was because Goebel willfully and deliberately committed fraud on the Plaintiffs and the Court, in collusion with Szegda, Midtown, Imperatore and Stone.

**The Appellate Division Decided the Case Based Upon the Fraud Perpetrated on them by Goebel, Midtown, Jones Day, Sherman and Geremia, and Not on the True Facts and Circumstances Underlying the Contract Transaction and Supporting the Plaintiffs' True Claims in Issue**

385.    The newly discovered documentary evidence and admissions of 2013 and 2014 proves that everything the Appellate Division stated regarding the facts of the case and what the plaintiffs had been claiming, as set forth in the August 17, 2006 decision, was false.

386.    Based upon the false statements presented to it, the Appellate Division mistakenly ruled, on August 17, 2006,

> Order, Supreme Court, New York County (Charles Edward Ramos, J.), entered May 18, 2005, which denied defendant's CPLR 3211 (a) (7) motion to dismiss the amended complaint, unanimously reversed, *on the law*, with costs, the motion granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly. [but Justice Ramos denied their MTD not on the *law* but

based on the facts based on the admissions of Sherman and Geremia and of Goebel, and based on the unopposed Affirmation of Pfeiffer and the letters attached]

On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase.

However, Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, *so that Jericho could find out the status of any spill and/or cleanup*.

*On the day before the study period expired*, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits.

*It also reminded Jericho* that it had 75 days during the study period *to request the exhibits from Amtrak*, or to meet with employees of Amtrak to discuss any issues regarding its easement.

On September 3, 2002, *counsel* for Jericho sent Midtown a letter stating: "Be advised that, unless you advise us in writing th[at] Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the Study Period for a sufficient time to allow Jericho to investigate this matter, and, *in any case provide Jericho with the requested due diligence documentation*, Jericho requests that the monies paid upon execution of the contract be *returned to it*  in accordance with the Contract's terms."  Midtown responded by requesting an express statement *from Jericho* as to whether it intended to cancel the contract. It indicated that in the absence of such express statement it would presume that Jericho intended to proceed to closing on September 18, 2002 pursuant to the terms of the contract.

On September 12, 2002, *Jericho sent Midtown a letter* stating: "*Although Jericho's principals felt, and still feel*, that, under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period *and the request for production of documents was warranted*, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of J0ericho's down payment was intended as the exercise of Jericho's

right under paragraph 29 (a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof." *Midtown returned the $250,000 down payment the next day*.

On September 3, 2002, the last day of the study period, *Jericho requested* return of its down payment unless it received certain "due diligence" *information* from Midtown. Midtown advised Jericho that it would not return the down payment unless, pursuant to the terms of the contract, Jericho *acknowledged in writing* that the contract was cancelled. On September 13, *Jericho sent* a letter stating that it was exercising its option to cancel the contract, and *it demanded* the return of its down payment.

The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement*, do *not support Jericho's allegation that Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*. …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]

An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]

 "Had Midtown willfully or deliberately breached its obligations under paragraph … of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment (*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]).  ..

However, none of these allegations *constitute actionable fraud*

Further, the *record is plain* that *Midtown provided Jericho* with *information* in its possession and that *it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill*.
It should also *be noted* that *Jericho made requests for documents on the eve of the expiration period which could have been made much earlier*.

387.   The flawed Appellate Division order of dismissal is based upon the intentional and knowing misrepresentations of Midtown and its representatives, Jones Day, Sherman and Geremia, and was facilitated by the collusion of Goebel, who allowed the foregoing misrepresentations to go into the record without opposition.

388.    The Appellate Division justifiably relied upon the foregoing false statements of fact and misrepresentations contained in the attorney's brief, because of the respective attorneys' duty of candor and obligation to be truthful in statements made by them to the Court, and because Goebel failed to refute any of the foregoing.

389.    The August 17, 2006 reversal contains a recitation of facts by the Appellate Division which are at odds with reality, but which has since been extensively relied upon by the Defendants.

390.    The August 17, 2006 reversal order was a product of Midtown, Jones Day, Sherman, Geremia and Goebel's fraud on the Court.

391.    The Defendants' reliance upon the fraudulently obtained August 17, 2006 reversal order, in subsequent court proceedings, constitutes additional and further frauds upon the court, in each such instance.

**Goebel is Fired and Plaintiff's Retain Herzfeld and Rubin to Pursue Their Claims**

392.    In or about September, 2006, Plaintiffs retained Herzfeld and Rubin to represent them in the Prior Litigation.

393.    In 2013, Plaintiffs discovered that Goebel failed to turn over his complete file to Herzfeld and Rubin, and he instead withheld most of the deposition transcripts and discovery documents in his possession, as well as the documentary evidence Plaintiffs provided Goebel in May 2004, and the considerable correspondence between Plaintiffs and Goebel.

394.    If Herzfeld and Rubin had been given Goebel's complete file, including the documentary evidence and deposition testimony which Goebel was then refusing to

turn over, they would have seen conclusive evidence of the outright lies and fraud the RICO Defendants had perpetrated on the Court.

395.    If Herzfeld and Rubin had been given Goebel's complete file, they would have had within their possession grounds to immediately move to vacate the judgment of dismissal, based upon the extensive fraud the RICO Defendants had perpetrated on the Court.

396.    Goebel's refusal to provide an accurate and complete copy of his case file was undertaken in furtherance of the Scheme to Defraud and to conceal his active participation in the conspiracy with the other RICO Defendants, against the Plaintiffs, to further defraud the Courts, Plaintiffs, Herzfeld and Rubin and any subsequent attorneys.

**Motion to Reargue the Appeal**

397.    Plaintiffs' motion to reargue the appeal was met by opposition, which again repeated and reasserted the Defendants' fraud.

398.    By Affirmation dated September 25, 2006, Geremia once again reiterated the false statements of fact and knowing misrepresentations of fact, which led to the adverse ruling in the first instance.

399.    Geremia Affirmed, that:

> **a.  Midtown moved to dismiss the complaint on, among other grounds, that Jericho may not seek to enforce a contract that it cancelled….**
>
> By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.
>
> **b.  the Court (the Appellate Division) noted that Jericho did not even ask Midtown for these exhibits until "the day before the study period expired" a fact that shows Jericho**

> **manufactured this issue as a pretext for bringing its meritless lawsuit. Final Order at 39.**

By this statement, they committed willful and deliberate fraud on the Court because they had admitted to Justice Ramos, on May 12, and they had documents in their possession which proved, that the Plaintiffs had requested the exhibits already in July, 2002.

> **c.   As the Court's Final Order later noted—in support of its alternative holding that there was no "actionable fraud" in this case—"Jericho made requests for documents *on the* eve of the expiration [of the study] period which could have been made much earlier." *Id* at 45-46**

By this statement, they committed willful and deliberate fraud on the Court because they had admitted to Justice Ramos, on May 12, that the Defendants had committed actionable fraud.  They had admitted to Justice Ramos, on May 12, that the Plaintiffs had requested the exhibits already in July, 2002, and the Emmet Email proves that Plaintiffs requested documents relating to the oil spill on Midtown's Property on or before August 21, 2002.

> **d.   As the Court noted in its Final Order, Jericho waited until the last day of the study period to ask Midtown for the exhibits to the Amtrak agreement, and Midtown promptly responded (the next day) that it did not have them:**

By this statement, they committed willful and deliberate fraud on the Court because they knew Jericho requested it already in July, 2002, as they had admitted to Justice Ramos on May 12, 2005.  In addition, they knew that Plaintiffs requested the Exhibits in July and August, 2002, and that in July, 2002 and August, 2002, Midtown and their representatives would provide them. In addition, they knew that Midtown had the exhibits and modification documents in their possession, custody and control.

> **e.   On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak.  The agreement had been included with the contract, but not the exhibits.  Midtown responded that it didn't have the requested exhibits.**

By this statement, they committed willful and deliberate fraud on the Court because they had admitted to Justice Ramos, on May 12, that the Plaintiffs had requested the exhibits already in July.  In addition, knew that Plaintiffs requested the Exhibits in July and August, 2002, and that in

July, 2002 and August, 2002, Midtown and their representatives would provide them. In addition, they knew that Midtown had the exhibits and modification documents in their possession, custody and control.

> **f. Final 'Order at 39. The Midtown letter to which the Court referred stated, in pertinent part, "Midtown does not now (and did not at the commencement of the Contractual 'Study Period') have the Exhibits referred [to] in your letter, so it could not provide those Exhibits to Jericho…**

By this statement, they committed willful and deliberate fraud on the Court because they knew that they did have the Exhibits, and they told Plaintiffs before they entered into the Contract, then again in July and August, 2002 that they would provide them, and they told their brokers in September 2002 and thereafter that they had the documents and would provide them to any prospective purchaser introduced by them.. In addition, they knew that Midtown had the exhibits and modification documents in their possession, custody and control.

> **g. Only *four days* before the study period expired, Jericho asked Midtown to "advise, immediately, if there is any truth to [the] *information*," which Jericho characterized as "scuttlebutt," that "there may-have been an oil spill on the properties which may or may not have been cleaned up" and also to "advise" whether Midtown had ever "received any notice, written or oral about the spill front the City of New York or any agency thereof or-from any third party" about the spill and its disposition…**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs made requests for documents concerning an oil spill on Midtown's Property before entering into the Contract, if any, and again in July and August, 2002; and then when they discovered there was an actual oil spill on Midtown's Property, Plaintiffs requested the documents relating to the actual oil spill on or before August 21, 2002, as evidenced by the Emmet Email.

> **h. At the threshold, Jericho signed a contract in which it expressly agreed that Midtown "has made *no representations and is unwilling to make any representations"* about the property or its condition. …**

They committed willful and deliberate fraud on the Court because they knew that Midtown did make representations when they signed the

108

Contract and they had documents that proved that Midtown made representations when they entered the Contract and concealed the fact that they made representations when they sent the countersigned Contract back, with cover letters that were representations.

 **i. Accordingly, Midtown was not contractually obligated to make the *requested representations* about the oil spill or "advise" Jericho in any manner, let alone "immediately." For this reason alone, the Court did not err in holding that "[t]he assertions in this complaint [including Jericho's allegations about the oil spill] ... do not support Jericho's allegation that Midtown breached the contract." Final Order at 42.**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, and that they were required to provide those documents pursuant to  paragraph 29c) of the Contract and that they had willfully and deliberately breached the Contract by failing to provide those documents.

 **j. Nevertheless, as the Court's Final Order noted, Midtown informed Jericho during the study period {on August 23, 2002} that there had been an oil spill *on* properties neighboring Midtown's sites.**

By this statement, they committed fraud on the Court, because the "Court's Final Order" was the product of their prior fraud on the Court, and they knew that the Court's ruling was the product of their prior fraud and of their fraud in misleading the Court to believe that the oil spill was on a neighboring property (The Javitz Center), and not on Midtown's property, and that they didn't have information because it was on the neighbors property, when in fact the oil spill was on their property and they had hundreds of documents relating to the oil spill, and if the Appellate Division knew that then they would have found that Midtown willfully and deliberately breached the Contract by failing to provide those documents and committed actionable fraud on the Plaintiffs by failing to tell . Had the Court known that the oil spill was on the 90,000 square feet Property, not a neighboring property, and that it was not cleaned up at that time, the Appellate Division would have ruled that Midtown had willfully and deliberately breached the Contract and committed actionable fraud on the Plaintiffs.

**k.  . . . and gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup.  Final Order at 39….**

By this statement, they committed fraud on the Court, because the "Court's Final Order" was the product of their prior fraud on the Court, and they knew that the Court's ruling was the product of their prior fraud and their fraud in stating to the Court that they had provided the name and phone number of the contact person at the NYDEC, and the project and spill numbers, was useless in light of the time constraints placed upon Plaintiffs.  The Appellate Division ruled the way they did on this issue, because they were deceived by the Defendants into believing that the oil spill was on the neighbor's property, and not the Midtown Property, and that they didn't have documents relating to the oil spill on the neighboring property.  Had the Court known that the oil spill was on the 93,000 square feet Property, not a neighboring property, and that it was not cleaned up at that time, the Appellate Division would have ruled that Midtown had willfully and deliberately breached the Contract and committed actionable fraud on the Plaintiffs.

They also knew that they had and must provide the hundreds of critical documents in their possession and control under par. 29c) of the Contract since requested of them on or before August 21, 2002, but instead told Plaintiffs to get them from the NYDEC.  They knew that to get documents from the NYDEC required a FOIL request and that it takes four to six weeks from the time the request is filed to get an appointment and the documents from the NYDEC.  They knew and had documents in their possession which show that a FOIL request had to be filed and that it takes four to six weeks from the time the request is filed to get an appointment and the requested documents from the NYDEC.

**l.  This is a "misreading of Midtown's obligations," as the Court correctly ruled.  Final Order at 43.  The Contract provides that Midtown  was obligated to disclose only those "documents" in its current possession or control that Jericho "reasonably requests," not everything that Jericho might *silently imagine* to be "due diligence" material…**

110

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs made requests for documents concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email, because of paragraph 29c) of the Contract and was a willful and deliberate breach. And those "documents" were in their current possession or control and was a "reasonably requests," by Jericho.   Plaintiffs did not silently imagine documents relating to an oil spill on the property, nothing is more critical due diligence than the oil spill

> **m. Third, even if Jericho's request concerning the oil spill night be considered a "reasonabl[e] request[]" for "documents" (and it was not), Jericho was asking Midtown to "advise" about "any notice" to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.123)** *There is no such document*, **because, as discovery showed, Midtown has never received any notice from the City, State, any City or State agency, or any "third party" about the oil spill….**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that the Plaintiffs made requests for actual documents, not for "advice" and not for "any notice", and concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email, because of paragraph 29c) of the Contract and that they willfully and deliberately breached the Contract by not providing them.

> **n. The Court similarly and accurately ruled that "Jericho made requests for documents on the eve of the expiration period which could have been made much earlier.". Final Order at 45-46. As noted, Jericho did not ask Midtown for the exhibits to the Amtrak agreement until the day before the study period expired, and it first raised the issue of the oil spill only four days before the study period expired. (R.119, 8.123)**

By this statement, they committed willful and deliberate fraud on the Court, because they knew that they had admitted to Justice Ramos that Plaintiffs requested the exhibits already in July, and document relating to the oil spill on Midtown's Property, on or before August 21, 2002.

> **o. The documents in the record on appeal thus refute Jericho's conclusory allegations that information about the oil spill**

and the exhibits to the Amtrak agreement were "*absolutely crucial*" or "*materially relevant*" to Jericho (R.37, Comp1.1 5), and therefore support the court's order dismissing the complaint… ("dismissal of the complaint was warranted" where "Plaintiffs allegations in this action for . . . specific performance of contracts for the sale of real property" *were* "refuted by the Documentary Evidence")

By this statement, they committed willful and deliberate fraud on the Court, because they knew that they had admitted to Justice Ramos that Plaintiffs requested the exhibits already in July, and document relating to the oil spill on Midtown's Property, on or before August 21, 2002 and that they were critical documents and they had promised to provide them.

p. As Midtown argued in its briefs on appeal—and the Court agreed—this limitation-of-liability provision is directly applicable here. Midtown could not "convey title in accordance with the terms of this contract" because Jericho cancelled the contract before the title was to be conveyed at the closing. *See also* Final Order at 46"

By this statement, they committed willful and deliberate fraud on the Court because they knew that Jericho never elected and never cancelled the contract.

400. The Geremia Affirmation underscores the fraud on the Court herein complained of, and memorializes that the fraud successfully resulted in the product of the scheme.

### The Trial Court Vacated the Judgment of Dismissal to Avoid being a Party to Midtown, Jones Day, Sherman and Geremia's Fraud on the Court

401. The Law Firm of Herzfeld and Rubin filed a motion seeking to vacate the fraudulently obtained reversal order in the 2004 Action, based upon documents obtained through discovery from Midtown and their Attorneys Sherman and Geremia, on or before December 15, 2005, and for leave to file an Amended Complaint.

402. In support of their motion, Herzfeld and Rubin claimed that the documents obtained in discovery proved that Midtown, its representatives and Attorneys committed

fraud on the Court when they claimed that the Plaintiffs had elected to cancel the Contract, that the Contract was canceled, that the cancellation of the Contract was valid, and that Midtown had not willfully and deliberately breached the Contract

403. These documents proved that Midtown, its representatives and Attorneys, committed fraud in the January 2005 Motion to Dismiss, Memorandum of Law and Affirmation in Support, and in their Appeal Briefs, and that Goebel and Midtown's Attorneys willfully and deliberately withheld these documents from Plaintiffs and the Court and allowed Midtown to argue and the Court to issue its Order, as if these issues were not in contention, that the oil spill was not on the Midtown Property, and that Midtown had not willfully and deliberately breached the Contract.

404. Based upon the documents obtained during discovery in the 2004 Action, and the arguments made by Herzfeld and Rubin thereon, Justice Ramos recognized and spelled out the frauds Midtown committed on Plaintiffs and the Court, and relating the oil spill, in his Order of February 2, 2007, as follows:

> a) "These documents completely and totally contradict Midtown's statement to Jericho in its September 3, 2002 letter signed by Edward G. Imperatore Esq., that `Midtown has no information with respect to whether or not an oil spill from adjacent properties onto the site was cleaned up'" (p. 7 of February 20, 2007 decision).

> b) The Trial Court further noted in its Decision that in 2002, in response to Jericho's question whether an environmental study had been performed, Midtown stated that "no Phase I environmental study" had been performed and that "Midtown has performed no environmental studies". During discovery which took place during the pendency of the prior appeal, however, Midtown produced documents to Jericho which showed that had performed such a study and that Midtown knew about it. In fact, Midtown produced photographs of the oil spill it had taken in 1998. Said the lower Court, "Clearly, Midtown had some information

113

about the spill when in 2002 it stated to Jericho it had none"

405.    Despite his affirmative finding that Midtown committed fraud on the Court and on the Plaintiffs, and that Midtown had willfully and deliberately breached the Contract, Justice Ramos expressed concern that his hands were tied because "[the trial] Court cannot reverse the Appellate Division's dismissal of the complaint".

406.    Justice Ramos denied Herzfeld and Rubin's motion to amend the Complaint, ruling that there was no complaint to amend because it had been dismissed by the Appellate Division.

407.    The Trial Court went on to state, however, that it would vacate its own Judgment of dismissal, which had been issued by the Clerk of the Court in accordance with the August 17, 2006 reversal order, because, as Justice Ramos put it, "[the trial] court will not be a party to [Midtown and its representatives'] fraud on the Court".

408.    Left with no case then before him, but opining as to the merits of the Plaintiffs' claims, Justice Ramos encouraged Plaintiffs to file a new action based upon the allegations Herzfeld & Rubin made in its proposed Amended Complaint.

409.    On or about February 22, 2007 the Law Firm of Herzfeld and Rubin filed a second action in the Supreme Court, New York County, on Plaintiff's behalf, entitled Jericho Group LTD –against- Midtown Development, L.P., bearing index number 600566/2007. (the "2007 Action")

**The Fraudulent Attempt to Remove the 2007 Action to Federal Court**

410.    Facing the likelihood that they would be back in front of a trial court judge, who had already seen through their deception, Midtown and its representatives, Jones Day, Sherman, Geremia joined in the 2007 Action by Philips Nizer and Berger,

sought removal of the 2007 Action to the United States District Court, claiming complete diversity, when no such Federal jurisdiction existed.

411.    In support of the Notice of Removal to Federal Court, and in a thinly veiled but apparent effort to manufacture diversity jurisdiction where no such jurisdiction in fact existed, Midtown and its representatives, Jones Day, Sherman, Geremia Philips Nizer and Berger, represented to the Southern District Court that Midtown only had two General Partners and only one Limited Partner, whereby Midtown and its representatives, Jones Day, Sherman, Geremia Philips Nizer and Berger, knowingly committed fraud on the Court United States District Court.

412.    In truth and fact, and as Plaintiffs proved, Midtownhad more than thirty partners at the time, and complete diversity was lacking.

413.    Midtown's Notice of Removal was fraught with willful and deliberate fraud, as they have done to Justice Ramos and the Appellate Division in this case from inception to 2010 and now again in 2014, and even to this Court.

414.    The prayer for removal was ultimately denied, because the Defendants were caught lying about the identity and domicile of Midtown's owners.

415.    Attorney Charles Crum, of Herzfeld and Rubin, provided an Affirmation, where he affirmed under penalty of perjury, that during a conference call held before the issuance of her order remanding the case to State Court, USDCJ McMahon stated;

> At Judge Coleen McMahon's request, I participated in a conference call with her and George Berger on January 17, 2008, concerning Jericho Group, Ltd. V. Mid-Town Development, L.P., Index No. 07-CV-1792 (CM), the action Midtown removed to the United States District Court for the Southern District of New York.  The Judge said that she was going to enter an order remanding the case before her to the State Court for lack of diversity.  Judge Mcmahon also said she was considering holding a hearing to determine if Midtown had

misrepresented the facts on which Midtown's removal was based in order to escape the State Court, although she had not decided whether to do so.  She said it was "most unlike" the Jones Day and Philips Nizer firms to remove the case given the facts, and that it was incomprehensible that they did not know the facts when they removed the case.

Mr. Berger asked if the Judge wanted him to hear his explanation.  She said no.

416.    In a later decision, USDCJ McMahon went on to state,

[f]rankly, I doubt very much that defendant Edward Imperatore was unaware, when the Notice of Removal was filed by Jones Day, that Midtown's ownership structure had changed back in 1987.  And if Mr. Imperatore was aware of the real ownership structure, [Philips Nizer] was aware of it, because Mr. Imperatore is (according to the firm's website) the managing partner of Philips Nizer's New Jersey office.  A partnership is charged with the knowledge of all of its partners.

417.    Midtown's failed attempt to remove the case was not, however, without gainful purpose.

**The Dismissal Judgment was Reinstated Through Fraudulent Pretense**

418.    The Defendants efforts to fabricate federal jurisdiction impeded any substantive progress of the 2007 Action.

419.    During the delay, and following Justice Ramos' February 2, 2007 finding that there was fraud on the Court, fraud on Plaintiffs and that the Contract had been willfully and deliberately breached by the Midtown Defendants, there was a hearing before Justice Ramos on April 11, 2007, at which time the following transpired:

420.

> **MR. BERGER: That was the deal at the beginning, There is no question they knew that our client's position was that the spill was on somebody else's property and the state was taking care of it with that other person. That was never an issue in the case…**

By this statement, Berger committed willful and deliberate fraud on the Court, because he knew that the oil spill was on Midtown's Property, he knew that they didn't tell Plaintiffs, before the Contract, that there was any oil spill in fact they represented that there was no oil spill and in fact that the main issue of the case was that Plaintiffs discovered on or before August 21, 2002 that there was a massive oil spill on Midtown's property, that Plaintiffs requested the critical documents relating to the actual oil spill on Midtown's Property on or before August 21, 2002, as reflected in the Emmet Email, and that Midtown admitted for the first time on or about August 22, 2002 that indeed they defrauded Plaintiffs and that there was a massive oil spill on Midtown's Property and even in August 2002 they never told Plaintiffs that the State was taking care of it.

**MR. BERGER: There was no question that everybody knew from the outset that the remediation was on the adjoining property. There is no question about that….**

By this statement, Berger committed willful and deliberate fraud on the Court, because he knew that the remediation was on Midtown's Property, he knew that Plaintiffs didn't know about any remediation until August 21, 2002, and in fact, Imperatore in his response Email of August 23, 2002, admitted that the remediation was on Midtown's property but it was not fully remediated and they still refused to provide those critical documents and refused to even tell Plaintiffs that the State was taking care of it at no cost to Midtown or to Plaintiffs.

**MR. BERGER: The only reason the plaintiffs didn't buy the property, with all due respect, is because they didn't have a penny….**

By this statement, Berger committed willful and deliberate fraud on the Court.  Berger knew that the reason Plaintiffs didn't buy the property was because Midtown refused to provide the critical requested documents relating to the oil spill on Midtown's Property and because Midtown falsely claimed that the plaintiffs cancelled the Contract through the bogus September 12, 2002 Letter.

421.    In so doing, Defendant Berger, accompanied by Sherman and Geremia,

now represented i) that Midtown had told the Plaintiffs, before entering the Contract, that

oil spill was only on a neighboring property; ii) that the State is taking care of it with the

other person; iii) that there was no remediation on Midtown's Property; iv) that the

documents received by Plaintiffs during discovery had nothing to do with Midtown's

Property; v) and that Plaintiffs elected to cancel the Contract because they didn't have the money necessary to close.

422.    In so doing, Defendants Berger and Philips Nizer, accompanied by Sherman, Geremia and Jones Day, committed a major fraud on Justice Ramos, convincing him through their fraud that he made a mistake in his February 2, 2007 findings that there was fraud on the Court, fraud on the Plaintiffs and that Defendants willfully and deliberately breached the Contract, by misrepresenting to Justice Ramos that the oil spill was on a neighboring property, not Midtown's Property, that the documents related to an oil spill on a neighboring property, and not Midtown's Property, that the documents discovered didn't have anything to do with Midtown's Property, that Midtown did not have to provide the documents to Plaintiffs and, therefore, Midtown did not commit fraud on the Court.

423.    Not only were the foregoing false and misleading statements made to the Court, but given the existence and their possession of the Emmett Email, what Berger, accompanied by Sherman and Geremia were then representing to the Court, known by them to be false when they made such statements.

424.    A transcript of the foregoing exchange, containing the false representations made by Berger, accompanied by Sherman and Geremia, was also submitted to the Appellate Division as part of the record on appeal and also as an exhibit to the Midtown Defendants' opposition to Plaintiffs' motion to extend and strike on April 12, 2007.

425.    When the Appellate Division received the transcript containing the false representations made by Berger, accompanied by Sherman and Geremia, they affirmed

their erroneous prior statement from their ruling on August 17, 2006, that "**By e-mail dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase**."

426.   The foregoing statements to the Court were false and misleading, and known by Philips Nizer, Berger, Jones Day, Sherman and Geremia to be false when they made such statements.

427.   On their appeal of Justice Ramos' vacatur of the Judgment of Dismissal, Midtown and their representatives, Philips Nizer and Berger, filed an Appeal Brief dated March 23, 2007, (also 7/15/08 to the Court of Appeals and others) which also contained false and misleading representations, including but not limited to Berger's false representations that the oil spill was not on Midtown's Property, that the remediation was not on Midtown's property and the documents discovered in 2005 had nothing to do with Midtown's property.

428.   The Midtown Appeal Brief filed by Berger, Philips Nizer, Jones Day, Sherman and Geremia, dated March 23, 2007, (also 7/15/08 to the Court of Appeals and others) also contained the foregoing false representations relating to the oil spill, and other misrepresentations and omissions to the Court, including but not limited to:

> a.  **Re: oil spill.  As to documents concerning the oil spill, both Jericho and the lower court fixate on how Midtown purportedly committed a "fraud" by failing to disclose that there had been an oil spill on adjacent land, and all documents concerning it.**
>
> Midtown committed "fraud" by failing to disclose that there had been an oil spill on Midtown's Property, and refused to provide the Critical documents requested on and before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate

Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**b. The contract did not, however, impose an open-ended obligation on Midtown to disclose all environmental conditions or all documents that might conceivably pertain to the property…**

Midtown made a representation when they sent the executed contract, that there was no oil spill on their property. Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since requested on or before August 21, 2002. This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**c. The Contract provided that Midtown was to disclose only those "documents" in its current possession or control that Jericho "reasonably requests."…**

Plaintiffs had reasonably requested these documents and they were within Midtown's "current possession or control" This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**d. The lower court stated that Midtown "failed" to comply with its obligation to "disclose documents in its custody or control that Jericho requests," but curiously never mentioned Jericho's actual request.**

The Court referred to the Plaintiffs' request of August 13, 2002 letter. This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

**e. Only four days before the Study Period expired, Jericho asked Midtown to "advise, immediately, if there is any truth to [the] information," which Jericho characterized as "scuttlebutt," that "there may have been an oil spill on the properties which may or may not have been cleaned up and also to "advise" whether Midtown had ever `received any notice, written or oral, from the City of New York or any agency thereof, or from any third party" about the spill and its disposition.**

120

By this statement, Berger committed willful and deliberate fraud on the Court, because he knew that the Plaintiffs made requests for "documents" concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

      **f.**  **Midtown's response to this request cannot, as a matter of law, cannot be deemed a breach of the contract. First Jericho expressly agreed in the contract that Midtown "has *made no representations (and] is unwilling to make any representations"* about the property or its condition. (R.106 ¶38 (emphasis added);…**

Plaintiffs requested documents and not representations. (see Emmet Email)  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

      **g.**  **Accordingly, Midtown was not contractually obligated to "advise" Jericho in any manner, let alone "immediately."**

Midtown made representations when they sent the executed contract, that there was no oil spill on their property.  Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since requested on or before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

      **h.**  **No matter what new facts Jericho claims it uncovered regarding the oil spill, Jericho cannot avoid that, under the plain language of the contract, Midtown was not required to make the requested representations about the oil spill…**

Midtown made representations when they sent the executed contract, that there was no oil spill on their property.  Midtown was also required to provide the documents, in accordance with paragraph 29c) of the contract, since Plaintiffs requested actual documents and not representations, on or before August 21, 2002.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **i.  Second, even if Jericho's request concerning the oil spill might be considered a "reasonabl[e] request[]" for "documents" (and it was not), Jericho was asking Midtown about *"any notice"* to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.101-02 ¶29(c); R.547).** *There is no such document,* **because, as discovery showed, Midtown has never received any notice from the City, State, any City or State agency, or any "third party" about the oil spill,…**

On or before August 21, 2002, Plaintiffs requested actual documents relating to the oil spill on Midtown's Property, and not "representations", "advice" or "any notice". (see Emmet Email)

    **j.  Indeed, in its entire bulky submission on its motion to vacate, Jericho could not point to a *single document* about the oil spill that, according to it, Midtown should have disclosed in response to Jericho's request that Midtown "advise" Jericho about a "notice" to Midtown.**

Berger himself finally but reluctantly admitted to the Court of Appeals, in his filing of April 1, 2010, that the oil spill was on Midtowns Property and that the documents show that it was on Midtowns Property. Plaintiffs requested documents (not for advice or notices) on and before August 21, 2002, which requests are well documented in the submission. This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **k.  Nor was Jericho's principal able to identify such a document at his deposition, even after he used the very information that Midtown provided to him to obtain documents concerning the spill from the DEC.**

Plaintiffs were able to identify such documents.

    **l.  Fourth, even assuming that Midtown was required to make representations and Jericho was entitled to rely on them, Midtown's conduct cannot be characterized as "willful or deliberate,"…**

Midtown's conduct was willful and deliberate and documentary evidence proves that Midtown's conduct was a willful and deliberate breach of the Contract.

    **m. Midtown also promptly responded to each of Jericho's inquiries during the Study Period, even after it became apparent that Jericho did not have a genuine interest in information regarding the property but was only seeking to protract the Study Period after the parties could not come to terms on an extension…**

Midtown did not provide the critical exhibits and documents relating to the Amtrak Agreement, requested since July, and didn't provide the critical documents relating to the oil spill, requested on and before August 21, 2003.  At no time did Plaintiffs not have a genuine interest in information regarding the property.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **n. Thus, as this Court noted in its opinion, "the record is plain that Midtown provided Jericho with information in its possession, and that-it alerted Jericho as to additional sources of information as to the .... alleged oil spill.**

The referenced language from the Court opinion was a product of Defendants' prior fraud on the Court.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **o. Although Jericho now contends that Midtown did not disclose every scrap of information Jericho had requested in its flurry of eleventh-hour letters, Midtown's conduct in promptly responding to Jericho's inquiry about the oil spill, disclosing that there had been a spill on adjacent properties, and giving Jericho detailed instructions on how to obtain current information about it directly from the DEC, cannot be deemed "willful or deliberate" in the circumstances of this case…**

Plaintiffs' requests were not on the "Eleventh Hour" and were not concerning the adjacent property.  Berger also knew that it takes four to six weeks to get the documents from the NYDEC.  This was also part of Berger's fraud, in that he was continuing to represent to the Appellate Division that the oil spill was not on Midtown's Property and the documents had nothing to do with Midtown's Property.

    **p. Finally, Jericho's conduct in waiting until four days before the Study Period expired to inquire about, the oil spill refutes its**

> **conclusory complaint allegation that information about the oil spill was "materially relevant" to Jericho…**

Plaintiffs made requests for "documents" concerning the actual oil spill on Midtown's Property, when they learned of it on or before August 21, 2002, as evidenced by the Emmet Email.

> **q. The lower court took it on faith that Jericho had no notice of what it now calls a "massive" oil spill until four days before the Study Period expired. "Jericho could not have inquired earlier as it had no notice of the oil spill prior to four days before [the end, of the Study Period]." The record contradicts that assumption... But even if Jericho's principal were being truthful, the lower court might have trained its lens on Jericho for just a moment before vacating a judgment and asked why Jericho waited for *more than 70 days after* signing the contract to *make any* inquiry concerning the environmental condition of a property it had agreed to purchase for $28 million." …**

Because Plaintiffs requested, before entering into the Contract, if there were any environment problems or oil spill and they represented before entering into the Contract and upon execution of the Contract, that there was no oil spill or environmental problems on their property, and that they will provide a phase-1 showing it is clean and only discovered on or before August 21 that they lied and there was a massive oil spill on the property.

> **r. Re: Amtrak exhibits and documents "The Copy Of The Amtrak Agreement Attached To The Contract Was A "True Copy"**

The Amtrak Agreement was not a complete and therefore not a "true copy".

> **s. As noted, Midtown did not breach the contract or commit a fraud by "failing to disclose" that the Amtrak exhibits do not exist. There is no evidence that they do, and so the contract accurately states that the copy of the Amtrak agreement attached to it, which did not include the exhibits, was a "true copy."**

The Amtrak Agreement states, and the signatories, including National Railroad, and Defendants, Arthur Imperator, Edward Ross, and other partners of Midtown, affirmed, that the Amtrak Exhibits exist and were part of the agreement.  In addition, Amtrak, Imperatore and Ross, have stated in their responses since July 2002 that the exhibits existed and their

attorney Sherman represented to Justice Ramos on 5/12/05 that the Exhibits existed, and based upon this admission, Judge Ramos made a finding that the exhibits existed and were in their possession.

   **t.   Also, when Jericho asked Midtown for the exhibits on the day before the Study Period expired, Midtown truthfully stated it did not have them.**

Sherman admitted to Justice Ramos on May 12, 2005, that Plaintiffs requested the exhibits already, in July 2002.

429.   The Appellate Division relied on the misrepresentations of Defendants, including but not limited to Berger's false representations that the oil spill was not on Midtown's Property, that the remediation was not on Midtown's property, that the documents discovered had nothing to do with Midtown's property, and that Plaintiffs only requested the documents, for the first time, on August 30, 2002.

430.   As a direct result of the foregoing misrepresentations and omissions of material fact, by decision and order dated January 16, 2008, the Appellate Division reversed Justice Ramos' order and findings of February 2, 2007.

431.   The Appellate Division reversed Justice Ramos' vacatur of the judgment of dismissal, and would have acted differently in their ruling of January 16, 2008, had they known of the falsity of the Defendants statements and of their misleading ommissions.

432.   As a direct, proximate and foreseeable result of the foregoing misrepresentations and omissions of material fact, the Appellate Division reversed Justice Ramos' findings of February 2, 2007 (that there was fraud on the Court, Fraud on Plaintiffs and that the Contract had been willfully and deliberately breached by the Midtown Defendants), and found instead just the opposite, that there was no fraud on the

Court, no Fraud on Plaintiffs and that the Contract had not been willfully and deliberately breached by Midtown.

433.    The statements made to the Appellate Division, in their March 23, 2007 submission to the Court were false and misleading, and known by Midtown, Philips Nizer,  Berger, Jones Day, Sherman and Geremis to be false when they made such statements.

434.    As a result, the Appellate Division reinstated the judgment of dismissal that had been vacated by Justice Ramos.

435.    The reinstatement was a product of fraud.

436.    Midtown and its representative's subsequent reliance upon the dismissal judgment they know to have been the product of fraud was, in and of itself, a separate and distinct fraud upon the Court, in each and every such instance.

**The Defendants Used the Fraudulently Obtained Dismissal Judgment in Defense of the 2007 Action**

437.    Arguing in support of a motion to amend their Summary Judgment motion in the 2007 Action, Midtown and its representatives, Imperatore and Stone, through their Attorneys, Jones Day, Sherman and Geremia, argued extensively against Plaintiffs' meritorious claims, in reliance upon the fraudulently obtained and flawed Appellate Division ruling of August 17, 2006, falsely stating that Plaintiffs' claims that they are entitled to specific performance because any alleged cancellation of the Contract had been on account Midtown's willful and deliberate breach, and because there had not been any valid cancellation of the Contract, in any event, were barred by the judgment dismissing the 2004 Action.

438.   Called upon to review the Plaintiffs' claims raised for the first time in the 2007 Action, however, and by decision and order dated November 5, 2008, the Appellate Division, First Department ruled:

> "…with respect to plaintiff's claims that it is entitled to specific performance because it cancelled the contract as a result of defendants' alleged willful and deliberate misconduct and because its attorney did not have the authority to cancel the contract, those claims are barred under the doctrine of res judicata <u>because they could have been raised in the prior action</u>. *(emphasis added)*

439.   The Appellate Division thereby undermined Midtown and its Attorneys, Jones Day, Sherman and Geremia's contention that the Appellate Division ruling of August 17, 2006, concerned or otherwise barred Plaintiffs' meritorious claims, in any way.

440.   The claims raised in the 2007 Action, for the first time, were not dismissed on the merits, but the Appellate Division dismissed the claims "because they could have been raised in the prior action".

441.   Plaintiffs did not raise the claims identified by the Appellate Division in its November 5, 2009 Order, in the prior 2004 Action, because their attorney, Goebel, failed and refused to do so.

442.   Goebel, failed and refused to raise the claims identified by the Appellate Division in its November 5, 2009 Order, in the 2004 Action, as part of his illicit agreement to act in collusion with Midtown and its representatives in furtherance of the conspiracy herein complained of.

443.   Their fraud in claiming that the August 17, 2006 ruling was a dismissal of the Plaintiffs' claims, which is the very same scheme employed yet again in this action, is

directly controverted by the November 5, 2009 Appellate Division ruling that the meritorious claims had never been raised before.

### Plaintiffs' Meritorious Claims Were Subverted - as Part of the Defendants' Racketeering Scheme to Defraud

444.    Goebel was specifically hired and agreed to argue those claims ultimately raised by subsequent attorneys in the 2007 Action; *to wit:* that the Plaintiffs had not cancelled the Contract; that Szegda was not authorized to cancel the Contract and that Midtown knew that Szegda was not authorized to cancel the Contract; that Midtown willfully and deliberately breached the Contract; that documentary evidence proves that Plaintiffs did not cancel the Contract; that documentary evidence proves that Midtown knew Plaintiffs did not cancel the Contract; that Midtown willfully and deliberately breached the Contract; that documentary evidence proves that that Midtown willfully and deliberately breached the Contract and that documentary evidence proves that Plaintiffs had been in contact with Midtown during the two years before the Prior Litigation was commenced, throughout which time Plaintiffs were stressing that they had not cancelled the Contract and that the Plaintiffs were requesting, throughout that time, that Midtown and its representatives proceed with the Contract and closing; and that Midtown and their representatives claimed that the September 12, 2002 letter is evidence that Plaintiffs cancelled the Contract but had no explanation how Szegda's letter of September 12, 2002 met the specific terms and condition of the Contract, regarding who, how and when Plaintiffs could cancel the Contract, as they themselves acknowledge in their letter of September 5, 2002, in addition to the threats of Midtown to Plaintiffs during that time not to dare sue Midtown or claim that the Contract is still in effect. (the "Plaintiffs' Meritorious Claims")

445.    It was a condition of his retention, and he promised to raise the claims throughout the 18 months he represented Plaintiffs in the prior litigation, but he never did.

446.    Goebel was provided with documentary and recorded audio evidence, along with Plaintiffs' memos containing a recitation of the pertinent facts and detailing Plaintiffs' theory of the case, and Goebel agreed to undertake his representation of Plaintiffs and to put forth Plaintiffs' Meritorious Claims.

447.    Goebel's purported representation of Plaintiffs was an instrument of the conspiracy with Szegda, Midtown and Midtown's representatives, including Imperatore and Stone, to steal the Contract from Plaintiffs, and to thereby deprive Plaintiffs of their interest in and to the Property.

448.    Acting without Plaintiffs' knowledge or consent, Goebel misrepresented to the Court the opposite of that for which he was specifically retained, (to set forth Plaintiffs' claim that the Contract had not been cancelled), but Goebel claimed instead that "Jericho cancelled the Contract" and otherwise failed to support Plaintiffs' Meritorious Claims by failing to refute the contentions Midtown and its representatives put forth throughout the Prior Litigation.

449.    In furtherance of the racketeering scheme herein complained of, Goebel mislead Plaintiffs by having them sign documents and pleadings and even displayed documents signed by Goebel, himself, which set forth the rightful claim that Plaintiffs had not cancelled the Contract and that Szegda was not authorized to cancel the Contract.

450.    Goebel then forged these documents and pleadings, and even changed the body of affidavits after the affidavits had already been executed by Plaintiffs, to falsely represent to the Court that the Plaintiffs had canceled the Contract.

451.    It wasn't until July 26, 2006, that Plaintiffs discovered, and for the first time, that Goebel made representations to the Court to the effect that Plaintiffs had cancelled the Contract.

452.    Upon their discovery that Goebel had claimed in the litigation process that "Jericho had cancelled the Contract", Plaintiffs confronted Goebel as to why and how he could put forth such claim.

453.    Goebel represented to Plaintiffs that when he claimed in Court and put forth in papers filed in Court, that "Jericho cancelled the Contract", it was meant and understood to mean that "Szegda and not Jericho had cancelled the Contract".

454.    Plaintiffs' requests during the Prior Litigation, that Goebel file with the Court a clarification of what he meant by the phrase "Jericho cancelled the Contract", and to amend the Amended Complaint to allege truthfully "that Jericho had not cancelled the Contract and the Contract was not cancelled" plus Plaintiffs' other Meritorious Claims as spelled out in the 2007 Action, were met with repeated promises and ongoing assurances that he would clarify Plaintiffs' position, and amend the Amended Complaint accordingly, but he never did.

455.    Upon information and belief, Plaintiffs' former litigation attorney, Goebel, acted in collusion with Midtown, its representatives and others, and against the interest of the Plaintiffs, throughout the Prior Litigation, and thereafter.

456.    In May 2013, Plaintiffs' former litigation attorney, Goebel, admitted to Plaintiffs, that he had acted in collusion with Midtown, its representatives and others, and against the interest of the Plaintiffs, throughout the Prior Litigation, and thereafter.

457.    Goebel admitted to Plaintiffs, in May 2013, that he withheld critical documents from Plaintiffs, from Plaintiffs subsequent attorneys and from the Court.

458.    Goebel admitted to Plaintiffs, in May 2013, that his entire representation of them, throughout the Prior Litigation and thereafter, was indelibly tainted and wholly the product of his collusion with Midtown, its representatives and others.

459.    Upon information and belief, Goebel's misrepresentations to the court, that Plaintiffs cancelled the Contract was the product of a pre-conceived arrangement with Midtown and its representatives.

460.    Goebel admitted to Plaintiffs, in May 2013, that his misrepresentation to the court, that Plaintiffs cancelled the Contract was the product of a pre-conceived arrangement with Midtown and its representatives.

461.    In or about May 2013, Plaintiffs' former litigation attorney, Goebel, admitted to Plaintiffs that he willfully and deliberately lied to the Court, during the Prior Litigation, when he repeatedly represented that "Jericho cancelled the Contract", despite his knowledge of the falsity of such statement.

462.    In or about May 2013, Plaintiffs' former litigation attorney, Goebel, admitted to Plaintiffs, that he had entered into an illicit agreement with Szegda, Midtown and its representatives, whereby he would act in contravention of Plaintiffs' claims, and in furtherance of the conspiracy herein complained of.

463.    Upon information and belief, Plaintiffs' former litigation attorney, Goebel, entered into an illicit agreement with Szegda, Midtown and its representatives, whereby he would act in contravention of Plaintiffs' claims, in furtherance of the conspiracy herein complained of.

464.    The false representations and omissions of Goebel, to the Court, included, without limitation, that:

(a)    When he filed the complaint dated September 2, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that Plaintiffs had cancelled the Contract;

(b)    When he filed the complaint dated September 2, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that the complaint had been approved and verified by Plaintiffs,

(c)    When he filed the amended complaint dated November 29, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that Plaintiffs had cancelled the Contract;

(d)    When he filed the amended complaint dated November 29, 2004, purportedly on behalf of Plaintiffs, he falsely represented to the Court that that the amended complaint had been approved and verified by Plaintiffs;

(e)    When he filed the memorandum of law dated February 23, 2005, purportedly on behalf of Plaintiffs, he falsely represented to the Court that the Plaintiffs had cancelled the Contract;

(f)    When he failed to correct Marrasse as he represented in open Court, to Justice Ramos on May 12, that Plaintiffs had cancelled the Contract;

(g)    When he failed to amend the complaint or put any motion into the Court, showing that documentary evidence proved that "Jericho" did not cancel the Contract

(h)    He failed to introduce the Plaintiffs' letters from 9/18/2002 through 2/16/04, to prove that Plaintiffs remained in contact with the Midtown Defendants for the two years preceding the commencement of the lawsuit, seeking to close the transaction, or to otherwise introduce these letters to refute the Midtown Defendants' representations that Plaintiffs did nothing during those two years;

(i)    He failed to introduce copies of the Amtrak Agreement, the NYDEC documents from September 24, 2002, the documents and correspondence

exchanged between Plaintiffs and Defendants from inception through the signing of the Contract;

(j)      .

He failed to introduce documents received during discovery in 2005, to the Trial Court and the Appellate Division, to prove that the oil spill was on Midtown's Property and to prove that Midtown did indeed have documents in their possession relating to the actual oil spill on Midtown's Property, and that Midtown had committed actionable fraud on Plaintiffs ,Midtown willfuly and deliberately breached the Contract and committed fraud on the Court;

(k)      When he did not claim or argue that Plaintiff's had requested the oil spill documents and Amtrak exhibits much earlier than the Midtown Defendants claimed, and when he did not amend the Amended Complaint to claim or argue that Plaintiff's had requested the oil spill documents and the Amtrak exhibits much earlier than the Midtown Defendants claimed and failed to refute the Defendants clams that the documents weren't requested until August 30, 2002 and September 2, 2002;

(l)      When he filed the affirmation of Samuel Pfeiffer, dated February 27, 2005, he falsely represented to the Court that the Plaintiffs had cancelled the Contract;

(m)      When he filed the affidavit of Samuel Pfeiffer, dated February 27, 2005, he falsely represented to the Court that the affidavit had been approved and sworn to by Plaintiffs;

(n)      When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court in the Imperatore Affirmation of January 6, 2005; the Midtown Defendants' Memorandum of Law dated January 6, 2005; the oral argument before Justice Ramos on May 12, 2005; the Notice of Appeal and Pre-Argument Statement of July 5, 2005; the Midtown Defendants' Appeal Brief dated November 7, 2005 and the Midtown Defendants' Reply Brief of December 15, 2005;

(o)      When he intentionally and knowingly failed to controvert the arguments made by the Defendants in their Appellate Briefs, and to point out to the Court and correct the record with the admissions made by the Defendants in their argument before Justice Ramos on May 12, 2005;

(p)      When he intentionally and knowingly allowed the Midtown Defendants to interpose their Motion for Summary Judgment, containing contradictory statements and arguments from that presented by the Defendants in the Motion to Dismiss and in the Defendants Appeal Briefs, but failed to point out these contradictions and admissions to correct the record before the Court;

(q)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs had cancelled the Contract;

(r)     When he intentionally and knowingly withheld documents and deposition testimony obtained during discovery, and withheld documents provided by the Plaintiffs, which would have refuted the Defendants contentions;

(s)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs didn't ask for documents regarding the oil spill on the Midtown Property until August 30, 2002;

(t)     When he intentionally and knowingly failed to refute, despite his knowledge of their falsity, the false statements of fact submitted to the Court by the Midtown Defendants, that the Plaintiffs didn't ask for documents regarding the Amtrak Agreement until September 2, 2002;

465.    The foregoing were part of the Scheme to Defraud Plaintiffs, by acting in collusion with the other RICO Defendants, and also resulted in the fraud on the Court herein complained of.

466.    Based upon Goebel's misplaced loyalty, and as a result of his outright deception against his purported clients, Plaintiffs were not represented in the Prior Litigation, and the Plaintiffs never had any case previously before the Court.

467.    From the day he signed the retainer agreement with Plaintiffs, Goebel was acting instead to protect the conspiracy and racketeering activity of Szegda, Midtown and Midtown's representatives, including Imperatore and Stone.

468.    As a direct result of Goebel's collusion with the very people Plaintiffs hired him to sue, the Plaintiffs never had any case, before any Court, because the courtroom doors slammed shut on Plaintiffs, as soon as Goebel falsely represented to them that he would represent their interests, and then to the Court, that his purported clients had cancelled the Contract.

**Midtown's Attorneys Had a Duty of Candor to the Court and were Otherwise
Complicit in the Scheme to Steal the Midtown Property**

469.    Midtown's Attorney representatives, throughout the prior litigation and indeed to date, had and continue to have a duty of candor to the Court.

470.    Midtown's Attorney representatives, Frederick Sherman ("Sherman"), Todd Geremia ("Geremia"), Jones Day, George Berger ("Berger"), Jeffery Shore ("Shore") and Philips Nizer repeatedly breached their duty of candor, however, in that they have willfully and knowingly offered false evidence and suborned perjury in furtherance of the conspiratorial scheme to steal the Midtown Property from the Plaintiffs.  Midtown's Attorney representatives, Sherman, Geremia, Jones Day, Berger, Shore and Philips Nizer thereby became complicit in the conspiracy and wrongful conduct herein complained of.

471.    Midtown and its Attorney representatives also misrepresented to the Court that Plaintiffs cancelled the Contract.

472.    Midtown and its Attorney representatives misrepresented to the Court that Midtown did not willfully and deliberately breach the Contract.

473.    Midtown and its Attorney representatives misrepresented to the Court that Midtown made no representation when they signed the Contract.

474.    Midtown and its Attorney representatives misrepresented to the Court that the first time the Plaintiffs requested any information or documents relating to an oil spill was on August 30, 2002, only after they gave notice on August 29, 2002 that the due diligence period would expire on September 3, 2002 and would not be extended and that the September 18, 2002 closing would also not be extended.

475.    Midtown and its Attorney representatives misrepresented to the Court that the first time the Plaintiffs requested the exhibits to the Amtrak Agreement was on September 2, 2002, only after they gave notice on August 29, 2002 that the due diligence period would expire on September 3, 2002 and would not be extended and that the September 18, 2002 closing would also not be extended.

476.    Midtown and its Attorney representatives misrepresented to the Court that Midtown provided any documents requested before August 29, 2002..

477.    Midtown and its Attorney representatives misrepresented to the Court that the reason they did not give any documents after August 30, 2002, was because they did not have any documents.

478.    Based upon the foregoing false factual assertions, Midtown and its Attorney representatives misrepresented that Plaintiffs really didn't want the documents requested, but were instead using the requests as a pretext for an eleventh hour extension of the due diligence period and the closing.

479.    Based upon the foregoing false factual assertions, Midtown and its representatives misrepresented that Plaintiffs' requests were not reasonable under paragraph 29(c) of the Contract.

**The 2007 Action was Dismissed Because Plaintiffs Failed to Raise Their Meritorious Claims in the 2004 Action**

480.    Presented for the first time with the actual claims in dispute, (i.e. that the Contract had not been cancelled), the Appellate Division upheld a dismissal of Plaintiffs' second case, by order dated November 5, 2009, stating that dismissal was proper only because Plaintiffs could have, but failed, to raised their claims in the prior Case.

481.    In May 2013 Plaintiffs discovered that their claims were not raised in the prior case because their litigation attorney had a pre-conceived arrangement with Szegda, Midtown and its representatives, not to interpose Plaintiffs true and meritorious claims.

482.    As a direct result of the conduct herein complained of, the Plaintiffs, have been deprived of a full or fair opportunity to be heard on their meritorious claims, arising out of the Contract.

483.    As a direct result of the conduct herein complained of, the Plaintiffs, have been deprived of their due process and constitutional rights to have their Contract claim and claim to the Property adjudicated.

484.    As a direct result of the conduct herein complained of, the Defendants abused the Court and its processes, at great expense of judicial resources, and also rendering the results thereof fatally infirm.

485.    As a direct result of the conduct herein complained of, the Court never had before it the true controversy between the Plaintiffs and Midtown and never came to any adjudication of the genuine dispute between the parties.

**Goebel Subverted the Plaintiffs' Interests From the
Moment he Solicited Them as Clients**

486.    Before and during his representation of Plaintiffs, Goebel represented to them that he had no relationship with their former transactional attorney, the Defendant, Szegda.

487.    In or about May, 2013, Goebel continued his lie to Plaintiffs, in furtherance of the racketeering scheme herein complained of, and Szegda also stated to Plaintiffs, that the two had no prior or current relationship.

488.   Plaintiffs discovered, in or about May, 2013, that during the same time as Goebel was representing Plaintiffs in the Prior Litigation, and prior thereto, he was also representing Szegda in the Baystone Litigation and in certain related litigation which had stemmed from the Baystone Matter.

489.   Upon information and belief, Goebel had a substantial interest in the Baystone Litigation, and stood to gain tens of millions of dollars upon its successful conclusion.

490.   Discovery of this falsehood, first revealed to Plaintiffs in or about May, 2013, highlighted Goebel's participation in the racketeering scheme to protect Szegda, Midtown and Midtown's representatives, in furtherance of the scheme to steal the Contract, Plaintiffs' interest in the Property and the escrowed down payment, and at odds with the Plaintiffs claims against the Property, Midtown, its representatives and Szegda.

491.   Goebel's retention, and his false agreement to represent Plaintiffs in the Prior Litigation, was itself undertaken in furtherance of the racketeering Scheme to Defraud.

492.   From the time of his retention by Plaintiffs, and thereafter, Goebel acted instead against his purported clients, to serve Szegda, Midtown and its representatives, including Imperatore and Stone, in furtherance of the racketeering scheme herein complained of, including his intent to protect his interest in the Baystone Litigation.

493.   Plaintiffs were not represented in Court, and there never was any case before the Court, because from the day he signed the retainer agreement Goebel was not acting on behalf of his purported clients, the Plaintiffs, but instead he was acting to

protect the conspiracy and racketeering activity of Szegda, Midtown and its representatives.

494.    Goebel's conduct, and his complicity in protecting the conspiracy over the Plaintiffs' interests, in furtherance of the racketeering scheme, deprived Plaintiffs of their fair day in Court, of their constitutional rights, of due process under the law, and of their valuable property rights in and to the Contract and the Property.

495.    Upon information and belief, Goebel acted in concert with Szegda, Midtown and its representatives, to subvert Plaintiffs' interests and to defrauded the Courts and Plaintiffs from inception through 2013, in furtherance of the racketeering scheme herein complained of.

496.    Goebel, admitted to Plaintiffs, in or about May 2013, that the he acted in concert with Szegda, Midtown and its representatives, to subvert Plaintiffs' interests and to defraud the Courts and Plaintiffs from inception through 2013, in furtherance of the racketeering scheme herein complained of.

**The Defendants' Web of Deceit
Begins to Unravel**

497.    On August 16, 2012, Plaintiffs came into possession of an email from Emmet to Imperatore, dated August 21, 2002.

498.    Plaintiffs had no prior knowledge of the Emmet Email or its existence because the Defendants withheld it from Plaintiff and the Court despite having been served with prior Court Orders for the production of such documents.

499.    The Defendants represented, throughout the Prior Litigation, that no request for any oil spill documents or information had been made by Plaintiffs before August 30, 2002.

500.     The Emmet Email unequivocally proves otherwise.

501.     The email from Emmet, to Imperatore, states as follows:

> Sam        Pfeiffer      wondered       if      you       might
> send him the papers documenting the successful cleanup
> of the oil spill CAUSED (emphasis added) by the
> neighboring property.

502.     By her email (the "Emmet Email"), Emmet confirmed that Samuel
Pfeiffer, on behalf of Plaintiffs, was then (as of August 21, 2002) requesting documents
relating to an oil spill on Midtown's property.

503.     The location of the oil spill had been a central issue in the Prior Litigation.

504.     The Plaintiffs' due diligence, and the timeliness of their demands for
documents relating to the oil spill had been a central issue in the Prior Litigation.

505.     Whether or not Plaintiffs even requested such documents relating to any
oil spill, at any time, had been a central issue in the Prior Litigation.

506.     Existence of the Emmet Email proves all that the Midtown Defendants
and their representatives claimed from the time they filed a motion to dismiss the Prior
Litigation, on January 6, 2005, through the last filing in the Prior Litigation, on April 1,
2010, and even now in 2014, was false.

507.     Throughout the Prior Litigation, the Defendants hid the Emmet Email
from the Court and from the Plaintiffs.

508.     In this regard, Midtown and its representatives have consistently
represented to the Court that on August 23, 2002, they had volunteered information
relating to an oil spill on a neighboring property.

509.    To support this contention, the Defendants offered an email from Imperatore to Emmet, dated August 23, 2002 (the "Imperatore Email"), which states as follows:

> We have no papers confirming the successful cleanup of
> the oil spill from the properties neighboring the Sites
>
> EDWARD G. IMPERATORE …

510.    The foregoing contention, based largely on the Imperatore Email, led to faulty court rulings, including that as stated by the Appellate Division on August 17, 2005, wherein it held, mistakenly, that:

> On August 30, 2002, Plaintiffs informed Midtown that it
> had heard something about an oil spill at or *near* the
> property. It requested that Midtown *inform* it about the
> *alleged* oil spill and *whether or not it had been cleaned up*.
> *This was not the first correspondence* between the parties
> on this subject. By e-mail dated August 23, 2002, Midtown
> let Plaintiffs know that it had *no information* concerning
> the cleanup of *an* oil spill *on properties neighboring the
> land* Plaintiffs sought to purchase.

511.    By hiding the Emmet Email from the Court and from the Plaintiffs, the Defendants effectively concealed the true meaning of the Imperatore Email and instead attributed to it an alternate and false meaning.

512.    The Imperatore Email was not, as the Appellate Division mistakenly ruled on August 17, 2005, a communication to let Plaintiffs know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Plaintiffs sought to purchase.

513.    The Imperatore Email was a response to Plaintiffs' request for documents relating to the actual oil spill on Midtown's Property.

514.    Imperatore was not volunteering that Midtown had no information about an oil spill on the neighbors' property (i.e. the Javtis Center 2 blocks away from Midtown's Property), but rather he was admitting, for the first time, that there was a massive oil spill on the Property; that it had not been cleaned; that the Property was still contaminated as of August 23, 2002; that Imperatore and Midtown had documents relating thereto; and that Imperatore and Midtown committed fraud on Plaintiffs since March 2002 by representing that there was no oil spill on Midtown's Property and had willfully and deliberately breached the Contract.

### The Emmet Email Leads Plaintiffs Back to Goebel

515.    Based upon their discovery of the Emmet Email, Plaintiffs approached the defendant, Goebel, in late 2012 through May 2013, seeking to ascertain if said attorney previously knew of its existence.

516.    Plaintiffs asked Goebel if he had received the Emmet Email during the discovery phase of the Prior Litigation.

517.    Goebel failed and otherwise simply refused to respond to Plaintiffs' direct inquiry.

518.    Plaintiffs then demanded from Goebel, all of the documents said attorney had obtained during the discovery phase of the Prior Litigation

519.    Plaintiffs also demanded from Goebel, at that time, for a turnover of copies of all the deposition transcripts said attorney had obtained during the discovery phase of the Prior Litigation.

520.    Plaintiffs also demanded from Goebel, at that time, all of the original documents and things it had entrusted to said attorney as part of Goebel's prior representation of Plaintiffs.

521.    Goebel failed and otherwise simply refused to turn the demanded documents and things over to Plaintiffs.

522.    Goebel instead proposed a new business plan, pursuant to which Plaintiffs would again retain his services, this time to act as a "supervising attorney", under which agreement Plaintiffs would give him $100,000 to hire and pay for the services of an attorney to work under him on the matter, in addition to a contingency fee to be paid on account of any potential recovery arising out of any action against Midtown and concerning the property.

523.    To support this new arrangement, Goebel claimed to Plaintiffs that he had "new ideas" and "new claims to bring", but he refused to disclose his purportedly newly conceived plans unless or until Plaintiffs executed the retention agreement being presented by him.

524.    Plaintiffs refused Goebel's overtures, refused Goebel's "new ideas" and refused to enter into any new retainer agreement with Goebel.

525.    Plaintiffs again demanded a turnover of the documents Goebel had received during the discovery phase of the Prior Litigation, and the things which remained in his possession but belong to Plaintiffs.

526.    Goebel again refused Plaintiffs' demands, but instead began a campaign in furtherance of the RICO conspiracy, to lure Plaintiffs back under his influence.

143

527. Goebel perpetrated this fraud, claiming to be in possession of documents withheld from Plaintiffs, and from the Court, describing them as "explosive"; "dynamite"; "atomic bombs"; and "bombs, bombs, bombs".

528. Goebel claimed to Plaintiffs, that if and when he turned over these documents Plaintiffs would "dance in the middle of the Street".

529. Goebel claimed to Plaintiffs, that the withheld documents "prove that Imperatore, and others [defendants herein named], committed fraud on Plaintiffs, fraud on Justice Ramos, fraud directly on the Justices of the Appellate Division and on the Justices of the Court of Appeals."

530. Goebel claimed to Plaintiffs, that "if they filed a motion or complaint based on documents he could provide, the defendants would not dare to file any motion, reply, answer or opposition because [the withheld documents] are so powerful, but instead the defendants would run to settle with Plaintiffs."

531. Goebel claimed to Plaintiffs, that the withheld documents "are so powerful, that if he were plaintiff in this case he would immediately run to the bank and borrow $1,000,000 and immediately retain one of the biggest Park Avenue law firms, and give them the $1,000,000 as a Retainer."

532. Upon information and belief, Goebel's efforts to be re-hired were in furtherance of the racketeering scheme herein complained of, to keep Plaintiffs under his and his co-conspirator's control, and to keep the Contract and Plaintiffs' interest in and to the Property out of the Plaintiffs' reach.

**Goebel's 2013 Admission and Extortion**

533.    In response to his pronouncements regarding the existence of the withheld documents, and their purportedly explosive nature, Plaintiffs asked Goebel why he didn't argue Plaintiffs' position in the Prior Litigation, and why he lied and mislead Plaintiffs and the Court throughout.

534.    Facing Goebel's demands to be re-hired, the Plaintiffs instead asked Goebel why he failed to argue and present documentary evidence that Plaintiffs had not canceled the Contract, as he had been hired and promised to do.

535.    Facing Goebel's demands to be re-hired, the Plaintiffs instead asked Goebel why he allowed the Midtown Defendants to represent to the Court that the Contract had been cancelled and why he failed to refute their false representation.

536.    Facing Goebel's demands to be re-hired, Plaintiffs instead asked Goebel why he falsely represented to the Court just the opposite of what he had been hired to do and what he promised to do; *to wit*, why he himself represented to the Court that Plaintiffs had canceled the Contract.

537.    Facing Goebel's demands to be re-hired, Plaintiffs instead asked Goebel why he falsely represented to the Court that Plaintiffs had canceled the Contract when he had documentary evidence that proved that Plaintiffs had not cancelled the Contract.

538.    Facing Goebel's demands to be re-hired, Plaintiffs instead asked Goebel why he did not amend the Amended Complaint to claim that Plaintiffs never cancelled the Contract, that the Contract was never cancelled that Plaintiffs requested documents regarding the oil spill and Amtrak Agreement much before August 29, 2002, as Plaintiffs had requested he do since on or about July 2005 through August 2006 and he promised to amend, but never did.

145

539.   Goebel did not deny having engaged in the conduct he was accused of in the Plaintiffs' questions to him, but instead responded, that if he got an agreement from Plaintiffs, including a general release of any and all claims Plaintiffs might have against him, that he would provide the "explosive" documents he claimed to be withholding.

540.   Goebel also stated at that time, that he would provide Plaintiffs with an affirmation, and other proof, that he was working together with Midtown and its representatives during the Prior Litigation; and that he had aided Midtown and its representatives by misleading Plaintiffs and the Court throughout the time he purportedly was representing Plaintiffs in the Prior Litigation and thereafter, through 2010.

541.   Goebel also stated at that time, that he had misled Plaintiffs through 2010 by continuing to withhold documents and facts from Plaintiffs; and that he had destroyed certain documents in 2011 and 2012 and would destroy more documents unless Plaintiffs agreed to issue him a general release.

542.   On or about April 15, 2013, through May 17, 2013, Goebel transmitted several revised versions of an agreement calling for, *inter alia*, a general release from Plaintiffs, in his favor, in exchange for his testimony and a turnover of the withheld documents to Plaintiffs.

543.   Various revision of the release agreement were transmitted to Plaintiffs through the mail and also by facsimile wire transmission.

544.   Fearing the loss of its documents and items of import, which had been placed in Goebel's possession, Plaintiffs eventually signed what it believed to be the final version of the release agreement.

545.    Goebel received and retained the release, but still failed to turn over to Plaintiffs the documents in his possession and control as promised by him.

546.    Goebel then, in furtherance of the racketeering Scheme to Defraud herein complained of, sent by mail documents and his extensive outline advising Plaintiffs not to claim what Plaintiffs wanted to claim but instead file claims based on false documents and misleading legal opinions intended to again subvert Plaintiffs' interests.

### Szegda's Recent Admissions

547.    Michael Szegda, acted as the Plaintiffs' attorney in connection with the Contract.

548.    Szegda is a convicted criminal, who was permanently disbarred to practice law.

549.    Szegda has admitted to having defrauded his own clients and has misappropriated escrow funds

550.    Szegda  recently admitted to Plaintiffs, in 2013, that he had committed the same fraud on Plaintiffs, and stole from Plaintiffs $150,000 he had been holding for them in escrow in connection with the Baystone Matter.

551.    Szegda admitted to Plaintiffs that he sent by fax an unauthorized and fraudulent letter to Defendants (not even cc'd to Plaintiffs) on September 12, 2002

552.    Szegda admitted to Plaintiffs, in May 2013, that he had and still has even in 2013, in his possession, Documents that Plaintiffs provided to him (with condition to return original to Plaintiffs but he never did), plus other critical Documents and evidence that Prove that the Defendants committed fraud on Justice Ramos, on the Justices of the

Appellate Division and on the Justices of the Court of Appeals, from inception to Present, but he has refused to return them and or to provide Plaintiffs copies thereof.

553.    Szegda admitted to Plaintiffs, in May 2013, that he was in collusion with Midtown Defendants (but he did not reveal with which Defendants) and that together they have willfully and deliberately defrauded Plaintiffs, the Justices of the Supreme Court, the Justices of the Appellate Division, First Department and the Justices of the Court of Appeals and others.

554.    Szegda admitted to Plaintiffs, in May 2013, that in September 2002, he entered into an agreement whereby he would send Midtown an unauthorized letter, purporting to cancel the Contract between Jericho and Defendants, and for that, Defendants would wire from their New Jersey bank, directly to Szegda's Bank account in New York, the $250,000 which Defendants were holding in escrow as the deposit on the Contract.

555.    Szegda admitted further that he knew and Midtown knew that they had no right to wire the $250,000 from their New Jersey bank to his bank in New York.

556.    Szegda admitted further that he knew and Midtown knew and he told Midtown that Jericho did not want to cancel the Contract and did not authorize him to cancel the Contract.

557.    Szegda admitted further that he knew and Midtown knew that no cancellation could be effective unless it is sent by "Notice" from Jericho and signed by Samuel Pfeiffer or any other principle of Jericho.

558.    Szegda admitted further that the documents and information in his file proves that what Defendants argued to the Court in the Prior Litigation was false.

559.    Szegda admitted further that he had the file of Jericho-Midtown in 2002-2006 and still has them even in 2013, contrary to what he told Plaintiffs in 2002-2006.

560.    Szegda admitted further that Goebel and Defendants never subpoenaed him for "Production of documents Request or for his deposition".

561.    Plaintiffs have requested an opportunity to review their files in Szegda's possession, but Szegda has refused.

**The Defendants Have Finally Admitted That the Contract is Still in Full Force and Effect and That the State Court Rulings were the Sole Product of Their Fraud on the Court – Absent Which, Plaintiffs Would Have been Awarded Specific Performance of the Contract**

562.    In 2013, and for the first time, Szegda and Goebel, finally admitted that Jericho never canceled the Contract, that the Contract was never cancelled, that the Contract was and still is in full force and effect, and that they have willfully and deliberately committed extrinsic and intrinsic "fraud on the Court" by affirming to the Court that Jericho cancelled the Contract, that Jericho elected to cancel the Contract and that it was a valid cancellation of the Contract.

563.    In 2014, and for the first time, Midtown, Imperatore and Midtown's representatives finally admitted, that Jericho never canceled the Contract, that the Contract was never cancelled, that the Contract was and still is in full force and effect and, that they have willfully and deliberately committed extrinsic and intrinsic "fraud on the Court" by affirming to the Court that Jericho cancelled the Contract, that Jericho elected to cancel the Contract and that it was a valid cancellation of the Contract.

564.    In 2014 Court filings, including but not limited to those submitted to this Court, Midtown and its representatives, including Imperatore and Stone, admitted:

a.  That Midtown willfully and deliberately breached the contract;

b.  That they utilized extortion and blackmail in an attempt to force the Plaintiffs to cancel the Contract;

c.  That they have no documents or for that matter, any evidence at all, to support their false contention that Plaintiffs cancelled the contract;

d.  That they committed fraud upon the Plaintiffs, in furtherance of the racketeering scheme, from inception to date;

e.  That they lied throughout the events herein complained of, from inception to date, in furtherance of the racketeering scheme; and

f.  That they committed extrinsic fraud on the Courts, in furtherance of the racketeering scheme, since the first filed action, in 2004, and continuing to date.

**The 2014 Submissions**

565.  The fraud upon the Court herein complained of continues to date.

566.  Submissions to the Court in 2014 contain misstatements of fact, which have been repeated by the Midtown Group Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, throughout the Prior Litigation, constituting just some of the fraud herein complained of.

**The January 8, 2013 Motion to Dismiss**

567.  On January 8, 2014, the Midtown Defendants and their attorneys, Defendants Berger, Shore and Philips Nizer, filed a Notice of Motion, Affirmation in Support and Memorandum of Law, seeking dismissal of a Verified Complaint filed in the matter of Jericho v Midtown et al, Index No: 101105/2013. (the "2013 Action")

568.    The frauds put forth throughout the Prior Litigation, and which were continued in the January 8, 2014 submission, can be summarized as follows:

      a.  That the Defendants claimed the contract was "as is", but the Defendants ignore the fact that they returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto;

      b.  That Plaintiffs elected to cancel the Contract, and that the Contract was cancelled by the Plaintiffs;

      c.  That information on the actual oil spill on Midtown's Property could be gotten from NYDEC seven days, one day, or even in one hour on September 3, 2002 between 4pm and 5pm;

      d.  That the Appellate Division made a finding and ruling on August 17, 2006 that Jericho cancelled the Contract through Szegda;

      e.  That the recently discovered but previously concealed Emmet Email was "immaterial" (but rather it was the main issue in the Prior Litigation);

569.    The January 8, 2014 submissions also contain shocking first time admissions by the Midtown Group Defendants, and the Defendants Berger, Shore and Philips Nizer, which prove all that the Midtown Group Defendants have been claiming to the Court since 2004 has been false.

570.    To this end, although the Emmet Email had never before been produced by Midtown, when displayed to them in the 2013 Action, they admit that an email they had relied on extensively in the Prior Litigation was a response thereto.

571.    The Emmet Email puts context on the August 23, 2002 email response from Imperatore they did produce, to show that the facts were other than what the Midtown was claiming.

572.    The Emmet Email is intrinsic evidence of the Plaintiffs' timely request for the critical documents.  The Emmet Email is anything but immaterial.  The Defendants' concealment of the Emmet Email is anything but immaterial.

573.    In their Memorandum of Law dated January 8, 2014, the Midtown Group Defendants, and the Defendants Berger, Shore and Philips Nizer, have finally admitted that the Contract was never cancelled.

574.    The memorandum of law dated January 8, 2014 proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs cancelled the Contract.

575.    The admission in the memorandum of law dated January 8, 2014  proves that the Appellate Division statements contained in their decision and order of August 17, 2005, that:

> "On September 13, *Jericho sent* a letter [dated September 12, 2002] stating that it was exercising its option to cancel the contract, and *it demanded* the return of its down payment."

and that;

> ". . .indicated that *Jericho cancelled the contract* and *recovered its down payment*."

and that;

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

576.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that it Willfully and Deliberately Breached the Contract**

577.    The Midtown Group Defendants represented to the Court, throughout the Prior Litigation, that Midtown did not willfully, deliberately or in any manner breach the Contract.

578.    Documentary evidence exists, including but not limited to that herein referred to, which proves that the Midtown willfully and deliberately breached the Contract.

579.    Midtown willfully and deliberately breached the Contract, including but not limited to paragraph 29(c), thereof.

580.    Paragraph 29(c) of the Contract, states:

> Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which purchaser reasonably requests.

581.    In their Memorandum of Law dated January 8, 2014, the Midtown
Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted
that Midtown willfully and deliberately breached the Contract.

582.    The Memorandum of Law dated January 8, 2014 proves that the Midtown
Defendants Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips
Nizer, committed fraud on the Court, when they represented throughout the Prior
Litigation, from January 2005 until April 2010, that Midtown did not willfully,
deliberately or in any manner breach the Contract.

583.    The admission in the Memorandum of Law dated January 8, 2014 proves
that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "The assertions in this complaint, brought two years subsequent to the
> cancellation of the agreement, do not support Jericho's allegation that Midtown
> breached the contract to sell the subject property, but instead indicate that
> Jericho cancelled the contract and recovered its down payment.

was incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

584.    The foregoing mistake of fact was based upon the Midtown Defendants
and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud
upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005,
and presented to the Appellate Division in the Record on Appeal and as presented in the
January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-
Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and
Reply Brief of December 15, 2005.

**Midtown Admits that it Committed Actionable Fraud on the Plaintiffs**

585.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that they did not commit actionable fraud on the Plaintiffs.

586.    The Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed, and thereafter.

587.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed, and thereafter.

588.    In their Memorandum of Law dated January 8, 2014, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that the Midtown Defendants committed actionable fraud upon the Plaintiffs from before the Contract was executed, when the contract was executed and thereafter.

589.    The Memorandum of Law dated January 8, 2014 proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that Midtown did not commit actionable fraud on the Plaintiffs.

590.    The admission in the memorandum of law dated January 8, 2014 proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

However, none of these allegations *constitute actionable fraud*

and

> Further, the record is plain that Midtown provided Jericho with information in its possession and that it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill.

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

591.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown Admits that Plaintiffs Requested Oil Spill, Hazard and
Other Environmental Documents Before June 14, 2002**

592.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that the Plaintiffs requested documents or information relating to an oil spill only, and for the first time, on August 30, 2002.

593.    Plaintiffs requested documents relating to any oil spill or other environmental or hazardous materials on Midtown's Property well before the Contract was executed by Plaintiffs in June, 2002.

594.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Plaintiffs requested documents and information relating to any oil spill or other environmental or hazardous materials on Midtown's Property well before the Contract was executed by Plaintiffs on June 14, 2002.

595.   The Midtown Defendants represented to Plaintiffs, well before the Contract was executed by Plaintiffs, that there wasn't any oil spill or other environmental or hazardous materials on Midtown's Property.

### Midtown Admits that There Had Been an Oil Spill
### Before the Contract was Countersigned and Returned

596.   The Midtown Defendants represented to Plaintiffs, when they countersigned the Contract on June 19, 2002, that there wasn't any oil spill or other environmental or hazardous materials on Midtown's Property.

597.   In their Memorandum of Law dated January 8, 2014, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that there was an oil spill or other environmental or hazardous materials on Midtown's Property before, at the time when the Contract was executed, and thereafter.

598.   The Memorandum of Law dated January 8, 2014 proves that the Midtown Defendants Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that there was no oil spill or other environmental or hazardous materials on Midtown's Property before, at the time when the Contract was executed, and thereafter.

599.   Plaintiffs requested all documents, relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs finally discovered, contrary to the Midtown Defendants representation, that there had been a major oil spill on Midtown's Property.

600.   Documentary evidence exists, including but not limited to that herein referred to, which prove that the Plaintiffs requested all documents, relating to the actual

157

oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs finally discovered, contrary to the Midtown Defendants representation, that there had not been a major oil spill on Midtown's Property.

601.   In their Memorandum of Law dated January 8, 2014, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Plaintiffs requested all documents, relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property, and not only for the first time on August 30, 2002.

602.   The Memorandum of Law dated January 8, 2014  proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs requested documents or information relating to an oil spill only, and for the first time, on August 30, 2002.

603.   The admission in the Memorandum of Law dated January 8, 2014 (Exhibit 3) proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up*. *This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase."

was incorrect, based upon a mistake of fact, and is the product of the Defendants' fraud.

604.   The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

### Midtown Admits that Plaintiffs Requested Documents Relating to the Oil Spill on or Before August 21, 2002

605.   The Midtown Defendants also represented to the Court, throughout the Prior Litigation, that the reason they did not provide documents relating to an oil spill was because i) Plaintiffs only requested the information, for the first time, on August 30, 2002; ii) because even on August 30, 2002, Plaintiffs only requested representations and not documents; and iii) because even on August 30, 2002, Plaintiffs only requested notice of violations and not documents.

606.   Plaintiffs requested all documents, (not for the first time on August 30, 2002, not representations and not just copies of notices of violations), relating to the actual oil spill on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property.

607.   In their Memorandum of Law dated January 8, 2014, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Plaintiffs requested all documents, (not for the first time on August 30, 2002, not representations and not just copies of notices of violations), relating to the actual oil spill

on Midtown's Property, on and before August 21, 2002, when Plaintiffs discovered that there had been a major oil spill on Midtown's Property.

608.    The Memorandum of Law dated January 8, 2014 proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the reason Midtown did not provide documents relating to an oil spill was because i) Plaintiffs only requested the information, for the first time, on August 30, 2002; ii) because even on August 30, 2002, Plaintiffs only requested representations and not documents; and iii) because even on August 30, 2002, Plaintiffs only requested notice of violations and not documents.

609.    The admission in the Memorandum of Law dated January 8, 2014 proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "On August 30, 2002, Jericho informed Midtown that it had heard something about an oil spill at or *near* the property. It requested that Midtown *inform* it about the *alleged* oil spill and *whether or not it had been cleaned up. This was not the first correspondence* between the parties on this subject. By e-mail dated August 23, 2002, Midtown let Jericho   know that it had *no information* concerning the cleanup of *an* oil spill *on properties neighboring the land* Jericho sought to purchase."

were incorrect, based upon a mistake of fact, and is the product of the Defendants' fraud.

610.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and as presented in the January 6, 2006 Affirmation of Imperatore, the July 5, 2005 Notice of Appeal and Pre-

Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

### Midtown Admits that Plaintiffs Did Not Elect to Cancel the Contract and that there is No Valid Cancellation

611.    The Midtown Defendants represented to the Court, throughout the Prior Litigation, that the Plaintiffs have elected to cancel the Contract and that there was a valid cancellation.

612.    The Plaintiffs never elected to cancel the Contract and never cancelled the Contract.

613.    Documentary evidence exists, including but not limited to that herein referred to, which prove that the Plaintiffs never elected to cancel the Contract and never cancelled the Contract.

614.    In their Memorandum of Law dated January 8, 2014, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, have finally admitted that Plaintiffs never elected to cancel the Contract and never cancelled the Contract.

615.    The Memorandum of Law dated January 8, 2014 proves that the Midtown Defendants, Sherman, Geremia, Jones Day and the Defendants Berger, Shore and Philips Nizer, committed fraud on the Court, when they represented throughout the Prior Litigation, from January 2005 until April 2010, that the Plaintiffs have elected to cancel the Contract and that there was a valid cancellation.

616.    The admission in the Memorandum of Law dated January 8, 2014 proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement*, do *not support Jericho's allegation that*

*Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment*.

and that

". . . instead indicate that *Jericho cancelled the contract* and *recovered its down payment*."

and that

"An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants'

fraud.

617.   The foregoing mistake of fact was based upon the Midtown Defendants

and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud

upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005,

and presented to the Appellate Division in the Record on Appeal and as presented in the

January 6, 2006 Affirmation of Imperitore, the July 5, 2005 Notice of Appeal and Pre-

Argument Statement, and the Defendants' Appeal Brief dated November 7, 2005 and

Reply Brief of December 15, 2005.

**Midtown Admits Its Extortion, Blackmail and Acts of Intimidation**

618.   In their Memorandum of Law dated January 8, 2014, the Midtown

Defendants and the Defendants Berger, Shore and Philips Nizer, admit that from August

29, 2002 through September 12, 2002, the Midtown Defendants used extortion, blackmail

and threats seeking to cause Plaintiffs to cancel the Contract.

619.   In their Memorandum of Law dated January 8, 2014, the Midtown

Defendants and the Defendants Berger, Shore and Philips Nizer, admit that from

September 12, 2002 through February 16, 2004, the Midtown Defendants used extortion, blackmail and threats intimidating Plaintiffs, seeking to have Plaintiffs agree that the Contract was cancelled and also causing them to forbear earlier litigation.

620.    The admission in the Memorandum of Law dated January 8, 2014 proves that the Appellate Division statement in their decision and order of August 17, 2005, that:

> "The assertions in this complaint, *brought two years* subsequent to the *cancellation of the agreement. . . .*

and that

> ". . . do *not support Jericho's allegation that Midtown breached the contract* to sell the subject property, but instead indicate that *Jericho cancelled the contract* and *recovered its down payment.*"

and that

> ". . . instead indicate that *Jericho cancelled the contract* and *recovered its down payment.*"

and that

> "An additional ground for dismissal of the first and third causes of action is the settled rule that a party cannot seek specific performance of a *cancelled real estate contract* …[specific performance unavailable where a contact for sale of real estate *was validly cancelled*]"

were incorrect, based upon a mistake of fact, and are the product of the Defendants' fraud.

621.    The foregoing mistake of fact was based upon the Midtown Defendants and Defendants Sherman's, Geremia's and Jones Day's misrepresentations and fraud upon the Court, as claimed in the oral argument before Justice Ramos on May 12, 2005, and presented to the Appellate Division in the Record on Appeal and in the Defendants' Appeal Brief dated November 7, 2005 and Reply Brief of December 15, 2005.

**Midtown's Stunning Admissions and The 2014 Fraud**

622.    The foregoing admissions appear in two places contained in the January 8, 2014 Memorandum Of Law.

623.    In the Memorandum of Law, the Midtown Defendants and the Defendants Berger, Shore and Philips Nizer, represent that "[o]n September 12, 2002, Jericho Group, *through its counsel*, cancelled the contract and requested the return of its deposit, which midtown promptly returned". (Memorandum of Law dated January 8, 2014, at p.3 – referring to Berger Aff., Ex J, p.3 – which is the Appellate Division decision dated August 17, 2006)

624.    Not only does the foregoing misquote the decision referred to by them, but it shows their knowledge of the falsity of their representations made by the Defendants throughout the Prior Litigation.

625.    By inserting the words "through its counsel", where no such words are contained in the cited decision, the Midtown Defendants, and the Defendants Berger, Shore and Philips Nizer, verify their knowledge that the Plaintiffs never cancelled the Contract.

626.    By inserting the words "through its counsel", where no such words are contained in the cited decision, the Midtown Defendants, and the Defendants Berger, Shore and Philips Nizer, confirm that they have no documents or evidence that Plaintiffs, including Jericho, cancelled the Contract.

627. That the words "through its counsel" don't exist in the cited decision, underscores that they had falsely, albeit successfully, argued throughout the Prior Litigation that Plaintiffs cancelled the Contract.

628. The Midtown Defendants argued throughout the Prior Litigation, and even now in 2014, that the Appellate Division ruled that Jericho cancelled the Contract, even though they know it is untrue.

629. The second instance of the Midtown Defendants admissions appears in page 16, fn 11 and page 17 of the January 8, 2014 Memorandum of Law, wherein it is stated, as follows:

"The only specific documents referenced as being "recently discovered" are in an August 21, 2002 3-line email from Defendant Emmet to Defendant Imperatore noting that Pfeiffer was asking for "papers documenting the successful cleanup of the oil spill caused… by the neighboring property…" (Section C – MOL pg 16)

"Imperatore promptly responded by email dated August 23, 2002, which was discussed by the Appellate Division, stating that in this email "Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase" but "Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup." (Berger Aff., Ex. L, pg. 3). FN 11 on p 16

Imperatore promptly responded to Emmet's email, advising Jericho Group that Midtown did not have the information about the oil spill . . . Therefore, the email from Emmet requesting information is immaterial." – (Berger Aff p17)

630. The foregoing was a major admission by the Midtown Defendants, that they all had this critical Emmet Email in their possession and that they willfully and deliberately withheld it from the Court and from the Plaintiffs, from inception, to present, and that they lied to the Court from inception to present, when they stated that

documentary evidence proves just the opposite of what the documentary evidence truly represents.

631.    Only now, confronted with the fact that Plaintiffs finally discovered the existence of the Emmet Email, do the Midtown Defendants come forward and acknowledged its existence.

632.    The Midtown Defendants had an obligation to come forward with the Emmet Email during the Prior Litigation, but instead concealed its existence and denied its import.

633.    Even now, having finally admitted the existence of this email, the Midtown Defendants still try to cover up their fraud on the Court, by downplaying the significance of this critical piece of documentary evidence.

### The June 30, 2014 Motion to Dismiss by Philips Nizer, Berger and Shore

634.    The Midtown Group Defendants, and the Defendants, Phillips Nizer, Berger and Shore, moved to dismiss this action on June 30, 2014, wherein the moving parties, including the attorneys who brought the motion, made the following misrepresentations:

> a. Plaintiffs assert that whenever Midtown's counsel have made legal arguments based on the prior state court decisions and judgments, they, along with Midtown, are somehow committing new frauds on the court. This, notwithstanding that the Appellate Division has squarely rejected the notion that it, or the trial court, was defrauded. They do so in an attempt to deflect the binding effect of those holdings.

> By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed

and fraudulently obtained dismissal of Plaintiffs meritorious claims. Plaintiffs do not seek to hold anyone liable, or otherwise complain in this action about legal arguments, but rather the claims set forth herein arise out of the fraud perpetrated upon the Court, and the Plaintiffs, resulting in the flawed prior decisions. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

b. Jericho then sued Midtown again in 2007, this time adding as defendants, Imperatore and Stone (the "2007 State Action"), seeking the same declaratory relief and specific performance of the 2002 Contract, or in the alternative millions in compensatory damages, plus punitive damages.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because that the equitable relief sought in the 2007 Action was different from that sought in the prior action. The Complaint filed in the 2004 Action (albeit the fraudulent and forged copy filed by Goebel as part of his collusion with Midtown) sought a declaration that the Contract be reinstated. The relief sought in the 2007 Action was a declaration that the Contract was never cancelled, and judgment declaring that it remained in full force and effect, and for a further declaration that Midtown had willfully and deliberately breached paragraph 29(c) of the Contract.

c. The history is set forth in the three decisions of the Appellate Division, as well as the 2002 Contract itself. –

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

d. The 2002 Contract provided for an "AS IS" sale and expressly disclaimed any representations as to the condition of the property or the use to which it could be put. (Shore Dec., Ex. B, 29(b), 38). Midtown expressly declined to make any representations about the properties, and disclaimed any "expressed or implied warranties, guarantees, promises, statements, misrepresentations or information pertaining to the [properties] as to the physical condition, income, expense, operation, or to what use the [properties] [could] be applied." (Shore Dec., Ex. B ˷ 38).

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the Defendants returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto.

e. During the 75 day study period, there were certain relevant communications between Jericho and Midtown. By email dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the August 23, 2002 email was not sent to let Plaintiffs know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Plaintiffs sought to purchase, rather the August 23, 2002 email was a response to an earlier email, only discovered by Plaintiffs in late 2012, and that the August 23, 2002 email proved instead that Midtown and its representatives had committed fraud on Plaintiffs, from inception of the negotiations for the Property, in March 2002, throughout the due diligence period, and that Midtown and its representatives had willfully and deliberately breached the Contract, in that there was a massive oil spill on the 93,000 square foot property Plaintiffs had contracted to purchase, and Midtown had many document relating to the oil spill and the partial cleanup.

Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number

for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup."

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the true documentary evidence, discovered in late 2012 and the 2013, proves that Midtown feigned their assistance, but Midtown knew that Plaintiffs had already approached the additional sources of information, and they also knew that the additional sources of information were impractical, at a time when they could have merely provided Plaintiffs with the documents which they had in their possession and which they were contractually obligated to provide, and could easily and quickly have provided, and because Midtown and its representatives had documents making a request for information from the NYDEC themselves, and they knew it would take four to six weeks to get the requested information.

    f.   Jericho informed Midtown that it had heard something about an oil spill at or near the property ... [and] requested that Midtown inform it about the alleged oil spill and whether or not it had been cleaned up. Id "On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. Id. Midtown responded that it did not have the requested exhibits. Id.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that that Plaintiffs had discovered, on or before August 21, 2002, that there was a massive oil spill on the Property and Plaintiffs requested documents as of that time. Plaintiffs had requested documents relating to the exhibits to the Amtrak Agreement already in July, 2002, and Midtown represented and promised that they would provide the documents relating to the oil and the documents relating to the exhibits to the Amtrak Agreement, as they also were contractually obligated to do. But then on August 29, 2002, Midtown refused to provide the documents, and thereby willfully and deliberately breached paragraph 29(c) of the Contract.

    g.   Plaintiffs. . . filed the 2013 State Action against Midtown, Imperatore and Stone, as well as thirteen other Midtown-related defendants, seeking the same equitable relief Jericho sought in the 2004 and 2007 State Actions concerning the 2002 Contract, which is the same equitable relief its seeks in this lawsuit.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, go well beyond the that requested and interposed in either the 2004 Action or the 2007 Action. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

     h.  Now, as noted above, Plaintiffs have filed a 154-page, 613-paragraph Complaint which fails to allege any viable claim against the Midtown Defendants. It rehashes that Midtown lied to the state trial and appellate courts by asserting that Jericho cancelled the 2002 Contract and that Midtown returned Jericho's deposit, notwithstanding that those facts were supported by documentary evidence and found to be accurate by the Appellate Division.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

     i.  Jericho is precluded from such relief on grounds of res judicata and collateral estoppel. The claims alleged herein were either already brought, or could have been brought, in the prior actions, and/or the issues underlying the claims herein have already been decided.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

> j. For the same reasons, and as further discussed below, Plaintiffs' RICO claims should be dismissed on grounds of res judicata because they arise out of the same transaction and they could have been brought in the prior state court actions, and Plaintiffs' state law claims also should be dismissed on grounds of res judicata because they all were either previously brought, or could have been brought, in the prior state court actions as well. 2008 WL 4537815

> By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

**The June 30, 2014 Motion to Dismiss by Jones Day, Sherman and Geremia**

635. The Defendants, Jones Day, Sherman and Geremia, moved to dismiss this action on June 30, 2014, wherein the moving parties made the following misrepresentations:

> a. This is the fifth lawsuit filed by plaintiff Jericho Group, Ltd. ("Jericho") attempting to reinstate a real estate contract it canceled over a decade ago.

> By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that Plaintiffs are not seeking to reinstate a real estate contract it cancelled over a decade ago (or ever); Plaintiffs do not seek through this action to have the Contract reinstated, on the contrary, this action seeks a declaration that the Contract is in full force and effect, because the Contract has never been cancelled and Jones Day, Sherman and Geremia know that Plaintiffs never elected to cancel the Contract and the Contract is not cancelled.

> b. These claims were twice rejected on the merits by the New York Appellate Division, First Department.

171

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, let alone "twice rejected", indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

    c.   Jericho now brings this fifth action in federal district court attempting to achieve the same result it could not achieve in state court. Plaintiffs again allege breach of contract, fraud, and fraud on the court in connection with the same real estate transaction that concluded over a decade ago.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, let alone four times previously, indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

    d.   Plaintiffs allege that the Jones Day Defendants "lied" to the trial court and the Appellate Division when they argued—accurately, as the state courts have repeatedly held—that Jericho canceled the contract and that Midtown did not breach the contract.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the Jones Day defendants did lie to the Trial Court and the Appellate Division, and they did not argue "accurately", but rather made arguments they knew to be false, when they claimed that Plaintiffs cancelled the Contract, and supported such claim by introducing fraudulent and incomplete documentary evidence, thereby causing the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. The newly discovered true documentary evidence, and recent admissions, prove that the Jones Day Defendants lied and misrepresented material facts to the Court, when they represented that Plaintiffs had cancelled the Contract, at a time when they knew and had documentary evidence in their possession, that Plaintiffs didn't cancel the Contract and that Midtown had willfully and deliberately breached the Contract.

    e.   Midtown expressly declined to make any representations about the properties, and disclaimed any "expressed or implied warranties, guarantees, promises, statements,

representations or information pertaining to the [properties] as to the physical condition, income, expense, operation, or to what use the [properties] [could] be applied.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the Defendants returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto.

     f.   Plaintiffs further claim the Jones Day Defendants "lied" to the trial court and the Appellate Division when they made the legal arguments that Jericho had canceled the contract and that Midtown had not breached the contract.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. Plaintiffs do not seek to hold anyone liable, or otherwise complain in this action about legal arguments, but rather the claims set forth herein arise out of the fraud perpetrated upon the Court, and the Plaintiffs, resulting in the flawed prior decisions. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

     g.  At a minimum, all of Plaintiffs' claims could have been brought in the prior actions, and are thus barred.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

h. However, the Complaint appears to allege that the Jones Day Defendants falsely represented (1) that Jericho had asked for information about the oil spill only a few days before the Study Period was set to expire (Plaintiffs claim the oil spill conversation began two days earlier than had previously been understood by the courts, and that it was initiated by Jericho rather than Midtown);

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that they did falsely represent that Plaintiffs had asked for information about the oil spill only a few days before the Study Period was set to expire, and Plaintiffs were not claiming in the initial complaint filed in this action is  that the oil spill conversation began two days earlier, than previously understood by the Courts, and that it was initiated by Plaintiffs and not Midtown. The Emmet Email discovered by Plaintiffs in late 2012, proves that Plaintiffs had discovered, on or before August 21, 2002, that there was an actual oil spill on Midtown's 93,000 square foot Property, which Plaintiffs had contracted to purchase for $28,000,000; that Midtown committed actionable fraud on Plaintiffs when the represented from March 2002, through August 21, 2002, that there was no oil spill on the Property and that they had no documents relating to any oil spill on the Property; that Midtown committed actionable fraud upon Plaintiffs when they returned the countersigned Contract and misrepresented that there was no oil spill or hazardous materials on Midtown's Property; that as of August 21, 2002, Plaintiffs had been requesting documents relating an actual oil spill on Midtown's Property, and that Midtown willfully and deliberately breached paragraph 29(c) of the Contract, when they promised to provide the requested documents on and after August 21, 2002, but instead on August 29, 2002, in contravention of their contractual obligation and independent promises, Midtown notified Plaintiffs that they were refusing to provide the requested critical documents.  Had Midtown or their Attorneys, who also had the Emmet Email, not lied to the Court, by claiming that Plaintiffs only requested information or documents relating to an oil spill on the Property for the first time on August 30, 2002, after a Midtown sent Plaintiffs the notice of August 29, 2002, and not mislead the Court that the oil spill was not on Midtown's property but on some neighbors property (i.e. the Javits center 2 blocks away), or if Midtown or their Attorneys had merely provided the Emmet Email to the Court before the August 17, 2006 Appellate Division ruling, or anytime before the January 16, 2008 Appellate Division ruling, or any time before the November 5, 2009 Appellate Division ruling, the Appellate

Division would have ruled on the true documentary evidence and would necessarily have found that the Plaintiffs never elected to cancel the Contract, that the Plaintiffs never cancelled the Contract, that the Contract was not cancelled, that Midtown had willfully and deliberately breached paragraph 29(c) of the Contract, and that Midtown had committed fraud on plaintiff in the underlying transaction and on the court in all their submissions with regard thereto.

**Philips Nizer, Berger and Shore July 24, 2014 Motion to Vacate the Lis Pendens**

636.   The Midtown Group Defendants, through their attorneys, the Defendants, Phillips Nizer, Berger and Shore, moved to vacate the lis pendens filed in this action on July 24, 2014, wherein the moving parties, including the attorneys who brought the motion, made the following misrepresentations:

      a.   The notices of pendency in those lawsuits were cancelled by the courts and the lawsuits dismissed on the merits –

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the prior lawsuits were not dismissed on the merits.

      b.   The history of this dispute between Midtown and Jericho is set forth in three decisions of the Appellate Division, a decision of the Supreme Court, New York County (hereinafter "trial court"), and reference is made herein to those decisions, as well as to the June 18, 2002 between Midtown and Jericho which is the subject of Plaintiffs' Complaint.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, and presented a history that is false resulting in the Appellate Division being misled about the history of the case as well the flawed and fraudulently obtained decisions referred to in the above referenced quotation. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and

Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

637.   The motion to vacate the notice of pendency itself, is fraudulent, in that the moving parties had already sought such relief in their previously filed motion to dismiss.

638.   Whereas Midtown, its representatives and Attorneys had already sought such relief in the prior motion, the request now, in the second filed separate motion is duplicative and unnecessarily vexatious.

639.   Moreover, having now admitted that Plaintiffs did not elect to cancel the Contract, that the Plaintiffs did not cancel the Contract, that there has not been any valid cancellation of the Contract, and that Midtown has willfully and deliberately breached the Contract, Midtown, its representatives and attorneys, including the Defendants, Philips Nizer, Berger and Shore, have no justification in moving now for the cancellation of the lis pendens, but should instead themselves be directed to specifically perform and close title on the Property with the Plaintiffs.

**The Fraud on the Court**

640.   From inception of the Prior Litigation, to date, the Defendants engaged in a pattern of activity whereby they defrauded the Court through oral representations in open Court, and the submission of written statements to the Court, including but not limited to the items identified in this paragraph:

        a.   Goebel's Complaint 9/2/4, Amended Complaint 11/29/05,

            Opposition to the Motion to Dismiss 2/23/05– including

Pfeiffer's Affirmation 2/23/05, at the Hearing before
Ramos on 5/12/05;

b.  Midtowns' First Motion to Dismiss and MOL (by Sherman
and Geremia, JD and MGD) and Affirmation of Imperatore
in support of Motion to Dismiss dated 1/6/05, and all
subsequent filings etc., including but not limited to, the
Hearing before Ramos on 5/12/05;

c.  Midtowns' Notice of Appeal & Pre-Argument Statement
7/5/05; (by Sherman and Geremia, JD and MGD)

d.  Midtowns' Production of Documents, 10/24/05;  (by
Sherman and Geremia, JD and MGD)

e.  Midtowns' Appeal Brief 11/7/05;  (by Sherman and
Geremia, JD and MGD)

f.  Imperatore's Deposition of 11/8/05;

g.  Goebels' Respondent Brief 12/7/05;

h.  Midtowns' Reply Brief, 12/15/05, (Production of
documents and Deposition by parties in 2006);

i.  Midtowns' Summary Judgment Motion and Affirmations
of Midtowns' Attorneys and Imperatore in support of
Summary Judgment Motion 7/7/06;

j.  Midtowns' Opposition to Motion to Reargue before
Appellate Division 9/25/06;

k.   Midtowns' Opposition to Motion to Vacate Judgment, 11/6/06, and the hearing of 11/8/06;

l.   Midtowns' Appeal Brief (filed by Berger, Philips Nizer, Jones Day, Sherman and Geremia, dated March 23, 2007), dated 2/22/07 and or 3/23/07;

m.  Midtown's Motion to Remove the 2007 Action to the Federal Court, and their related filings in the Southern District Federal Court in February and March 2007.

n.   Midtowns' Opposition to Motion to extend filing of Respondent Brief & to Strike, Hearing before Ramos 4/11/07, 4/12/07, Midtowns' Reply Brief 9/14/07;

o.   Midtowns' Opposition to Motion to Reargue before Appellate Division, 2/28/08;

p.   Midtowns' multiple Motions before Ramos, 5/9/08 (in Second case), Midtowns 'Reply Affirmation, 6/19/08,

q.   Midtowns' Response to Plaintiffs Motion to Court of Appeals to Appeal,7/15/08;

r.   Midtowns' Respondent Brief, 9/9/09;

s.   Midtowns' Memo in Opposition to Application to Appellate Division for permission to Appeal, 12/29/09; and

t.   Midtowns' Response to Plaintiffs Motion to Court of Appeals to Appeal, 4/1/10 and thereafter.

u.  Midtown's Memorandum of Law and Berger's Affirmation dated January 8, 2014.

v.  The Motions to Dismiss and Motion to Vacate the Notices of Pendency filed in this action on June 30 and July 24, 2014, respectively.

641.    The fraud herein complained of is as contained in almost every page in every paragraph of the above submission.  Plaintiffs hereinafter set forth the following specified misrepresentations, to identify the nature of the Defendants fraud, the magnitude of which would unduly belabor the Court at this time.

642.    The false representations and omissions of the Defendants (other than Szegda and Baystone), to the Court, included, without limitation

a.  That "Jericho" had cancelled the Contract;

b.  That "Jericho" had cancelled the Contract on September 3, 2002;

c.  That "Jericho" had cancelled the Contract on September 12, 2002;

d.  That "Jericho" had elected to cancel the Contract and that there was in fact a valid cancelation of the Contract;

e.  That Midtown did not willfully and deliberately breach the Contract;

f.  That Midtown did not breach the Contract;

g.  That "Jericho" had requested a return of the deposit on September 3, 2002;

h.  That "Jericho" had requested a return of the deposit on September 12, 2002;

i.  That "Jericho" received a return of the deposit on September 13, 2002;

179

j.   That the Plaintiffs did nothing about the Contract, contacting the Midtown Defendants or attempting to close the transaction during the two year period preceding the filing of the Complaint in September 2004;

k.   That Plaintiffs didn't ask for documents or information relating to any oil spill on Midtown's Property until August 30, 2002;

l.   That even on August 30, 2004, Plaintiffs had only asked for notice of violations relating to an oil spill, and not documents;

m.  That even on August 30, 2004, Plaintiffs had only asked for representations relating to an oil spill, and not documents;

n.   That Plaintiffs, or anyone, could get documents relating to an oil spill from the NYDEC in seven days, one day, or even in one hour on September 3, 2002 between 4pm and 5pm;

o.   That Midtown did not have documents relating to the oil spill;

p.   When they hid the existence of other documents in their possession, they misrepresented, by omission, and also hid from the Court the true state of facts underlying the Prior Litigation which would, if discovered, have refuted the claims made in their motion when they argued for dismissal based upon;

q.   That they had fully complied with all outstanding discovery obligations and had provided all documents responsive to Plaintiffs' demands and subpoenas, when they had not;

r.   That they intentionally and knowingly withheld documents and deposition testimony obtained during discovery which was contradictory to the statements of fact they were simultaneously representing to the Court;

s.   When they hid the existence of the Emmet Email, they misrepresented, by omission, and also hid from the Court that the Plaintiffs had been asking for documents concerning the oil spill on Midtown's Property from and prior to August 21, 2002;

t.   That there was no oil spill on Midtown's Property;

180

u.  That the oil spill documents were not material to the Contract;

v.  That Midtown had provided all due diligence material required under the Contract;

w.  That Midtown had provided all due diligence material requested under the paragraph 29c) of the Contract;

x.  That the Contract was "as is", and that there were no representations made to Plaintiffs in the Contract, or when the executed copy was returned;

y.  That Midtown had misplaced the Amtrak exhibits, and did not have it when the Contract was signed, and during the due diligence period through July 11, 2006

z.  From and after July 11, 2006, they claimed that the Amtrak exhibits never existed (but they admitted to Justice Ramos on May 12, 2005, that the Exhibits did exist, and if in fact they "never" existed, then they committed fraud on Plaintiffs at the contract signing, and thereafter, because the "Amtrak Agreement" attached to Contract was "null and void", and the Plaintiffs couldn't build without the "Amtrak Agreement", and also because Defendants represented in the Contract that it was subject to the "Amtrak Agreement" and would be assigned to Plaintiffs at Closing, including their rights under the "Amtrak Agreement" but if the exhibits didn't exist, then they had NONE since it was therefore null and void) in addition, they have represented in the Amtrak Agreement that the Exhibits were attached;

aa. That Plaintiffs didn't ask Midtown for the exhibits to the Amtrak Agreement until September 2, 2002;

bb. That Plaintiffs didn't ask Amtrak for the exhibits to the Amtrak Agreement;

cc. That Plaintiffs could contact Amtrak and get exhibits and documents relating to the Amtrak Agreement even in two hours on September 3, 2002 between 3:00 and 5pm;

dd. That the Amtrak Agreement Exhibits were not material to the Contract;

ee. That all dealings throughout the course of the underlying Contract transaction were with Szegda and not Plaintiffs;

ff. The Defendants repeated all of these misrepresentations and omissions in the Federal District Court, when they attempted to have the case removed; and

gg. The Defendants also misrepresented in the removal application that Midtown only had three partners (when they had more than thirty partners) and that there was complete diversity (when complete diversity was clearly lacking).

**The Defendants' Statements Were False and Known to be False When Made**

643.    Upon information and belief, on or about February 15, 2006, Sherman went to Goebel's house and received from him, in preparation of the upcoming deposition of Shafran, various documents provided by Shafran during discovery in the 2004 Action, including numerous emails concerning the underlying transaction.

644.    Upon information and belief, included amongst the documents received by Sherman at that time was the Emmet Email, and numerous emails amongst Pfeiffer, Shafran and Emmet concerning the underlying transaction, including emails regarding engineering studies Plaintiffs had conducted, even before entering into the Contract.

645.    Upon information and belief, Jones Day, Sherman and Geremia also received the Emmet Email during discovery in the 2004 Action Emmet, Brown Harris Stevens, Harwood Lloyd, and from their clients, Midtown, Imperatore and Stone, in addition to and numerous emails amongst Pfeiffer, Shafran and Emmet concerning the underlying transaction.

646.    Accordingly, and at least as of that date, Jones Day, Sherman and Geremia had knowledge of the fact that Pfeiffer was requesting document from Midtown concerning the oil spill on Midtown's property at least as of August 21, 2002.

647.    Accordingly, and at least as of that date, Jones Day, Sherman and Geremia had knowledge of the fact that Pfeiffer was requesting document from Midtown

concerning the concerning the Exhibits to the Amtrak Agreement, the zoning and any potential hazardous condition on the property already even before entering into the Contract, then again as of July, 2002 and in August, 2002, and that Midtown repeatedly responded that they would provide them.

648.    Upon information and belief, Berger, Shore and PN also had all these documents when they appeared in the case from their colleagues or their clients.

649.    Existence of the Emmet Email proves that each of the various Affirmations of Defendant Imperatore, dated January 6, 2005, June 29, 2006 and September 18, 2006, respectively, contained false statements of fact and constituted misrepresentations to the Court.

650.    Existence of the Emmet Email proves that all of the numerous submissions made in the Prior Litigation, and even now in 2014, to the Trial Court, to the Appellate Division, to the Court of Appeals and to the Southern District Federal Court, by Midtown, the Midtown Group Defendants and their attorneys contained false statements of fact and constituted misrepresentations to the Court.

651.    Existence of the Emmet Email proves that the Midtown Defendants and their attorneys knew of the falsity of the statements of fact and representations that they were then making to the Court.

652.    Existence of the Emmet Email underscores the failings of the Court rulings in the Prior Litigation, and the purported findings of fact therein contained.

653.    Existence of the other Emails proves that each of the various Affirmations of Defendant Imperatore, dated January 6, 2005, June 29, 2006 and September 18, 2006,

respectively, contained false statements of fact and constituted misrepresentations to the Court.

654. Existence of the other Email proves that all of the numerous submissions made in the Prior Litigation, and even now in 2014, to the Trial Court, to the Appellate Division, to the Court of Appeals and to the Southern District Federal Court, by Midtown, the Midtown Group Defendants and their attorneys contained false statements of fact and constituted misrepresentations to the Court.

655. Existence of the other Email proves that the Midtown Defendants and their attorneys knew of the falsity of the statements of fact and representations that they were then making to the Court.

656. Existence of the other Email underscores the failings of the Court rulings in the Prior Litigation, and the purported findings of fact therein contained.

657. By concealing the existence of these emails from Plaintiffs, and from the Court, the defendants violated their duty of candor and obligation to be truthful in the arguments they made and the evidence they presented throughout the Prior Litigation, and even in 2014, in their submissions to this Court, when they instead misrepresented the true state of affairs to the Court.

658. By concealing the existence of these emails and then making statements to the Court, which flat out contradict the secreted evidence, the Defendants perpetrated a fraud on the Court.

659. Their receipt and possession of the Emmet Email and the other emails, by at least on or about February 16, 2006, establishes that Jones Day, Sherman and Geremia had knowledge of the contents of the Emmet Email and the other emails, at least as of

that date, and that everything they said to the Court thereafter which was in conflict with the Emmet Email was false and known to them to be false when made.

660.    Upon information and belief, Goebel also had possession and knowledge of these emails and their contents.

661.    At the deposition of Shafran, held on February 27, 2006, the following exchange transpired:

A    … there came a time and I don't know if it was with this or somewhere in the time range, where there was information that it was some environmental problems ON the property and they needed to follow up on that.

Q    When, to your knowledge, did Jericho become aware of some environmental situation <u>on</u> the property?

A In that summer. I don't remember exactly when.

Q    Do you know how Jericho became aware that there were some environmental problems?

A    No.

Q    How did you become aware that there was some environmental problem on the Midtown property?

A    I think Sam Pfeiffer told me and he asked me to see if I can find something from DEC.

Q    When did Sam Pfeiffer tell you that there was environmental problem in the Midtown property?

A    During that summer.

Q    During that summer, how did Mr. Pfeiffer tell you that he had come to understand that there was an environmental problem in the Midtown property?

A   I don't remember.

Q   You said Mr. Pfeiffer asked you to --

A   See if I can --

185

Q  -- see if you can find out any information on the  environmental problem on the Midtown  property?

A  That's  correct.

Q   What  did  he  ask  you  to  do?

A        Just  that,  find  whatever  information I can.

Q    Did  you  find  whatever  information  you  could  for  Mr.  Pfeiffer concerning the environmental problem on the Midtown  property?

A     Well, I submitted a full request to the DEC and subsequently (September 24, 2002) went with Mr. Pfeiffer to  look at  the  file.

Q   When did you submit a FOIA request to DEC?

A     Again, sometime that summer. ..

A   I  know  he  was concerned  and  he  wanted  me  to  follow  up  on  the environmental  issues…

The  main  concern  and  the  sum  and substance  of  the  conversation  was  the  concern about  the  environmental  issues…

The issue of environmental  contamination  was important  and  of concern  to  Mr. Pfeiffer…

And  I  recall  that  somehow  through  this conversation  an  agreement  was  reached that  the  FOIA  would  be  filed…

Q   Exhibit 18 is an e-mail from Emmet to Ben Shafran, dated August 23, 2002. Did  you  receive  this  e-mail  from  Ms.  Emmet  on  August  23,  2002?

A       Yes …

Q       Why  was  there  not  a  visit  to  the  New York  Department  of  Environmental Conservation until  September  24?

A        YOU  NEED  AN  APPOINTMENT.   YOU  CAN'T  JUST GO  IN  THERE…

A     I  don't  remember  the  date  when  the  permission  was  received,  but  the  date was whenever  we  went there  because  it  was  by appointment.”

186

662.    Shafran's deposition testimony and the questioning by Geremia proves that as of February 27, 2006, Geremia, Sherman, Jones Day, Goebel, Imperatore and Midtown all knew that Pfeiffer was very concerned in mid Summer about the discovery of the oil spill on the Property, that on or before August 21, 2002, Plaintiffs had asked Shafran to obtain all information and documents from NYDEC, that Shafran had made a FOIL request regarding the oil spill on Midtown's Property, on or before August 21 2002, that the NYDEC gave the appointment for September 24, 2002, and that Pfeiffer and Shafran went to NYDEC and attended the FOIL appointment on September 24, 2002.

663.    Accordingly, they all knew that which they represented to the Court in their January 2005 Motion to Dismiss, Memorandum of Law, and supporting Affirmation of Imperatore dated January 6, 2005, was false; that which they represented to the Court in Appeal Briefs of 2005 was false; and that which they represented to the Court in their Affirmation and Summary Judgment Motion of July 7, 2006, was false; and yet they together with Goebel, hid this testimony and Shafran's Deposition from the Courts and from Plaintiffs, and Plaintiffs remained unaware of this critical testimony until they discovered the Shafran transcript 2013.

664.    Accordingly, and by representing facts to the Court they all knew to be false, they all willfully and deliberately committed extrinsic and intrinsic fraud on the Court foreseeably resulting in the flawed Appellate Division Ruling of August 17, 2006.

665.    Geremia, Sherman, Jones Day, Imperatore, Midtown and the Midtown Group Defendants continued with this fraud and represented their fraud regarding the oil spill in all their filings, motions, Affirmations, appeals up to mid 2010.

666.    Berger and Philips Nizer engaged in the same fraud on the Court since February 2007, and Shore since early 2008.

667.    The fraud on the Court herein complained of was undertaken in furtherance of the racketeering Scheme to Defraud, and continues to date, as recently as the motions filed in this action in June and July 2014.

**The Plaintiffs Have Thus Far Been Deprived of their Rights in and to the Property, and Have Been Left Instead to Fight Through the Court System and Against the Ongoing Scheme to Defraud**

668.    The State Court rulings, that Jericho cancelled the Contract, that Jericho elected to cancel the Contract and that there was a valid cancellation of the Contract, and the orders to vacate the two prior notices of pendency placed upon the Midtown Property, by the Plaintiffs, are the direct and proximate result of the Defendants' fraud on the Court, in the absence of which, Plaintiffs would have been sustained on its claims, the notices of pendency undisturbed, and specific performance of the Contract would otherwise also have been directed by the Court.

669.    Based upon the foregoing, the Plaintiffs respectfully request that the Court exercise its equitable jurisdiction and issue a judgment declaring that the Contract between Jericho and Midtown is Still in Full Force and Effect, that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract, and that Plaintiffs never cancelled the Contract, and the Court should Order that Mid-town and the Defendants should specifically perform and close and transfer title of the Property to Plaintiffs under the terms of the Contract, and award the Plaintiffs compensatory damages, in an amount to be proven at trial, but at-least $200,000,000, and damages on Plaintiffs' State Law Claims, together with punitive damages, sanctions plus

statutory trebling of its damages under 18 U.S.C. § 1964( c ) and Judiciary Law § 487, in

an amount to be determined.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Violations of RICO, 18 U.S.C. § 1962(c))
### (Against The RICO Defendants)

670.    Plaintiffs repeat the allegations contained in all paragraphs above, and in

the paragraphs below, as if fully set forth at length herein.

671.    This cause of action arises under 18 U.S.C. § 1962(c) and is asserted

against all the RICO Defendants.

672.    At all relevant times, each Plaintiff is a person within the meaning of 18

U.S.C. §§ 1961(3) and 1962(c).

673.    At all relevant times, each RICO Defendant is a person within the

meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

674.    The RICO Defendants did conduct and/or participate, either directly or

indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering

activity in violation of 18 U.S.C. § 1962 (c).

675.    The RICO Defendants did cooperate jointly and severally in the

commission of two (2) or more of the RICO predicate acts that are itemized in the RICO

laws at 18 U.S.C. §§ 1961 (1)(A) and (B) (Prohibited activities).

676.    Since on or around, 2002, the RICO Defendants knowingly, intentionally

and unlawfully, aided and abetted, and conspired with each other, to devise, or intend to

devise the Scheme to Defraud, by which they sought to illegally obtain, acquire and

maintain control of the Contract, Plaintiffs' interest in the Property and the down payment held under the Contract, to later illegally keep those assets for the pecuniary benefit and interest of the Enterprise.

677.    In order to effect the objectives of the Enterprise, the RICO Defendants knowingly, intentionally and unlawfully, aided and abetted to commit, attempted to commit, conspired to commit, did commit, and caused to be committed, the below enumerated overt and/or predicate acts of racketeering activity in furtherance of the Scheme to Defraud.

678.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity**

679.    The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (5) and in violation of 18 U. S.C. § 1962( c ), to wit:

***Pattern of Racketeering Activity: Obstruction of Justice in Violation of 18 U.S.C. § 1503***

680.    In a concerted effort and in furtherance of the Scheme to Defraud, the RICO Defendants have habitually made false and misleading statements of fact and misrepresentations to the Court, as set forth in detail above, and throughout this Amended Complaint, including, *inter alia*:

        a.  that Jericho canceled the Contract;

        b.  that Jericho elected to cancel the Contract;

c.   that the Contract was cancelled;

d.   that there was a valid cancellation of the Contract;

e.   that Midtown did not willfully and deliberately breach the Contract;

f.   that Midtown did not breach the Contract;

g.   that all documents Plaintiffs requested before August 29, 2002 had been provided by Midtown;

h.   that Plaintiffs didn't request documents relating to the oil spill on the Property until August 30, 2002, after Midtown sent its notice of August 29, 2002;

i.   that Midtown didn't have any documents in their possession, relating to the oil spill on the Property, when Plaintiffs requested them on August 30, 2002;

j.   that Plaintiffs didn't ask for the exhibits to the Amtrak Agreement, or request documents relating to the Amtrak Agreement until August 30, 2002, after Midtown sent its notice of August 29, 2002;

k.   that Midtown was ready, willing and able to close pursuant to the terms and conditions of the Contract;

l.   that Midtown didn't make any representations with and as part of the Contract.

m.   that Midtown only has three partners and that there was complete diversity in the Prior Litigation.

191

681.    The RICO Defendants have made the false and misleading statements of fact and misrepresentations to the Court herein complained of with the full knowledge that these statements and representations were false.

682.    The false and misleading statements of fact and misrepresentations to the Court were through oral representations in open Court, and the submission of written statements to the Court, including but not limited to the items detailed throughout this Amended Complaint.

683.    The false and misleading statements of fact and misrepresentations to the Court were known by the respective RICO Defendants to be false when they were made, and were made, in each instance, with the intent to deceive the Court, to the Plaintiffs' detriment.

684.    By making these deliberate and strategic false representations in various pending judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor, influence, obstruct, and impede the due administration of justice, the Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

685.    The RICO Defendants have engaged in multiple predicate acts of obstruction of justice in violation of 18 U.S.C. § 1503, as described in detail above and throughout this Amended Complaint.

686.    The conduct of each of the Defendants described in detail above and throughout this Amended Complaint constitutes a pattern of racketeering activity within the meaning of 18U.S.C. § 1961(5).

***Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18U.S.C.§§1341, 1343***

687.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiffs and various courts of law.

688.    The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to illegally obtain, acquire and maintain control of the Contract, Plaintiffs' interest in the Property and the down payments held under the Contract.

689.    In furtherance of their Scheme to Defraud, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier those letters, communications and wire transfers identified in detail above and throughout this Amended Complaint, including, but not limited to, the following:

        a.          Interstate emails incorporating false and misleading statements identified throughout this Amended Compalint;

        b.          Interstate wirings, facsimile transmission, phone calls and/or mailings between and among the Defendants;

        c.          Interstate communications directed toward Plaintiffs;

        d.          Funds transferred by wire from Midtown's Representatives, Imperatore and Stone, in New Jersey to Szegda, in New York, in furtherance of the Scheme to Defraud;

        e.          Interstate mail service of court papers containing false and misleading statements intended to

impede the operation of those courts; and,

f.          Interstate electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts.

690.   The foregoing constitutes the use of wire and mail communications in furtherance of the Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443.

691.   The Defendants' false and misleading statements have been relied on by U.S. Courts and by the Courts of the State of New York, by means of their acceptance of the Defendants' misrepresentations and omissions, and the Courts' failure to take meaningful corrective action.

692.   Plaintiffs have and continue to suffer substantial damages in an amount to be proven at trial and believed to be in excess of Two Hundred Fifty Million and 00/100 ($250,000,000) Dollars as the foreseeable, direct and proximate result of the Defendants' false and misleading statements.

***Pattern of Racketeering Activity: Extortion in Violation of New York Penal Law §§110.00, 155.05(2)(e), 155.42***

693.   As set forth in detail above, throughout this Amended Complaint, the wrongful attempts by Goebel to appropriate Plaintiffs' property by instilling fear that if the property is not delivered the Defendants would perform an act calculated to harm Plaintiffs materially with respect to its business, financial condition, and reputation violates New York Penal Law§§ 110.00, 155.05(2)(e), 155.42.

*Pattern of Racketeering Activity: Witness Tampering in Violation of l8 U.S.C. § 1512*

694.    The RICO Defendants knowingly engaged in intimidation, threats, misleading conduct, and corrupt persuasion toward Plaintiffs, Pfeiffer and Goebel, with the specific intent to influence, delay, and prevent Pfeiffer's and Goebel's testimony or cause Pfeiffer and/or Goebel to withhold records, objects, documents, and testimony from an official proceeding and to cover up their fraud, on the Plaintiffs and on the Court.

695.    The Defendants, Imperatore's and Stone's warnings to Pfeiffer that testifying could result in a potential law suit against him and/or possible physical harm were undertaken with the intent, and did in fact place fear and apprehension in Pfeiffer, causing Plaintiffs to forego taking steps to commence litigation against Midtown from September, 2002, through February, 2004.

696.    Plaintiffs continue under the fear and intimidation of Imperatore's threats throughout the prior litigation and even to date.

697.    Upon information and belief, the RICO Defendants' threats and intimidation towards Goebel were undertaken with the intent, and did in fact place fear and apprehension in Goebel, and chilled him into inaction in not coming forward sooner, to correct the harm he had done and damage he caused Plaintiffs, until he finally admitted his participation in the Racketeering Scheme to Defraud, in May, 2013.

698.    Upon information and belief, RICO Defendant, Berger's threatening message to Pfeiffer on October 8, 2014, was undertaken with the intent that Pfeiffer suffer emotional distress, and with the additional specific intent to influence Pfeiffer to withdraw Plaintiffs claims in this action.

699.    Based upon the foregoing, The RICO Defendants tampered with witnesses, Pfeiffer and Goebel, in violation of 18 U.S.C. § 1512.

700.    The RICO Defendants' witness tampering as herein set forth was undertaken in furtherance of the Racketeering Scheme to Defraud.

**Plaintiffs Were Injured by the Racketeering Scheme to Defraud**

701.    Plaintiffs were injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c).

702.    Plaintiffs have been and will continue to be injured in their business and property, by reason of the violations of 18 U.S.C. § 1962(c), in an amount to be proven at trial, including but not limited to the damage to Plaintiffs' reputation and goodwill; the loss of its joint venture on the Property; the impairment of Plaintiffs' interest in executed contracts (the Contract); the loss or interruption of the Plaintiffs interest in and right to the Property; the loss associated with the Baystone Matter; and the attorneys' fees and costs associated with investigating and exposing the racketeering Scheme to Defraud, in an amount to be proven at trial and believed to be in excess of Two Hundred Fifty Million and 00/100 ($250,000,000) Dollars.

703.    Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962(c). Plaintiffs are the ultimate victims of the RICO Defendants' unlawful association with the Enterprise.

704.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## SECOND CLAIM
### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))
### (Against All RICO Defendants)

705.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

706.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962( c) as described above, in violation of 18 U.S.C. § 1962(d).

707.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

708.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

709.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiffs and it was part of the conspiracy that the RICO Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in detail above.

710.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that

conspiracy, and violations of 18 U.S.C. §l962(d), Plaintiffs have been injured in their business and property, including damage to Plaintiffs' reputation; the impairment of Plaintiffs' interest in executed contracts (the Contract) and the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud.

711.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

**THIRD CLAIM**
**(Direct Fraud on the Plaintiffs)**
**(Against the Midtown Group Defendants)**

712.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

713.    The Midtown Group Defendants have knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Courts and to the Plaintiffs.

714.    The false representations and omissions of The Midtown Group Defendants include, without limitation, the statements attributed to them and detailed throughout this Amended Complaint.

715.    The misrepresentations and omissions of the Midtown Group Defendants were material and made with the intent to defraud the Plaintiffs.

716.    Plaintiffs have reasonably and justifiably relied upon The Midtown Group Defendants' material misrepresentations and/or omissions to their detriment.

717.    Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

718.    The Midtown Group Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Midtown Group Defendants.

**FOURTH CLAIM**
**(Direct Fraud on the Plaintiffs)**
**(Against Goebel and Solomon)**

719.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

720.    The Defendants, Goebel and Solomon have knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Courts and to the Plaintiffs.

721.    The false representations and omissions of Goebel and Solomon include, without limitation, the statements attributed to them and detailed throughout this Amended Complaint.

722.    The misrepresentations and omissions of the Defendants, Goebel and Solomon were material and made with the intent to defraud the Plaintiffs.

723.    Plaintiffs have reasonably and justifiably relied upon Goebel and Solomon' material misrepresentations and/or omissions to their detriment.

724.    Plaintiffs have been damaged as a result their reliance on the foregoing misrepresentations and omissions.

725.    The Defendants, Goebel and Solomon have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible

and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Midtown Group Defendants.

**FIFTH CLAIM**
**(Indirect Fraud on Plaintiffs)**
**(Fraud on the Court by Jones Day, Sherman and Geremia)**

726.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

727.    The Defendants, Jones Day, Sherman and Geremia, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

728.    Also during the course of their conduct, and while they had a duty of disclosure to the Court, they affirmatively concealed material facts from Court.

729.    The Court relied on the misrepresentations of the Defendants, Jones Day, Sherman and Geremia, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

730.    The false representations and omissions of the Defendants, Jones Day, Sherman and Geremia, are as set forth in detail above and throughout this Amended Complaint.

731.    These misrepresentations and omissions of the Defendants, Jones Day, Sherman and Geremia, were material and made with the intent to defraud the Court.

732.    The Court justifiably relied on the misrepresentations of the Defendants, Jones Day, Sherman and Geremia, and would have acted differently in their rulings during the Prior Litigation, had they known of the falsity of the Defendants statements and of their non-disclosures.

733.    Plaintiffs have been damaged as a result the Court's reliance on the foregoing misrepresentations and omissions.

734.    As a direct result of the foregoing misrepresentations and omissions of material fact, and despite the Plaintiffs' meritorious claims, the Court dismissed the Prior Litigation.

735.    Had it not been for the Defendants, Jones Day, Sherman and Geremia's, fraud on the Court, Plaintiffs would have been awarded specific performance of the Contract and would also have been granted damages on account of the Defendants willful and deliberate breach of the Contract.

736.    The Defendants, Jones Day, Sherman and Geremia, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Jones Day, Sherman and Geremia.

**SIXTH CLAIM**
**(Indirect Fraud on Plaintiffs)**
**(Fraud on this Court by Jones Day, Sherman and Geremia)**

737.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

738.    The Defendants, Jones Day, Sherman and Geremia, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

739.    Also during the course of their conduct, and while they had a duty of disclosure to the Court, they affirmatively concealed material facts from Court.

740.    The false representations and omissions of the Defendants, Jones Day, Sherman and Geremia, to this Court, include but are not limited to those set forth in the motion to dismiss filed by them in this action, on June 30, 2014, wherein the moving parties made the following misrepresentations:

a.   This is the fifth lawsuit filed by plaintiff Jericho Group, Ltd. ("Jericho") attempting to reinstate a real estate contract it canceled over a decade ago.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that Plaintiffs are not seeking to reinstate a real estate contract it cancelled over a decade ago (or ever); Plaintiffs do not seek through this action to have the Contract reinstated, on the contrary, this action seeks a declaration that the Contract is in full force and effect, because the Contract has never been cancelled and Jones Day, Sherman and Geremia know that Plaintiffs never elected to cancel the Contract and the Contract is not cancelled.

b.   These claims were twice rejected on the merits by the New York Appellate Division, First Department.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, let alone "twice rejected", indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

c.   Jericho now brings this fifth action in federal district court attempting to achieve the same result it could not achieve in state court. Plaintiffs again allege breach of contract, fraud, and fraud on the court in connection with the same real estate transaction that concluded over a decade ago.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, let alone four times previously, indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

d. Plaintiffs allege that the Jones Day Defendants "lied" to the trial court and the Appellate Division when they argued—accurately, as the state courts have repeatedly held—that Jericho canceled the contract and that Midtown did not breach the contract.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the Jones Day defendants did lie to the Trial Court and the Appellate Division, and they did not argue "accurately", but rather made arguments they knew to be false, when they claimed that Plaintiffs cancelled the Contract, and supported such claim by introducing fraudulent and incomplete documentary evidence, thereby causing the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. The newly discovered true documentary evidence, and recent admissions, prove that the Jones Day Defendants lied and misrepresented material facts to the Court, when they represented that Plaintiffs had cancelled the Contract, at a time when they knew and had documentary evidence in their possession, that Plaintiffs didn't cancel the Contract and that Midtown had willfully and deliberately breached the Contract.

e. Midtown expressly declined to make any representations about the properties, and disclaimed any "expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the [properties] as to the physical condition, income, expense, operation, or to what use the [properties] [could] be applied.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that the Defendants returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto.

f. Plaintiffs further claim the Jones Day Defendants "lied" to the trial court and the Appellate Division when they made the legal arguments that Jericho had canceled the contract and that Midtown had not breached the contract.

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents

from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims.  Plaintiffs do not seek to hold anyone liable, or otherwise complain in this action about legal arguments, but rather the claims set forth herein arise out of the fraud perpetrated upon the Court, and the Plaintiffs, resulting in the flawed prior decisions.  Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

g.  At a minimum, all of Plaintiffs' claims could have been brought in the prior actions, and are thus barred.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided.  Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

h.  However, the Complaint appears to allege that the Jones Day Defendants falsely represented (1) that Jericho had asked for information about the oil spill only a few days before the Study Period was set to expire (Plaintiffs claim the oil spill conversation began two days earlier than had previously been understood by the courts, and that it was initiated by Jericho rather than Midtown);

By this statement Jones Day, Sherman and Geremia committed willful and deliberate fraud on this Court, because they knew that they did falsely represent that Plaintiffs had asked for information about the oil spill only a few days before the Study Period was set to expire, and Plaintiffs were not claiming in the initial complaint filed in this action is  that the oil spill conversation began two days earlier, than previously understood by the Courts, and that it was initiated by Plaintiffs and not Midtown. The Emmet Email discovered by Plaintiffs in late 2012, proves that Plaintiffs had discovered, on or before August 21, 2002, that there was an actual oil spill on Midtown's 93,000 square foot Property, which Plaintiffs had contracted to purchase for $28,000,000; that Midtown committed actionable fraud on Plaintiffs when the

represented from March 2002, through August 21, 2002, that there was no oil spill on the Property and that they had no documents relating to any oil spill on the Property; that Midtown committed actionable fraud upon Plaintiffs when they returned the countersigned Contract and misrepresented that there was no oil spill or hazardous materials on Midtown's Property; that as of August 21, 2002, Plaintiffs had been requesting documents relating an actual oil spill on Midtown's Property, and that Midtown willfully and deliberately breached paragraph 29(c) of the Contract, when they promised to provide the requested documents on and after August 21, 2002, but instead on August 29, 2002, in contravention of their contractual obligation and independent promises, Midtown notified Plaintiffs that they were refusing to provide the requested critical documents.  Had Midtown or their Attorneys, who also had the Emmet Email, not lied to the Court, by claiming that Plaintiffs only requested information or documents relating to an oil spill on the Property for the first time on August 30, 2002, after a Midtown sent Plaintiffs the notice of August 29, 2002, and not mislead the Court that the oil spill was not on Midtown's property but on some neighbors property (i.e. the Javits center 2 blocks away), or if Midtown or their Attorneys had merely provided the Emmet Email to the Court before the August 17, 2006 Appellate Division ruling, or anytime before the January 16, 2008 Appellate Division ruling, or any time before the November 5, 2009 Appellate Division ruling, the Appellate Division would have ruled on the true documentary evidence and would necessarily have found that the Plaintiffs never elected to cancel the Contract, that the Plaintiffs never cancelled the Contract, that the Contract was not cancelled, that Midtown had willfully and deliberately breached paragraph 29(c) of the Contract, and that Midtown had committed fraud on plaintiff in the underlying transaction and on the court in all their submissions with regard thereto.

741.   These misrepresentations and omissions of the Defendants, Jones Day, Sherman and Geremia, were material and made with the intent to defraud this Court.

742.   The conduct complained of constituted a fraud on the Court, by which Plaintiffs have been tortuously injured.

743.   The Defendants, Jones Day, Sherman and Geremia, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the

reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Jones Day, Sherman and Geremia.

### SEVENTH CLAIM
**(Indirect Fraud on Plaintiffs)**
**(Fraud on the Court by Philips Nizer, Berger and Shore)**

744.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

745.    The Defendants, Philips Nizer, Berger and Shore, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

746.    Also during the course of their conduct, and while they had a duty of disclosure to the Court, they affirmatively concealed material facts from Court.

747.    The Court relied on the misrepresentations of the Defendants, Philips Nizer, Berger and Shore, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

748.    The false representations and omissions of the Defendants, Philips Nizer, Berger and Shore, are as set forth in detail above and throughout this Amended Cplaint.

749.    These misrepresentations and omissions of the Defendants, Philips Nizer, Berger and Shore, were material and made with the intent to defraud the Court.

750.    The Court justifiably relied on the misrepresentations of the Defendants, Philips Nizer, Berger and Shore, and would have acted differently in their rulings during the Prior Litigation, had they known of the falsity of the Defendants statements and of their non-disclosures.

751.   Plaintiffs have been damaged as a result the Court's reliance on the foregoing misrepresentations and omissions.

752.   As a direct result of the foregoing misrepresentations and omissions of material fact, and despite the Plaintiffs' meritorious claims, the Court dismissed the Prior Litigation.

753.   Had it not been for the Defendants, Philips Nizer, Berger and Shore's, fraud on the Court, Plaintiffs would have been awarded specific performance of the Contract and would also have been granted damages on account of the Defendants willful and deliberate breach of the Contract.

754.   The Defendants, Philips Nizer, Berger and Shore, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Philips Nizer, Berger and Shore.

### EIGHTH CLAIM
**(Indirect Fraud on Plaintiffs)**
**(Fraud on this Court by Philips Nizer, Berger and Shore)**

755.   Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

756.   The Defendants, Philips Nizer, Berger and Shore, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to this Court.

757.   Also during the course of their conduct, and while they had a duty of disclosure to this Court, they affirmatively concealed material facts from Court.

758.   The false representations and omissions of the Defendants, Philips Nizer, Sherman and Geremia, to this Court, include but are not limited to those set forth in the motion to dismiss filed by them in this action, on June 30, 2014, wherein the moving parties made the following misrepresentations:

a.   Plaintiffs assert that whenever Midtown's counsel have made legal arguments based on the prior state court decisions and judgments, they, along with Midtown, are somehow committing new frauds on the court. This, notwithstanding that the Appellate Division has squarely rejected the notion that it, or the trial court, was defrauded. They do so in an attempt to deflect the binding effect of those holdings.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims.  Plaintiffs do not seek to hold anyone liable, or otherwise complain in this action about legal arguments, but rather the claims set forth herein arise out of the fraud perpetrated upon the Court, and the Plaintiffs, resulting in the flawed prior decisions.  Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

b.   Jericho then sued Midtown again in 2007, this time adding as defendants, Imperatore and Stone (the "2007 State Action"), seeking the same declaratory relief and specific performance of the 2002 Contract, or in the alternative millions in compensatory damages, plus punitive damages.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because that the equitable relief sought in the 2007 Action was different from that sought in the prior action.  The Complaint filed in the 2004 Action (albeit the fraudulent and forged copy filed by Goebel as part of his collusion with Midtown) sought a declaration that the Contract be reinstated.  The relief sought in the 2007 Action was a declaration

that the Contract was never cancelled, and judgment declaring that it remained in full force and effect, and for a further declaration that Midtown had willfully and deliberately breached paragraph 29(c) of the Contract.

    c.  The history is set forth in the three decisions of the Appellate Division, as well as the 2002 Contract itself. –

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

    d.  The 2002 Contract provided for an "AS IS" sale and expressly disclaimed any representations as to the condition of the property or the use to which it could be put. (Shore Dec., Ex. B, 29(b), 38). Midtown expressly declined to make any representations about the properties, and disclaimed any "expressed or implied warranties, guarantees, promises, statements, misrepresentations or information pertaining to the [properties] as to the physical condition, income, expense, operation, or to what use the [properties] [could] be applied." (Shore Dec., Ex. B ~ 38).

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the Defendants returned the countersigned Contract under cover letters dated June 19, 2002, which contained documents all documents relating to zoning, air right, approvals, permits, environmental study and reports, and Amtrak Agreements, etc. . . from NYC agencies, and which constituted representations regarding thereto.

    e.  During the 75-day study period, there were certain relevant communications between Jericho and Midtown. By email dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the August 23, 2002 email was not sent to let Plaintiffs know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Plaintiffs sought to purchase, rather the August 23, 2002 email was a response to an earlier email, only discovered by Plaintiffs in late 2012, and that the August 23, 2002 email proved instead that Midtown and its representatives had committed fraud on Plaintiffs, from inception of the negotiations for the Property, in March 2002, throughout the due diligence period, and that Midtown and its representatives had willfully and deliberately breached the Contract, in that there was a massive oil spill on the 93,000 square foot property Plaintiffs had contracted to purchase, and Midtown had many document relating to the oil spill and the partial cleanup.

> Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup."

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the true documentary evidence, discovered in late 2012 and the 2013, proves that Midtown feigned their assistance, but Midtown knew that Plaintiffs had already approached the additional sources of information, and they also knew that the additional sources of information were impractical, at a time when they could have merely provided Plaintiffs with the documents which they had in their possession and which they were contractually obligated to provide, and could easily and quickly have provided, and because Midtown and its representatives had documents making a request for information from the NYDEC themselves, and they knew it would take four to six weeks to get the requested information.

> f.  Jericho informed Midtown that it had heard something about an oil spill at or near the property ... [and] requested that Midtown inform it about the alleged oil spill and whether or not it had been cleaned up. Id "On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. Id. Midtown responded that it did not have the requested exhibits. Id.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that that Plaintiffs had discovered, on or before August 21, 2002, that there was a massive oil spill on the Property and Plaintiffs requested documents as of that time.  Plaintiffs had requested documents relating to the exhibits to the Amtrak Agreement already in July, 2002, and Midtown represented and promised that they would provide the documents relating to the oil and the documents relating to the exhibits to the Amtrak Agreement, as they also were contractually obligated to do.  But then on August 29, 2002, Midtown refused to provide the documents, and thereby willfully and deliberately breached paragraph 29(c) of the Contract.

g.  Plaintiffs. . . filed the 2013 State Action against Midtown, Imperatore and Stone, as well as thirteen other Midtown-related defendants, seeking the same equitable relief Jericho sought in the 2004 and 2007 State Actions concerning the 2002 Contract, which is the same equitable relief its seeks in this lawsuit.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, go well beyond the that requested and interposed in either the 2004 Action or the 2007 Action.  Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

h.  Now, as noted above, Plaintiffs have filed a 154-page, 613-paragraph Complaint which fails to allege any viable claim against the Midtown Defendants. It rehashes that Midtown lied to the state trial and appellate courts by asserting that Jericho cancelled the 2002 Contract and that Midtown returned Jericho's deposit, notwithstanding that those facts were supported by documentary evidence and found to be accurate by the Appellate Division.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained dismissal of Plaintiffs meritorious claims. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its

211

representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

> i. Jericho is precluded from such relief on grounds of res judicata and collateral estoppel. The claims alleged herein were either already brought, or could have been brought, in the prior actions, and/or the issues underlying the claims herein have already been decided.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

> j. For the same reasons, and as further discussed below, Plaintiffs' RICO claims should be dismissed on grounds of res judicata because they arise out of the same transaction and they could have been brought in the prior state court actions, and Plaintiffs' state law claims also should be dismissed on grounds of res judicata because they all were either previously brought, or could have been brought, in the prior state court actions as well. 2008 WL 4537815

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the relief sought in this action, and the basis for the claims herein interposed, were not already brought, nor could they have been brought, in the prior actions, and the issues underlying the claims herein have not been decided. Indeed the facts upon which this action is primarily based were not even available to Plaintiffs until late 2012, and thereafter.

759.    The Midtown Group Defendants, through their attorneys, the Defendants, Phillips Nizer, Berger and Shore, moved to vacate the lis pendens filed in this action on

July 24, 2014, wherein the moving parties, including the attorneys who brought the motion, made the following misrepresentations:

      a.   The notices of pendency in those lawsuits were cancelled by the courts and the lawsuits dismissed on the merits –

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that the prior lawsuits were not dismissed on the merits.

      b.   The history of this dispute between Midtown and Jericho is set forth in three decisions of the Appellate Division, a decision of the Supreme Court, New York County (hereinafter "trial court"), and reference is made herein to those decisions, as well as to the June 18, 2002 between Midtown and Jericho which is the subject of Plaintiffs' Complaint.

By this statement Philips Nizer, Berger and Shore committed willful and deliberate fraud on this Court, because they knew that Midtown, its representatives and attorneys withheld documents from the Court and from the Plaintiffs during the Prior Litigation, and made arguments they knew to be false, resulting in the flawed and fraudulently obtained decisions referred to in the above referenced quotation. Whereas those decisions are the product of the complained of fraud on the Court, and, because each time Midtown, its representatives and Attorneys make arguments based upon the prior Court rulings, knowing them to be the product of their fraud, they each commit a separate and new fraud on the Court, in each such instance.

760.   The motion to vacate the notice of pendency itself, is fraudulent, in that the moving parties had already sought such relief in their previously filed motion to dismiss.

761.   Whereas Midtown, its representatives and Attorneys had already sought such relief in the prior motion to dismiss, the request now, in the second filed separate motion is duplicative and unnecessarily vexatious.

762.    Moreover, having now admitted that Plaintiffs did not elect to cancel the Contract, that the Plaintiffs did not cancel the Contract, that there has not been any valid cancellation of the Contract, and that Midtown has willfully and deliberately breached the Contract, Midtown, its representatives and attorneys, including the Defendants, Philips Nizer, Berger and Shore, have no justification in moving now for the cancellation of the lis pendens, but should instead themselves be directed to specifically perform and close title on the Property with the Plaintiffs.

763.    These misrepresentations and omissions of the Defendants, Philips Nizer, Berger and Shore, were material and made with the intent to defraud this Court.

764.    The conduct complained of constituted a fraud on the Court, by which Plaintiffs have been tortuously injured.

765.    The Defendants, Philips Nizer, Berger and Shore, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Philips Nizer, Berger and Shore.

**NINTH CLAIM**
**(Indirect Fraud on Plaintiffs)**
**(Fraud on the Court by Goebel and Solomon)**

766.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

767.    The Defendants, Goebel and Solomon, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

768.    Also during the course of their conduct, and while they had a duty of disclosure to the Court, they affirmatively concealed material facts from Court.

769.    The Court relied on the misrepresentations of the Defendants, Goebel and Solomon, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

770.    The false representations and omissions of the Defendants, Goebel and Solomon, are as set forth in detail above, and throughout this Amended Complaint.

771.    These misrepresentations and omissions of the Defendants, Goebel and Solomon, were material and made with the intent to defraud the Court.

772.    The Court justifiably relied on the misrepresentations of the Defendants, Goebel and Solomon, and would have acted differently in their rulings during the Prior Litigation, had they known of the falsity of the Defendants statements and of their non-disclosures.

773.    Plaintiffs have been damaged as a result the Court's reliance on the foregoing misrepresentations and omissions.

774.    As a direct result of the foregoing misrepresentations and omissions of material fact, and despite the Plaintiffs' meritorious claims, the Court dismissed the Prior Litigation.

775.    Had it not been for the Defendants, Goebel and Solomon's, fraud on the Court, Plaintiffs would have been awarded specific performance of the Contract and

would also have been granted damages on account of the Defendants willful and deliberate breach of the Contract.

776.    The Defendants, Goebel and Solomon, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Goebel and Solomon.

**TENTH CLAIM**
**(Indirect Fraud on Plaintiffs)**
**(Fraud on the Court by Imperatore)**

777.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

778.    The Defendants, Imperatore, knowingly and intentionally made misrepresentations of material facts, as well as knowingly and intentionally failed to disclose material facts, to the Court.

779.    Also during the course of his conduct, and while he had a duty of disclosure to the Court, he affirmatively concealed material facts from Court.

780.    The Court relied on the misrepresentations of the Defendant, Imperatore, and would have acted differently had it known of the falsity of their statements and of their non-disclosures.

781.    The false representations and omissions of the Defendants, Imperatore, are as set forth in detail above and throughout this Amended Complaint.

782.    These misrepresentations and omissions of the Defendants, Imperatore, were material and made with the intent to defraud the Court.

783.    The Court justifiably relied on the misrepresentations of the Defendants, Imperatore, and would have acted differently in their rulings during the Prior Litigation, had they known of the falsity of the Defendant statements and of their non-disclosures.

784.    Plaintiffs have been damaged as a result the Court's reliance on the foregoing misrepresentations and omissions.

785.    As a direct result of the foregoing misrepresentations and omissions of material fact, and despite the Plaintiffs' meritorious claims, the Court dismissed the Prior Litigation.

786.    Had it not been for the Defendants, Imperatore, fraud on the Court, Plaintiffs would have been awarded specific performance of the Contract and would also have been granted damages on account of the Defendants willful and deliberate breach of the Contract.

787.    The Defendants, Imperatore, has engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants, Philips Nizer, Berger and Shore.


### ELEVENTH CLAIM
**(For Declaratory Relief Under the Federal Declaratory Judgment Act)**

788.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

789.    Defendants willfully and deliberately lied to Plaintiffs and to the Court in making false representations that Plaintiffs had elected to cancel the Contract, and that the Contract was cancelled.

790.     Plaintiffs maintain that the Contract remains in full force and effect, even today.

791.     Defendants willfully and deliberately lied to Plaintiffs and to the Court in making false representations that Midtown had produced all the materials in its possession concerning environmental matters referenced in the Contract.

792.     Defendant's fraudulent representations, misleading responses and concealments were intended to induce the Court into ruling, as it did, and dismissing the Prior Litigation.

793.     The Court reasonably relied on defendants' fraudulent representations, misleading responses and concealments in its decision to dismiss the Prior Litigation.

794.     There has never been any finding of fact that the Contract had been cancelled, but rather the Court's relied solely upon the false contentions submitted by the attorneys on both sides of the controversy as if this hotly contested issue had been uncontroverted.

795.     There is no evidence that the Contract has been cancelled, and in truth and fact, the Contract remains in full force and effects.

796.     Goebel's complicity in the scheme to steal the Midtown Property from the Plaintiffs, and his forgery and false representation that the Contract was cancelled, effectively deprived the Plaintiffs of any fair let alone full opportunity to have presented their case to any tribunal, thereby rendering any and all prior proceedings fatally infirm and void, *ab initio*.

797.    Were it not for the Defendants' fraudulent representations, misleading responses and concealments, the Plaintiffs would have been awarded specific performance and damages on account of the Defendants willful and deliberate breach.

798.    Plaintiffs have been injured as a result of Defendants' conduct in various ways, including by virtue of the fact that they have thus far been deprived of the benefits under the Contract.

799.    By virtue of the Defendants fraudulent conduct, and since there is a substantial and continuing controversy between Plaintiffs and Midtown, and a declaration of rights is both necessary and appropriate the Plaintiffs are entitled to declaratory relief establishing that the Contract between Jericho and Midtown is Still in Full Force and Effect, that Midtown had willfully and deliberately breached the Contract, that Jericho did not elect to cancel the Contract, and that Plaintiffs never cancelled the Contract.

800.    Plaintiffs have no adequate remedy at law.

## TWELFTH CLAIM
### (Specific Performance against Midtown)

801.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

802.    The Contract represents an agreement between the Plaintiffs and the Defendant, Midtown, for a purchase of the Midtown Property.

803.    The Midtown Property is comprised of a unique and specific real estate devise.

804.    The Plaintiffs remain ready, willing and able to close pursuant to the terms of the Contract.

805.    The Defendant, Midtown, is the owner of the Midtown Property and it is within its power to perform the Contract and convey the Midtown Property pursuant to the Contract.

806.    Plaintiffs have been damaged for which no monetary relief can be granted.

## THIRTEENTH CLAIM
### (Breach of Contract against Midtown)

807.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

808.    Plaintiffs performed all that was required of them under the Contract.

809.    Plaintiffs remain ready willing and able to perform under and pursuant to the Contract.

810.    Midtown has breached the Contract, including but not limited to its failure to provide documents requested by Plaintiffs, under paragraph 29(c), and its failure to close pursuant to the terms of the Contract.

811.    Plaintiffs have been damaged as a result of the foregoing breach of contract.

## FOURTEENTH CLAIM
### (Bad Faith/Willful and Deliberate Breach)
### (Claim against the Midtown Group Defendants)

812.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

813.    The Midtown Group Defendants acted in bad faith and with wonton disregard for the rights of the Plaintiffs, with respect to the real estate transaction which is the subject to this action.

220

814. The bad faith conduct herein complained of includes, but is not limited to, the Midtown Group Defendants failure and refusal to provide the oil spill documents and the exhibits, documents and modifications to the Amtrak Agreement, when requested and as required under the Contract; their wrongful declaration that Plaintiffs cancelled the Contract, and their failure and refusal to close pursuant to the terms of the Contract.

815. The Midtown Group Defendants willfully and deliberately breached the Contract as stated in the detailed allegations set forth throughout this Amended Complaint.

816. The Plaintiffs have been damaged as a result of the foregoing willful and deliberate breach of contract.

## FIFTEENTH CLAIM
**(Conversion against Goebel, Solomon and Szegda)**

817. Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

818. Plaintiffs are the rightful owners of the files and original documents and things (the "Converted Property") now in the possession of Goebel, Solomon and Szegda.

819. Plaintiffs are entitled to possession thereof.

820. The Defendants Goebel, Solomon and Szegda have and continue to exert wrongful dominion and control over the Converted Property, in violation of Plaintiffs' rights in and to the same.

821. Plaintiffs made due and proper demand for the return of the Converted Property.

822. The Defendants have refused to return the Converted Property.

823.    The Defendants, Goebel, Solomon and Szegda, have thereby converted Plaintiffs' property, causing damage to Plaintiffs.

824.    Plaintiffs have been damaged on account of the Defendants' conversion of the Converted Property, for which it seeks compensatory damages herein.

825.    The Defendants, Goebel, Solomon and Szegda,  undertook the foregoing wrongful conduct with actual malice towards Plaintiffs, or with wonton and reckless disregard for the interest of Plaintiffs, or under such other circumstances, thus warranting an award of punitive damages in this matter.

**SIXTEENTH CLAIM**
**(Conversion against Szegda and Baystone)**

826.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

827.    Plaintiffs are the rightful owners of certain funds placed in deposit with Szegda (the "Escrow Funds").

828.    Szegda is in possession of the Escrow Funds, either in his individual capacity, or as his alter ego – Baystone.

829.    Plaintiffs are entitled to possession thereof.

830.    Upon information and belief, Szegda, in his individual capacity, or as his alter ego – Baystone, has and continues to exert wrongful dominion and control over the Escrow Funds, in violation of Plaintiffs' rights in and to the same.

831.    Plaintiffs made due and proper demand for the return of the Escrow Funds.

832.    The Defendant, Szegda in his individual capacity, or as his alter ego – Baystone, has refused to return the Escrow Funds.

833. The Defendant, Szegda, in his individual capacity, or as his alter ego – Baystone, has thereby converted Plaintiffs' property, causing damage to Plaintiffs.

834. Plaintiffs have been damaged on account of Szegda's and Baystone's conversion of the Escrow Funds, for which it seeks compensatory damages herein.

835. Upon information and belief, the Defendant, Szegda, in his individual capacity, or as his alter ego – Baystone, undertook the foregoing wrongful conduct with actual malice towards Plaintiffs, or with wonton and reckless disregard for the interest of Plaintiffs, or under such other circumstances, thus warranting an award of punitive damages in this matter.

### SEVENTEENTH CLAIM
### (Tortious Interference With Contract)
### (Against the RICO Defendants – Other than Midtown)

836. Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

837. The RICO Defendants are and have been aware of valid and enforceable contracts between Midtown and Plaintiffs.

838. The RICO Defendants, other than Midtown under this Claim, have intentionally caused and continued to cause an ongoing breach of the Contract.

839. By their conduct, the RICO Defendants, other than Midtown under this Claim, have intentionally and deliberately placed the Plaintiffs in a position where they had to take actions necessary to secure their rights under the Contract.

840. As a direct, proximate, and foreseeable result of Midtown's breach of the Contract, Plaintiffs have been deprived of the benefit of the Midtown Property, which has caused significant pecuniary and other damages. These injuries include significant

damage to attorneys' fees and costs in related litigation to attempt to enforce the Contract and a loss of the value of the Property.

841.   The RICO Defendants, other than Midtown on this Claim, have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages on this Claim, against each of the RICO Defendants, other than Midtown.

## EIGHTEENTH CLAIM
### (Intentional Infliction of Emotional Distress Against Berger, Shore, Phillips Nizer and the Midtown Group Defendants)

842.   Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

843.   On September 22, 2014, Pfeiffer's son Hershi Pfeiffer, was the victim of a horrific and violent crime on the streets of Brooklyn Heights, when he was stabbed several times in an attempted murder, including once in the neck.

844.   The Hershi Pfeiffer stabbing received considerable news coverage and was the subject of regional interest as he miraculously pulled through a life saving surgery.

845.   On October 8, 2014, During a conversation between counsel concerning the allegations against the attorney defendants in this litigation, and any possible disciplinary action which may arise here from, Attorney Berger, specifically asked that Pfeiffer be told that he is happy to hear that Pfeiffer's son survived the recently attempted

murder, but that Pfeiffer should always remember that he [Attorney Berger] "had a long memory".

846.    Mr. Pfeiffer, has experienced prior threats against himself, his wife and children, and which prior threats resulted in Pfeiffer being injured during a gunpoint attempt on his life in the past, and even the death of one of his other sons, understood Attorney Berger's statement to be a threat and force of intimidation should he fail or otherwise refuse to withdraw his claims in this action.

847.    Berger's threatening message to Pfeiffer, at a time when he was going through a family crisis over his son's stabbing, was extreme and outrageous conduct.

848.    Upon information and belief, Berger's threatening message to Pfeiffer was made with intent to cause, or was otherwise made with disregard of a substantial probability of causing, severe emotional distress.

849.    Upon information and belief, Berger's threatening message to Pfeiffer was made on his behalf, and on behalf of Shore, Philips Nizer, and the Midtown Group Defendants.

850.    As a direct and proximate result of Berger's threatening message to Pfeiffer, Pfeiffer and his family were caused to suffer severe emotional distress.

851.    As a direct and proximate result of Berger's threatening message to Pfeiffer, Pfeiffer was caused to suffer considerable pain, anxiety, shakiness, loss of appetite and sleepless over his concern for his wellbeing and that of his immediate family.

852.     Berger's conduct as complained of in this claim was undertaken on his own behalf, and on behalf of Shore, Philips Nizer, and the Midtown Group Defendants,

was malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiffs are entitled to, and should be awarded, punitive damages against each of the Defendants.

**NINETEENTH CLAIM**
**(Violations of New York Judiciary Law§ 487)**
**(Against Goebel, Solomon, Sherman, Geremia)**
**(Jones Day, Berger Shore and Philips Nizer, Imperatore and Stone)**

853.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

854.    New York Judiciary Law § 487 provides, in pertinent part, as follows: "An attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

855.    As set forth above, the Defendants, Goebel, Solomon, Sherman, Geremia, Jones Day, Berger Shore and Philips Nizer, Imperatore and Stone (the "Attorney Defendants"), engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive both Plaintiffs and multiple state and federal courts, including the United States District Court for the Southern and Eastern Districts of New York and the New York State Supreme Court and Court of Appeals.

856.    The Attorney Defendants actively participated in the preparation and filing of multiple court submissions to the various courts, as described in detail above.

857.    The Attorney Defendants knowingly caused these misstatements to be filed with the intent of deceiving the Court.

858.    The Attorney Defendants concealed evidence and testimony in furtherance of their scheme to deprive Plaintiffs of the benefits under the Contract and to deprive facilitate the Midtown Group Defendants' theft of Plaintiffs' interest in the Property.

859.    As a result of the deceitful and fraudulent conduct of the Attorney Defendants, as described herein and throughout this Amended Complaint, Plaintiffs have been injured in an amount to be established at trial but believed to be in excess of Two Hundred Fifty Million ($250,000,000) Dollars.

860.    By reason of the foregoing, Plaintiffs are entitled to monetary damages against the Attorney Defendants, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law§ 487.

**TWENTIETH CLAIM**
**(Civil Action Under 42 U.S.C § 1983)**
**(Against the Attorney Defendants)**

861.    Plaintiffs repeat the allegations contained in all paragraphs above, and in the paragraphs below, as if fully set forth at length herein.

862.    This claim is brought under 42 U.S.C § 1983 seeking damages against the Attorney Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States.

863.    Each of the Attorney Defendants was licensed to practice law by either the State of New York or the State of New Jersey at the time of the acts herein complained of.

864.    The Attorney Defendants, acting individually or at times in collusion with each other, used the authority and power they had by virtue of their respective State law

licenses, and further by their actions usurped the power and authority of the Courts of the State of New York, such that their conduct was taken under color of State law.

865.   As a direct result of the actions herein complained of, the Plaintiffs suffered an unconstitutional deprivation of their rights under the Fourteenth Amendment to the U.S. Constitution

866.   The Attorney Defendants acted intentionally and with callous disregard for the Plaintiffs' known statutory and constitutional rights.

867.   As a direct and proximate result of the Attorney Defendants' violations of Plaintiffs' statutory and constitutional rights as described herein, Plaintiffs have suffered mental and emotional anguish and distress and violation of their right to have and enforce the Contract as protected under the Constitution, as well as other compensatory damages, in an amount to be determined by a jury and the Court.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants herein, as follows:

- a. Awarding Plaintiffs compensatory and punitive and statutory attorneys fees and treble damages on their claims and as detailed above,

- b. For an Order declaring:

  - i. The continued viability of the Contract, that the Contract is in full force and effect and that the Defendants should specifically perform under the terms of the Contract, close and transfer title of the property known as and located at 11th Avenue at 36th – 38th Street, block 708, lot 1 and Block 709, lot 17, to the Plaintiffs;

  - ii. That under the laws of the State of New York, and under the terms of the contract, Szegdas letters of

September 3, 2002 and September 12, 2002, did not constitute an election by Plaintiffs, to cancel the Contract, and did not Cancel the Contract;

iii.   That failing to disclose the oil spill before, during and after execution of the Contract was an actionable fraud upon Plaintiffs;

iv.   That failing to give the documents requested by Plaintiffs, concerning the oil spill on the property, was a willful and deliberate breach of the Contract;

v.   That failing to give the complete Amtrak Agreement with the countersigned contract was a fraud on the Plaintiffs;

vi.   That the Defendants committed fraud on the Plaintiffs, and on the Court, from August 29, 2002 and thereafter, because they knew that they didn't give the Plaintiffs the oils spill documents when they were requested, they knew they were in willful and deliberate breach of the Contract, and they knew Plaintiffs never elected to cancel the Contract and never canceled the Contract; and

vii.   That the Defendants perpetrated a fraud on the Plaintiffs, and on the Court, in their numerous filings and representations made throughout the Prior Litigation and in the Memorandum of Law filed by them on January 8, 2014.

c.   Awarding Plaintiffs specific performance of the Contract,

d.   Awarding Plaintiffs compensatory and punitive damages against the Defendants, Goebel, Szegda and Baystone and directing said Defendants to turn over and return Plaintiffs' property to them;

Awarding Plaintiffs such other and further relief as the Court may deem appropriate, including injunctive and declaratory relief, as may be required in the interests of justice.

NOTICE OF VOLUNTARY WITHDRAWAL

Plaintiffs hereby voluntarily withdraw their claims in this action against WR WEST SIDE ASSOCIATES, HADRIAN PROPERTIES LTD, FANFARE ENTERPRISE INC, ARCORP PROPERTIES, JERRART VENTURE PROPERTIES, HARWOOD LLOYD LLC, BROWN HARRIS STEVENS LLC, ELAINE OSBORN EMMET and RICHARD MARASSE, without prejudice.

VERIFICATION

I, Samuel Pfeiffer, a citizen of the United States and resident of the State of New York, am an officer of the Plaintiff in this action.  I have read the foregoing Complaint and declare under penalty of perjury that the foregoing facts are correct and true to the best of my knowledge and belief and that those factual matters that are stated upon information and belief are believed by me to be true.

_____
Samuel Pfeiffer

Dated:  New York, New York
        November   14 , 2012

The Law Offices of Bradley S. Gross

By: _____
Bradley S. Gross (1909)
Attorney for Plaintiffs
JERICHO GROUP LTD. and JERICHO CO.
45 Rockefeller Plaza – Suite 2000
New York, New York 10111
(212) 732-7412

231